******************************************************************

# IN THE UNITED STATES DISTRICT COURT

# FOR WESTERN DISTRICT OF VIRGINIA

# LYNCHBURG DIVISION

CLERK'S OFFICE U.S. DISTRICT. COURT
AT LYNCHBURG, VA
FILED
DEC 18 2025
LAURA A. AUSTIN, CLERK
BY: [signature]
DEPUTY CLERK

ONIER OSWALDO VARGAS )

Plaintiff )

)

v. ) **Civil Action No.:** 6:25CV00100

)

VIRGINIA MILITARY INSTITUTE )

VMI BOARD OF VISITORS )

VMI ALUMNI AGENCIES )

KEYDET CLUB )

VMI FOUNDATION )

VMI ALUMNI ASSOCIATION )

Defendants )

Amended

**COMPLAINT**

******************************************************************

## NATURE OF THE CASE

1. Plaintiff Onier Oswaldo Vargas brings this action against the Virginia Military Institute (VMI), its governing body, the Board of Visitors, VMI Alumni Agencies, Keydet Club, VMI Foundation, and the VMI Alumni Association.

2. During his employment as Director of Athletic Multimedia at VMI, the Plaintiff was assigned projects involving the creation of promotional content for the Keydet Club and other components of the VMIAA. These assignments included donor-related materials disseminated through institutional platforms.

3. While performing these duties, the Plaintiff identified inconsistencies in equipment procurement, payroll and wage procedures, and the integration of state labor and public resources with private financial development initiatives.

4. The Plaintiff submitted reports through internal administrative channels identifying matters of public concern related to operational procedures and resource allocation.

5. Following these disclosures, the Plaintiff experienced a sequence of personnel actions, including reassignment of duties, administrative oversight reviews, suspension, and eventual termination.

## PARTIES

6. **Plaintiff** Onier Oswaldo Vargas is an individual residing at:

627 TANGLEWOOD DR.

FAYETTEVILLE, NC 28311

Telephone: (818) 983-3412

7. **Defendant** Virginia Military Institute (VMI):

The Virginia Military Institute is a state-supported military college headquartered at

201 Smith Hall, Virginia Military Institute, Lexington, VA 24450

8. **Defendant** Board of Visitors of VMI:

The Board of Visitors of the Virginia Military Institute is the governing body responsible for oversight of the Institute and is located at

201 Smith Hall, Virginia Military Institute, Lexington, VA 24450

9. **Defendant** Virginia Military Institute Alumni Agencies (VMIAA):

The Virginia Military Institute Alumni Agencies (VMIAA) is a 501(c)(3) private charity that coordinates the operations of multiple affiliated nonprofit entities.

P.O. Box 932 Lexington, VA 24450

10. **Defendant** Keydet Club:

The Keydet Club is a 501(c)(3) private charity that focuses financial support to the Virginia Military Institute Intercollegiate Athletics Department.

P.O. Box 932 Lexington, VA 24450

11. **Defendant** VMI Foundation:

The VMI Foundation is a 501(c)(3) private charity that focuses financial support to the Virginia Military as a state institution.

P.O. Box 932 Lexington, VA 24450

12. **Defendant** VMI Alumni Association:

The VMI Alumni Association is a 501(c)(3) private charity that focuses on organizing Virginia Military alumni.

P.O. Box 932 Lexington, VA 24450

13. The operating location and headquarters of the Virginia Military Institute Alumni Agencies, Keydet Club, VMI Foundation, VMI Alumni Association is 304 Letcher Avenue, Lexington, VA 24450.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction under 28 U.S.C. §1331, as this action arises under the Constitution and laws of the United States pursuant to 42 U.S.C §1983, 18 USC §1962(c), 10 USC §4701, 41 USC §4712, 42 USC §12112(5)(A), 29 USC §213(a)(1), 29 USC §215(a)(3).

15. This Court has supplemental jurisdiction over related claims arising under Virginia law pursuant to 28 U.S.C. §1367, including claims brought under Virginia Code §40.1-27.3 and Virginia Code §2.2-3011.

16. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because all Defendants reside within this judicial district and a substantial part of the events or omissions giving rise to these claims occurred within this District.

## FACTUAL BACKGROUND

The events described herein took place between March 4, 2024, and April 18, 2025.

17. On March 4, 2024, the Plaintiff interviewed for the Director of Athletic Multimedia position at the Virginia Military Institute (VMI) in Lexington, Virginia.

18. Between 9 a.m. and 11 a.m., the Plaintiff met with the Deputy Athletics Director Lenny Brown, a representative from VMI's Communications and Marketing Department, a

representative from the VMI Alumni Agencies, an Independent Contractor retained by VMI, Athletics Department staff members, and members of the initial search committee.

19. Following the completion of the interview process, on March 11, 2024, the Associate Athletic Director for External Operations, Phil Marcello, verbally notified the Plaintiff that he was selected for the position.

20. Subsequently, on March 18, 2024, the Plaintiff received a document from Mr. Marcello confirming that VMI Athletics had hired him for the position of Director of Athletic Multimedia.

21. On March 25, 2024, the Plaintiff received a Letter of Appointment from the Director of Human Resources, Valerie Stores. The letter served as a written offer of appointment for the position of Director of Athletic Multimedia. In accepting the position, the Plaintiff was designated as a VMI Administrative and Professional Faculty employee.

22. On March 27, 2024, the Plaintiff received the contractual terms of employment from the Interim Director of Intercollegiate Athletics.

23. The agreement outlined provisions covering: Employment and Term, Duties, National Collegiate Athletic Association Requirements, Compensation, Employee Fringe Benefits, Casual Expenses and Contracting Authority, Leave of Absence, Termination by Employer, Governing Law, Policies and Regulations, Merger Clause, Severability, Amendments, Availability of Funds, Acknowledgment, and a Schedule 1 summary detailing the duties of the position.

24. Summary 1 lists the responsibilities of the Plaintiff's role when he was hired and is as follows:

- Responsible for developing and producing video content for the Department of Intercollegiate Athletics, ESPN+ and select linear events for Southern Conference TV Packages
- Produce live video production for all home athletic events designated for ESPN+ as well as supervise all game day production crew.
- Create highlight packages, conceptualize, and develop features and produce other creative content for use throughout the Department of Intercollegiate Athletics.
- Serve as liaison to the Southern Conference for video and multimedia, coordination and developing student and freelance help as well as producing video content for the department website (both promotional and advertisement inventory).
- Assist in other external relations efforts, the development of content for use on all social media platforms and creation of appropriate strategy for expanding the VMI brand through video.

25. The agreement further established that the Plaintiff would report directly to Mr. Marcello, and that any additional responsibilities are governed by the VMI Administrative and Professional Faculty Handbook.

26. The agreement additionally notes that the handbook outlines specific requirements beyond the agreement itself.

27. During his introductory meeting with Mr. Marcello, the Plaintiff informed him that he was medically discharged from the United States Army, and is a disabled veteran with a verified disability rating through the Department of Veterans Affairs.

28. The Plaintiff also disclosed a diagnosis of ADHD to Mr. Marcello, and requested reasonable accommodations as necessary to perform the essential functions of his position effectively.

29. The Plaintiff further requested an accommodation to travel to North Carolina as necessary for ongoing medical treatment through the Department of Veterans Affairs. The Plaintiff informed Mr. Marcello that he would provide advance notice and coordinate those absences to ensure uninterrupted departmental operations.

30. Mr. Marcello accepted the accommodation requests, and instructed the Plaintiff to provide reasonable notice of upcoming medical appointments and requests.

31. Additionally, during the employment application and screening process, the Plaintiff provided the Virginia Military Institute with documentation verifying his veteran status and service-connected disability.

32. In that same submission, the Plaintiff affirmed receiving an honorable discharge after more than 180 consecutive days of full-time active duty in the United States Army and that he held a service-connected disability rating issued by the Department of Veterans Affairs. Supporting materials submitted with the application included his DD-214 (Member 4 Copy) and VA disability rating letter.

33. After concluding the HR new hire process on March 27, 2024, the Plaintiff began overseeing and observing live broadcast operations while simultaneously learning established departmental workflows.

34. This included understanding institutional practices, assessing how broadcasts were managed under the supervision of Mr. Marcello, and evaluating appropriate remedies to stabilize and improve existing multimedia infrastructure.

35. Operational support during the Plaintiff's employment was provided by the same Independent Contractor who had participated in the Plaintiff's interview process on March 4, 2024.

36. Between April 19 and April 21, 2024, during a home baseball series against The Citadel, a Southern Conference member institution, broadcast operations experienced a technical failure resulting in a computer malfunction. The Plaintiff and the Independent Contractor were unable to identify the cause.

37. If the Plaintiff and Independent Contractor were unable to resolve the issue, the broadcast would have fallen out of compliance with ESPN broadcasting standards, and could not proceed as scheduled.

38. The issue was later resolved with assistance from a VMI employee who had used external contacts to obtain technical support.

39. In the weeks leading up to the conclusion of the spring season, Mr. Marcello coordinated with the Keydet Club, a private charity, on its *Compete to Win* fundraising campaign.

40. The campaign is held annually, and in 2024 the campaign took place between May 7 and May 9.

41. The Plaintiff and Mr. Marcello filmed the cadet-athletes during normal duty hours using institutional equipment and facilities to produce promotional material for the fundraising campaign.

42. The cadets appeared in uniform and training apparel, and the resulting videos were posted on the official VMI Wrestling Instagram account on May 6, 7, and 9, 2024, to encourage donor participation.

43. The fundraising campaign proceeds are intended to provide financial support for VMI's athletic programs by assisting with equipment, apparel, travel, nutrition, lodging, and general cadet-athlete experience costs, as stated by Andrew Deal, Chief Operating Officer of the Keydet Club.

44. At the conclusion of the fundraising campaign, the Keydet Club reported raising $20,707.77 for the wrestling program and exceeded their $20,000 goal.

45. Following the Keydet Club's Compete to Win event and the conclusion of the spring season, the Plaintiff and the Independent Contractor began postseason equipment recovery, inventory, and administrative transitions to prepare for fall sporting events.

46. After the recovery process concluded between late May and early June, the Plaintiff reported significant damage to the department's audio and video cable supply to Mr. Marcello during a spring postseason debrief.

47. Additionally, the Plaintiff reported that video production equipment was being transported between venues without protective transport equipment to maintain operations following each event.

48. During his brief, the Plaintiff inquired with Mr. Marcello to determine whether reserve audio and video cables were available in the department. The Plaintiff explained that if no replacement cables were available, procurement attention might need to be redirected toward purchasing new audio and video cables rather than video production equipment. He stated he would make the determination once inventory had been verified.

49. Mr. Marcello informed the Plaintiff that he was unsure of the reserves, and suggested the Independent Contractor might know more.

50. The Plaintiff asked Mr. Marcello whether he was authorized to collect and provide vendor proposals through the appropriate channels for purchase. Mr. Marcello informed the Plaintiff that he could do so, provided the vendors complied with the Commonwealth of Virginia's Small, Women-owned, and Minority-owned Business (SWaM) certification policy.

51. On May 24, 2024, an official press release published on the VMI Athletics Department website announced that Superintendent Major General (Ret.) Cedric Wins appointed Jamaal Walton as VMI's Director of Intercollegiate Athletics.

52. Following his appointment, Mr. Walton requested to meet with select Athletics Department staff on an individual basis to discuss departmental objectives.

53. The Plaintiff was among the individuals requested to meet with Mr. Walton, and in preparation for that meeting, on June 20, 2024, the Plaintiff emailed Mr. Marcello outlining his professional goals for the department.

54. The email detailed objectives focused on improving broadcast production, enhancing fan engagement through coordinated efforts with other members of the External Operations team, and producing high-quality multimedia content for the athletics program.

55. In the early summer of 2024, the Plaintiff compiled a list of fall sports home games to develop a broadcast schedule for submission to the Southern Conference. VMI has an obligation as a member of the Southern Conference to broadcast a required number of athletic events each academic year to remain in compliance with the Southern Conference and ESPN broadcasting agreements.

56. Preparations for the fall athletic season began mid to late July.

57. The Plaintiff and the Independent Contractor convened around mid to late July to survey the broadcast venues across campus to measure and calculate audio and video cable lengths, test remaining inventory, identify defective or suitable multimedia equipment for continued operational use, and initiate related administrative transitions.

58. To follow up on their previous discussion regarding procurement, the Plaintiff asked Mr. Marcello for clarification on the procedures for purchasing replacement equipment and materials.

59. Mr. Marcello notified the Plaintiff that he had retained the purchase list prepared by the previous Director of Athletic Multimedia, and had deferred ordering any new equipment until the Plaintiff's arrival so that purchases would better align with departmental needs.

60. Mr. Marcello advised the Plaintiff that he was authorized to expend up to $25,000 for video production equipment, and $10,000 for ancillary equipment, totaling $35,000 in available funds. He explained that any purchase exceeding the $10,000 threshold required secondary authorization from another senior staff member, and directed the Plaintiff to ensure that all expenditures remained within those limits. Mr. Marcello further requested that the Plaintiff obtain, if at all possible, multiple proposals under $10,000 for the purchase of the required equipment. Mr. Marcello then informed the Plaintiff that he would provide further instruction to proceed with the purchases once the Plaintiff completed his review.

61. The Plaintiff began establishing broadcast operations within the shared broadcast venue used for soccer and baseball events in late July.

62. Following the conclusion of the spring season agreement, the Independent Contractor provided limited assistance during the setup process, after which the Plaintiff coordinated equipment placement without assistance for an extended period of time.

63. In reference to his verbally established accommodation request, the Plaintiff asked Mr. Marcello regarding the procedures to use part-time staff for broadcast setup and operations outside of events.

64. Mr. Marcello explained to the Plaintiff that historically, the person in the role of Director of Athletic Multimedia worked unassisted, with operational support only provided by the Independent Contractor during the fall and spring seasons.

65. He added that he would look into whether part-time staff could be made available to assist the Plaintiff as needed outside of scheduled broadcast events if he deemed it necessary.

66. Completing the broadcast setup process unassisted required extended hours of work during July and August amid high temperatures.

67. Limited equipment and resources further extended the process and added to the existing operational challenges.

68. The Plaintiff continued to accommodate his physical limitations during the setup and transport process by adjusting his work activity as the workflow allowed.

69. While awaiting a response to his earlier request regarding the use of part-time staff, the Plaintiff sought assistance with the broadcast setup process from Mr. Marcello and other members of the External Operations team. However, due to workload demands and scheduling constraints, the Plaintiff continued the setup process unassisted.

70. To address the equipment shortages, the Plaintiff contacted a vendor recommended by both Mr. Marcello and the Independent Contractor to request pricing for replacement audio and video cables.

71. On August 5, 2024, the Plaintiff received a proposal from the vendor.

72. On or about August 8, 2024, the Plaintiff completed establishing broadcast operations in preparation for the start of the men's and women's soccer season.

73. The home broadcast schedule for the 2024 men's and women's soccer season was as follows: August 15, August 18, August 22, August 24, August 26, August 29, September 14, September 15, September 19, September 21, October 3, October 4, October 11, October 12, October 16, October 20, October 25, October 26, October 27, October 29, and November 23, 2024.

74. On August 12, 2024, the Plaintiff received an Administrative and Professional Faculty Performance Evaluation conducted by Mr. Marcello. The evaluation used a five-point scale system designating:

5 = Outstanding

4 = Excellent

3 = Fully Competent

2 = Marginal

1 = Unsatisfactory

75. The evaluation assessed eleven categories: Job Performance, Productivity, Integrity, Oral and Written Communication, Timeliness, Interpersonal Skills, Dependability,

Initiative, Support of the VMI System, Overall Rating, and Importance of Rules Compliance.

76. The Plaintiff received ratings ranging between Fully Competent and Excellent in the listed categories in his evaluation.

77. On or near August 19, 2024, the Independent Contractor informed the Plaintiff and Mr. Marcello that he would undergo a medical procedure in late September.

78. During the week of August 19, 2024, the Plaintiff attended a digital conference call with representatives from ESPN, the Southern Conference, and each member institution to discuss the upcoming 2024 football and fall sports broadcast operations and transmission compliance protocol.

79. Around the middle of the week of August 19, 2024, Mr. Marcello initiated an informal discussion with the Plaintiff to review departmental progress. The discussion focused on video and creative content, and the status of regularly uploaded video segments.

80. The Plaintiff explained to Mr. Marcello that video projects had been delayed due to time spent setting up, repairing, and servicing broadcast equipment.

81. Mr. Marcello instructed the Plaintiff to complete the video projects in a timely manner.

82. As the meeting continued, Mr. Marcello requested a progress update on the football hype video for the start of the home games.

83. The Plaintiff informed him that he had coordinated with the team captains and the Director of Athletics Equipment and Services to meet on August 23, 2024, to film the introduction. The Plaintiff notified Mr. Marcello that he would arrive at the visiting team locker room around 7:00 a.m. to finalize last-minute video production preparations.

84. On August 22, 2024, the Plaintiff prepared the visiting team locker room at the football stadium for the video shoot scheduled the following morning with the football team captains.

85. He requested assistance from Mr. Marcello and members of the External Operations team in moving equipment to the visiting team locker room; however, most were unavailable.

86. The Plaintiff completed all production related tasks and final preparations into the evening before returning the following morning.

87. On the morning of August 23, 2024, the Plaintiff arrived between 7:00 a.m. and 7:30 a.m. to finalize last-minute video production tasks before the start of the event.

88. Shortly after the Plaintiff's arrival, the Director of Athletics Equipment and Services delivered the uniforms and equipment for the team captains in preparation for the video shoot, assisted the Plaintiff with aspects of the filming process, and ensured the captains remained on schedule for their subsequent meeting before departing with them at the conclusion of the event.

89. Mr. Marcello arrived at the location shortly after the event concluded and asked whether the event had started.

90. The Plaintiff informed him that filming had concluded, and the players and the Director of Athletics Equipment and Services had left. The Plaintiff explained that he was in the process of conducting post-production teardown of the equipment.

91. Mr. Marcello revisited the discussion regarding video content and stated that he believed the matter remained unresolved from their previous meeting earlier that week.

92. The Plaintiff continued collecting the video equipment and reaffirmed his prior statement regarding completion of the creative content.

93. Mr. Marcello acknowledged his response, and departed after confirming whether the Plaintiff would be working in his office or at the soccer field.

94. Between July and August 2024, the Plaintiff reviewed multiple vendor proposals and kept Mr. Marcello informed throughout the process.

95. During this period, the department's audio and video cable reserves were nearly depleted, with the remaining equipment showing increasing signs of wear.

96. With the remaining cable inventory in use for soccer broadcast operations, the football broadcasts lacked sufficient materials to establish reliable video or audio signals.

97. Equipment preparation for the upcoming football season proceeded concurrently with equipment procurement coordination.

98. The Plaintiff informed Mr. Marcello of the department's equipment condition, and the finalization of the vendor proposal under consideration.

99. As previously discussed, the Plaintiff inquired with Mr. Marcello about the appropriate steps necessary to advance the proposal for purchase.

100. Mr. Marcello verbally instructed the Plaintiff to submit the finalized proposal directly to the Director of Business Operations for processing through the appropriate institutional channels.

101. On the afternoon of August 26, 2024, the Plaintiff received and provided the finalized vendor proposal for video production equipment to the Director of Business Operations for processing via email.

102. In the late morning of August 27, 2024, the Plaintiff sent Mr. Marcello a photo via text message showing the condition of damaged broadcast cables located at the football venue.

103. The Plaintiff notified Mr. Marcello that the photo reflected the general condition of departmental broadcast equipment as observed since his arrival at VMI.

104. In response, Mr. Marcello instructed the Plaintiff to include him in all related correspondence going forward, and stated that no order would be placed unless he reviewed the proposals.

105. The Plaintiff informed Mr. Marcello in the text exchange that he sent him the proposal.

106. Mr. Marcello acknowledged the Plaintiff's message and notified him they would meet at 2:30 p.m. to review additional matters.

107. In late August 2024, the Plaintiff and the Independent Contractor initiated preparations to establish broadcast operations at the football venue.

108. The elevator at the football venue was inoperable and under repair until on or about August 26, 2024, which prevented relocation of the mobile unit that had remained at the shared broadcast venue for baseball and soccer following the spring 2024 season.

109. On August 31, 2024, the Plaintiff began setting up the football venue unassisted.

110. He concluded in the late evening after sorting, organizing, and relabeling the existing audio and video cables that are permanently installed along the ceiling, and terminate in the broadcast operations area.

111. The Plaintiff and the Independent Contractor continued the setup and configuration of the football broadcast venue during the period of September 02 through September 6, 2024.

112. To complete the broadcast setup at the football venue, the Plaintiff and the Independent Contractor relocated production equipment between the soccer and football venues.

113. The historical precedent was to repurpose audio and video cables between venues to establish functional signal flow and ensure operational readiness for football broadcasts.

114. Due to the delay of equipment movement caused by the elevator's inoperability, the Plaintiff and the Independent Contractor began the setup process in the early morning and continued into the late evening to prepare the venue for football broadcast operations.

115. At the completion of each day's setup, the Plaintiff edited video content into the early morning hours to meet deadlines established under Mr. Marcello's directive.

116. After the home football game opener on September 7, 2024, the Plaintiff and the Independent Contractor transported the broadcast equipment and ancillary components back to the shared venue to prepare for the upcoming soccer broadcast events scheduled for September 14 and 15, 2024.

117. The practice of relocating equipment between venues continued until the conclusion of the men's 2024 fall season on October 29, 2024.

118. The home broadcast schedule for the 2024 football season included games on: September 7, September 21, October 19, November 2, November 9, and November 23, 2024.

119. Following the first home football game, the Plaintiff provided the Director of Business Operations and Mr. Marcello a second vendor proposal in the early hours of the morning of September 10, 2024.

120. Mr. Marcello instructed the Plaintiff and the Director of Business Operations to delay further action until his return from overseas travel so the matter could be discussed more thoroughly.

121. The additional equipment was needed to accommodate a sideline commentator arranged by Mr. Marcello to provide commentary for home football and basketball broadcast events.

122. Between September 13 and 14, 2024, the Plaintiff and Assistant Director of Athletic Communications and Creative Content Nathanial Barbee, traveled to Georgia for a high-profile football event for VMI.

123. While the Plaintiff was away, the Independent Contractor informed him on September 14 that the broadcast transmission had been lost during a portion of the game. The Plaintiff asked for additional details, and requested a follow-up call after the conclusion of events.

124. The following week, on September 18, 2024, the Director of Digital Content for the VMI Alumni Agencies, Christian Heilman, emailed Mr. Marcello to ask whether advertisements for the Keydet Club and VMI Foundation would be played on ESPN broadcasts and on the in-stadium videoboard during fall home football games. Mr. Heilman informed Mr. Marcello that it had been reported that the advertisements were not appearing during broadcasts or in-venue during the home football game.

125. He informed Mr. Marcello that the Keydet Club advertisement would be updated within the next few weeks, and he would forward the updated file upon receipt.

126. Mr. Heilman additionally asked Mr. Marcello whether specific dimensions were required for ESPN broadcasts or the in-stadium video board.

127. The email concluded with Mr. Heilman stating he would supply correctly sized assets if any were required.

128. Continuing the same email correspondence between Mr. Heilman, on September 19, 2024, Mr. Marcello included the Plaintiff, Assistant Athletic Director for Corporate Partnerships Blake Brinkley, and Director of Ticketing and Promotions Antoine Prather.

129. In his response to Mr. Heilman, Mr. Marcello confirmed that the external operations team would begin incorporating the advertisements during game day events.

130. Between September 20 and September 24, 2024, the Plaintiff provided Mr. Marcello multiple vendor proposals for audio cables and ancillary equipment.

131. After reviewing the proposals provided by the Plaintiff, Mr. Marcello initiated communications with an alternative vendor on September 25, 2024 for the same items. In this exchange, Mr. Marcello inquired about the expected timeframe for delivery of the equipment.

132. The following afternoon, on September 26, 2024, Mr. Heilman emailed Mr. Marcello, and included the Plaintiff, Mr. Brinkley, and Mr. Prather, requesting that the updated Keydet Club advertisement be played during the fall football season.

133. Mr. Heilman informed them that he had prepared two versions: one formatted for the ESPN broadcast and another for the in-stadium videoboard.

134. Following Mr. Heilman's email, Mr. Marcello replied with only the Plaintiff and Mr. Brinkley included and confirmed the external operations team would update the advertisements to play during broadcasts and on the in-stadium video board.

135. During the fall, the Keydet Club has an ongoing annual fundraising event and scholarship award presentation titled the *"Three-Legged Stool."*

136. The event serves as both a scholarship award presentation and a donor engagement banquet, attended by institutional leadership, cadet-athletes, fund representatives, and donors to the VMI Alumni Agencies, VMI Foundation, and the Keydet Club.

137. In 2024, the fundraiser was held in Marshall Hall, a facility within VMI, with Mr. Walton and Major General (Ret.) Wins appearing in their official capacity for the event.

138. Between October 1 and 2, 2024, Mr. Marcello instructed the Plaintiff to meet him at Scott Shipp Hall and the Corps Physical Training Facility Phase III (Aquatic Center) to film Mr. Deal announcing the nominees for the "*Three-Legged Stool*" scholarship award.

139. The filming took place during normal working hours, and used departmental multimedia equipment to document and capture the event.

140. After filming concluded, Mr. Marcello notified the Plaintiff that Mr. Heilman would be providing interviews of the cadet-athletes to incorporate into the final product.

141. Mr. Marcello further informed the Plaintiff that the videos he created would be previewed at the fundraising event, and directed him to create three impact videos featuring the scholarship award nominees for the Keydet Club.

142. Mr. Marcello also noted that this process had been used in prior years for the same fundraising event and that the previous year's video could be found on the cloud-based storage drive.

143. On the morning of October 3, 2024, the Plaintiff began preparing the shared broadcast venue for the home soccer event the same afternoon.

144. At this time, the Independent Contractor was recovering from his medical procedure and was unavailable. This left the Plaintiff to travel between the football and soccer production locations unassisted to create graphics, prepare event segmentation, and establish audio and video signals without assistance.

145. Mr. Marcello sent the Plaintiff a text message mid-morning asking if he was going to be present for the event operations meeting. The Plaintiff replied that he was still in the process of setting up and saw the message as he responded. Mr. Marcello acknowledged his response, and requested that the Plaintiff communicate such information in advance.

146. That same afternoon, within thirty minutes of the scheduled start of the soccer broadcast, the Plaintiff contacted ESPN Transmission and informed a representative that the event needed to be canceled due to technical issues that could not be resolved before the start of transmission. The Plaintiff explained that video signals were not being detected within the video broadcast equipment, and that additional time would be required to restore connections as he was the only staff member at the institution available at the time with the technical capabilities to resolve the issue.

147. As a matter of departmental concern, the Plaintiff sent an email to Mr. Walton and Mr. Brown notifying them that the upcoming men's and women's home soccer broadcasts would have to be canceled due to technical failures.

148. The Plaintiff noted that he had raised these concerns on several prior occasions, but had encountered resistance from leadership. He reported that the production equipment

was out of compliance with ESPN transmission standards as it was not transmitting any video signal.

149. The Plaintiff clarified that football broadcasts would not be affected, but that soccer operations could not resume until the vendor delivered the ordered audio and video cables.

150. In a separate email, the Plaintiff informed Mr. Marcello, Mr. Barbee, and Mr. Whitehead of the same cancellation status and that operations would resume upon receipt of the vendor delivery.

151. Mr. Marcello arrived at the shared broadcast venue and discussed the situation with the Plaintiff.

152. At the start of the conversation, Mr. Marcello commented that the remnants of the recent storm were unusual. He noted the age of the broadcast cables and was not surprised that they had malfunctioned. Mr. Marcello asked the Plaintiff whether the audio and video cable ends were protected. The Plaintiff explained that he typically protected the components but that one of the connectors had detached during readjustment while being disconnected from a camera.

153. The Plaintiff further explained that since the summer, he had been developing plans to prevent similar issues for other sports by designing audio and video signal flow diagrams of the department's broadcast equipment. He explained that he was designing the placement of weatherproof terminal boxes for the venue and coordinating with facility maintenance to execute the project, as the existing audio and video cables were exposed to the elements. The Plaintiff noted the established method prior to his arrival at VMI had been to leave them unprotected and largely exposed to the elements.

154. Mr. Marcello expressed that he did not want the equipment to remain unprotected, and stated that a solution should be implemented to ensure the cables were shielded from exposure. He asked the Plaintiff whether temporary protective measures could be implemented until a permanent solution was installed.

155. The Plaintiff confirmed he was implementing protective measures for the equipment, and Mr. Marcello left following the conclusion of this conversation.

156. On the morning of October 4, 2024, the Plaintiff began audio and video cable recovery efforts with Mr. Stuart Burbidge, a part-time employee at the time of the event.

157. At 10:46 a.m., the Plaintiff received a text message from Mr. Marcello instructing him to call at his earliest convenience. The Plaintiff called Mr. Marcello upon reviewing the message.

158. At the start of the call, Mr. Marcello questioned the Plaintiff's location.

159. The Plaintiff informed Mr. Marcello that he was retrieving the remaining audio and video cables and assessing the condition of the remaining inventory with Mr. Burbidge at the shared broadcast venue.

160. Mr. Marcello stated that he did not like the email the Plaintiff sent to Mr. Walton and Mr. Brown. He accused the Plaintiff of having gone around him, and added that even if he did, the information would reach him regardless.

161. The Plaintiff explained that he had been addressing issues with the video broadcast equipment since his arrival to VMI, and that the cancellation of the soccer broadcast resulted from unresolved technical problems previously brought to his attention.

162. As the conversation continued, Mr. Marcello accused the Plaintiff of being responsible for the broadcast cancellation, stating that it occurred because he had failed to

perform his duties. The Plaintiff replied that he had repeatedly raised these concerns, and explained that the only remaining course of action was to receive the pending equipment delivery and establish a stable supply to prevent future cancellations.

163. The Plaintiff and Mr. Marcello recognized that the conversation had reached an impasse and agreed to revisit the matter after Mr. Marcello's return from the away football game in Samford, Alabama.

164. The Plaintiff completed the recovery process for the day in the early afternoon with assistance from two part-time employees.

165. On the morning of October 7, 2024, the Plaintiff emailed Mr. Marcello, and informed him that he was at the shared soccer broadcast venue troubleshooting the broadcast production equipment.

166. The Plaintiff stated that he would not be present for the 10:30 a.m. meeting, and requested assistance from the External Operations team. He closed the email by explaining that his staff was unavailable, and that he was alone working on the project. At the conclusion of the email, the Plaintiff reiterated that any help would be appreciated.

167. On the afternoon of October 7, 2024, the Plaintiff went to Mr. Marcello's office to follow up on their previous phone conversation from October 4, 2024.

168. At the start of the conversation, Mr. Marcello acknowledged that the Plaintiff had likely worked over the weekend, and asked if he had taken any time off. The Plaintiff responded that he had worked Friday night, Saturday, and Sunday.

169. The Plaintiff acknowledged that the October 4, 2024, phone call with Mr. Marcello had been difficult for both parties, and that tensions were high at the time. The Plaintiff explained that the strain appeared to have started following the departmental progress

meeting in August regarding video content, and the conversation that took place in the locker room.

170. The Plaintiff explained that the issues with women's soccer reflected the buildup of ongoing operational problems he had been addressing, describing the difficulty of maintaining and repairing the video broadcast systems under those conditions. He stated that his priority was keeping the broadcasts running since they were the department's core responsibility, but instead attention was being diverted to other multimedia projects.

171. The Plaintiff also noted that the Independent Contractor had not been adequately executing his duties, and that this forced the Plaintiff to oversee and correct his work. He explained that because the required tasks were physically demanding, he had to remain mindful of the Independent Contractor's medical limitations and physical condition, as the Independent Contractor had previously disclosed this information to both the Plaintiff and Mr. Marcello.

172. The Plaintiff explained that video operations had been difficult to maintain, and that he was doing everything possible to keep them running effectively. He stated that his frustration came from those challenges and noted that he had been repairing malfunctioning equipment, and that his efforts had produced measurable cost savings for the department.

173. He added that he spent the weekend troubleshooting and repairing the replay system and emphasized that priority should be placed on essential operations tasks, as the items that were being replaced were the most critical for continued operations.

174. The Plaintiff clarified that the issue was not specifically regarding video editing, but that it served as a useful example to illustrate his point. He explained that when choosing

between producing video content and ensuring that ESPN broadcasts aired as scheduled, he had to decide which priority to address and recognized that one side would be dissatisfied regardless of the decision.

175. The Plaintiff informed Mr. Marcello that once operations were stabilized and ongoing repairs were completed, he would be able to assume full accountability for the equipment. He explained that maintaining accountability was difficult while managing inherited malfunctioning equipment, and he clarified that his long-term plans remained unchanged.

176. The Plaintiff added that he was at that time the only individual capable of completing the necessary repairs, and concluded that this statement reflected his overall perspective on the situation.

177. As the conversation continued, Mr. Marcello stated that his frustration stemmed from a perception that the Plaintiff went around him on various occasions.

178. He added that he did not appreciate the email the Plaintiff sent to Mr. Walton and Mr. Brown, describing it as lacking subtlety.

179. Mr. Marcello further explained that he believed the Plaintiff had attempted to bypass him, but that such efforts were unnecessary because any information shared would ultimately reach him regardless.

180. Mr. Marcello acknowledged the Plaintiff's perspective that the August discussion regarding the regularly uploaded video segments marked the beginning of their professional tension.

181. He explained that he believed the primary issue was the Plaintiff's tendency to make independent decisions on matters such as the recurring video segments without prior discussion.

182. Mr. Marcello continued, stating that his frustration also stemmed from several meetings the Plaintiff missed without notice, which he said reflected poorly on him in front of others, and added that these absences prompted others to question the broadcast's overall preparedness.

183. Mr. Marcello stated that he believed he had been lenient regarding video content expectations, and explained that while the segments were originally produced weekly, he had reduced the schedule to every couple of weeks. He added that despite this flexibility, more than a month had passed without a new segment being produced, and he found the Plaintiff's explanation unacceptable.

184. In reference to the email chain between Mr. Heilman and Mr. Marcello, Mr. Marcello told the Plaintiff that advertisements were not being played during the broadcast, and he reminded the Plaintiff that these errors were the Plaintiff's responsibility.

185. The remainder of the discussion focused on accountability, game-day workflow, communication, equipment logistics, facility improvements, and a variety of other related topics that arose during the meeting.

186. Between October 7 and 11, 2024, the Plaintiff reestablished video broadcast operations at the shared soccer venue largely unassisted. The Plaintiff conducted video restoration efforts that began in the morning and concluded each evening.

187. On or about October 8, 2024, Mr. Marcello visited the shared soccer broadcast venue to review the Plaintiff's progress.

188. The Plaintiff explained his current stage of completion and stated that he needed assistance to complete the project in a timely manner.

189. He further explained that the Independent Contractor was still recovering from a medical procedure and that, without additional support, he was uncertain whether the project could be completed in time for the October 11, 2024, women's soccer broadcast.

190. In response, Mr. Marcello stated that he would meet with the Associate Athletic Director for Internal Operations, Emily Fulton, to discuss the possibility of assigning cadets to assist the Plaintiff with the broadcast re-establishment process. He added that once he received additional information from Ms. Fulton, he would notify the Plaintiff of their decision.

191. During this period, the Plaintiff frequently requested assistance from Mr. Marcello and other members of the External Operations team. Most of the team was unavailable, but on the afternoon of October 9, 2024, Mr. Whitehead assisted the Plaintiff for a brief period.

192. On the morning of October 10, 2024, the Plaintiff emailed Mr. Marcello to ask whether there was an update on the audio cable order from the vendors they had both contacted, and noted that the items would be needed soon.

193. That afternoon, the Plaintiff was informed that Ms. Fulton would assign cadets on disciplinary duty to assist with the project until their duty concluded for the day.

194. The following afternoon, on October 11, 2024, the Plaintiff restored video connections within the equipment and successfully transmitted the event to ESPN.

195. During the broadcast troubleshooting and recovery period, the Plaintiff continued editing and delivering video content at Mr. Marcello's directive while concurrently performing venue setup, signal restoration, and equipment repairs.

196. Following the men's soccer broadcast on October 12, 2024, the Plaintiff and the Independent Contractor began preparing the football broadcast for the *"Military Classic of the South"* event.

197. To prepare for the event, broadcast equipment, video and audio cables, cameras, and communications units needed to return to the football venue.

198. During the week of October 14, 2024, the Plaintiff and the Independent Contractor worked late into the evening to troubleshoot persistent audio communication failures affecting commentator headsets used for audio commentary during broadcast events at the football broadcast location.

199. In the late hours of October 18, 2024, the Plaintiff and the Independent Contractor successfully resolved the issue.

200. During the event on October 19, 2024, one of the commentators informed the Plaintiff that he was not receiving any audio communications in his headset. The Plaintiff made several troubleshooting attempts, but was ultimately unable to restore communications for the commentator.

201. At the conclusion of the broadcast, the Plaintiff, the Independent Contractor, and several part-time employees transported the equipment back to the shared broadcast venue in preparation for the women's soccer broadcast the following afternoon.

202. The Plaintiff, the Independent Contractor, and a part-time employee worked into the evening to prepare the space for the following morning.

203. On October 20, 2024, shortly after the start of the men's soccer broadcast, the Plaintiff received a call from ESPN stating that they were not receiving any audio signal from the sports commentator.

204. The Plaintiff immediately initiated troubleshooting procedures. Shortly after troubleshooting began, the commentator reported a loss of audio in his headset, while the ESPN technician informed the Plaintiff that the commentary signal had resumed on their end.

205. The Plaintiff notified the ESPN technician that the commentator continued to experience a loss of audio in his headset and that the issue remained unresolved. He added that he would make further attempts to correct the issue during the halftime commercial intermission.

206. At the start of the halftime intermission, the Plaintiff provided the commentator with an update on the status of the ongoing audio-communications troubleshooting. He informed the commentator that if the issue was not resolved by the end of the intermission, the commentator would lose monitor audio and production cues from the Plaintiff for the remainder of the broadcast.

207. The Plaintiff explained that additional troubleshooting during live transmission could risk further technical instability. Despite his efforts, the Plaintiff was unable to restore the audio-communications system.

208. At the conclusion of the event, the Plaintiff attempted to review the audio-communications malfunction, and to discuss a corrective plan to prevent similar incidents in the future. The commentator expressed frustration and stated that such issues

had occurred repeatedly, citing the September 19 and October 3 events as examples of an ongoing pattern, and that he will no longer continue under those conditions.

209. On the afternoon of October 20, 2024, the Plaintiff texted Mr. Walton to inquire about his availability for the upcoming week in order to request a private meeting regarding a departmental concern. The Plaintiff explained that he did not feel comfortable raising the matter with his direct supervisor, Mr. Marcello.

210. The following afternoon, on October 21, 2024, the Plaintiff met with Mr. Walton to discuss the department's current operational standing.

211. The Plaintiff informed Mr. Walton that the primary play-by-play commentator for the women's soccer broadcasts had resigned, citing repeated equipment failures that impaired his ability to perform his duties effectively. The Plaintiff explained that this was the third technical failure directly impacting the commentator, and that the commentator no longer wished to continue working under those conditions.

212. He continued by explaining that Mr. Marcello was placing the department's focus toward video content creation, while neglecting the contractually obligated ESPN broadcasts.

213. The Plaintiff informed Mr. Walton that the technical failures on September 19, October 3, and October 20 could have been prevented if the requested audio and video cable purchases had been approved, and added that Mr. Marcello had indicated he might reduce the requested order, stating that additional equipment could be purchased at a later time.

214. The Plaintiff emphasized that his intent was to maintain ESPN transmission compliance and ensure the Institute fulfilled its contractual obligations with the Southern

Conference to broadcast the required number of events. He clarified that once those obligations were satisfied, video content projects could resume regular production, but stated that completing both duties simultaneously without assistance had become increasingly difficult.

215. The Plaintiff explained that he had repeatedly requested assistance from Mr. Marcello and the External Operations team since preparations for the fall broadcasts began. He stated that, apart from Mr. Whitehead's assistance on two occasions, no other team members provided operational support when requested. The Plaintiff further noted that one team member expressed frustration toward him when a broadcast had to be canceled.

216. The Plaintiff explained to Mr. Walton that he wished to pursue additional creative projects, but emphasized that the department was in poor operational standing. He stated that until stability was restored, the priority needed to remain on meeting the department's contractual obligations with ESPN and the Southern Conference.

217. In the course of the discussion, the Plaintiff requested to report directly to Mr. Walton, explaining that tensions were escalating between himself and Mr. Marcello following the discussion of a regularly segmented video project in August. He stated that he had regularly exceeded forty working hours in a workweek since the beginning of the fall home broadcasts, and was exhausted from the unassisted strenuous activities and late evenings to maintain operations and video editing.

218. The Plaintiff further explained that he feared reprisal or additional escalation from Mr. Marcello, and that those tensions began in August after a departmental progress meeting.

219. At the conclusion of the meeting, Mr. Walton informed the Plaintiff that he would review the matters discussed and conduct an investigation. He stated that he would speak with Mr. Marcello regarding the issues raised and follow up with the Plaintiff once he had reached a determination.

220. On or about October 24, 2024, Mr. Marcello asked the Plaintiff about the status of the impact videos for the Keydet Club scholarship award banquet. The Plaintiff explained that he had not yet begun the project because he had been actively troubleshooting and reestablishing broadcast operations. Mr. Marcello reminded him that the videos were due soon, and stated that he would resend the materials.

221. During this brief exchange, the Plaintiff informed Mr. Marcello he had a scheduled medical appointment with the Department of Veterans Affairs on October 30, 2024, and intended to meet with a separate medical provider to attempt to refill prescribed medications on October 31, 2024.

222. The Plaintiff stated that he would travel for these appointments immediately after relocating equipment and reestablishing audio and video connections at the football broadcast venue on October 29, 2024.

223. The Plaintiff additionally notified Mr. Marcello that he would return on November 1, 2024, to finalize last minute video production.

224. On the afternoon of October 24, 2024, the Plaintiff and Independent Contractor were troubleshooting the audio communications unit in preparation for the women's soccer event the following day on October 25, 2024.

225. The communications unit began experiencing a short-circuiting error, rendering it inoperable until further troubleshooting and diagnostic assessments could be completed.

226. That same afternoon, Mr. Marcello sent two separate emails to the Plaintiff regarding the video project for the Keydet Club.

227. One email informed the Plaintiff that the "*Three-Legged Stool*" video needed to be completed and submitted by Tuesday, October 29, 2024.

228. The second email was a forwarded message from October 10, 2024 between Mr. Heilman and Mr. Marcello, with Mr. Deal included in the correspondence.

229. In that email, Mr. Heilman notified Mr. Marcello that the interviews with all "*Three-Legged Stool*" award nominees had been completed and shared a Dropbox link containing the media files.

230. The Plaintiff sent a text message to Mr. Marcello that evening reporting that the audio communications unit had malfunctioned. He explained that he was unable to determine the root cause of the malfunction, and planned to visit the vendor the following morning to identify an appropriate remedy. The Plaintiff informed Mr. Marcello that if the issue could not be resolved, the October 25 broadcast would have to be canceled.

231. The Plaintiff was unable to resolve the audio-communications malfunction, and the women's home soccer broadcast on October 25, 2024, was canceled.

232. On the afternoon of October 25, 2024, the Plaintiff emailed Mr. Walton and Mr. Marcello to report that broadcast operations could not be restored for the weekend due to the same technical issue that caused the initial failure. He noted that a replacement unit obtained from the vendor had not resolved the problem, but that he was pursuing an alternative solution expected to arrive on Monday and would keep them informed of progress.

233. On the evening of October 25, 2024, Mr. Marcello emailed a representative of the Southern Conference informing him that the audio communications unit had failed, forcing the cancellation of the women's soccer broadcast.

234. Mr. Marcello inquired whether an exception could be made to stream the upcoming weekend games on social media until the replacement unit arrived Monday. He added that while it was not ideal, fans would likely prefer a single-camera stream over no coverage and welcomed alternative suggestions.

235. The representative from the Southern Conference responded to Mr. Marcello's email, and informed him that under their agreement with ESPN, all games played by a Southern Conference member institution must be streamed exclusively on an ESPN platform, or not broadcast at all. The representative asked further questions pertaining to the equipment malfunction.

236. For the remainder of the men's and women's soccer season, broadcasts were conducted without audio commentary, or internal communications between technical broadcast and camera staff.

237. On Monday, October 28, 2024, the Plaintiff and Mr. Marcello met for their regularly scheduled departmental update meeting. The topics discussed included: workload management, operational practices, purchase order reductions, the Keydet Club video project deadline, internal video project disputes, and meeting attendance expectations.

238. Mr. Marcello asked the Plaintiff for updates regarding the audio communications issue. The Plaintiff explained that the malfunction was disrupting communications with staff, on-air talent, and that this issue affects every sports broadcast.

239. The Plaintiff informed Mr. Marcello that he was uncertain about making a decision on purchasing any new equipment until verifying that all components of the communication system were compatible and could function together once installed. He explained that the loaner unit provided by the vendor appeared similar to the institution's system, but was a different model and did not operate in the same manner.

240. The Plaintiff reminded Mr. Marcello that he had been informed by the Independent Contractor and his predecessor in the role that the communications system had experienced recurring malfunctions for years.

241. The Plaintiff explained that he had not personally experienced such malfunctions until they resurfaced recently.

242. He further explained that this was not a new issue, and that it had been listed on the replacement schedule for several years.

243. He continued explaining that when he inherited the broadcast equipment, he prioritized replacing the audio and video cables first, and explained his reasoning that without working cables, no broadcasts could be transmitted.

244. The Plaintiff added that this required him to assess which equipment could be salvaged, which could be repaired temporarily, and which required full replacement.

245. The Plaintiff explained that multiple broadcast systems had experienced failures and malfunctions over time, and noted that the malfunctions began with the video cables and later extended to the video and replay playback systems.

246. He added that the department had depleted its remaining audio cables, and this was causing recurring audio disruptions that ultimately affected the communications unit used by on-air talent and production staff.

247. Mr. Marcello asked the Plaintiff whether any other vendors could provide or sell equipment since the chosen vendor was unable to fix the issue. He stated that the audio-communications unit had not been the Plaintiff's area of focus in his view. He added that when the previous employee held the position, his approach was to ask which operational needs required attention.

248. As the topic transitioned, Mr. Marcello accused the Plaintiff by stating he contributed to the audio and video cable failures. The Plaintiff immediately questioned how he was responsible for the damaged cables.

249. The Plaintiff rejected Mr. Marcello's accusation and explained that the cables were damaged at the lacrosse location at the end of the season. He denied responsibility for the damage, and stated that he had taken extensive measures to prevent further damage to the department's equipment. The Plaintiff added that the setup existed before his arrival and that he used a different configuration to establish the fall 2024 season.

250. Mr. Marcello re-stated that the Plaintiff had pinched several audio and video cables, and insisted that the Plaintiff told him directly that he had damaged the cables.

251. The Plaintiff immediately clarified that the department lacked the capability to bring the cables indoors after each event because the same cables used for soccer were also used for football operations.

252. The Plaintiff stated that departmental equipment was deteriorating, and that it had become increasingly difficult to perform the basic operational tasks of the role.

253. He added that three broadcasts had already been canceled and expressed frustration about the cancellations, and questioned why the department lacked essential equipment necessary for broadcast operations.

254. The Plaintiff explained that he was attempting to secure essential equipment including audio cables, but stated that Mr. Marcello had reduced the order by half. He informed Mr. Marcello that cutting the cable order contributed to the continuing malfunctions.

255. The Plaintiff noted that the additional cables would have prevented the need to relocate equipment, and added that some cables supported the audio-communications unit.

256. He emphasized that equipment needed to remain in fixed locations rather than being moved after each event. He explained that repeated relocation degraded cable integrity and accelerated wear.

257. The Plaintiff stated that the situation had developed over an extended period pre-dating both of their tenures, continued into the start of Mr. Marcello's tenure, and had continued to build during their time working together.

258. He emphasized the need to resolve the ongoing issues, and added that further reductions to future equipment orders would stop basic operations.

259. In response to the Plaintiff, Mr. Marcello stated that the department had sufficient resources to operate, and that additional equipment could be purchased later if needed.

260. The Plaintiff informed Mr. Marcello that he had to make difficult operational decisions and that relocating equipment was no longer feasible without causing additional damage to the equipment.

261. The Plaintiff explained that his primary focus was maintaining broadcast continuity and addressing malfunctions to sustain efficiency, and noted that the problems extended

beyond football operations, and that equipment failures were affecting overall broadcast functionality.

262. The Plaintiff added that he had been consistently exceeding a forty-hour workweek to sustain operations over an extended period of time, and that he was exhausted.

263. He informed Mr. Marcello that departmental conditions were destabilizing due to years of deferred maintenance, and these actions left him responsible for stabilizing broadcast operations.

264. Mr. Marcello suggested that the Plaintiff reach out to other state institutions to gather information on their broadcast systems and available rental options.

265. He added that no operational changes would be implemented at that time, and concluded the topic by stating that the same operational system used prior to their tenures would remain in place.

266. As the discussion transitioned from operational updates to video editing projects, Mr. Marcello asked the Plaintiff if he was aware of the upcoming deadline for the "*Three-Legged Stool*" project for the Keydet Club. He stated that if the Plaintiff already gathered footage of the cadet-athletes, he should use it, but directed him to collect any additional available footage for the project.

267. Mr. Marcello additionally directed the Plaintiff to mention in the following meeting that the "Three-Legged Stool" video project was being prepared, and to request assistance in gathering footage of the cadet-athletes.

268. As the discussion of the Keydet Club video editing project concluded, the Plaintiff informed Mr. Marcello of a disagreement between himself and Mr. Barbee regarding who would edit a hype video.

269. The Plaintiff explained that Mr. Barbee had stated his intention to edit the video and assume responsibility for its submission. He stated that he still intended to complete the project, but had been occupied with maintaining broadcast operations.

270. The Plaintiff expressed that Mr. Barbee's actions appeared to reflect an interest in assuming only the creative or higher-visibility aspects of the role, while declining to provide the operational and maintenance assistance the Plaintiff had requested to sustain broadcast functionality.

271. Mr. Marcello responded that the Plaintiff was misinterpreting the situation and explained that Mr. Barbee's intent was to ensure coverage of the program he oversaw, while helping reduce workload rather than assume preferred tasks.

272. Towards the end of the meeting Mr. Marcello noted that they were approximately ten minutes late to the External Operations Team meeting, but wanted to address whether the Plaintiff had attended the Thursday game operations meeting.

273. The Plaintiff responded to Mr. Marcello's question by stating that he had realized he missed the meeting while working at the shared broadcast venue in preparation for an event. Mr. Marcello replied to the Plaintiff's statement that improvement in meeting attendance was necessary, and noted that the issue had become a recurring discussion.

274. At the conclusion of their private meeting, Mr. Marcello stated it was time to meet with the others, and directed the Plaintiff to mention the "Three-Legged Stool" project so the team could assist in gathering materials to send to the Plaintiff.

275. During the External Operations Team meeting, as directed by Mr. Marcello, the Plaintiff requested assistance in gathering photos and videos of the cadet-athletes.

276. Immediately following his request for assistance in gathering items for the Keydet Club video project, the Plaintiff reminded the team that he would be traveling to North Carolina following the equipment move and reestablishment of the football broadcast venue at the conclusion of the men's soccer event on October 29, 2024.

277. He added that he had a Veterans Affairs appointment on October 30, and was going to see a separate medical provider on October 31, 2024.

278. When questioned about his anticipated return date, the Plaintiff stated that he would return no later than the afternoon of November 1, 2024, to finalize broadcast preparations for the football game on November 2, 2024.

279. Later that afternoon on October 28, 2024, Mr. Marcello forwarded an email between himself and Mr. Heilman to the Plaintiff, Mr. Prather, and Mr. Brinkley.

280. In the initial email sent to Mr. Marcello on October 25, 2024, Mr. Heilman informed Mr. Marcello that he was providing him with an advertisement for the Day of Giving on November 14, 2024. He informed Mr. Marcello that Mr. Deal mentioned he would like to see the advertisement played on the in-stadium video board during the November 2 Furman and November 9 Mercer home football games.

281. In Mr. Marcello's email to the team, he stated he was unsure whether to designate the advertisement or use it intermittently.

282. Following the equipment move and reestablishment of the football broadcast venue on October 29, 2024, the Plaintiff departed Lexington, VA for his Veterans Affairs appointment.

283. On the morning of October 30, 2024, Mr. Marcello sent the Plaintiff a text message inquiring if the Plaintiff had completed the "*Three-Legged Stool*" video project. Mr.

Marcello stated he needed to update the Keydet Club on the status since they were inquiring. The Plaintiff responded to Mr. Marcello's message informing him that the video would be completed by the end of the day.

284. Around 11:34 a.m., Mr. Marcello called the Plaintiff, but the Plaintiff was unavailable, and informed Mr. Marcello that he was unable to answer the call.

285. Mr. Marcello responded to the Plaintiff's message and inquired if the video could be delivered sooner than the timeframe the Plaintiff provided. In response, the Plaintiff stated that although it was unfortunate that the video project for the Keydet Club was late, he had been working to repair the malfunctions that had prevented the broadcasts from occurring.

286. On the evening of October 30, 2024, Mr. Marcello messaged the Plaintiff inquiring if the video had been completed. The Plaintiff replied to Mr. Marcello, and informed him that he was still working on the project, and that it is not an easy process.

287. In response, Mr. Marcello reminded the Plaintiff that he had been aware of the video's deadline for some time, and that it should be completed. The Plaintiff responded to Mr. Marcello by reminding him that equipment failures had been occurring across the broadcasts.

288. On the morning of October 31, 2024, Mr. Marcello messaged the Plaintiff inquiring if the video was ready for delivery. The Plaintiff responded to Mr. Marcello's message by informing him that he had sent an email addressing the matter.

289. The Plaintiff's email to Mr. Marcello explained that due to prior departmental negligence, he had been forced to repair multiple preventable system failures. He stated that restoring broadcast functionality had become the highest priority. He added that this

priority delayed completion of the Keydet Club video and noted that he had already invested over sixteen hours into the project.

290. The Plaintiff emphasized that assuming such videos could be produced in one hour reflected a fundamental misunderstanding of his profession. He further stated that if the department's equipment had not been in poor condition when he assumed the role, he could have focused on creative content rather than continuous technical repair.

291. The Plaintiff affirmed that he was completing the video diligently and professionally and addressed Mr. Marcello's statement regarding basketball and football operations.

292. He stated that he believed Mr. Marcello's concerns were less about athletic operations and more about an attempt to accost him for the delayed video, and noted Mr. Marcello's prior response patterns whenever technical issues arose.

293. In a separate email, the Plaintiff notified Mr. Walton, expressing concern that tensions with Mr. Marcello had escalated to an unmanageable level.

294. He explained that while the immediate issue involved the Keydet Club video, the tensions had been compounding over time. The Plaintiff stated that he was in North Carolina for a Veterans Affairs appointment and believed that, due to the tensions, it was necessary to take immediate vacation leave to avoid retaliation. The Plaintiff informed Mr. Walton that he felt the environment would not have been conducive for either Mr. Marcello or himself.

295. On the afternoon of October 31, 2024, Valerie Stores, the Director of Human Resources, informed the Plaintiff that Mr. Marcello and Mr. Walton had filed a complaint against him, and that she was seeking to obtain his statement regarding the matter.

296. He explained that Mr. Marcello had reduced an equipment order that would have alleviated operational strain and prevented additional broadcast cancellations or malfunctions.

297. The Plaintiff alleged that Mr. Marcello's directive to create a fundraising video for the Keydet Club without an available Memorandum of Understanding, combined with his reduction of necessary equipment, resulted in the misuse of public resources valued at over $5,000.

298. The Plaintiff informed Ms. Stores during the call that his statement was being provided as a matter of public concern. He restated that there were multiple broadcast cancellations that could have been prevented.

299. Additionally, the Plaintiff informed Ms. Stores that he feared retaliation for reporting the misuse of state resources and operational issues within the department.

300. In response to the Plaintiff's allegations, Ms. Stores requested his statement in writing.

301. The Plaintiff asked Ms. Stores about the status of his immediate vacation request, as he had not received a response from Mr. Walton. Ms. Stores informed the Plaintiff that it was approved until his anticipated return on November 5, 2024.

302. Between October 31 and November 4, 2024, following his call with Ms. Stores, the Plaintiff drafted the initial version of "*Addressing Managerial Challenges and Operational Analysis*" in response to Ms. Stores' statement request.

303. The document contained the following topics: Abstract, Inheriting the Department, Troubleshooting Procedures Performed on Multimedia Equipment, Patchin Field, Foster Stadium, Assessment, Conflicts Within the Department, and Attempts at Resolution,

Commitment to VMI's Standards, Vision, and Values, Current Impact to VMI's Reputation, Moving Forward, References, Appendix A, and Appendix B.

304. The Plaintiff's abstract summarized the purpose and scope of the document as follows:

> "This document presents my comprehensive analysis of the operational challenges currently facing the Virginia Military Institute Athletics Department. It details the ongoing conflicts related to management practices, and addresses the issues encountered with the Associate Athletic Director of External Communications, Phil Marcello. This document highlights the systemic shortcomings in technical understanding and managerial approaches that have hindered departmental performance and contributed concerns about institutional fiscal responsibility.
> *Keywords: Fiscal Responsibility, Conflict, Leadership, Adaptability to Change"*

305. In the Plaintiff's Moving Forward section he expressed his commitment in continuing his employment with VMI, but stated that managerial conditions hindered his ability to perform his role effectively. He explained that despite efforts to resolve concerns with Mr. Marcello, his limited technical experience, communication style, and unrealistic expectations had created persistent challenges for the Plaintiff.

306. He conveyed concerns that remaining under Mr. Marcello's supervision could lead to further misunderstandings or misrepresentations affecting the Plaintiff's professional standing, and that his recent interactions with Human Resources suggest that there may have been miscommunications that compounded the issues further.

307. Included in Appendix A were images documenting the condition of departmental broadcast equipment and ancillary items, vendor proposals selected by the Plaintiff, and other related materials.

308. On the morning of November 4, 2024, the Plaintiff submitted the first draft of "*Addressing Managerial Challenges and Operational Analysis*" to Ms. Stores.

309. Following the submission of his statement, in the later part of the morning, the Plaintiff sought medical treatment due to continued sleep deprivation from sustaining broadcast operations, video editing, and completion of the written statement requested by Ms. Stores.

310. That same afternoon, the Plaintiff received a calendar invitation from a Human Resources representative to attend a follow-up meeting with Ms. Stores scheduled for November 5, 2024.

311. In the early morning of November 5, 2024, the Plaintiff responded to the Human Resources representative informing her that he would be unable to attend as he had been discharged from the hospital. The Plaintiff informed the representative that he had included his medical documentation excusing him from work following his hospitalization.

312. In response to the Plaintiff's email, the Human Resources representative rescheduled the meeting with Ms. Stores for November 13, 2024.

313. On the afternoon of November 5, 2024, Mr. Marcello emailed the Plaintiff acknowledging that he had been unable to attend the meeting earlier that day. Mr. Marcello instructed the Plaintiff to check in at 8:30 a.m. upon his return, and directed him to refrain from participating in broadcast operations until the scheduled Human Resources meeting on November 13. Mr. Marcello added that once expectations were established during that meeting, they could proceed accordingly.

314. Mr. Marcello informed the Plaintiff that since his office was being used as the basketball production studio, a separate workspace would be arranged for him and outlined projects for him to work on.

315. In his email to the Plaintiff, Mr. Marcello outlined video projects for the Plaintiff to complete as follows:

a. Shortening the football hype video to 60 seconds and replacing the flaming logo at the end of the video

b. Watch Wednesday

c. Mic'D Up

d. Three Legged Stool video

e. VMI Basketball Hype video

316. The email additionally provided the Plaintiff instructions to begin gathering footage to complete the following assigned projects:

a. Women's Soccer Season Highlight Video

b. Men's Soccer Season Highlight video

317. On November 12, 2024, the Plaintiff arrived as instructed to his temporary workspace, and discovered it was missing a chair.

318. The Plaintiff was instructed to refrain from his office space until he and Mr. Marcello met with Ms. Stores on November 13, 2024. This directive restricted him from retrieving his office chair from his workspace.

319. The Plaintiff emailed Mr. Marcello stating that he had checked in at 8:30 a.m. as instructed, but found Mr. Marcello absent. He noted that the designated workspace did

not have a chair for the Plaintiff to sit in while performing his assigned video editing assignments.

320. The Plaintiff located a hard plastic chair stored in a nearby mechanical room, and moved it to his designated workspace to perform his duties as instructed.

321. In a separate email sent to the Plaintiff later that morning, Mr. Marcello instructed him to remain uninvolved with broadcast and setup areas until after the upcoming Human Resources meeting. Mr. Marcello directed the Plaintiff to continue working in his newly assigned office, and to notify him by email or text of his arrival, departure, and lunch times whenever he was not physically present.

322. On November 13, 2024, the Plaintiff, Mr. Walton, and Mr. Marcello met for the rescheduled Human Resources meeting with Ms. Stores.

323. The meeting was a formal mediation session facilitated by Ms. Stores, with the Plaintiff, Mr. Marcello, and Mr. Walton present. The discussion discussed ongoing tensions and disagreement between Mr. Marcello and the Plaintiff concerning equipment malfunctions, workload management, and video editing assignments.

324. At the outset of the meeting, Ms. Stores stated that she had requested the meeting to ensure a mutual understanding of the ongoing matters. She explained that she needed clarification on the circumstances and asked the Plaintiff to elaborate on his claims of retaliation. Ms. Stores emphasized that it was a serious allegation, and that she needed to ensure clarity regarding its meaning.

325. Continuing her opening remarks, Ms. Stores stated that she preferred to discuss the matter in person rather than continue exchanging emails.

327.. In response to the invitation, The Plaintiff explained that the events leading to the meeting arose from operational dysfunction within the Athletics Department, and that he had submitted his document outlining his inability to perform essential job functions.

328. He described inheriting a department that was deficient in supplies, contained broken or incomplete equipment, and that these conditions made it difficult to conduct broadcasts or create multimedia content as directed. He stated that he had repeatedly communicated these concerns to both Mr. Marcello and Mr. Walton, and added that the department had been forced to cancel multiple broadcasts due to technical failures that could not be resolved before the start of the event.

329. Building on his explanation, the Plaintiff explained that he had detailed in the appendices the corrective measures he attempted to implement to maintain a functioning broadcast environment. He stated that when he brought these solutions to Mr. Marcello's attention, they were met with resistance.

330. The Plaintiff informed Ms. Stores that fulfilling the institution's contractual obligations to ESPN through the Southern Conference required producing a set number of events annually. He explained that repeated broadcast cancellations due to equipment failures, inadequate supplies, and a lack of remedial action made compliance increasingly difficult.

331. He concluded his remarks by stating that both Mr. Marcello and Mr. Walton were aware of the conditions since August, and that he had informed Mr. Marcello upon his arrival that these deficiencies existed.

332. After hearing the Plaintiff's account, Ms. Stores stated that she had not heard him mention anything of retaliation, and asked what had prompted that concern or where it originated.

333. Expanding on his earlier statement, the Plaintiff responded that his concern regarding retaliation arose from recent circumstances.

334. Addressing Ms. Stores' question, the Plaintiff responded to her statement by explaining that he had been removed from his assigned office space and was directed to refrain from accessing his office or equipment. He stated that he had expressed concern about establishing broadcast operations in his office, as it would not have been a conducive environment to complete his assignments.

335. Further describing the conditions, the Plaintiff informed Ms. Stores that he had been placed in a room that was not adequately equipped for him. The Plaintiff notified Ms. Stores that a chair was missing, and that there was no dedicated workstation to complete his assignments.

336. To clarify the sequence of events, Ms. Stores asked whether the Plaintiff had raised his concerns with Mr. Walton directly.

337. In response to her inquiry, the Plaintiff responded to Ms. Stores and informed her that he had requested to meet with Mr. Walton on October 20, 2024, due to a situation that made him uncomfortable addressing Mr. Marcello directly.

338. He added that the meeting with Mr. Walton took place on October 21, 2024, at approximately 3:00 p.m.

339. Upon hearing the Plaintiff's explanation, Mr. Walton confirmed the Plaintiff's statement was accurate.

340. Once Mr. Walton confirmed the statement, Ms. Stores asked the Plaintiff to explain why he did not feel comfortable communicating directly with his immediate supervisor.

341. Addressing her question, the Plaintiff explained that his discomfort speaking directly with his supervisor, Mr. Marcello, stemmed from prior attempts to address operational and workload concerns that were met with dismissiveness.

342. To provide context, the Plaintiff began to describe the incident that occurred on August 23, 2024, in an isolated locker room immediately following the conclusion of a video shoot for the football team.

343. As he elaborated on the incident, the Plaintiff explained that he attempted to inform Mr. Marcello that he was having difficulties with the broadcast setup process and that it was time-consuming. He added that completion took longer during the summer because he was the only person working on the setup, and the inclement weather made it difficult to perform his duties effectively.

344. Continuing his account, the Plaintiff noted that he repeatedly requested assistance from others during External Operations team meetings. He acknowledged that colleagues might not always be available, but he nonetheless sought support due to operational demands.

345. Summarizing the impact, the Plaintiff stated that the conditions mentioned prevented the timely delivery of the social-media content.

346. As part of her fact-finding, Ms. Stores requested the Plaintiff to clarify in what way Mr. Marcello had been dismissive.

347. Clarifying his prior statement, the Plaintiff explained that Mr. Marcello disregarded his concerns, and directed him to complete the project despite the concerns he raised.

348. Expanding on the events, the Plaintiff recounted that on the morning of August 23, 2024, Mr. Marcello approached him after the video shoot concluded and said he believed conflict remained from their prior discussion. The Plaintiff replied that there was no conflict and reiterated that he had agreed to complete the work as directed.

349. Further describing the interaction, the Plaintiff added that while he was collecting the video equipment, Mr. Marcello's manner changed and he began to approach him physically. The Plaintiff stated that this caused concern, and prompted him to retreat further into the locker room.

350. Following the Plaintiff's account, Ms. Stores turned to Mr. Marcello and requested his response.

351. When prompted by Ms. Stores, Mr. Marcello explained that the video content in question was a recurring weekly social-media feature.

352. Further describing the workflow, Mr. Marcello added that the segments were normally produced each week, and occasionally every other week during the summer when cadets were not on campus.

353. Addressing the period in question, he maintained that the Plaintiff had not produced a segment for approximately five weeks, and characterized this as an excessive delay.

354. He further recounted approaching the Plaintiff in his office to ask whether he planned to resume production, and said the Plaintiff replied that he was not.

355. Mr. Marcello concluded his remarks by emphasizing that the project was a sponsored segment that could not be delayed further.

356. As the session progressed, the discussion briefly addressed communication practices before transitioning to the topic of procurement.

357. To begin outlining the procurement process, the Plaintiff stated that he spoke with Mr. Marcello regarding the procedures for making purchases to replace faulty equipment.

358. Continuing his explanation, the Plaintiff stated that he reviewed a list of items previously identified by the Plaintiff's predecessor for replacement during his assessment period.

359. Expanding on the procurement timeline, the Plaintiff stated that Mr. Marcello deferred purchasing decisions until after his arrival.

360. He further explained that as part of his assessment, he evaluated the existing equipment and determined that many items required maintenance rather than replacement.

361. As a result of his evaluation, the Plaintiff explained he redirected focus towards repairing available equipment, and replacing audio and video cables to maintain operational functionality.

362. The Plaintiff concluded this portion of his explanation by noting that these actions led to continued troubleshooting discussions between himself and Mr. Marcello.

363. Addressing the Plaintiff's statement, Ms. Stores asked Mr. Marcello whether any changes had occurred regarding the budget or spending limits he initially communicated to the Plaintiff.

364. Responding to Ms. Stores' inquiry, Mr. Marcello stated that he had reviewed the list of equipment needs prepared by the previous Director of Athletic Multimedia, but wanted whoever filled the role to identify new priorities.

365. He explained that the department had made large purchases at the start of previous fiscal years to address urgent equipment failures.

366. Adding to his explanation, Mr. Marcello stated that funds could not be spent freely and emphasized the need for strategic planning to preserve the budget for emergencies.

367. Seeking clarification, Ms. Stores asked Mr. Marcello if he had communicated that explanation to the Plaintiff.

368. Responding to Ms. Stores' question to Mr. Marcello, the Plaintiff responded by stating that Mr. Marcello had not shared that information. He added that had it been communicated, he would have agreed with parts of the explanation.

369. Following the Plaintiff's response, Mr. Marcello expanded his remarks to address budget constraints, procurement procedures, and general operational expectations.

370. At this point in the meeting, Ms. Stores acknowledged that tension existed between the parties and stated that a resolution would require mutual participation.

371. Referencing the Plaintiff's written statement, she stated that the current organizational structure required the Plaintiff to report directly to Mr. Marcello and noted that no changes had been made in the Athletics Department's reporting hierarchy. Ms. Stores confirmed that the structure had been reviewed and approved by the Superintendent and Chief of Staff and asked the Plaintiff whether he could continue working under Mr. Marcello's supervision.

372. In response to Ms. Stores's question, the Plaintiff stated that he could continue working under Mr. Marcello, but expressed concern regarding future treatment.

373. Elaborating on prior experiences, he stated that previous instances raised issues of misrepresentation and that he had discussed these matters with Mr. Walton.

374. The Plaintiff explained that his concern was not with the reporting relationship itself, but with how Mr. Marcello might act moving forward.

375. Following the Plaintiff's statement, the discussion transitioned to the events of October 30 and 31, 2024, centering on the differing accounts presented by the Plaintiff and Mr. Marcello. Both parties confirmed that the Plaintiff had informed Mr. Marcello of an upcoming Veterans Affairs appointment, but disagreed on the subsequent sequence of events.

376. After being questioned by Ms. Stores regarding the duration of his medical appointment, the Plaintiff explained that during this period, tensions escalated due to repeated directives from Mr. Marcello to complete a video project for an private alumni organization.

377. The Plaintiff stated that his workload was already strained due to ongoing operational failures, and that the editing process was complex.

378. He described Mr. Marcello's conduct as increasingly coercive during these interactions.

379. Clarifying what he meant by coercive behavior, the Plaintiff explained that Mr. Marcello's conduct involved verbal accostment and an aggressive tone when expressing frustration.

380. He stated that Mr. Marcello often issued directives in a stern and forceful manner, including demands for immediate completion of tasks.

381. The Plaintiff added that Mr. Marcello frequently escalated routine matters by linking unrelated issues together, and noted that he would use this to berate him.

382. Ms. Stores questioned the Plaintiff about the cause of Mr. Marcello's frustration, and suggested it could relate to broadcast delays or accountability concerns. The Plaintiff

explained that the disruptions resulted from longstanding technical failures and the department's lack of proper equipment, not neglect.

383. As the discussion continued, Ms. Stores asked about available repair options and suggested contacting maintenance staff for support. She further recommended that the Plaintiff seek additional assistance, and concluded that his statements indicated he was overextended in his responsibilities.

384. During his explanation, the Plaintiff described his general work routine as beginning in the morning and varying based on operational requirements.

385. As he continued describing his routine, he stated that on event-preparation days the tasks included creating game graphics, arranging visual elements, and formatting assets to meet broadcast and transmission standards.

386. The Plaintiff concluded his statement by informing Ms. Stores that his video editing assignments often required working into the early morning hours to complete deliverables.

387. Following his explanation, Ms. Stores asked the Plaintiff whether he needed an apprentice.

388. In response to Ms. Stores's question, the Plaintiff stated that having an apprentice would be beneficial due to the physically strenuous nature of broadcast operations. He further explained that during the setup process, he ensured both he and his staff remained within their physical limitations while performing their duties.

389. As the discussion continued, Ms. Stores stated that she was unfamiliar with the Plaintiff's job duties and was collecting information to understand his responsibilities.

390. Following Ms. Stores's statement, Mr. Marcello responded by stating that the Keydet Club video project had been on the Plaintiff's radar since late September, and by early October nearly all required materials were collected.

391. He said the Plaintiff had about a month to complete the project but had not provided a draft.

392. Mr. Marcello added that he and his assistant had gathered some of the footage because the Plaintiff was unable to attend one of the events.

393. Concluding his remarks, Mr. Marcello stated that this reflected a broader pattern of missed assignments that required others to assist in gathering materials.

394. During this portion of the discussion, Mr. Walton sought clarification regarding the video project under review. He asked whether the project in question was associated with the Keydet Club, and Mr. Marcello confirmed that it was.

395. Mr. Walton then acknowledged the clarification and noted that the project was for an external organization in connection with the Keydet Club's scholarship luncheon event. He added that the video was intended to accompany the scholarship luncheon program.

396. In response to Mr. Marcello's remarks, the Plaintiff stated that on October 3, 2024, a catastrophic equipment failure occurred that required three days to repair, and did not fully resolve until approximately 30 minutes before the October 11, 2024 broadcast.

397. To clarify the record, Ms. Stores asked the Plaintiff to identify the individuals who provided the information he referenced.

398. The Plaintiff responded to Ms. Stores' question by stating that Mr. Walton, Mr. Marcello, and others within the department were aware of the ongoing operational failures.

399. Ms. Stores then asked the Plaintiff whether anyone had offered suggestions or assistance.

400. The Plaintiff replied that there was no available support during the initial period despite his repeated requests. He stated that Ms. Fulton and Mr. Marcello later contacted cadets to assist for one day. The Plaintiff explained that the cadet assistance allowed him to complete repairs approximately thirty minutes before the broadcast was scheduled to transmit.

401. Following the Plaintiff's explanation, Mr. Walton asked him to confirm whether the issue he described referred to the stream being canceled.

402. In response to Mr. Walton's question, the Plaintiff confirmed that the malfunction caused the broadcast cancellation. He explained that once the damaged equipment was retrieved, the department began experiencing significant technical failures that required him to focus his time on maintaining ESPN transmission capability. He stated that he repeatedly requested assistance, but the support he received did not match his requests.

403. After hearing the Plaintiff's response, Ms. Stores suggested that the assistance he requested may not have been available. She added that she did not fully understand the Plaintiff's job duties and suggested that the assistance provided may not have aligned with the Plaintiff's needs. She further stated that the situation may have limited the type of support that could be offered.

404. Mr. Walton began to explain that the Plaintiff and Mr. Marcello both met with him privately, and that he was made aware that a stream was going to have to be cancelled.

405. Expanding on the circumstances, he explained that canceling a broadcast was unusual, so he sought to understand the reason for the cancellation and whether the issue was temporary or indicated a longer-term problem.

406. He further stated that after speaking with the Plaintiff, he learned that damaged broadcast cables and other equipment issues contributed to the disruption. He also described his role as gathering information from both the Plaintiff and Mr. Marcello to determine what solutions were available and whether funding could support the necessary repairs.

407. Expanding on the operational impact, Mr. Walton explained that maintaining high-quality broadcasts was essential because fans, alumni, parents, and prospective recruits relied on ESPN+ streams, and equipment failures resulted in complaints. He stated that the Plaintiff made him aware of the operational concerns, and he attempted to determine what could be done. He said that because he lacked the same technical expertise as the Plaintiff or Mr. Marcello, he relied on them for the details and focused on how the department could support the needed repairs or improvements.

408. Turning to the reporting structure issue, Mr. Walton noted that the Plaintiff had asked whether his reporting structure could be reassigned so that he reported to Mr. Walton instead of Mr. Marcello. He explained that he considered the request but maintained that External Operations staff should continue reporting to Mr. Marcello.

409. Concluding his remarks, Mr. Walton stated that the Plaintiff had made him aware of the concerns he raised, and that he considered them when determining what he believed was the appropriate course of action.

410. Building on Mr. Walton's remarks, Mr. Marcello stated that the first broadcast failure was caused by equipment conditions he had previously raised concerns about.

411. According to his explanation, he had warned over the summer about cables being exposed to weather and asserted that this exposure ultimately caused the failure.

412. He further noted that rain had contributed to the issue and pointed out that cables had been run through a window where they became pinched.

413. He concluded by stating that he had voiced concerns about the setup and exposure risks in the press box, but that the Plaintiff had indicated the conditions were acceptable.

414. Turning to procurement-related concerns, Mr. Marcello stated that the equipment the Plaintiff identified as necessary had already been ordered.

415. He asserted that it would have arrived sooner had the Plaintiff not attempted to place an order without approval.

416. Expanding on that point, he stated that the Plaintiff attempted to submit an order of more than eleven thousand dollars through Mr. Nichols and Ms. Fulton, and that both informed the Plaintiff no purchase could be processed without his approval.

417. He characterized this sequence as an attempt to bypass his authority and asserted that it delayed the ordering process.

418. Continuing his explanation, Mr. Marcello stated that the Plaintiff would have had the necessary equipment if he had followed proper procedures and included his supervisor, but that the process was delayed because he did not.

419. He concluded that staff members who regularly assist with broadcasts questioned why cameras were being tested and connected only thirty minutes before kickoff. He stated that equipment failures should be identified earlier and not discovered minutes before the event.

420. Following Mr. Marcello's statement, the Plaintiff asked for permission to respond, and Ms. Stores allowed him to proceed.

421. The Plaintiff stated that early in the procurement discussions he asked Mr. Marcello for guidance on the purchase process.

422. He explained that Mr. Marcello told him that purchases over ten thousand dollars required approval outside his authority, and that purchases under ten thousand dollars could be submitted directly to Mr. Nichols.

423. The Plaintiff stated that after gathering the vendor quotes, Mr. Marcello instructed him to submit the selected quote to Mr. Nichols.

424. He concluded by noting that this differed from what Mr. Marcello had stated during the meeting.

425. Clarifying the protocol, Ms. Stores responded that a purchase of that amount required Mr. Marcello's approval under standard protocol.

426. The Plaintiff reaffirmed his prior statement and reiterated that he had been instructed to submit the request to Mr. Nichols and to proceed based on that direction.

427. Ms. Stores reiterated the procedural requirement that the request should have gone through Mr. Marcello, and the Plaintiff concluded that he believed he had been misled due to receiving conflicting instructions.

428. The Plaintiff addressed Ms. Stores' statement by concluding he believed he had been misled by his leadership because he acted based on instructions that conflicted with established procedures.

429. Following the Plaintiff's remarks, the discussion remained on the topic of procurement and the differing accounts provided by the parties.

430. As the discussion progressed, Ms. Stores stated that the underlying issue was a communication problem between the Plaintiff and Mr. Marcello. She emphasized that communication had been a major concern and then directed the conversation to the Plaintiff's recent time off.

431. Ms. Stores moved to a different topic and noted that the Plaintiff requested additional time off after his initial absence, and added that during their phone call on October 31, 2024, he had said the request was based on fearing retaliation. She informed the Plaintiff that this was not a valid basis for approving leave and added that Mr. Walton, as his supervisor, was responsible for authorizing his time off.

432. Following Ms. Stores' explanation regarding leave authorization, the Plaintiff clarified that he had contacted Mr. Walton earlier that morning but received no further response after a brief exchange.

433. The Plaintiff continued his account and explained that he requested emergency leave because the circumstances had escalated, and it created a situation he believed required him to step away for his safety and well-being.

434. After a brief discussion of the Plaintiff's remarks, the conversation returned to communication requirements and expectations.

435. Ms. Stores began explaining that individuals in leadership positions are required to review and respond to emails regularly, and emphasized that responding only when time permits is not acceptable.

436. She stated that individuals in leadership positions are required to review and respond to emails regularly, and emphasized that responding only when time permits is not acceptable. She explained that senior leadership expects timely communication from staff in leadership roles.

437. In summarizing her observations, Ms. Stores stated that significant tension existed between the Plaintiff and Mr. Marcello, and that the two did not appear to be functioning as a team. She emphasized that the professional gap between them needed to be addressed before progress could occur.

438. The Plaintiff responded to Ms. Stores by stating that he was willing to continue working under Mr. Marcello now that Ms. Stores and Mr. Walton were involved in mediation.

439. He explained that any future working relationship required assurance that no unjustified disciplinary actions would be taken against him.

440. Expanding on his point, The Plaintiff added that he had attempted to resolve the communication breakdown with Mr. Marcello previously, but had been unable to reach a remedy.

441. The Plaintiff explained that this ultimately led him to request emergency leave. He concluded that he had no objection to proceeding under a new plan of action, and that his concern was the possibility of repeated disciplinary action without justification.

442. Following the Plaintiff's explanation, Ms. Stores stated that retaliation was not permitted within the institution and that any such conduct would be addressed by her office.

443. She further explained that employees were required to complete their work and remain accountable for their responsibilities.

444. Ms. Stores additionally identified communication as the primary concern and stated that time management might also need improvement.

445. Ms. Stores noted that she did not know whether the Plaintiff's long work hours occurred every day or only during certain periods. She then asked what his routine looked like on days when he had downtime and stated that she could not imagine that his schedule followed the described pattern every day.

446. As the discussion turned to workload expectations, Ms. Stores proposed developing a structured schedule that would include downtime and stated that it could be at least one day a week.

447. In her assessment, Ms. Stores stated that she did not know all the specifics of the Plaintiff's responsibilities and only had a broad overview of his duties.

448. She advised that the Plaintiff and Mr. Marcello could determine an appropriate scheduling plan based on the demands of each week.

449. Ms. Stores concluded her statement acknowledging that there might be a week with no downtime and stated that working at full pace every day seemed excessive.

450. The Plaintiff responded to Ms. Stores' statement and explained that he ultimately submitted medical paperwork after reaching a level of exhaustion associated with routinely working hours that exceeded a normal workweek.

451. In concluding his explanation, the Plaintiff stated that the video project required sustained work over extended periods and included prolonged editing hours within a condensed timeframe.

452. Responding to the Plaintiff's remarks, Ms. Stores stated that the Plaintiff and leadership would need to determine an appropriate work schedule.

453. Expanding on potential support options, she recommended considering the use of a part-time cadet for regular assistance.

454. She added that this option could offer a student a potential career opportunity.

455. Shifting to equipment-related concerns, Ms. Stores stated that she could not intervene in equipment replenishment decisions.

456. She explained that those decisions were the responsibility of departmental leadership.

457. Ms. Stores clarified the department's decision-making procedures and stated that leadership must determine whether new equipment should be purchased, or whether the existing equipment was sufficient to support reliable streaming.

458. Returning to the topic of administrative requirements, she concluded by stating that time off could not occur without prior approval from leadership.

459. In response to Ms. Stores' emergency leave remarks, the Plaintiff reiterated that he notified Mr. Walton.

460. In response to the Plaintiff's remark, Mr. Walton explained that after receiving the Plaintiff's email requesting vacation time for concerns about retaliation, he asked the Plaintiff to provide the correspondence between the Plaintiff and Mr. Marcello to understand the situation.

461. Outlining his actions, Mr. Walton explained that he also sought clarification on the length of the Plaintiff's absence, and whether he would be available for the upcoming football game.

462. Concluding his statement, Mr. Walton said that after the Plaintiff informed him he would not be present and intended to remain out through the end of the week, he approached Mr. Marcello to ask whether he was aware of the request or had approved it.

463. In response, Ms. Stores stated that no leave request had been approved, and Mr. Walton confirmed that he had not approved.

464. Mr. Walton continued his statement that after receiving the Plaintiff's email, he sought clarification about the situation and asked Mr. Marcello what was occurring.

465. As he continued his explanation, Mr. Walton stated he understood the Plaintiff to be in a situation where he felt he needed medical intervention.

466. Mr. Walton added that he asked Mr. Marcello whether the department was prepared for the Plaintiff's absence.

467. Following Mr. Walton's statement, Ms. Stores addressed the Plaintiff and stated that the Plaintiff's email served two functions: it informed Mr. Walton that he would not be present and simultaneously requested time off. She explained that the proper procedure was to request whether leave was possible so that approval could be granted. She added that an employee should not inform a supervisor that they are taking time off without prior authorization.

468. In response to Ms. Stores' statement, the Plaintiff stated that due to the circumstances and the acute stress and physical symptoms he was experiencing, he made

an attempt to notify leadership to the best of his ability. He clarified that he was not in a position to provide a more detailed or measured explanation at that time.

469. Ms. Stores stated that moving forward, the Plaintiff needed to request additional time off rather than notifying staff after already being absent. She emphasized that the Plaintiff was required to communicate directly with his supervisor regardless of the reason. She explained that Mr. Walton was not the Plaintiff's direct supervisor, and that Mr. Walton relied on Mr. Marcello for information. She stated that when Mr. Marcello could not answer his questions because he had not been informed, the lack of available information reflected negatively on the department.

470. Ms. Stores stated that communication between the Plaintiff and Mr. Marcello was imperative, and emphasized that Mr. Marcello's communication was equally essential. Ms. Stores indicated that she was unclear about the tone the Plaintiff described because she had not personally heard it. In her explanation, she stated that her own tone could sometimes sound gruff or short when she was frustrated or under pressure from senior leadership. She added that she did not know whether similar circumstances applied here. She continued her statement by noting that staff should be civil to each other but acknowledged that communication does not always come across as intended.

471. As she continued her statement, Ms. Stores explained that supervisors may occasionally speak in a stern manner to convey urgency, and that a stern tone did not necessarily indicate hostility. She added that individuals interpret communication differently and reiterated that she was not present for the interactions at issue. Building on her point, she stated that employees should be mindful of how they speak to one another because people may react differently to the same message. She explained that apologies

are sometimes appropriate when external stress affects delivery. Expanding on the issue, she stated that the parties involved could determine whether an apology was warranted.

472. Ms. Stores continued her statement and added that workload demands may contribute to communication that appears abrupt, but she could not determine what occurred because she was not present. Continuing her guidance, she instructed the parties to be mindful of the content of their communication and stated that email should not be their sole form of contact. She emphasized the importance of in-person communication, and she advised the parties to remain courteous during meetings and mindful of their body language. Ms. Stores concluded by asking Mr. Marcello whether he could work with the Plaintiff.

473. Following Ms. Stores' prompt for a response, Mr. Marcello stated that he would need the Plaintiff to be present for duty and perform his responsibilities.

474. Ms. Stores acknowledged Mr. Marcello's statement and indicated that it was a reasonable request.

475. After acknowledging Mr. Marcello's expectations, she turned to the Plaintiff and asked whether he was being receptive to Mr. Marcello's expectations.

476. Addressing Ms. Stores' question, the Plaintiff stated that he had been performing his job duties and that it was unfair for Mr. Marcello to claim otherwise.

477. He explained that he was stretched thin because he prioritized maintaining broadcast operations over producing social-media videos.

478. The Plaintiff concluded his statement by adding that he wanted acknowledgment that he was fulfilling his responsibilities.

479. Following the Plaintiff's remarks, the discussion shifted to the parties' conflicting interpretations of the underlying events.

480. Ms. Stores addressed the overall atmosphere and stated that there was still significant tension between the parties, and Mr. Walton agreed with her assessment.

481. As the mediation continued, Mr. Marcello returned to the issue of the Plaintiff's office assignment.

482. He stated that several staff members had reported that the Plaintiff did not want to broadcast from his office.

483. Mr. Marcello provided Ms. Stores with historical context and explained that the Plaintiff's office had traditionally served as the basketball control room, and staff expected broadcasts to continue from that location.

484. As he expanded on the issue, Mr. Marcello stated that the department completed multiple broadcasts while the Plaintiff was out, and added that conflicting schedules prevented a meeting with the Plaintiff until the present session.

485. Mr. Marcello concluded by noting that the broadcast crew had completed an event the evening prior, and that the department sought to avoid interference with its operations.

486. The Plaintiff responded to Mr. Marcello's statement and disagreed with his interpretation of events.

487. He stated that Mr. Marcello had accused him of intentionally disrupting broadcast transmissions and believed this contributed to unfair disciplinary treatment.

488. Expanding on his position, he stated that being removed from his office felt punitive because Mr. Marcello had repeatedly attributed broadcast issues to him.

489. The Plaintiff concluded his statement by stating that his experience of the work environment differed from Mr. Marcello's account and that he documented the condition of his workspace after the removal from his office.

490. Mr. Walton began to address the matter by providing information that closely aligned with Mr. Marcello's explanation, and added that Mr. Marcello asked him for input on how to proceed once they knew a meeting was scheduled with Ms. Stores. He further explained that he suggested placing the Plaintiff in a temporary workspace so the Plaintiff could continue to carry out his responsibilities until the meeting took place.

491. As the meeting was beginning to conclude, Ms. Stores explained that the issues discussed in the meeting remained unresolved and that significant tension remained between the parties. She added that she did not expect an immediate resolution but emphasized that all participants were required to maintain civility.

492. Ms. Stores continued her closing remarks and emphasized that professional respect was required even without personal rapport. She instructed all parties to remain present for their assignments and to monitor the tone of their interactions. She stated that if concerns arose, Mr. Marcello would contact H.R., and that any documentation created by H.R. would be for managerial purposes. She clarified that the Plaintiff would be included in any related discussions. She added that retaliation concerns did not prevent supervisors from addressing performance or conduct issues and stated that leadership was required to manage those issues appropriately.

493. Ms. Stores reiterated that the Plaintiff was required to direct all concerns to Mr. Marcello because he was the Plaintiff's supervisor. She stated that personality conflicts did not alter the supervisory chain.

494. Turning to Mr. Marcello, she advised him to remain mindful of how employees receive information, and noted that some individuals may be more sensitive to tone or manner of communication. She clarified that supervisors are not required to investigate personal histories, but they must remain aware of how their communication is interpreted.

495. Additionally, she instructed both parties to prioritize direct verbal contact and avoid relying solely on email or text messages.

496. Ms. Stores noted that the conflict remained unresolved and that additional work would be necessary. She added that either party could return to Human Resources for further mediation if needed.

497. Addressing workload and staffing concerns, Ms. Stores recommended evaluating whether additional assistance was necessary and suggested that the Plaintiff provide written updates to Mr. Marcello to document his workload and responsibilities.

498. She concluded by directing the Plaintiff to submit all leave requests in writing so approvals could be documented and tracked. She also clarified that equipment and budgeting matters fell under departmental authority and that she did not have decision-making input on those issues.

499. The session ended with confirmation that the Plaintiff would return to the supervision of Mr. Marcello and his previously assigned office pending leadership approval.

500. On the afternoon of November 13, 2024, the Plaintiff went to the office of the Deputy Superintendent for Finance and Support to report a matter of public concern involving the misuse of public resources carried out in coordination and close association with a private charity.

501. At the time, the Deputy Superintendent for Finance and Support Dallas Clark was unavailable.

502. Colonel Jeffrey Boobar advised the Plaintiff to contact either Mr. Clark's secretary or Mr. Clark directly to schedule a meeting to address his concerns.

503. On the evening of November 13, 2024, the Plaintiff received an email from Mr. Marcello with additional directives and deadlines following their Human Resources meeting earlier that day.

504. The correspondence set forth additional expectations that required the Plaintiff to check in between 8:30 and 9:00 a.m. every morning, and if Mr. Marcello was unavailable, to confirm his arrival with Mr. Whitehead or Mr. Barbee.

505. Mr. Marcello informed the Plaintiff that they would meet within the next few days to finalize broadcast procedures moving forward, and directed the Plaintiff to continue working on assigned creative projects and to resume his normal day-to-day office duties.

506. The assigned projects and deadlines issued by Mr. Marcello are as follows:

a. Basketball Hype Video – Need to see a draft 11/15, Final Product 11/18
b. Football Hype video – Draft 11/20, Final Product 11/21

507. On the morning of November 14, 2024, the Plaintiff emailed Mr. Clark to request a meeting regarding a sensitive matter.

508. The Plaintiff stated in his email that he did not feel comfortable detailing the issue over email. He added that he had visited the office the prior afternoon, and was advised by Colonel Boobar to send the request that morning.

509. Shortly after, Mr. Clark emailed the Plaintiff informing him that a meeting had been scheduled.

510. On the evening of November 14, 2024, Mr. Marcello provided the Plaintiff with additional directives in the same email correspondence chain from the previous evening.

511. Mr. Marcello began his email by instructing the Plaintiff that during business hours, his office door was required to remain open unless he received specific approval from Mr. Marcello to close it.

512. Additionally, he instructed the Plaintiff to provide a draft of the basketball hype video by close of business the following day, and the final version by close of business on Monday, November 18, 2024.

513. As he continued his directive, Mr. Marcello stated that the Independent Contractor would assist with packing and moving equipment from the basketball broadcast to the football venue, and instructed the Plaintiff to follow the Independent Contractor's lead with the move to be completed by close of business on November 18, 2024.

514. Mr. Marcello's final directive instructed the Plaintiff that the wrestling setup needed to be completed by November 21 at close of business.

515. He directed the Plaintiff to follow the Independent Contractor's lead for the Friday wrestling broadcast.

516. At the conclusion of his email, Mr. Marcello informed the Plaintiff that the Independent Contractor would also direct the November 23, 2024 football broadcast, after which the situation would be reassessed.

517. On the morning of November 18, 2024, the Plaintiff met with Mr. Clark and Colonel Boobar to report a matter of public concern regarding the use of institutional facilities and resources in connection with VMI and an alumni-affiliated organization.

518. After a brief discussion, Mr. Clark introduced himself to the Plaintiff, and noted that the Plaintiff had initiated contact with him.

519. Before the meeting began, Mr. Clark informed the Plaintiff that Human Resources no longer reported to him for personnel matters if this was the concern he wanted to address.

520. The Plaintiff formally introduced himself to Mr. Clark and Colonel Boobar, and provided them with a summary of his background, education, military service, and professional experience before addressing the purpose of the meeting.

521. As the Plaintiff concluded his background, he informed Mr. Clark that he assumed his role at the institution in March and explained that he had identified waste of departmental resources, conflicts of interest, retaliatory conduct following those discoveries, and a potential bribery scheme involving a private charity.

522. In response to the Plaintiff's disclosure, Mr. Clark requested clarification regarding the term the Plaintiff had referenced.

523. The Plaintiff referred to his second edited version of "*Addressing Managerial Challenges and Operational Analysis*", and informed Mr. Clark that it included annotated key items and information for his review.

524. He explained that he took steps to prevent lapses in production as departmental conditions worsened, and his conflict with his supervisor increased.

525. As he continued his statement, the Plaintiff informed Mr. Clark that he was producing a video for the Keydet Club. He added that he discovered that the Keydet Club offers a donor courtesy reward system, and that a $10,000 donation provided direct access to the Athletics Director.

526. In response to the Plaintiff's statement, Colonel Boobar asked whether the Plaintiff's discovery was connected through the Keydet Club.

527. The Plaintiff continued his explanation and stated that donor benefits through the Keydet Club included direct access to the Superintendent at the $40,000 level.

528. He explained that the Keydet Club is a private 501(c)(3) organization outside the institution's chain of command.

529. Mr. Clark responded to the Plaintiff's disclosure and acknowledged the close relationship between VMI and its affiliated private organizations: the VMI Foundation, the Keydet Club, and the VMI Alumni Agencies.

530. He added that despite the close relationship, VMI and the affiliated private organizations remained separate from each other.

531. As he continued his remarks, Mr. Clark asked the Plaintiff to identify the specific activities he had observed and stated that he could see how those activities might reflect improper influencing factors.

532. The Plaintiff began addressing Mr. Clark's question by explaining that the issue began when his supervisor directed him to create a video for the Keydet Club.

533. Expanding on the events, the Plaintiff stated that the department was experiencing significant technical problems that led to three canceled broadcasts, yet his supervisor prioritized the Keydet Club video over addressing those failures.

534. He explained that he believed his duties as a state employee required prioritizing institutional operations.

535. As he continued his explanation, the Plaintiff stated that his supervisor insisted on completing the video and became increasingly coercive as delays occurred.

536. The Plaintiff stated that he discovered an athletics staff member with a Keydet Club leadership sticker on her vehicle who oversees the Director of Business Finance, and noted that the football budget exceeded $200,000 without explanation.

537. He concluded his disclosure by adding that her dual role within the Keydet Club and the institution presented an additional conflict of interest.

538. In response to the Plaintiff's statement, Colonel Jeffrey Boobar asked whether the individual referenced was Ms. Fulton, and the Plaintiff confirmed that it was.

539. Colonel Boobar then asked the Plaintiff what role Ms. Fulton held within the Keydet Club.

540. The Plaintiff responded to Colonel Boobar that he had only observed a Keydet Club leadership sticker on her vehicle, and did not know the full scope of her position.

541. In response to the Plaintiff's disclosure, Mr. Clark stated that the sticker is consistent with Ms. Fulton's donor giving level, and asked whether there were any additional concerns related to it.

542. The Plaintiff addressed Mr. Clark's question by stating that the staff member oversaw the director of finance and that the department had exceeded its budget.

543. He added that the Keydet Club offered additional donor-tiers with various benefits, and explained that he had limited information about those operations.

544. As he concluded his statement, the Plaintiff noted that further conflicts existed within the organization, but emphasized that his primary purpose was to bring these concerns to Mr. Clark's attention.

545. Responding to the Plaintiff, Colonel Boobar asked whether an employee of the institution was permitted to be affiliated with the external organization in question. He requested clarification on whether such involvement posed an issue given the circumstances the Plaintiff described.

546. The Plaintiff stated that the involvement of the Keydet Club created potential conflicts of interest. He explained that responsibilities between the institution and the external organization had become blurred and created an overlap that risked merging priorities without clear distinction. He noted that although the organizations were nominally separate, their coordinated activities suggested a lack of practical separation.

547. As he concluded his remarks, the Plaintiff added that this was concerning because the institution is publicly and federally funded, and that insufficient separation could lead to additional conflicts of interest.

548. Following the Plaintiff's statement, Mr. Clark declined to review the Plaintiff's document.

549. He explained that his office would likely be subject to review in connection with an Inspector General inquiry and he did not want to interfere with that process.

550. Instead Mr. Clark offered to escort the Plaintiff to VMI's Office of the Inspector General to provide his account and submit his documentation.

551. Once the meeting concluded, the Plaintiff was escorted to VMI's Office of the Inspector General by Mr. Clark for a formal introduction to the Deputy Inspector General, Anna Honig.

552. During the introduction, Mr. Clark provided a brief synopsis.

553. He stated that the matter involved issues related to waste, fraud, and abuse, and that his office was directly implicated in those concerns.

554. As his introduction continued, Mr. Clark informed Ms. Honig that the Plaintiff worked in athletics.

555. Mr. Clark further explained that the concerns involved financial lines for which his own office would likely be investigated.

556. Mr. Clark added that he did not want to take possession of the Plaintiff's documents, and instead sought to formally introduce the Plaintiff so the Office of the Inspector General could determine the next appropriate steps.

557. To conclude the introduction, Mr. Clark noted the Plaintiff's background as a United States Army veteran with extensive professional experience in multimedia.

558. After a brief informal discussion, the Plaintiff explained that upon arriving at VMI he observed widespread equipment damage and improper setup caused by negligence and inexperience.

559. The Plaintiff stated that when he attempted to replace essential items needed to maintain broadcast capability, he encountered resistance from his direct supervisor.

560. Ms. Honig asked the Plaintiff to identify his direct supervisor, and he responded that it was Phil Marcello, the Associate Athletic Director of External Communications.

561. As he began his account, the Plaintiff stated that broadcast conditions deteriorated and reached an inflection point on October 31 while he was away for a Veterans Affairs appointment.

562. He explained that internal operations were failing, several broadcasts had already been canceled, and his supervisor's attention remained fixed on a fundraising video project for a private charity that fell outside of the department's jurisdiction.

563. As the Plaintiff continued his disclosure, he informed Ms. Honig that Human Resources became involved and directed him to submit a written statement.

564. The Plaintiff informed Ms. Honig that following the drafting of his written statement he expanded the document, and in the process identified major conflicts of interest between VMI and the private charity.

565. He concluded his disclosure and stated that the charity operated donor courtesy tiers that functioned as a potential bribery scheme, and explained that these tiers included a ten-thousand-dollar contribution to secure a meeting with the Athletics Director and a forty-thousand-dollar contribution to secure a meeting with the Superintendent.

566. Ms. Honig asked how the Plaintiff learned of the information, and the Plaintiff replied that he found it on the organization's website.

567. Ms. Honig asked the Plaintiff whether he had spoken with Mr. Walton regarding the concerns he raised.

568. The Plaintiff stated that he sought resolution through all available channels with his direct supervisor and later escalated them to Mr. Walton when the issues persisted.

569. When neither step resolved the matter, Human Resources became involved.

570. The Plaintiff concluded his statement by saying that Ms. Stores was accusatory toward him and lacked impartiality during their meeting, and that the meeting ended without resolution.

571. In response to the Plaintiff's disclosure, Ms. Honig stated that she would consult with the Inspector General to determine whether the matter should remain internal or be referred to the State Office of the Inspector General.

572. She explained that the state office conducts independent investigations into fraud, waste, and abuse, and depending on the severity, may either retain the case or return it to VMI's internal office with limited oversight.

573. As she continued her statement, Ms. Honig added that another option was to file through the Department of Human Resource Management's employee relations process, and stated that she might involve the Chief of Staff, Colonel (Ret.) Gary Bissell, to provide his perspective on the matter.

574. Ms. Honig concluded that the relationship between the private charities and the athletics department was convoluted, and historically entrenched.

575. She cautioned that although the Plaintiff's concerns were not unfounded, pursuing the matter would be an arduous process.

576. Ms. Honig requested to review the Plaintiff's document, and the Plaintiff formally submitted it for official review and consideration.

577. The Plaintiff added that he included publicly available Keydet Club IRS Form 990 records detailing assets and related information.

578. As the meeting began to conclude, Ms. Honig informed the Plaintiff that the Inspector General was in another meeting and would not be available until later in the day.

579. The Plaintiff informed Ms. Honig that he would be available for further questioning, and provided his contact information.

580. Ms. Honig requested to retain the Plaintiff's report for review, and informed the Plaintiff that the likely outcome would be a referral to the State Office of the Inspector General.

581. She concluded her statement by adding that she would first confer with the Inspector General directly since the matter had been referred directly by Mr. Clark.

582. The document the Plaintiff provided to the Office of the Inspector General was the second edition of "*Addressing Managerial Challenges and Operational Analysis*".

583. This version expanded upon the initial draft submitted to Human Resources and incorporated: External Organizations and VMI; Risk and Impact to the Institution; Table of Contents; and Keydet Club Donor Courtesy Levels and Descriptions.

584. Within the External Organizations and VMI section, the Plaintiff documented his concerns in the following excerpt:

"VMI's support for professional relationships with alumni organizations plays a key role in strengthening its network and demonstrating to future alumni that the institution values these connections. These affiliations can promote opportunities that enhance VMI's mission and contribute to its overall success. However, when current employees hold dual roles in both an alumni organization and a leadership position within VMI, potential ethical and legal risks must be acknowledged. Overlapping

affiliations increase the risk of conflicts of interest, which can affect the institution's reputation, financial integrity, and allocation of resources.

Specifically, these dual roles carry a heightened likelihood of scenarios involving misappropriation of funds, procurement fraud, bribery, inappropriate allocation of donations and grants, favoritism in hiring and promotions, inaccurate financial reporting, misuse of state resources, and insider transactions."

585. The Plaintiff included the Keydet Club Donor Courtesy Levels and Descriptions in Appendix A of the document.

586. The Keydet Club Donor Courtesy Levels and Descriptions are as follows:

Donor Levels:

- *KEYDET*: $2k-$4.9k
- *LETTERMAN: $5k-$9.9k*
- *ALL-CONFERENCE: $10k-$19.9k*
- *ALL-AMERICAN: $20k-$39.9k*
- *HALL OF FAME: $40k+*
- Donor Courtesy Descriptions:
- *Exclusive Athletic Communications*: Donor will receive periodic communications from the Keydet Club detailing the latest in VMI athletic schedules, results, and important updates.
- *Football Parking (Parade Ground/Overflow)*: Donor will receive a pass providing first-come, first-serve access to Parade Ground and overflow lot parking for home football games.

- *Basketball Parking (CPTF)*: Donor will receive a pass providing first-come, first-serve access to the parking garage under the Corps Physical Training Facility (adjacent to Cameron Hall) for home basketball games.
- *Gameday Socials*: Donor will be granted access to gameday social events, including football tailgates and basketball halftime socials.
- *Annual Leadership Outing*: Donor and spouse/significant other will receive an invitation to the annual Keydet Club Leadership Outing.
- *Exclusive KC Apparel Shop*: Donor will receive exclusive access to an online Keydet Club apparel shop where they can purchase Keydet Club swag. This access is offered during a designated window of time at the beginning of the athletic season, and costs are discounted through a partnership with BSN Sports.
- *Complimentary Football/Basketball Tickets*: Donor will have the option to reserve complimentary tickets for whichever home football and basketball contests they would like to attend. Quantity of complimentary tickets is dependent upon leadership level.
- *Football Parking (Stadium)*: Donor will receive a pass providing first-come, first-serve access to the stadium parking lot for home football games.
- *VMI Athletics Kick-Off Party*: Donor and spouse/significant other will be invited to attend the annual fall athletic Kick-O Party to enjoy fellowship

with other leadership members and to engage with cadet-athletes, coaches, and members of the administration.

- *Athletic Director's Circle*: Donor will be granted exclusive access to engage with VMI's athletic director including special invitations to periodic Zoom calls and other communications.
- *Ferebee Lounge Access*: Donor and a guest will be granted access to the amenities of Ferebee Lounge at home football games, including snacks, refreshments, and shelter from the elements.
- *Reserved Football Parking (Stadium)*: Donor will receive a pass providing reserved parking access to the stadium parking lot for home football games. The Keydet Club will coordinate the week of each home football game, and reserved spots will be designated with personalized signage.
- *Cadet-Athlete Scholarship Recognition*: Donor will receive fund representative recognition by being paired with the cadet-athlete(s) who benefit(s) from their extraordinary support. Benefactors will have the opportunity to connect with cadets at the annual Keydet Club Scholarship Banquet.
- *Superintendent's Special Guest (Football)*: Donor will be invited back to post for a home football game as a guest of the superintendent to attend a gameday luncheon and take in the football game from the superintendent's box seating.

- *Superintendent's Circle*: Donor will be invited to attend an exclusive, quarterly call with the superintendent where they will have unparalleled access to the latest VMI news.

587. Following the submission of his documentation, on November 19, 2024, the Plaintiff returned to the Office of the Inspector General to provide an expanded version of his account to the Inspector General, Colonel (VaARNG) Alyssa Astphan.

588. On the afternoon of November 19, 2024, Inspector General Colonel Astphan emailed the Plaintiff with further instructions should he wish to provide information to file a complaint through her office.

589. The instructions were as follows:

a. Subject(s) (Person you are alleging violated a policy, regulation, law, etc)
b. What Occurred (Dates, times, places, people involved, and policy violated)

590. On the morning of November 21, 2024, Mr. Walton requested a private meeting with the Plaintiff for a post-mediation update.

591. At the beginning of the meeting, Mr. Walton stated that he wanted to check in with the Plaintiff following their meeting with Ms. Stores approximately one week earlier. The Plaintiff responded that he was not doing well.

592. The Plaintiff responded to Mr. Walton's question and informed him that conditions worsened immediately following the HR meeting.

593. He explained that upon returning to the office, he asked Mr. Marcello for permission to work in another room due to the disorganized state of his office, but his

request was denied. Mr. Marcello instructed him to remain in his office despite the Plaintiff's objections.

594. Expanding on his account, the Plaintiff informed Mr. Walton that he opposed others setting up in his office because it was his personal workspace containing confidential materials such as quotes and internal spreadsheets. He added that upon returning, he discovered his personal items had been damaged and an article displayed on his wall had been removed.

595. The Plaintiff addressed the condition of his office, and stated that his article had been removed and placed on boxes and that his office was left in disarray, requiring him to reorganize before working.

596. He stated that upon returning to VMI after being placed on medical leave, his temporary workspace lacked a chair despite accommodations provided for his service-connected disabilities, and that Mr. Marcello placed him under heightened oversight by requiring frequent check-ins throughout the day.

597. The Plaintiff explained that prior to his removal, his assigned office workspace was specifically arranged to prevent aggravating his service-connected injuries.

598. He concluded his statement by noting that he felt isolated from colleagues, that Mr. Marcello repeatedly undermined and misrepresented his concerns, and that he had been removed from managing broadcasts without explanation.

599. After hearing the Plaintiff's update, Mr. Walton acknowledged his remarks before asking what assignments the Plaintiff had been working on since the previous Wednesday, what tasks he had completed, and the current overall status of his projects.

600. The Plaintiff explained that Mr. Marcello's conflicting directive prevented him from performing his duties, and created conditions that made successful completion of his tasks impossible.

601. The Plaintiff added that he raised the issue with Mr. Marcello, and stated that Mr. Marcello falsely claimed he had always had access despite prior written instructions explicitly prohibiting him from using the equipment.

602. In response to the Plaintiff's statement, Mr. Walton acknowledged his remarks before pivoting to inquire whether the Plaintiff's medical appointments were a recent development or previously established.

603. The Plaintiff responded to Mr. Walton's question by notifying him he had informed Mr. Marcello since the start of his employment that he is a disabled veteran and would have ongoing Veterans Affairs appointments.

604. The Plaintiff explained that he had attempted to follow the recent HR protocol to schedule leave for his Veterans Affairs appointments.

605. He stated that he had already canceled two appointments, and had two more scheduled for the upcoming week.

606. The Plaintiff concluded his answer by notifying Mr. Walton that he had previously informed Mr. Marcello of all related medical appointments.

607. Following the Plaintiff's answer, Mr. Walton acknowledged his remarks before requesting information regarding the upcoming schedules for wrestling and football, and whether he, Mr. Marcello, or anyone else had discussed those schedules.

608. The Plaintiff responded to Mr. Walton's statement by informing him that he was no longer involved in the broadcast process, and that the Independent Contractor was placed in charge over broadcast operations.

609. He continued explaining that no justification had been provided for his removal from oversight, and that all broadcast matters now went through the Independent Contractor.

610. The Plaintiff concluded his statement by notifying Mr. Walton that he was instructed to remain in his office and focus solely on assigned projects.

611. Mr. Walton acknowledged that the Plaintiff's explanation was reasonable before asking whether there had been any further communication with Ms. Stores since their last interaction.

612. The Plaintiff stated that he had emailed Ms. Stores to request the necessary leave form, but never received a response.

613. As he continued his remarks, the Plaintiff asked whether it would be acceptable for him to notify Mr. Walton and copy Mr. Marcello in an email regarding an upcoming Veterans Affairs medical appointment the following Monday.

614. The Plaintiff concluded his statement by informing Mr. Walton that his appointments were part of a consecutive treatment plan and that he had been forced to cancel two of those appointments.

615. The meeting progressed, and the Plaintiff stated that the work environment was becoming increasingly adversarial, and that he no longer felt comfortable leaving his office.

616. In response to the Plaintiff's statement, Mr. Walton asked whether the Plaintiff was referring solely to Mr. Marcello, or whether it extended more broadly within the department.

617. The Plaintiff answered Mr. Walton's question by stating that others in the department beyond Mr. Marcello were involved.

618. The Plaintiff added that he did not know what information or comments Mr. Marcello communicated to staff concerning his professional standing or reputation.

619. As he continued his explanation, the Plaintiff notified Mr. Walton that nothing had improved, and that the shift in how staff interacted with him was noticeable.

620. He concluded his statement by informing Mr. Walton that he now remained in his office because leaving it risked another confrontation with Mr. Marcello.

621. Mr. Walton explained that him and Mr. Marcello reporting to Human Resources together was merely coincidental.

622. He added that he was attempting to remain impartial to both parties, and to evaluate their respective positions.

623. Mr. Walton continued his statement and noted that although a week had passed since the HR meeting, he wanted to check in with the Plaintiff to ensure the best outcome for everyone involved.

624. He acknowledged that the situation was serious and might not be able to be remedied, and that any improvement would likely require a substantial amount of time to resolve.

625. Mr. Walton concluded his remarks by expressing that he did not want the Plaintiff to feel the way he did, and asked when the situation began to change.

626. The Plaintiff began answering Mr. Walton's question by explaining that the strain on his working relationship with Mr. Marcello began in August.

627. He explained to Mr. Walton that he had been unable to complete regularly scheduled social media content in August as he was preparing for the upcoming soccer and football broadcasts by himself or with the Independent Contractor while managing his daily tasks.

628. The Plaintiff described the isolated locker room incident, and explained that Mr. Marcello approached him slowly, displayed visible anger, and threatened him over the incomplete Watch Wednesday content despite being informed the day prior that he would complete the task as requested.

629. The Plaintiff added that the situation worsened, and that Mr. Marcello later accused him of sabotaging the October 3 2024 broadcast.

630. He continued his statement and added that Mr. Marcello made the accusation at the shared broadcast venue.

631. The Plaintiff stated that he denied the allegation, and reminded Mr. Marcello that he had been reporting the operational deficiencies since August or July of 2024.

632. As he concluded his statement, the Plaintiff informed Mr. Walton that Mr. Marcello was accusing him of intentionally causing the broadcast malfunction.

633. Following the Plaintiff's statement, Mr. Walton pivoted the discussion and asked the Plaintiff if there was an update on the leave request form.

634. The Plaintiff informed Mr. Walton that no such document was in circulation or existence.

635. Mr. Walton followed up on the Plaintiff's upcoming Veterans Affairs appointment and asked whether the Plaintiff had informed Mr. Marcello.

636. The Plaintiff informed Mr. Walton that he had not spoken with Mr. Marcello all week, and that their last email exchange on Monday indicated that he would be receiving a disciplinary reprimand.

637. He concluded his statement by stating that he had remained in his office throughout the week, and stated that he felt relief being able to step out briefly without being subjected to cold stares.

638. In response to the Plaintiff's statement, Mr. Walton acknowledged his remarks before asking whether the Plaintiff would feel comfortable with him communicating with Mr. Marcello as an intermediary regarding the upcoming appointment.

639. Mr. Walton continued his statement by returning to the administrative matter of the leave request form, and asked the Plaintiff to email Ms. Stores to request the document as he had not yet received it.

640. Responding to Mr. Walton's request, the Plaintiff confirmed that he would follow up with Ms. Stores.

641. Mr. Walton stated that Ms. Stores was the one who directed the Plaintiff to submit a leave request form during the mediation session.

642. He continued his statement and added that he would speak with Mr. Marcello regarding the Plaintiff's upcoming Veterans Affairs appointment, and noted that the appointment would lead into the Thanksgiving holiday.

643. Mr. Walton then shifted to address the prior instruction regarding office doors. He explained that both he and Mr. Marcello had recently learned that no department-wide

memo had been issued requiring staff to keep their office doors open, and stated that such a directive could not be selectively applied. He added that he had informed Mr. Marcello of this directive. Mr. Walton concluded his explanation by stating that his primary expectation was that assigned tasks be completed.

644. In response to Mr. Walton's statement, the Plaintiff inquired whether Mr. Walton wished to review the Plaintiff's video editing progress.

645. Mr. Walton declined to review the Plaintiff's video editing progress as he believed the Plaintiff was actively working on his assignments.

646. Mr. Walton then began to discuss the broadcast operations and stated that he did not believe assigning the Plaintiff to the Friday or Saturday broadcast events would be necessary given the circumstances. He explained that he did not want the Plaintiff placed in an environment where he might feel isolated or unwelcome, and noted that such conditions could increase operational pressure. Mr. Walton concluded by asking, on a personal level, whether the Plaintiff felt that his position at VMI was the best fit for him professionally.

647. In response to Mr. Walton's question, the Plaintiff stated that he did feel VMI was best for him because he had worked his way up into the role, and alleged that Mr. Marcello was attempting to coerce him to resign from his position by making the environment untenable for him to remain in the role.

648. The Plaintiff added that he perceived Mr. Walton's question as a suggestion to consider resigning from his role because circumstances were not proceeding favorably for the Plaintiff.

649. Mr. Walton responded to the Plaintiff's statement by explaining that he asked the question in an effort to understand the Plaintiff's concerns.

650. He explained that the Plaintiff had expressed feeling that others were against him, and that the Plaintiff and Mr. Marcello were not getting along.

651. Mr. Walton noted that the Plaintiff also had Veterans Affairs appointments to address in North Carolina, and observed that the situation had deteriorated since August despite earlier months being positive.

652. He continued his statement and added that he was speaking to the Plaintiff as a person rather than solely as an employee, and wanted to ensure that the Plaintiff was in a supportive environment.

653. Mr. Walton acknowledged that no one should interfere with the Plaintiff's personal effects or make him feel isolated or retaliated against. He stated that improvements were needed to ensure a better environment for everyone.

654. Mr. Walton emphasized that he wanted the best for all involved and that his question was not intended to push the Plaintiff away, nor did he want the Plaintiff to believe he was being encouraged to resign from his position.

655. He concluded his statement by stating that if the Plaintiff felt VMI was still best for him, he supported his decision, but if the Plaintiff felt the situation was too difficult, he understood should the Plaintiff decide to resign.

656. The Plaintiff responded to Mr. Walton's question by stating that he simply wished to perform his duties, and that the issues began due to audio and video cables.

657. In response to the Plaintiff's comment, Mr. Walton asked the Plaintiff whether an order for the audio and video cables had been placed.

658. The Plaintiff responded to Mr. Walton's question by stating that his order was reduced by half, which resulted in the remaining cables being moved between locations contrary to his original plan. He explained that this method created a risk of damage because he was no longer overseeing the broadcast setup process, and that the revised order was likely to be ineffective given that he had been removed from the planning process.

659. The Plaintiff added that he was not informed directly that the order would be halved, and learned of the change second-hand.

660. He concluded his statement by reminding Mr. Walton that the cable shortages were the source of the operational failures, and noted that he had raised the issue in August when he reported that the cables needed to be replenished.

661. Mr. Walton acknowledged the Plaintiff's statement before addressing the current status of the Plaintiff's office door.

662. The Plaintiff responded to Mr. Walton's question by informing him that he was working with his door closed because he was actively editing video content.

663. To clarify his question, Mr. Walton asked the Plaintiff when he last interacted with Mr. Marcello occurred regarding the status of his office door.

664. The Plaintiff responded to Mr. Walton's question by informing him that his last interaction with Mr. Marcello regarding the door occurred a few days prior. He explained that Mr. Marcello knocked on his door, entered the office, and forcibly attempted to prop the door open with a chair.

665. The meeting concluded with Mr. Walton informing the Plaintiff he will notify him about his Veterans Affairs appointment request for the following Monday.

666. On the afternoon of November 22, 2024, Mr. Marcello issued the Plaintiff seven disciplinary reprimands. The reprimands are as follows:

- Unapproved Vacation for October 30, Nov 1, Nov 4
- Football Hype Video due 11/20/2024
- Football Hype Video Final due 11/21/2024
- Football Last Practice Video due 11/22/2024
- Basketball Hype Video Draft due 11/15/2024
- Basketball Hype Video Final Cut due 11/18/2024
- No Show to External Team Meeting 11/18/2024

667. Immediately following the disciplinary reprimand session, Mr. Marcello emailed Ms. Stores and included the Plaintiff regarding the seven disciplinary reprimands.

668. Mr. Marcello informed Ms. Stores that he was providing a document outlining seven examples of the Plaintiff failing to meet professional standards over the previous two weeks.

669. He noted that the Plaintiff had not submitted any of the requested work during that period and indicated that he planned to develop a "performance enhancement plan" for the Plaintiff in an attempt to correct his performance deficiencies.

670. Mr. Marcello concluded his email by informing Ms. Stores that the Plaintiff was copied on the email for official record.

671. In the early hours of November 23, 2024, the Plaintiff emailed Colonel (VaARNG) Astphan, and provided his first draft of "*Addressing Managerial Challenges and Operational Analysis*: *A Summary of Allegations and Compliance Concerns*".

672. As instructed by Colonel Astphan, the document outlines the Plaintiff's effort to provide truthful information regarding alleged violations of school policy, regulations, and law and the possible commission of federal and state offenses by state officials acting in their official capacities.

673. The document additionally includes a section where the Plaintiff identified two witnesses who could attest to the events at issue.

674. On the morning of November 23, 2024, the Plaintiff received a response from Colonel Astphan stating that she would follow up after reviewing the material. She informed the Plaintiff that due to the upcoming holiday week, the Plaintiff could expect a response within two weeks.

675. Between November 25, 2024 and November 29, 2024, the Plaintiff was out of the office for his scheduled Veterans Affairs appointment in North Carolina.

676. On the afternoon of November 26, 2024, Mr. Marcello emailed the Plaintiff to address the upcoming home basketball season.

677. Mr. Marcello began the email by acknowledging the Plaintiff's completion of the women's soccer payroll spreadsheet, but noted that it was submitted after his established deadline.

678. He informed the Plaintiff that the men's soccer payroll information had been due on November 25, but was extending the deadline to December 2 due to the Plaintiff being out of the office.

679. Mr. Marcello informed the Plaintiff that the Independent Contractor would be working in his office to prepare for the remainder of the basketball season.

680. He explained that the Plaintiff's office had historically been used for basketball production due to its configuration for broadcasting.

681. As he continued the email, Mr. Marcello added that the desk in the office would need to be repositioned for operational functionality, and asked the Plaintiff whether there was anything they needed to be mindful of before the Independent Contractor proceeded with rearranging the space.

682. As Mr. Marcello continued his directive, Mr. Marcello informed the Plaintiff that the Independent Contractor and his staff would run the December 3 broadcast until he, Mr. Walton, and Michelle Murphy, Executive Secretary, met with the Plaintiff on December 3 or 4 to establish a plan for broadcasts, job expectations, and performance for the remainder of the month through a Performance Improvement Plan. He then instructed the Plaintiff to work in Cameron Hall 245 on December 2–3 until after the first Performance Improvement Plan session.

683. Mr. Marcello concluded his email by listing the following tasks for the Plaintiff to complete:

- Basketball hype video (draft was due 11/15, final cut 11/18) – needs to be done ASAP
- Women's Soccer Season Highlight video – draft needed by 12/3 by 4:00 PM
- Men's soccer season highlight video

684. In the early evening of December 1, 2024, Mr. Marcello emailed Mr. Whitehead, Mr. Brinkley, Mr. Barbee, the Plaintiff, and Mr. Prather with a newly implemented External Team Open Door Policy. The Open Door Policy reads as follows:

"Hey everyone, this is a memo to inform our external team of our open-door policy effective immediately. During normal business hours (8:30 AM-4:30 PM), office doors are to remain fully open unless otherwise approved by the Associate Athletic Director for External Operations (Phil Marcello). Cracked or partially closed doors must be approved each individual occurrence as well. This policy helps foster a culture of communication and comradery for not only our team, but the rest of the staff, coaches and Athletics Department as a whole."

685. On December 3, 2024, Mr. Marcello requested a meeting with the Plaintiff to discuss a new payroll process he was implementing for part-time staff to consolidate the payroll procedure. He explained that the revised approach would allow him to approve payroll directly rather than having Ms. Fulton complete the approval process.

686. Mr. Marcello acknowledged that the Plaintiff had completed his portion of the payroll process, but informed the Plaintiff that moving forward he would submit the Personnel Action Forms for his approval.

687. During the block of instruction, Mr. Marcello demonstrated the Personnel Action Form submission process while the Plaintiff documented each step from initiation to submission.

688. Immediately following the block of instruction, Mr. Marcello pivoted the conversation and questioned the Plaintiff regarding his reasoning for writing the statement on his office whiteboard.

689. The Plaintiff responded to Mr. Marcello's question by stating that he believed it to be an accurate representation of the departmental environment following the events of October 31, 2024.

690. In response to the Plaintiff's answer, Mr. Marcello issued a direct denial, characterized the Plaintiff's writing on his office whiteboard as accusatory, and stated his intent to issue him a disciplinary reprimand.

691. As the meeting concluded, Mr. Marcello informed the Plaintiff to retrieve any items he needed from his office no later than 1:00 p.m. the following afternoon, and stated that they would discuss operational plans moving forward with Mr. Walton during their Performance Improvement Plan session.

692. In the late evening of December 3, 2024, the Plaintiff emailed Mr. Walton, Mr. Marcello, and Ms. Murphy to request that an additional individual attend the Performance Improvement Plan session the following afternoon.

693. The Plaintiff explained that the individual's role would be to serve as a neutral observer to maintain transparency during the Performance Improvement Plan session.

694. The Plaintiff concluded his email by requesting that the selected individual not hold a senior leadership role within the Athletics Department.

695. On December 4, 2024, the Plaintiff went to the Office of the Inspector General to submit an updated version of "*Addressing Managerial Challenges and Operational Analysis: A Summary of Allegations and Compliance Concerns*" to Colonel (VaARNG) Astphan.

696. The updated copy included a section titled 'Current Environment' where the Plaintiff describes his account of deteriorating workplace conditions within the Athletics Department, and concerns that senior officials were coordinating against him.

697. During the inquiry intake meeting, the Plaintiff explained to Colonel Astphan that he had been removed from his office without an explanation. He stated that he was instructed to relocate all items from his office that were necessary to complete his assigned tasks to the temporary workspace.

698. The Plaintiff informed Colonel Astphan that he received seven disciplinary reprimands in a single day, and that he anticipated additional pending disciplinary actions against him.

699. Concluding his statement, he explained that Mr. Walton had been aware of the situation, but stated that based on how the events were unfolding, the Plaintiff believed there were indications of coordinated actions directed toward him.

700. In response, Colonel Astphan informed the Plaintiff that she had prepared a response regarding how her office would proceed moving forward, but explained that she would delay issuing her decision until she reviewed the Plaintiff's updated submission to determine whether it affected her planned course of action.

701. The Plaintiff informed Colonel Astphan that he felt ongoing apprehension about entering the office due to not knowing what working conditions he would encounter upon arrival.

702. Responding to the Plaintiff, Colonel Astphan inquired whether he had spoken with Mr. Walton in a private capacity since their previous meeting.

703. The Plaintiff responded to Colonel Astphan's question by stating that Mr. Walton had asked him whether VMI was the right fit for him professionally, and he explained that this led him to believe there was coordinated communication occurring between Mr. Walton, Mr. Marcello, and possibly Ms. Stores.

704. He continued his explanation and stated that during his call with Ms. Stores on October 31, 2024, she minimized his concerns and told him he did not understand how processes operated at VMI.

705. The Plaintiff stated that Ms. Stores informed him that Mr. Walton and Mr. Marcello both arrived at her office to file a complaint against him, and that she appeared to use his statements against him.

706. Continuing his statement, the Plaintiff informed Colonel Astphan that he required medical intervention following the submission of his statement. He explained that he felt coerced to complete the report urgently due to the implied expectation from Ms. Stores that any delay would be used to justify adverse actions concerning his performance.

707. The Plaintiff concluded his statement that Ms. Stores determined that there was no resolution, and further mediation between both parties would be required.

708. Colonel Astphan explained to the Plaintiff that his allegations fell into several categories, and noted that mismanagement of resources would proceed as an Inspector General inquiry.

709. Continuing her explanation, Colonel Astphan stated she understood the Plaintiff's reservations about involving Human Resources, but informed the Plaintiff that allegations of a hostile work environment and retaliation were outside the Inspector General's scope and would not be investigated unless the Plaintiff's updated submission warranted

reconsideration. She noted that complaints outside the Inspector General's authority are typically referred to Human Resources.

710. Colonel Astphan concluded her statement by informing the Plaintiff that the Chief of Staff, Colonel (Ret.) Bissell was made aware of the matter, and that she may consult with him before finalizing her response.

711. As the meeting approached its conclusion, Colonel Astphan stated that she needed additional time to review the Plaintiff's updated submission. She explained that her current assessment was based on the information previously provided, and noted that any new information could alter her evaluation.

712. She concluded by advising the Plaintiff to await further guidance in the interim.

713. The meeting continued with the Plaintiff providing further detail about the adverse working conditions he was experiencing, along with the disciplinary actions that had been taken against him.

714. Colonel Astphan provided the Plaintiff with available institutional resources to privately discuss the adverse working conditions with licensed professionals before the meeting concluded.

715. Following the Inspector General inquiry meeting, the Plaintiff's first Performance Improvement Plan session convened with the Plaintiff's request for a neutral observer approved by Mr. Walton.

716. In attendance for the Performance Improvement Plan was the Plaintiff, Mr. Walton, Mr. Marcello, Ms. Murphy, and Greg Horne, Director of Compliance.

717. At the beginning of the meeting, Mr. Walton explained that a Performance Improvement Plan had been established and noted that he was unsure how familiar Mr. Horne was with the situation.

718. Mr. Walton added that meeting materials would be distributed for the group to review collectively, and emphasized that the process would be a collaborative effort in addressing the matter.

719. The Plaintiff stated for the record that Mr. Horne was present solely as an observer to maintain transparency and proper documentation of the discussion.

720. Mr. Walton began his remarks by stating that the purpose of the meeting was to review the Performance Improvement Plan that had been discussed with Ms. Stores.

721. He explained that the objective was to establish specific and measurable tasks that were achievable, relevant, and time bound.

722. He added that the process required clear communication, identification of necessary resources, defined expectations regarding roles, responsibilities, deadlines, and accountability.

723. Mr. Walton stated that the core objectives of the Performance Improvement Plan was communication, clarity, time management, teamwork, responsiveness, professionalism, and respect.

724. At the outset of the discussion, Mr. Walton stated that the core objectives of the Performance Improvement Plan was to promote communication, clarity, time management, teamwork, responsiveness, professionalism, and respect.

725. He continued by outlining his expectation for Ms. Murphy to take notes and prepare a recap of the meeting to ensure alignment, and emphasized the importance of reaching a shared understanding of expectations.

726. Mr. Walton acknowledged the Plaintiff's email and recognized that relocating office spaces takes time and effort, and he informed the Plaintiff that he would be assigned to the unassigned office.

727. Expanding on the assignment, Mr. Walton explained that the assignment was temporary due to upcoming renovations related to the video board and uncertainty about future room needs. He stated that the space would allow the Plaintiff to complete his day-to-day work and that any additional needs could be accommodated.

728. Mr. Walton added that the Plaintiff's current office would be used exclusively as the control room.

729. He concluded his opening remarks by stating that based on the Plaintiff's email correspondence, he believed it should have been communicated when he accepted the position, his office would also function as a control room since it had historically been used that way by previous staff in the role.

730. The Plaintiff began his explanation by stating that he had offered alternative solutions to Mr. Marcello by proposing to route the video production equipment into his temporary office, and asserted that he could implement the setup professionally and without disrupting broadcast operations.

731. He explained that his proposed configuration would have required minimal adjustments to the system, and expressed confusion regarding why his alternative option was rejected.

732. The Plaintiff acknowledged that the office had historically been used as a control room, but stated given his professional background, he could implement his proposed configuration seamlessly without any disruption, and that he had been required to move his workstation into the room he proposed to use as a temporary or permanent broadcast production room.

733. In response to the Plaintiff's question, Mr. Walton stated that the Athletics Department believed the existing control room remained the appropriate space for broadcast operations, and stated the department viewed the traditional setup as the best option.

734. He continued his explanation and added that placing the Plaintiff in a separate office would reduce foot traffic, minimize disruptions during the sports season, and assist the Plaintiff in meeting assigned expectations and deadlines.

735. The Plaintiff restated that his video production configuration was intended to minimize foot traffic into his workspace so he could continue his production and video content duties without interruption.

736. The Plaintiff stated that while he acknowledged Mr. Walton's explanation, he maintained that the situation could have been resolved through alternative methods.

737. He noted that the timing of their decision was unusual, and referenced his October 31, 2024 emergency leave request and his repeated written statements that he did not want his office used for broadcast operations.

738. The Plaintiff added that the timing appeared coincidental in light of the recent events.

739. Mr. Marcello stated that during the Plaintiff's interview, he observed his office in use during the basketball season, and that its operational role had been explained to him at that time. Mr. Marcello asserted that the Plaintiff had been aware of the setup, and appeared to accept this arrangement before accepting the position.

740. In rebuttal to Mr. Marcello's statement, the Plaintiff explained that after operational conditions changed, his solution was to continue using the same style of audio and video cable runs deployed at the football broadcast venue.

741. The Plaintiff continued his explanation and stated that applying the same method required time to review the operational environments. He noted that the equipment would have to be moved back and forth regardless and stated that the purchase that was cut in half would have allowed the configuration to be completed smoothly and without disruption.

742. Following the discussion regarding the Plaintiff's office workspace, Mr. Walton addressed the topic of multimedia content management.

743. Mr. Walton stated that the Independent Contractor would assume full responsibility for overseeing all broadcast operations.

744. He added that he and Mr. Marcello believed it would be beneficial for the Plaintiff to apply his creative capabilities in multimedia video editing, and to collaborate with Mr. Marcello to define his abilities.

745. Mr. Walton concluded by stating that the Performance Improvement Plan was intended to track weekly tasks, identify what had been completed or remained in progress, determine any needs, and review project deadlines to ensure all required items were addressed.

746. The Plaintiff stated that before the discussion proceeded, he sought clarification on the department's expectations for video quality, and whether the focus was on meeting accelerated deadlines, or producing compelling content that would strengthen institutional branding.

747. Responding to the Plaintiff's question, Mr. Marcello stated that both quality and speed were relevant, but emphasized that in athletics turnaround time is critical.

748. Mr. Marcello added that social media content engagement required immediate delivery, and explained that a win required next-day content posting due to public attention declining rapidly.

749. He concluded his explanation by stating that rapid content production was the primary focus given the pace of current media expectations in athletics.

750. Responding to Mr. Marcello's expectations, the Plaintiff stated that while he understood his intent, the expectations assigned to him did not align with the standard Mr. Marcello described.

751. He explained that his assigned video editing tasks primarily involved season recaps, game introductions, and hype-style video productions.

752. He addressed the document provided and stated that Mr. Marcello's expectation for him to submit a highlight video draft by December 3 at 4:00 p.m. overlooked the reality that the assignment required reviewing extensive hours of video footage to identify usable material that matched the intended impact of the video.

753. The Plaintiff concluded his explanation by stating that the editing process required several days, and that he was denied access to the footage.

754. Mr. Marcello responded to the Plaintiff's statement by rejecting the allegation that the Plaintiff was denied access to the footage, and clarified that he was only denied access to the video production equipment that stored the footage, not the footage itself.

755. The Plaintiff responded to Mr. Marcello's clarification that he maintained the directive in email correspondence that the Plaintiff would support his allegation.

756. Responding to the Plaintiff's email remark, Mr. Marcello stated he also retained the same email correspondence.

757. Mr. Walton interjected and shifted the discussion to address task progression, and stated that the first assignment was to submit all Personnel Action Forms.

758. Mr. Walton then asked Mr. Marcello when the directive had been communicated to the Plaintiff.

759. Mr. Marcello informed Mr. Walton that he implemented the directive to the Plaintiff on Tuesday, December 3, 2024 in an effort to streamline the payroll process by eliminating an intermediary.

760. He explained that Personnel Action Forms were currently processed and sent to Ms. Fulton before being forwarded to Finance.

761. Mr. Marcello added that the revised approach was a new procedure intended to expedite the payroll workflow, and noted that the Plaintiff already had all the necessary information compiled for each sport pay period.

762. Concluding his response, Mr. Marcello estimated the task could be completed in approximately one hour.

763. The Plaintiff responded to Mr. Marcello's explanation regarding completion time, and noted that it might not apply universally. The Plaintiff explained that he exercised deliberate care to ensure pay accuracy involving institutional funds and employee wages.

764. Following the Plaintiff's explanation, Mr. Marcello stated that it was solely his responsibility to review, verify, and approve the submitted information.

765. Transitioning from the exchange between Mr. Marcello and the Plaintiff, Mr. Walton inquired about the current status of the Personnel Action Forms.

766. Responding to Mr. Walton's question, the Plaintiff stated that this would be his first attempt at completing the Personnel Action Forms, and that his only prior experience with the process was preparing Excel sheets that were sent to Mr. Marcello for him to conduct the Personnel Action Form.

767. Addressing the Plaintiff's explanation, Mr. Walton asked about the nature of the payment process and whether the timing of the assignment was consistent with prior practice.

768. In response to Mr. Walton's question, Mr. Marcello stated that the purpose of the task was to ensure part-time employees received their wages, and explained that the process was typically slow and had been slower that year.

769. The Plaintiff added to Mr. Marcello's statement and wanted the record to reflect that members of his staff had raised concerns regarding the payroll process and wages being delayed for work completed prior to his arrival.

770. Following the Plaintiff's remarks, Mr. Walton stated that if the Plaintiff believed he did not have the resources necessary to complete his assignments, the appropriate course of action was to ensure he received the necessary support to resolve the issue.

771. Responding to Mr. Walton's question, the Plaintiff stated that he had received an email from Mr. Marcello directing him not to access any broadcast production equipment.

772. He explained that the directive prohibited him from using the laptop containing broadcast content, or accessing any other video production-related systems that contained video footage from each event.

773. The Plaintiff emphasized that Mr. Marcello's directive prevented him from gathering the required materials for his assignments, and concluded his statement by offering to provide the email in question to support his account.

774. Responding to Mr. Walton's question, the Plaintiff stated that he had received an email from Mr. Marcello directing him not to access any broadcast production equipment.

775. He explained that the directive prohibited him from using the laptop containing broadcast content, or accessing any other video production-related systems that contained video footage from each event.

776. The Plaintiff emphasized that Mr. Marcello's directive prevented him from gathering the required materials for his assignments, and concluded his statement by offering to provide the email in question to support his account.

777. As the meeting progressed, the discussion returned to the Personnel Action Forms and the internet connectivity issues in the temporary workspace the Plaintiff reported following removal from his office.

778. Following the Plaintiff's explanation, Mr. Walton asked the Plaintiff whether his computer workstation could be portable, and added that if the Plaintiff had any equipment that did not require a fixed connection, an additional temporary workspace could be provided to him.

779. The Plaintiff explained that the workstation he moved into his temporary office could operate through a hardwired connection, and added that he had been using his personal laptop to complete video projects.

780. He informed Mr. Walton that prior to October 31, 2024 he continued working from home to meet video project deadlines.

781. The Plaintiff concluded his statement by noting that as long as the internet in that space was functional, he would be able to complete the required forms without issue.

782. Responding to the Plaintiff's explanation, Mr. Walton stated that the tasks mentioned required confirming what equipment was available in the temporary workspace, and explained that if the setup functioned properly, the Plaintiff should be able to complete the Personnel Action Forms using his reference materials.

783. Mr. Walton then directed the meeting to address the women's soccer team season highlight video draft.

784. The Plaintiff restated his request for clarification on the department's expectations. He explained that he approached his video editing to ensure it was visually appealing and engaging, and therefore sought a clear understanding of the department's quality standards.

785. The Plaintiff added that other staff members had recently edited videos and requested a parallel comparison to understand the department's expectations.

786. He explained that video editing work could be subject to interpretation, and stated that he wanted to review comparable examples if specific standards were required by Mr. Marcello.

787. Mr. Marcello responded to the Plaintiff's question and explained that the Plaintiff had repeatedly stated he was gathering highlights throughout the season and asserted that this would have reduced the need for additional review when editing videos.

788. He added that if the Plaintiff had not done so, any resulting delay would be attributed to his performance.

789. Mr. Marcello concluded his statement by adding that a draft's sole intention is to demonstrate progress, and stated that providing no draft led him to conclude that no work was being completed.

790. In response to Mr. Marcello's statement, the Plaintiff reminded the participants that he had been troubleshooting broadcast malfunctions since the summer, and alleged that Mr. Marcello was altering information and facts of events as he had done previously.

791. He continued explaining that ongoing system malfunctions required him to repeatedly fix avoidable and preventable technical errors.

792. The Plaintiff added that the video delivery expectation made completion unattainable for the requested assignments as he was already working late into the evenings to complete

793. The Plaintiff added that reviewing footage, selecting clips, and applying his editing approach required time, and reiterated his point that the expectations placed on him exceeded what could reasonably be completed within the available timeframe.

794. Concluding his remarks, the Plaintiff stated that reviewing footage, selecting clips, and applying his editing approach required a considerable amount of time and reiterated that Mr. Marcello's expectations were unattainable.

795. Following the Plaintiff's statement, Mr. Walton questioned whether the Plaintiff provided a draft submission of the assignment to Mr. Marcello.

796. The Plaintiff responded to Mr. Walton's question and stated that he had not submitted a draft to Mr. Marcello as he was still actively working on the basketball video project.

797. Responding to the Plaintiff's statement, Mr. Walton explained that while Mr. Marcello had certain expectations regarding timely completion of assignments, all parties were expected to remain flexible.

798. He acknowledged that the Plaintiff's strengths had benefited the department, but stated that there appeared to be a disconnect between those strengths and meeting Mr. Marcello's submission timelines.

799. In response to Mr. Walton's explanation, the Plaintiff restated his request for a parallel video comparison to evaluate expectations, and stated that the deadlines being set were unrealistic.

800. The Plaintiff explained that Mr. Marcello's expectation was in stark contrast to the operational reality of the video editing assignment and expressed concern that the disconnect reflected an inaccurate interpretation and presentation of the Plaintiff's role.

801. Responding to the Plaintiff's remarks, Mr. Walton stated that respect was an expectation for everyone involved, and expressed that he viewed the Plaintiff's comment in regards to Mr. Marcello was disrespectful.

802. He affirmed that while the Plaintiff may possess more experience in multimedia than others in the room, he explained that Mr. Marcello also had professional experience in the field.

803. Mr. Walton added that although he did not claim to have the Plaintiff's level of expertise, he had previously overseen multimedia operations, and maintained expectations for the quality and timing of completed work.

804. Transitioning to the upcoming basketball video project, Mr. Walton referenced the upcoming game and noted the importance of producing a highlight video within a constrained timeframe to allow the department to maximize the impact of the win if the team won.

805. He aligned with Mr. Marcello's view that video content released even a day or two later following an event was past its effective window of relevance.

806. Mr. Walton concluded by reiterating that the intent was not to impose constraints, but to ensure the department operated within necessary timeframes.

807. He emphasized the need to manage pressure when required, and stated that the goal was to maximize the effectiveness of multimedia content to support departmental progress.

808. Responding to Mr. Walton's remarks, the Plaintiff stated that a productive resolution was unlikely and restated that he had proposed a procedural approach to establish a consistent video content standard and expectation within the department.

809. The Plaintiff concluded his statement by adding that continued discussion on the video editing topic would likely remain circular and counterproductive, and that addressing matters as they arose was the more appropriate approach.

810. Responding to the Plaintiff's comment, Mr. Walton acknowledged the Plaintiff's point and stated that the department would always have tasks and expectations.

811. Mr. Walton explained that if the Plaintiff believed those expectations were unreasonable or unattainable, the situation could be re-evaluated to avoid placing him in a position where he felt he could not meet the expectations or lacked sufficient time to complete assigned tasks.

812. The Plaintiff clarified that he intended no disrespect and explained that his comments were made solely to articulate his position.

813. Following the Plaintiff's clarification, Mr. Marcello stated that the Plaintiff had disrespected him and referenced their prior Human Resources meeting on November 13, 2024 as support for his claim.

814. The Plaintiff responded that he also felt disrespected by Mr. Marcello during both the HR session and their current discussion.

815. Mr. Marcello asserted that Ms. Stores had told him the Plaintiff was the one who had been disrespectful.

816. In response, the Plaintiff stated that he perceived the meeting with Ms. Stores as lacking impartiality and operating in favor of Mr. Marcello.

817. Following their exchange, Mr. Marcello stated that he believed the assigned deadlines were fair, referenced his own experience producing similar content, and stated that he had been in multiple schools where similar timelines were used.

818. Continuing his explanation, Mr. Marcello then outlined general expectations for video submissions by providing a target length of approximately one minute with the requirement that his video assignment be submitted via direct link through email.

819. Following Mr. Marcello's response, Mr. Walton stated that the purpose of the meeting was to review the assigned tasks and ensure they were manageable.

820. He emphasized that any needs or support required should be communicated so that the situation could improve.

821. Mr. Walton then asked the Plaintiff whether there were any additional upcoming tasks that required additional assistance or support.

822. The Plaintiff responded that he had been directed by Mr. Marcello to not access any equipment containing video footage, and stated that he needed the required files either uploaded to their shared cloud network or provided on a USB drive due to the instructions provided.

823. Responding to the Plaintiff's statement, Mr. Marcello stated that most of the footage was already stored on their shared cloud network, and added that if the Plaintiff needed anything specific, he could request it from himself, Mr. Whitehead, or Mr. Barbee as they could retrieve the material more efficiently.

824. As the meeting continued, Mr. Marcello issued the Plaintiff a directive stating that certain cameras were required to remain in the shared office used by Mr. Whitehead and Mr. Barbee.

825. He explained that the Plaintiff could access the camera before a game, but that it must be returned immediately following the conclusion of an event.

826. Mr. Marcello further instructed that the Plaintiff was prohibited from accessing any broadcast equipment, and emphasized that the broadcast team needed to configure and operate the equipment according to their requirements.

827. He added that only cameras not used for broadcast operations would be available for the Plaintiff's assignments, and explained that keeping those cameras in the shared

office would prevent the Plaintiff from entering the control room or interfering with broadcast setup on game days.

828. In response to Mr. Marcello's directive, the Plaintiff stated that he disagreed with the decision to remove him from broadcast operations and requested that his objection be reflected in the record.

829. As the meeting neared its conclusion, Mr. Walton stated that the group could reconvene the following week to review the Plaintiff's progress, and added that he would send Mr. Marcello the template so they could plan the upcoming tasks.

830. Mr. Walton concluded by noting that some tasks might remain ongoing, and advised that if the Plaintiff required any office-related support for daily work, he should inform Mr. Marcello so those needs could be addressed in his new workspace.

831. Immediately following the meeting's conclusion, Mr. Walton asked Ms. Murphy to remain behind so that he could review her notes taken during the Performance Improvement Plan.

832. The following day, on December 5, 2024, Mr. Marcello issued the Plaintiff five disciplinary reprimands. The reprimands are as follows:

- Violation of External Operations Team Open Door Policy
- Violation of External Operations Team Open Door Policy
- Failed to Meet Deadline for Senior Football Team Practice
- Employee Wrote Inappropriate and Accusatory Comments
- Women's Soccer Season Highlight Video Draft Due 12/3

833. Immediately following the disciplinary reprimand session, Mr. Marcello emailed Ms. Stores and included the Plaintiff regarding the seven disciplinary reprimands.

834. Mr. Marcello informed Ms. Stores that he was forwarding documentation of the recent employee counseling session, and noted that he was working with Mr. Walton to address the identified issues moving forward.

835. In the early morning of December 7, 2024, the Plaintiff emailed Mr. Marcello in regards to the Personnel Action Form.

836. He explained that he was attempting to complete the assignment, but explained that the form available to him differed from the one Mr. Marcello had used.

837. The Plaintiff concluded his email by notifying Mr. Marcello that he did not have access to the same version of the Personnel Action Form.

838. In a subsequent email sent shortly after, the Plaintiff informed Mr. Marcello that he was still unable to complete the Personnel Action Form and stated that he provided Mr. Marcello the information for the first four forms he attempted to submit.

839. In an additional follow-up sent later that day, the Plaintiff informed Mr. Marcello that he was following up from their prior conversation earlier that afternoon, and included the four forms located through his parameter controlled Etrieve search function and stated that he wanted to keep him informed of his progress.

840. In a continued email exchange sent later that day, the Plaintiff informed Mr. Marcello that he was following up from their prior conversation earlier that afternoon, and included the four forms located through his parameter controlled Etrieve search function, and noted that he was keeping him informed of his progress.

841. Mr. Marcello responded to the Plaintiff's email the same afternoon and identified the correct attachment needed to process the Personnel Action Forms.

842. In his subsequent email, the Plaintiff notified Mr. Marcello that the form he identified was the same version he previously provided, and stated that he included a timestamped screenshot and PDF copy for Mr. Marcello's review.

843. He explained in the email that it may be necessary for Mr. Marcello to send him a PDF version to complete and return, or alternatively for Mr. Marcello to process the form so that employees could receive their wages for work completed.

844. The Plaintiff concluded his email by adding that he could forward the information he had already compiled if needed, and to notify him the manner in which he wanted him to proceed.

845. Shortly thereafter, Mr. Marcello sent two follow-up emails to the Plaintiff.

846. In his first email, he asked whether the Plaintiff was able to access and complete the forms.

847. In his second email, Mr. Marcello directed the Plaintiff to enter the worker information as previously instructed and to submit the forms that evening.

848. On December 8, 2024, during the continued email exchange, the Plaintiff informed Mr. Marcello that he did not have the same system permissions or form options, and stated that the Personnel Action Form available to him differed from the version Mr. Marcello had used.

849. He explained that he lacked the authorization required to complete the requested entries, and that he was unable to submit the forms as directed based on the system restrictions.

850. As the Plaintiff continued his email, he asked Mr. Marcello whether he was still required to submit a leave form for the upcoming Monday, and noted that he had completed his video assignment in the early morning hours.

851. The Plaintiff concluded his email by stating that he had previously requested the day off due to having already exceeded a standard workweek, and stated that requiring vacation time under those circumstances was inconsistent with Ms. Stores' instruction.

852. Responding to the Plaintiff's prior email, Mr. Marcello stated that the Plaintiff's lack of communication contributed to the ongoing issues.

853. He added that Mr. Barbee had completed the forms without difficulty, and noted that he might need to complete the task himself since employees were waiting to receive their wages for work already completed.

854. Addressing the Plaintiff's video assignment, Mr. Marcello stated that the agreed-upon deadline was 7:00 p.m., and that the submission was not received until approximately 2:00 a.m.

855. Mr. Marcello stated that the Plaintiff was permitted to take the day off, but that it would be charged to his accrued leave and required submission of the corresponding HR form for approval.

856. Concluding his email, Mr. Marcello stated that if the Plaintiff still intended to take the day off, he should notify him, and added that the delay in submitting the required form would be noted.

857. On the evening of December 9, 2024, the Plaintiff sought medical intervention for sleep deprivation for a second time while employed by the Virginia Military Institute.

858. The Plaintiff was given a return to work date of December 11, 2024.

859. On or around December 10, 2024, the Plaintiff received an official letter from Colonel (VaARNG) Astphan notifying him that a thorough review of the Plaintiff's complaint had concluded, and in response her office would be conducting an inquiry into certain allegations within her purview.

860. The Inspector General Inquiry reads as follows:

> Response to Complaint, Case # 20240029
>
> *IG Inquiry*
>
> The VMI Office of the Inspector General will conduct an inquiry in response to some of the "Misuse of Public Resources" allegations made in your complaint and report. The actions of Institute officials, programs, and policies related to the Keydet Club will be included as an issue in the IG inquiry (please see the "Screened Out Allegations" section for the response to the allegations made against the Keydet Club).

861. Colonel Astphan informed the Plaintiff that certain portions of the complaint were screened out, and guidance for further pursuit of those allegations was provided in the corresponding section.

862. The *"Screened Out"* section reads as follows:

- The allegations that Phil Marcello and Valarie Stores created/failed to address a hostile work environment, in violation of Title VII of the Civil Rights Act and VA Code § 40.1-28, are screened out because they fall outside the scope of the IG's purview (not fraud, waste, or abuse).

Additionally, there was no information provided in the report that indicated potential violations of the Civil Rights laws you referenced.

- The allegations that Phil Marcello, Jamal Walton, Valarie Stores, and Emily Fulton retaliated against you, in violation of Virginia Code § 40.1-27.3 are screened out because they did not present potential policy violations. You did not meet the criteria necessary to establish retaliation protections at the time of the alleged conduct. Additionally, the allegations of retaliation in violation of Title VII of the Civil Rights Act, § 42 U.S.C. § 12182(a), and § 29 U.S.C. 215(a)(3) are screened out because there was no information provided in your report that indicated potential violations of the Civil Rights laws you referenced. The conduct alleged may still be in potential violation of other employee conduct-related policies or regulations.
- The allegations that Phil Marcello, Jamal Walton, Valarie Stores, and Emily Fulton retaliated against you, in violation of Virginia Code § 40.1-27.3 are screened out because they did not present potential policy violations. You did not meet the criteria necessary to establish retaliation protections at the time of the alleged conduct. Additionally, the allegations of retaliation in violation of Title VII of the Civil Rights Act, § 42 U.S.C. § 12182(a), and § 29 U.S.C. 215(a)(3) are screened out because there was no information provided in your report that indicated potential violations of the Civil Rights laws you referenced. The conduct alleged may still be

in potential violation of other employee conduct-related policies or regulations.

- The allegations that Phil Marcello, Jamal Walton, and Valarie Stores violated several OSHA statues are screened out because they fall outside the scope of the IG's purview (not fraud, waste, or abuse). You may address this aspect of your complaint by filing a complaint with OSHA.
- The allegations that Phil Marcello, Jamal Walton, Valarie Stores, and Emily Fulton breached their fiduciary duty and were negligent in leadership, in violation of Virginia Code § 18.2-112, are screened out because of a lack of specific details (no information provided alleged violation of cited law on embezzlement).
- The allegations made directly against the Keydet Club are screened out because VMI lack's jurisdiction over external organizations.

863. On the afternoon of December 11, 2024, the Plaintiff submitted a third "*Addressing Managerial Challenges and Operational Analysis: A Comprehensive and Detailed Documentation of Events and Communications*" to Colonel (VaARNG) Astphan.

864. The third document provided Colonel Astphan with emails supporting the Plaintiff's complaint, and it covered the period between June 20, 2024 and December 9, 2024.

865. Additionally, the Plaintiff included a section titled *Critical and Ethical Violations* in support of his *"Addressing Managerial Challenges and Operational Analysis : A*

*Summary of Allegations and Compliance Concerns"* submission, with subsections addressing the Virginia Public Records Act and the State and Local Government Conflict of Interests Act.

866. The *Critical and Ethical Violations* section reads as follows:

"There is discussion within the Athletics Department that senior leadership is advocating for the manipulation of official communications within the Athletics Department manipulating critical information and events. Altering state records, to include email correspondence, undermines transparency, accountability, and trust. Advocation of the alteration of email correspondence not only violates ethical standards, but this may also breach Commonwealth statutes governing public records management and state employees."

867. Immediately following his submission to Colonel Astphan, the Plaintiff met with Ms. Stores to make an additional attempt to file a retaliation complaint at her recommendation.

868. At the beginning of the meeting, Ms. Stores opened the discussion by greeting the Plaintiff and introducing Christina Fargiano as the new Human Resources Generalist.

869. Following her introduction, Ms. Stores asked about the Plaintiff's recent emergency medical intervention.

870. The Plaintiff responded to Ms. Stores' question by stating that he was still recovering from residual symptoms.

871. To begin his description of the workplace, the Plaintiff informed Ms. Stores that his working conditions had progressively worsened since their prior meeting, and stated that he had been relocated from his original office without reason. The Plaintiff added that staff had been allegedly directed to minimize contact with him.

872. When Ms. Stores asked the Plaintiff directly whether Mr. Walton and Mr. Marcello reporting him to her was what he considered retaliation, he answered no.

873. The Plaintiff clarified that the disciplinary actions occurred following their prior Human Resources meeting.

874. He explained that he had received seven write-ups in one day, and five in another with more disciplinary reprimands pending.

875. When Ms. Stores asked whether the reprimands were valid, the Plaintiff provided examples that contradicted their stated reasoning.

876. Ms. Stores instructed the Plaintiff to go through them one at a time, and to start with the recently implemented door policy.

877. She asked the Plaintiff whether his office door was allowed to be closed, or whether it had to remain open.

878. The Plaintiff explained that he kept his office door closed due to the environmental noise interfering with his concentration. The Plaintiff added that the noise disrupted his ability to focus on his video editing assignments.

879. When asked whether he closed his door only while working, the Plaintiff explained that he kept it closed while editing video, but stated he would sometimes briefly prop it open before resuming his video editing assignments.

880. Ms. Stores then asked the Plaintiff whether this was out of compliance with policy, and the Plaintiff explained that no such policy existed until after repeated disputes with Mr. Marcello over the necessity of keeping his door closed to work effectively

881. The Plaintiff explained that following these disputes, Mr. Marcello created and disseminated an open-door policy to the External Operations team.

882. After completing his explanation, Ms. Stores asked the Plaintiff to explain the third reprimand.

883. The Plaintiff described being given unreasonable expectations and then being disciplined for failing to meet them.

884. The Plaintiff continued his explanation and stated that he had previously been directed not to access the video production equipment, but noted that the directive contradicted the submission timeline he was expected to meet.

885. He explained that he had the broadcast laptop in his office to pull video footage for an assignment, but found it had been removed from his desk after he left the office for the day.

886. He explained that he later received an email from Mr. Marcello stating that the laptop was needed, and was instructed not to remove it from the broadcast room moving forward.

887. When questioned regarding justification for the equipment restriction, the Plaintiff explained that none had been provided, and that Mr. Marcello had accused him on multiple occasions of purposely sabotaging or damaging broadcast equipment.

888. He explained that since the events of October 31st, and following those accusations, he had not been allowed to touch the equipment without direct authorization.

889. Ms. Stores asked the Plaintiff whether the equipment was damaged.

890. The Plaintiff explained to Ms. Stores that it was not damaged and had recently been used for a broadcast.

891. After listening to the Plaintiff's explanation, Ms. Stores concluded that the source of the concern was lack of communication.

892. Responding to Ms. Stores' determination, the Plaintiff explained to Ms. Stores that he had been communicating with Mr. Marcello through both email and in-person conversations.

893. He added that when he encountered difficulties completing tasks, he either emailed Mr. Marcello or went to his office to talk directly, and that Mr. Marcello sometimes showed him how to complete tasks.

894. Despite these efforts, the Plaintiff stated that the burden of communication was placed entirely on him.

895. After listening to the Plaintiff's explanation, Ms. Stores asked the Plaintiff to describe what the adverse treatment looked like.

896. The Plaintiff explained that he was subjected to isolation, multiple disciplinary reprimands that disrupted and destabilized his work environment, forced relocations between offices, and being berated or humiliated over missed deadlines even after explaining that he could not meet them without assistance.

897. Ms. Stores asked the Plaintiff how he saw the matter concluding, and inquired whether her direct involvement on-site would be necessary.

898. In response to her inquiry about direct involvement, the Plaintiff explained that the behavior of those involved would change if internal authority was present, but noted that he had been placed on a Performance Improvement Plan.

899. The Plaintiff explained that since October 31st, the behavior toward him made it clear they were trying to remove him, and he stated that during the Performance Improvement Plan meeting, every issue he raised was dismissed.

900. The Plaintiff informed Ms. Stores that another Performance Improvement Plan meeting was scheduled for the following day.

901. He concluded his explanation by stating that he believed the process was being used to advance terminating his employment with VMI.

902. When questioned about why he was directed to refrain from accessing the equipment, the Plaintiff explained that the situation was unclear to him, because he was being told his performance was poor even though his first evaluation rated him positively.

903. Ms. Stores responded to the Plaintiff's statement and clarified that the document he received was not a formal evaluation and should have been treated as a progress report.

904. She admitted that Human Resources had failed to establish or enforce the correct process for employee evaluations, and stated that she had already spoken to Mr. Marcello and Mr. Walton to address the confusion.

905. Following Ms. Stores' response, the Plaintiff emphasized that he was the only staff member assigned to cover both video editing and broadcast operations, and noted that by October 31, 2024 he had regularly exceeded a standard workweek for more than 30 consecutive days.

906. As the meeting progressed, Ms. Stores stated that something had her attention that she regarded as extremely concerning, and required immediate attention.

907. Ms. Stores stated that she had been informed that employees had worked without receiving their wages, and emphasized that no one should ever work without being compensated.

908. She further noted that several individuals had already raised complaints about unpaid wages, and directed that anyone working under the Plaintiff be compensated immediately.

909. In response to Ms. Stores' statement, the Plaintiff explained that he had informed Mr. Marcello that he did not have the same parameters or access needed to complete the payroll forms.

910. He added that despite knowing this information, Mr. Marcello still placed responsibility on him for completing the Personnel Action Forms.

911. Ms. Stores questioned who had been handling payroll previously, and the Plaintiff explained that he completed his portion in the Excel spreadsheet, and in that sequence, Mr. Marcello was supposed to go into Etrieve and fill out the forms to send over to Ms. Fulton for approval.

912. The Plaintiff added that Mr. Marcello proposed a new process in which the Plaintiff would work on the Personnel Action Forms while he approved them.

913. The Plaintiff concluded his statement by explaining that the process ultimately failed due to access limitations.

914. Ms. Stores asked whether anyone had contacted IT to provide the Plaintiff with access, and the Plaintiff confirmed they had not.

915. Following the Plaintiff's response, Ms. Stores noted that such access would require approval from Mr. Marcello.

916. The Plaintiff stated that knowing IT approval was required was critical as he was facing a disciplinary reprimand for not being able to complete the Personnel Action Forms.

917. In response to the Plaintiff, Ms. Stores stated that she could approve the Plaintiff's access provided he was present to perform his duties.

918. As the meeting progressed, Ms. Stores re-addressed the Performance Improvement Plan and stated that she did not believe anyone was intentionally creating conditions that would hinder his performance.

919. Ms. Stores explained that the purpose of a Performance Improvement Plan was to help an employee improve, and concluded her response by noting that she did not fully understand the scope of the Plaintiff's duties.

920. The Plaintiff explained to Ms. Stores that in the first Performance Improvement Plan he asked what the standard for video quality was, but no clear standard was ever set.

921. Ms. Stores asked the Plaintiff whether he had been informed during his Performance Improvement Plan that the institution expected high-standard video production.

922. The Plaintiff replied that no such guidance had been provided, and added that he had requested video comparisons to establish these expectations.

923. Transitioning back to the earlier concern he raised, Ms. Stores reintroduced the Plaintiff's request to raise a retaliation complaint, and remarked that retaliation is a significant matter in the context of Human Resources.

924. Ms. Stores explained that she needed additional information, and asked the Plaintiff what he believed Mr. Marcello and Mr. Walton were retaliating against.

925. The Plaintiff explained to Ms. Stores that on October 31, 2024 he informed Mr. Marcello that they should not prioritize a fundraising video project for the VMI Alumni Agencies umbrella organizations while internal operations were falling apart.

926. He added that the umbrella organizations were outside their chain of command, and that institutional resources should not be diverted for a project that benefited their private fundraising efforts.

927. The Plaintiff concluded his statement by noting that after raising these concerns, disciplinary actions were taken against him.

928. In response, Ms. Stores asked why the Plaintiff's statement would have bothered Mr. Walton and Mr. Marcello.

929. The Plaintiff responded to Ms. Stores' question by informing her that he did not have an answer.

930. Ms. Stores asked the Plaintiff when his next Performance Improvement Plan meeting was, and he informed her that his next Performance Improvement Plan meeting was scheduled for the following afternoon.

931. As the meeting was beginning to conclude, Ms. Stores stated that the tension between Mr. Marcello and the Plaintiff had begun to affect others, and explained that many matters reached her office that people were not aware of.

932. Ms. Stores acknowledged the Plaintiff's retaliation complaint, and said she would investigate it with impartiality.

933. As she continued her explanation, Ms. Stores stated that if the Plaintiff believed she was biased, she could assign it to Ms. Fargiano to conduct the investigation.

934. The Plaintiff agreed to her reassigning the matter to Ms. Fargiano, and noted her involvement in the situation since October 31, 2024.

935. As the meeting officially concluded, the Plaintiff provided Ms. Fargiano with his contact information to schedule the inquiry.

936. Following the session with Ms. Stores, the Plaintiff received an additional four disciplinary reprimands. The reprimands are as follows:

- Violation of External Operations Team Open Door Policy
- Missed Deadline for Men's Soccer Personnel Action Forms
- Missed Deadline for Women's Soccer Personnel Action Forms
- Missed Deadline for Queens Basketball Highlight Video

937. Immediately following the disciplinary reprimand session, Mr. Marcello emailed the Plaintiff and included Ms. Stores regarding the four disciplinary reprimands.

938. On the morning of December 12, 2024, Mr. Marcello issued the Plaintiff one disciplinary reprimand. The reprimand goes as follows:

- Violation of External Operations Team Open Door Policy

939. On December 12, 2024, the Plaintiff's second Performance Improvement Plan meeting took place.

940. Present at the meeting were Mr. Marcello, Mr. Walton, Ms. Murphy, and Mr. Horne.

941. During this meeting, Mr. Walton informed the Plaintiff that he was being issued a Notice of Improvement Needed/Substandard Performance for failing to meet duties and responsibilities outlined in his contract and the employee handbook.

942. Mr. Walton additionally informed the Plaintiff that he had forty-five days to demonstrate noticeable improvement or face termination.

943. In the Notice, the "Summary of Past Performance Deficiencies" identified the performance issues the Plaintiff was required to address as follows:

"Since your most recent Performance Evaluatio… a pattern of substandard performance has been noted. In addition, several violations of both your Employment Agreement and the VMI Administrative and Professional Handbook have occurred. Specifically,...

missing team meetings, failing to meet creative or professional deadline on a consistent basis, not coming to the office, keeping office door closed, poor attitude towards coworkers.

As examples of the above noted behavior, the following instances were observed"

944. The Notice included a total of forty observed instances that began on August 21, 2024 and concluded on the date the Notice of Improvement Needed/Substandard Performance was issued.

945. On December 13, 2024, the Plaintiff submitted his fourth and final document titled "*Addressing Managerial Challenges and Operational Analysis*: *A Case Study in Leadership Accountability and Documentation*"

946. The document contains audio transcripts prepared by the Plaintiff to reflect as accurately as possible the real-time recorded statements during the events relevant to his misuse of public resources complaint.

947. The document also contained a *"Summary", "Coordinated Efforts", and "Moving Forward"* section, from which the following excerpt is provided:

*Summary:*

"The Commonwealth of Virginia is a One-Party Consent state, meaning that only one individual had to agree to partake in the recording. As I was party to each of these recordings, I consented to the recording. These recordings were captured to protect myself from accusatory, inflammatory, and manipulation of a setting, or circumstance. Leading up to the first broadcast failure, Phil Marcello's behavior and demeanor shifted, and trust in leadership was eroded. The events of October 31st was a pivotal moment, as it showed the concerted effort of various senior leadership within the Athletics Department, and the institution as a whole."

948. The document contains thirteen transcripts of the following events:

- October 3, 2024 Broadcast Cancellation
- October 7, 2024 Meeting with Mr. Marcello
- October 28, 2024 Meeting with Mr. Marcello
- November 13, 2024 Human Resources Mediation Session
- November 21, 2024 Meeting with Mr. Walton
- November 22, 2024 First Disciplinary Reprimand
- December 3, 2024 Discussion with Mr. Brinkley
- December 3, 2024 Personnel Action Former Process Change
- December 4, 2024 Interaction with Mr. Marcello
- December 4, 2024 First Performance Improvement Plan Meeting

- December 5, 2024 Interaction with Mr. Marcello
- December 11, 2024 Human Resources Retaliation Complaint
- December 12, 2024 Second Performance Improvement Plan Meeting

949. Following his submission, on the afternoon of December 13, 2024, Mr. Marcello issued the Plaintiff two disciplinary reprimands. The reprimands go as follows:

- Violation of External Operations Team Open Door Policy
- Missed Basketball Non-Conference Highlight Video

950. Between December 16, 2024 and January 5, 2025, the Plaintiff was out of the office for a Veterans Affairs appointment followed by the winter furlough.

951. On the evening of January 5, 2025, the Plaintiff emailed Mr. Clark to report a matter concerning delayed delivery of part-time employee wages.

952. The Plaintiff explained that processing delays in Personnel Action Forms directly affected staff wages, and that he was not informed of these issues until early December.

953. He added that he completed his portion of the paperwork on or about November 22, 2024.

954. Continuing his email, the Plaintiff expressed concern about leadership's role in the delays and the resulting impact on staff morale and operational continuity.

955. The Plaintiff concluded the email by requesting a meeting to present additional context, documentation, and timeline clarification.

956. On January 6, 2025, the Plaintiff emailed Ms. Stores and included Colonel (VaARNG) Astphan and Ms. Honig to follow up on his formal retaliation complaint.

957. In his email, the Plaintiff stated that twenty-six days had passed without formal communication and requested an update on the status of his retaliation complaint.

958. The Plaintiff stated that on October 31, 2024, he raised a matter of public concern regarding departmental inefficiencies, misuse of public resources, and potential conflicts of interest involving senior leadership and a private charity.

959. He explained that he reiterated these concerns on November 13, 2024, and noted that during the subsequent discussion on December 11, 2024, his concerns were minimized by questioning the terminology he used.

960. He explained that he requested reassignment of the investigation to Ms. Fargiano due to the relationship he observed between Human Resources and the individuals named in his retaliation complaint.

961. The Plaintiff stated that on December 12, 2024, he was issued a Notice of Improvement Needed/Substandard Performance, and noted that its timing closely followed his December 11, 2024 discussion with Human Resources.

962. The Plaintiff added that he had not received any correspondence from Ms. Stores or Ms. Fargiano regarding the status of the investigation, and noted that although the winter furlough may have contributed to delays, he had provided direct contact information to facilitate communication.

963. The Plaintiff concluded his email by requesting that intervention from a state or federal Inspector General or authoritative body authorized to conduct investigative inquiries to ensure impartiality and transparency in the investigation.

964. On the afternoon of January 8, 2025, Ms. Fargiano requested a meeting with the Plaintiff for January 9, 2025, at the VMI Police Station to conduct her inquiry.

965. On the morning of January 9, 2025, Ms. Fargiano conducted her inquiry

966. At the outset of the inquiry, the Plaintiff made a formal written request as follows:

"Due to the escalating retaliation and the director of HR being implicated in my documentation, I would like to formally request that this investigation be escalated to an external governing body. Due to this, I don't believe Human Resources can handle this investigation impartially. The inspector general has received my evidence in regards to this investigation. The evidence provided that will assist this investigation are:

- *"Addressing Managerial Challenges and Operational Analysis"*
- *"Addressing Managerial Challenges and Operational Analysis: A Summary of Allegations and Compliance Concerns"*
- *Addressing Managerial Challenges and Operational Analysis: Comprehensive and Detailed Documentation of Events and Communications"*

I am requesting that an external governing body conduct this investigation to ensure fairness, credibility, and impartiality for everyone involved. I have documented everything thoroughly, and if there are any questions, I would be happy to assist further. Thank you for understanding the gravity of this situation."

967. During the inquiry, the Plaintiff provided Ms. Fargiano a detailed account of the events leading up to his reporting of a matter of public concern and of additional events that had occurred up to the date of their meeting.

968. Following the Human Resources inquiry, on the early afternoon of January 9, 2025, the Plaintiff reported to Colonel (VaARNG) Astphan that Mr. Marcello initiated unwanted physical contact to prevent him from reviewing a disciplinary reprimand.

969. Responding to the Plaintiff's email, Colonel Astphan informed him that the unwanted physical contact he reported did not fall within the scope of the ongoing investigation into allegations of fraud, waste, and abuse.

970. She added that the Plaintiff retained the right to report the matter to law enforcement if he believed criminal activity was involved, and noted that he could report the incident to Human Resources or his supervisory chain.

971. Colonel Astphan concluded by stating that she could forward the information to Human Resources, but since she had not personally heard the Plaintiff's report or recording, she recommended that he provide the most accurate account directly to Ms. Fargiano.

972. Following the instructions of Colonel Astphan, the Plaintiff emailed Ms. Fargiano, and on January 10, 2025, she notified the Plaintiff that a meeting was scheduled to take place in Ms. Stores' office for the early afternoon.

973. On the morning of January 10, 2025, Mr. Marcello emailed the Plaintiff his disciplinary reprimands from January 9, 2025. The reprimands are as follows:

- Unapproved Absence on 1/04/2025
- Violation of External Operations Team Open Door Policy 01/07, 01/08, 01/09
- Acted Outside of Authority
- Missed Creative Deadline

974. On the early afternoon of January 10, 2025, the Plaintiff presented and played back audio recordings documenting the unwanted physical contact and additional incidents to substantiate his complaints to Ms. Stores and Ms. Fargiano.

975. At the conclusion of that meeting, Ms. Stores requested that VMI Police Captain David Henson be present during the Plaintiff's second inquiry.

976. Following the meeting with Ms. Stores, the Plaintiff and Ms. Fargiano retrieved *"Addressing Managerial Challenges and Operational Analysis: A Case Study in Leadership Accountability and Documentation"* from the Office of the Inspector General to provide additional evidence for Ms. Fargiano's inquiry.

977. On the afternoon of January 10, 2025, the Plaintiff met with Ms. Fargiano, Police Captain Henson, and by the Plaintiff's request, an additional VMI Police Officer.

978. In response to that request, Captain Henson asked Officer Ryan Knick to attend the inquiry.

979. At the beginning of his explanation, the Plaintiff explained that he requested Officer Knick's presence and noted that Ms. Stores had requested Captain Henson's presence to ensure impartiality after a contentious conclusion to his prior meeting with the Director of Human Resources.

980. The Plaintiff continued his opening remarks and added that the first document contained an account of events, the second contained the alleged violations of school policy, regulations, law, and waste, fraud, and abuse by state officials acting in their official capacities, the third consisted of email correspondence including an additional alleged violation, and the fourth contained audio transcripts of key events regarding his complaint.

981. He then stated that the documents he presented related to his truthful reporting of alleged misuse of public resources in connection with VMI and a private charity.

982. The Plaintiff concluded his opening statement by noting that the Commonwealth of Virginia is a one-party consent state, and confirmed that he was present for all recordings.

983. During this meeting, the Plaintiff presented and played back audio recordings documenting the unwanted physical contact and additional incidents to Ms. Fargiano, Captain Henson, and Officer Ryan Knick.

984. At the conclusion of the meeting, the Plaintiff requested to no longer be isolated with Mr. Marcello, citing concerns of further physical escalation from him.

985. In response, Ms. Fargiano informed the Plaintiff she would notify Ms. Stores of his request.

986. Following the second inquiry, on the late afternoon of January 10, 2025, the Plaintiff received an email from Mr. Walton that informed the Plaintiff that he would be reporting to him directly for the foreseeable future.

987. Additionally, on the same afternoon of January 10, 2025, the Plaintiff emailed Ms. Fargiano four supporting documents related to his complaint.

988. The Plaintiff explained in his email that some transcript entries may contain minor errors.

989. The four items included in the email to support his claims are as follows:

- 01/09/2025 Audio Transcript of Mr. Marcello Unwanted Physical Contact
- 01/10/2025 Audio Transcript of Project Submission Timeline with Mr. Barbee
- Two Supporting Emails from 01/07/2025 and 01/08/2025

990. On the morning of January 16, 2025, the Plaintiff met with Mr. Clark and Colonel Boobar to report employee wage tampering, payroll delays, and retaliation connected to the Personnel Action Forms.

991. During this meeting, the Plaintiff provided Mr. Clark a supporting document and gave the following statement:

"I have reason to believe that Phil Marcello and various other personnel within the Virginia Military Institute used employee's wages to conduct retaliatory efforts against me. The reasoning of the retaliation is for addressing concerns of waste, fraud, and abuse.

"Following our first meeting on November 18th, 2024, I notified the Inspector General about my concerns, and an investigation has been opened. On December 11th, 2024, I filed a formal retaliation complaint against my direct supervisor, the Associate Athletic Director for External Operations, Phil Marcello for retaliation for addressing various concerns to the conflicts of interest, fiscal impropriety, and negligence of duty.

I have provided copies of the Employee Counseling Forms as well as the email correspondence to. I have made efforts to address the employee payroll accountability, but it was met with further retaliatory efforts.

It is deeply concerning that individuals in positions of leadership are purposely withholding employee pay as a part of a coordinated retaliation effort. As the Director of Athletic Multimedia it is my duty to notify the Deputy Superintendent for Finance and Support of the unlawful behavior within this institution."

992. On January 21, 2025, the Plaintiff sent an email correspondence to Ms. Fargiano on the status of his state or federal Inspector General or authoritative body request.

993. On the afternoon of January 24, 2025, Ms. Fargiano emailed the Plaintiff, VMI General Counsel Patrick O'Leary, Ms. Stores , and Mr. Walton her investigative findings.

994. The findings are as follows:

*INVESTIGATION SUMMARY*

"On January 9, 2025, you requested an investigation be conducted by Human Resources in reference to your claim of retaliation by your supervisor, Phil Marcello, as it relates to you and your work performance and Mr. Marcello's alleged involvement in receiving funds from the Keydet Club. You also alleged that Phil Marcello struck your body with his body.

*FINDINGS*

"At conclusion of the investigation, the following has been determined:

- Retaliation – no evidence has been provided that you have or are being retaliated against.
- Marcello receiving funds from the Keydet Club – this accusation is not substantiated.
- Mr. Marcello striking your body with his body – this accusation cannot be substantiated.

995. Shortly after receiving the findings from the investigation, the Plaintiff received notification that his MyID account was no longer active, and that he would be unable to access his Disney ESPN account used for broadcasting home events.

996. On the morning of January 29, 2025, the Plaintiff emailed Ms. Fargiano and included Mr. O'Leary in the exchange.

997. At the start of his email, the Plaintiff stated that he was following up on his request for a state or federal Inspector General or authoritative body.

998. Building on this context, the Plaintiff stated that he had formally requested intervention from a state or federal Inspector General or authoritative body on January 9, 2025 due to conflicts of interest involving Ms. Stores, and explained that he still provided three documents in good faith to support the inquiry.

999. Continuing his explanation, the Plaintiff noted that after their meeting, Mr. Marcello escalated the situation by using physical contact to block access to a document.

1000. He informed Ms. Fargiano that he reported the unwanted physical contact to both Colonel (VaARNG) Astphan and Ms. Fargiano the day of the incident.

1001. The Plaintiff explained that during the follow-up meeting, he reiterated his request for a state or federal Inspector General or authoritative body to oversee his case due to Ms. Stores' direct involvement as Director of Human Resources.

1002. At the conclusion of his email, the Plaintiff formally requested the return of all four reports he provided, and requested that they be returned in their entirety with assurance that his evidence had not been altered.

1003. On the afternoon of January 29, 2025, the Plaintiff received an invite to meet with Colonel (Ret.) Travis Homiak, the newly appointed Chief of Staff.

1004. On the morning of January 30, 2025, the Plaintiff was notified by Colonel Homiak, in the presence of Ms. Stores and Mr. Walton and with security provided by VMI Police

Captain Henson, that VMI intended to terminate his employment through a Notice of Intent to Terminate.

1005. Colonel Homiak explained to the Plaintiff that VMI intended to terminate the Plaintiff's position based on identified performance deficiencies, and informed him that he would remain employed for thirty days before the termination took effect.

1006. Immediately following the meeting, Captain Henson requested further information as to the meeting that took place.

1007. The Plaintiff explained that when he presented his evidence, it was rejected as insufficient, and that leadership used the Notice of Improvement Needed/Substandard Performance as justification by backdating deficiencies to August.

1008. He added that the conflict began when he told Mr. Marcello they should not prioritize a video project for a private charity.

1009. The Plaintiff stated that all his retaliation claims had been denied, and requested to pursue action regarding the physical contact incident that occurred on VMI property.

1010. Captain Henson explained that the incident qualified as a misdemeanor that did not occur in police presence, and advised the Plaintiff to file the matter with a magistrate. He added that assistance would be available to the Plaintiff as needed.

1011. In response, the Plaintiff requested his assistance, and Captain Henson responded to his request informing him that Officer Knick would arrive later that morning to take his official statement.

1012. In the late morning of January 30, 2025, Officer Ryan Knick took the Plaintiff's statement in his temporary office regarding the unwanted physical contact from Mr. Marcello.

1013. Shortly thereafter the Plaintiff received an email from Ms. Stores that included General Counsel O'Leary, Chief of Staff Colonel (Ret.) Homiak, Inspector General Astphan, and Deputy Superintendent Clark, and that email contained a memorandum for record described as follows:

"Onier, during one of our conversations there was a concern by your supervisor, Phil Marcello and Jamaal Walton, AD that the wage employees who report to you had timesheets that were not being processed for payment by you. I have spoken with the payroll manager, Marsha Mayhew and she stated the timesheets you are responsible for were processed by Phil Marcello and Emily Fulton, they are now current, and the employees have been paid.

You stated you were not familiar with Etrieve, the system by which timesheets are processed. I contacted Darrell Campbell, CIO and asked if you could be trained by a member of the IT team. He stated they would be more than happy to help train you on Etrieve and recommended Matthew Wallace, a developer to assist you."

1014. On the afternoon of January 30, 2025, Officer Ryan Knick escorted the Plaintiff to the Rockbridge County Sheriff's Office to appear before a magistrate to file a criminal complaint concerning unwanted physical contact by Mr. Marcello that he alleged occurred in connection with the Plaintiff's reporting of the misuse of public resources and the commission or possible commission of federal and state offenses.

1015. On the afternoon of January 31, 2025, the Plaintiff met with Mr. Walton and Ms. Murphy to discuss the upcoming multimedia content schedule and associated deadlines.

1016. On the evening of January 31, 2025, two Rockbridge County Deputy Sheriffs and a VMI Police Officer served the Plaintiff with a warrant for his arrest arising from the unwanted physical contact incident.

1017. The warrant was issued on the basis of a separate criminal complaint filed by Mr. Marcello earlier that day arising from the January 9, 2025 unwanted physical contact incident.

1018. In the later evening of January 31, 2025, the Plaintiff sought medical intervention for sleep deprivation for a third time while employed by the Virginia Military Institute.

1019. The Plaintiff was given a return to work date of February 4, 2025.

1020. On February 3, 2025, Ms Stores sent the Plaintiff a request to meet with Colonel (Ret.) Homiak the following morning.

1021. On the morning of February 4, 2025, Colonel Homiak informed the Plaintiff that he was being placed on administrative suspension following the recommendation from the VMI's Threat Assessment Team.

1022. Colonel Homiak explained to the Plaintiff that following the Notice of Intent to Terminate, several employees reported they could not come to work while the Plaintiff remained on duty.

1023. He stated that the VMI Threat Assessment Committee met and made a recommendation to Superintendent Major General (Ret.) Wins that the Plaintiff be placed on suspension due to his alleged behavior impacting Athletic Department operations.

1024. To conclude his explanation, Colonel Homiak noted that the Superintendent accepted this recommendation, and that the suspension period would coincide with the thirty-day Notice of Intent to Terminate ending on March 1, 2025.

1025. The Plaintiff was given a direct order from Colonel Homiak prohibiting him from returning to work during the suspension period unless advance permission was expressly granted by Colonel Homiak.

1026. The following members of the Threat Assessment Team issued the recommendation to Major General (Ret.) Wins:

- Chief Michael Marshall, Chief of VMI Police Department;
- Brig. Gen. Dallas Clark, Deputy Superintendent for Finance and Support;
- Col. Jeff Boobar.; Senior Director for Finance and Support;
- Col. Robert McDonald, Associate Dean for Academic Affairs;
- Col Lawrence Havird, Commandant,
- CPT Eric Moore, Assistant Commandant for Cadet Government;
- Ms. Patricia Fry, Director of Cadet Counseling;
- Dr. Melissa Krawiec, Institute Physician;
- Ms. Valarie Stores, Director of Human Resources;
- Chaplain (COL) John Casper, Chaplain to the Corps of Cadets;
- Mr. Patrick O'Leary, Institute General Counsel

1027. On the afternoon of February 4, 2025, the Plaintiff reported alleged misconduct at the Virginia Military Institute to the final authority in the Institute's chain of command.

1028. On the evening of February 4, 2025, the Plaintiff's email communications access was revoked, and his professional biography was removed from the Athletics Department directory.

1029. On February 10, 2025, during his active suspension, the Plaintiff received a VMI-issued Trespass Warning Form delivered by Rockbridge County Deputy Sheriff David McCreery.

1030. The Trespass Warning Form reads as follows:

- "You are hereby notified that you are not to enter or trespass on property owned or under the control of Virginia Military Police Department after receipt of this notice.

  **If you are found on the property of Virginia Military Institute for any reason, you will be arrested and charged with trespassing, under the Code of Virginia 18.2-119."**

1031. On the afternoon of February 10, 2025, the Plaintiff received an email from the VMI's Office of the Inspector General with findings for his complaint filed on January 16, 2025.

1032. The emailed informed the Plaintiff that Colonel Astphan's response to his January 16, 2025 complaint filed with Mr. Clark was enclosed, and noted that the message was sent to his last known contact information after a delivery attempt to his VMI address failed.

1033. The findings of the investigation read as follows:

Response to 16 Jan 25 Complaint, Case # 20240029

"This letter is in response to a complaint of retaliation you submitted to BG Dallas Clark on 16 Jan 25. I received the complaint on 23 Jan 25 because, pursuant to General Order 90, VMI's policy on retaliation, the VMI Inspector General is charged with investigating all reports of retaliation, as defined in the policy.

In your complaint, you alleged the following: "I have reason to believe that Phil Marcello along with other personnel within the Virginia Military Institute is engaging in retaliatory actions against me through the misuse of employee wages. This retaliation stems from my efforts to address concerns related to waste, fraud, and abuse within the Athletics Department…my efforts to address employee payroll accountability have been met with further retaliation by several individuals signaling a coordinated effort to suppress legitimate concerns."

After completing a thorough review of your complaint, including the supporting documents, your facts that you have alleged are insufficient to support a claim of retaliation for the following reasons:

- You failed to provide sufficient information to show a connection between Mr. Marcello's actions and your role as a complainant.
- You failed to provide sufficient information that showed retaliation by other VMI employees or identify the subjects with sufficient detail in your complaint and evidence.

1034. On March 4, 2025, the Plaintiff received his official termination letter signed by Colonel (Ret.) Homiak.

1035. Following his termination, the Plaintiff was awarded Unemployment Insurance by the Virginia Employment Commission (VEC).

1036. The Plaintiff was notified that although VEC requested information from VMI, VMI provided no reason for his separation at the time of determination.

1037. On the morning of April 18, 2025, the Plaintiff and Mr. Marcello appeared in Rockbridge County District Court.

1038. Upon the advice of counsel, both entered Fifth Amendment pleas to avoid self-incrimination in connection with the unwanted physical contact on January 9, 2025.

**OPERATIONAL INTEGRATION BETWEEN PUBLIC AND PRIVATE ENTITIES**

1039. The Virginia Military Institute (VMI) is a state-operated institution of higher education that receives federal funding through the Department of Defense and the Department of Education.

1040. The chain of command structure is as follows:

- VMI → Superintendent → VMI Board of Visitors → Governor of Virginia

1041. The VMI Alumni Agencies consist of four nonprofit organizations organized under Section 501(c)(3) of the Internal Revenue Code.

1042. The four private charities that comprise the Alumni Agencies are as follows:

- VMI Alumni Agencies
- The Keydet Club
- VMI Foundation
- VMI Alumni Association

1043. The VMI Alumni Agencies describe their mission as advancing the success of the Virginia Military Institute and its cadets.

1044. The institutional structure includes the Superintendent and the President of the Board of Visitors serving as Ex-Officio Non-Voting members on one or more of the governing boards of the private charities as follows:

- Foundation Board of Trustees
- Keydet Club Board of Governors
- Alumni Agencies Board of Directors

1045. On their website, the VMI Alumni Agencies describe their organizational history as follows:

**Forming the Agencies**

"Between 2014–16, the heads of the Alumni Association, Keydet Club, and Foundation thoughtfully and intentionally formed a plan for a combined Agencies headed by a single executive in order to improve support for VMI.

Building on a study done by an outside firm in 1989, three alumni—Turner Perrow '96, then-Alumni Association president; Hugh Fain '80, then-Foundation president; and Bill Paulette '69, then-Keydet Club president—asked Paul B. Maini '66 and George H. Roberts '68 to analyze restructuring the Agencies. In the past, Maini and Roberts had selflessly served the Agencies and the Institute in numerous capacities. The report thoroughly explored possible organizational structures for a combined Agencies and effects on a committed, active alumni body and—ultimately—the Institute. After

receiving and studying this report, Perrow, Fain, and Paulette prepared a resolution that proposed restructuring the Agencies under a single chief executive officer."

1046. According to official materials, each affiliated organization operates with a defined functional role as follows:

- VMI Alumni Agencies: Creating strength of purpose for efficient and effective operations, stewardship, fundraising, communications, events, advancement services, and engagement in support of the VMI alumni family, the Corps of Cadets, and the future of the Institute. The VMI Alumni Agencies Board consists of the president and vice president of the Foundation Board of Trustees, the Alumni Association Board of Directors, and the Keydet Club Board of Governors, as well as a representative from the VMI Board of Visitors.
- VMI Keydet Club: Responsible for the financial support of NCAA Division I cadet-athletes via scholarships, coaches' salaries, academic support, and operating budgets for VMI's 18 individual NCAA teams. The Keydet Club provides directed communications to donor leadership and supports engagement at sporting events. Financial support from the Keydet Club creates opportunity for cadet-athletes.
- VMI Foundation: Responsible for fundraising and comprehensive giving options, including vital unrestricted funding, directed giving funds and scholarships, cadet life and leadership programs support, and planned giving—all types of financial support with the exception of NCAA Division I athletics. The VMI Investment Holdings, LLC board has the overall responsibility for the management of the

VMI endowment, operating within fiscal best practices and processes to secure a strong future for the Institute.

- VMI Alumni Association: To organize alumni in one general body to keep alive the memories of Institute life and to efficiently aid in the promotion of the welfare of the Institute and the successful prosecution of its educational purposes in the future. The VMI Alumni Association supports alumni engagement and the Institute through chapter activities, admissions recruiting, Moody Hall activities, career support, and alumni reunions with support from advancement services.

1047. The VMI Alumni Agencies identify 304 Letcher Avenue (Moody Hall) Lexington, VA 24450 as their operational headquarters.

1048. IRS Form 990 filings for the four charities do not list 304 Letcher Avenue (Moody Hall), Lexington, VA 24450 as their operational headquarters, but instead identify P.O. Box 932, Lexington, VA 24450 as their address despite conducting business on VMI property.

1049. As described in ¶¶ 124-127, 128-129, 132-134, 226, 227, 228, 278-280, the email correspondence between VMI employees and VMI Alumni Agencies personnel reflects a recurring operational workflow in which Agencies personnel determine which fundraising advertisements are to be displayed, specify timing and placement for ESPN broadcasts and in-stadium videoboard programming, and transmit creative assets, while VMI personnel execute those directives through institutional broadcast and game-day operations.

1050. On January 8, 2025, the Lexington City Council unanimously approved a conditional use permit allowing the VMI Alumni Agencies to operate under the zoning classification of "Educational Facility, College/University."

1051. Prior to the vote, Council member David Sigler disclosed a conflict of interest due to his employment with VMI, but stated he did not need to recuse due to the benefit being extended to a group of three or more, and that he could vote impartially.

1052. The "Educational Facility, College/University" zoning classification is defined as an institution authorized by the Commonwealth to award degrees and the facilities associated with that use.

1053. Lexington City Council's approval of the conditional use permit reflects the City's treatment of the VMI Alumni Agencies' operations as functioning within and aligned with the institutional framework associated with a Virginia degree-granting college or university.

1054. Between March 25 and March 27, 2025, the Keydet Club conducted its annual "Compete to Win" donation campaign.

1055. As part of the campaign, Mr. Walton declared that he would wear a cadet uniform and participate in cadet routines for 24 hours if the campaign raised a threshold of $25,000.

1056. He further stated that if the campaign reached $40,000, he would extend the participation to 48 hours, including attending classes and staying in the barracks.

1057. The barracks houses Reserve Officer Training Candidates for the Department of Defense, and the barracks itself was constructed under Department of Defense Contract Purchase Order (PO) PIID W9124D24P0119.

1058. In a separate video related to the same campaign, Mr. Walton appeared alongside Commandant of Cadets Colonel (Ret.) Lawrence Havird while appearing in uniform.

1059. In the video, viewers were directed to the Keydet Club's unrestricted giving initiative titled "Value Makes Impact."

1060. Colonel Havird stated in this video that if the campaign exceeded $50,000, he would join Mr. Walton in participating in the overnight commitment.

1061. As of early 2025, the Virginia Military Institute hosted job postings for the VMI Alumni Agencies on its publicly maintained VMI.edu website.

1062. These postings invited applicants to submit materials directly to the Alumni Agencies, bypassing the Commonwealth of Virginia's official public employment system.

1063. The VMI Alumni Agencies operate in coordination with VMI personnel and pursue objectives aligned with institutional fundraising priorities.

1064. Based on the governance roles, shared executive leadership structure, use of VMI property for operations, and coordination with VMI personnel described above, the Alumni Agencies are not meaningfully separable from VMI's institutional operations for purposes of state action and entwinement.

1065. In Brentwood Academy v. Tennessee Secondary School Athletic Association, 531 U.S. 288, 298 (2001), the Supreme Court held: "The nominally private character of the Association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings. We therefore hold that state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself."

## COMMISSIONED AND RETIRED OFFICERS AND UCMJ JURISDICTION

1066. The Virginia Military Institute is a state and federally-supported senior military college that educates and trains Reserve Officers' Training Corps (ROTC) candidates under the authority of the United States Department of Defense.

1067. Historically, the superintendents of the Virginia Military Institute have held the rank of general officer in the United States Armed Forces, with the six most recent incumbents listed as follows:

- General Sam S. Walker, United States Army (1981–1988)
- Lt. General John W. Knapp, United States Army (1989–1995)
- Major General Josiah Bunting III, United States Army (1995–2002)
- General J. H. Binford Peay III, United States Army (2003–2020)
- Major General Cedric T. Wins, United States Army (2020–2025)
- Lt. General David Furness, United States Marine Corps (2025–present)

1068. The Virginia Military Institute employs former and retired commissioned officers and alumni in its senior leadership, staff, administrative, and instructional roles within the institution.

1069. The status of these current, former, or retired commissioned and general officers, together with their prior service in command and staff positions within the Department of Defense, and, in some cases, assignments that involved coordination with other state and federal agencies, distinguish them from typical civilian administrators of a public college.

1070. During their command and staff service within the Department of Defense, such officers held security clearances at levels required for duties that could require access to classified and other sensitive information.

1071. The Virginia Military Institute's affiliated alumni organizations serve as the primary organized mechanism through which former cadets, graduates, and other supporters remain connected to the institution and its leadership.

1072. These affiliated alumni organizations are private nonprofit charitable entities under Section 501(c)(3) of the Internal Revenue Code and are largely led and staffed by alumni of the Virginia Military Institute.

1073. Cadets who later commission as officers, and graduates who pursue military, government, or private-sector careers, commonly participate in events, communications, and other activities coordinated by these entities as their careers progress.

1074. Under the unified VMI Alumni Agencies structure, the VMI Foundation and the Keydet Club operate donor courtesy rewards that are open to the general public.

1075. These donor courtesies provide tier-based access to VMI officials and institutional personnel acting in their official capacities through invitations to events and functions they attend and more frequent and direct contact with VMI officials, senior administrators, and former commissioned and retired general officers who hold institutional roles.

1076. As stated in section 2-503 of the Department of Defense Joint Ethics Regulation, retired military members are subject to 5 C.F.R. §2635.702, and as such may not use their title or rank for their own private gain or for the private gain of friends, relatives, or nonprofit organizations with which they are affiliated in some capacity.

1077. By structuring the donor courtesy rewards and tier-based access through the VMI Alumni Agencies, by means of the VMI Foundation and the Keydet Club, retired commissioned officers and other institutional leadership provide preferential access to

donors using their positions within VMI and their official rank through a private fundraising mechanism.

1078. Through the IRS Form 990 filings published on the Alumni Agencies website, the VMI Foundation reported in Schedule I that it provided cash and non-cash grants to VMI leadership.

1079. Based on those filings and publicly available information regarding institutional compensation, these grants were provided in addition to the regular salary and compensation institutional leadership received through their employment with the Virginia Military Institute.

1080. By appearing in their official capacities at events coordinated through the VMI Alumni Agencies, retired commissioned officers used their rank and institutional positions to gain private benefit through additional supplemental income and other rewards funded through the donor courtesy structure.

**Article 78. Accessory After the Fact**

1081. Current and retired commissioned and general officers employed by VMI, together with other institutional officials, were informed of the Plaintiff's reports regarding Bribery Concerning Programs Receiving Federal Funds and Misapplication of Institutional Property.

1082. After receiving the Plaintiff's reports, and knowing that the conduct described in those reports, if committed by persons subject to the Uniform Code of Military Justice, would constitute a violation of Article 78 of the Uniform Code of Military Justice, these officers and associated officials retained and continued to support individuals implicated

in the misconduct and used institutional processes in a manner that shielded those individuals from scrutiny and potential discipline.

1083. By retaining and protecting individuals implicated in the misconduct, and by using institutional processes in this manner after receiving the Plaintiff's reports, these current and retired officers and associated officials provided comfort and assistance to those offenders and engaged in conduct within the meaning of Article 78 of the Uniform Code of Military Justice.

**Article 81. Conspiracy**

1084. Current and retired commissioned and general officers employed by VMI, together with other institutional officials, coordinated their actions to preserve the donor courtesy reward systems operated through the VMI Alumni Agencies and to deter or retaliate against internal and external reporting concerning Bribery Concerning Programs Receiving Federal Funds and Misapplication of Institutional Property.

1085. This coordination included the issuance of disciplinary reprimands, the Notice of Improvement Needed/Substandard Performance, the Threat Assessment Team process, administrative suspension, trespass restrictions, and Mr. Marcello's criminal complaint after the Plaintiff reported unwanted physical contact and potential federal offenses to institutional authorities and law enforcement.

1086. By jointly using their institutional authority and military rank in this manner, these current and retired officers and associated officials entered into a mutual understanding and engaged in conduct within the meaning of Article 81 of the Uniform Code of Military Justice.

**Article 92. Failure to Obey Order or Regulation**

1087. As stated in section 2-503 of the Department of Defense Joint Ethics Regulation and 5 C.F.R. §2635.702, retired military members are prohibited from using their military title, rank, or position for their own private gain or for the private gain of nonprofit organizations with which they are affiliated, and are required to avoid the appearance that public office is being used for private benefit.

1088. The VMI Foundation and the Keydet Club operate the donor courtesy reward system that solicits access to VMI officials and events to specified contribution levels.

1089. Retired commissioned officers employed by VMI in leadership, staff, administrative, instructional, or advisory roles used their military rank and institutional positions at donor-tier events coordinated through the VMI Foundation, the Keydet Club, and the VMI Alumni Association to cultivate contributors and advance the private fundraising interests of the VMI Alumni Agencies.

1090. The VMI Foundation reported in their Schedule I that VMI leadership was provided cash and non-cash grants in addition to the salary and compensation those officers received through their employment with the Virginia Military Institute.

1091. By using their rank, titles, and institutional positions in connection with donor courtesy rewards and tier-based access systems, these current and retired officers and associated officials engaged in conduct within the meaning of Article 92 of the Uniform Code of Military Justice.

**Article 93. Cruelty and Maltreatment**

1092. The Plaintiff is a former E-4 Specialist in the United States Army and a disabled veteran.

1093. Current and retired commissioned and general officers employed by VMI exercised supervisory and institutional authority over the Plaintiff and were aware of his prior military service and disability status.

1094. After the Plaintiff made his internal reports regarding Bribery Concerning Programs Receiving Federal Funds and Misapplication of Institutional Property, these officers and associated officials, despite having knowledge of his disabilities, altered workplace procedures in ways that increased his workload and reduced support.

1095. They created working conditions that magnified the Plaintiff's disability by imposing artificially heightened environmental stimuli that exacerbated his sensory hypersensitivity and work schedules that resulted in intentional sleep deprivation.

1096. While acting in their institutional capacities, these current and retired commissioned and general officers worsened the Plaintiff's disability-related limitations and inflicted mental anguish and emotional duress by using his limitations as a basis for adverse treatment, escalating demands, performance documentation, disciplinary action, and termination of his employment.

1097. By using their institutional authority and, for those subject to the Uniform Code of Military Justice, their military rank in this manner toward a person subject to their orders, these current and retired officers and associated officials engaged in cruelty, oppression, and maltreatment within the meaning of Article 93 of the Uniform Code of Military Justice.

**Article 107. False Statements**

1098. On August 12, 2024, the Plaintiff received his Administrative and Professional Faculty Performance Evaluation with the Plaintiff receiving ratings ranging between Fully Competent and Excellent.

1099. On November 18, 2024, the Plaintiff reported potential Bribery Concerning Programs Receiving Federal Funds and Misapplication of Institutional Property to the Deputy Superintendent for Finance and Support and VMI's Office of the Inspector General.

1100. On November 22, 2024, the Plaintiff received seven disciplinary reprimands, followed by ten additional disciplinary reprimands issued between December 5, 2024 and the date the Notice of Improvement Needed/Substandard Performance was issued.

1101. On January 30, 2025, VMI's Chief of Staff, Colonel (Ret.) Homiak informed the Plaintiff that VMI intended to terminate his employment through a Notice of Intent to Terminate.

1102. The Notice of Intent to Terminate relied on the Notice of Improvement Needed/Substandard Performance as the basis for termination.

1103. On February 4, 2025, following the Mr. Marcello's criminal complaint, the Plaintiff was placed on administrative suspension pursuant to a recommendation from the VMI Threat Assessment Team to the Superintendent.

1104. Throughout this period, current and retired commissioned and general officers employed by VMI, together with other institutional officials, relied on and disseminated official records and communications that recast the Plaintiff's performance, disciplinary

history, and suspension status to justify his termination while an active inquiry by VMI's Office of the Inspector General into his reports was ongoing.

1105. By preparing, approving, and transmitting those records and communications under these circumstances, these current and retired officers and associated officials engaged in conduct within the meaning of Article 107 of the Uniform Code of Military Justice.

**Article 133. Conduct Unbecoming an Officer and Gentlemen**

1106. Current and retired commissioned and general officers employed by VMI held positions of trust that required them to uphold the standards of honor, integrity, and leadership expected of officers in the United States Armed Forces while exercising institutional authority over the Plaintiff and the operations of the Virginia Military Institute.

1107. These officers and officials took disciplinary actions against the Plaintiff through reprimands, administrative suspension, and termination while shielding individuals implicated in Bribery Concerning Programs Receiving Federal Funds and Misapplication of Institutional Property from scrutiny and potential discipline.

1108. Taken together, this misuse of rank and position for private benefit, the reprisal and cruelty toward a former enlisted soldier under their authority, and the reliance on distorted official records and processes to justify adverse action are inconsistent with the standards of conduct expected of commissioned officers and reflect discredit upon themselves, their offices, and their respective branches of service.

1109. Taken together, the conduct described in connection with Articles 78, 81, 92, 93, and 107, when committed by current and retired officers holding themselves out as representatives of the Virginia Military Institute, is incompatible with the standards of

honor, integrity, and leadership expected of officers in the United States Armed Forces and reflects discredit upon themselves, their offices, and their respective branches of service.

1110. This conduct constitutes conduct unbecoming an officer and gentleman within the meaning of Article 133 of the Uniform Code of Military Justice.

1111. Retired officers of the United States Armed Forces fall within the meaning of 10 U.S.C. §802 and remain subject to recall to active duty as described in 10 U.S.C. §688, and remain subject to trial by court-martial for violations of the Uniform Code of Military Justice.

## COUNTS

1112. The four separately incorporated charities, the VMI Alumni Agencies, the VMI Foundation, the VMI Keydet Club, and the VMI Alumni Association, operate as a collective advancement and fundraising structure that publicly present and market under the "VMI Alumni Agencies" designation.

1113. For clarity and naming purposes in this Complaint, "VMI Alumni Agencies" refers to the four entities collectively, unless a specific entity is identified by its legal name.

## COUNT I - DEPRIVATION OF FIRST AMENDMENT RIGHTS

## (First Amendment; 42 U.S.C. §1983)

**Defendants: VMI, VMI Board of Visitors, VMI Alumni Agencies**

1114. The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1115. At all relevant times, the Plaintiff was a salaried employee of the Virginia Military Institute working under an employment agreement.

1116. At all relevant times, VMI and the VMI Board of Visitors acted under color of state law and coordinated with the VMI Alumni Agencies in the conduct described in the *Operational Integration Between Public and Private Entities* section.

1117. Through this coordination and operational integration, the VMI Alumni Agencies acted jointly and in concert with VMI and the VMI Board of Visitors, and therefore acted under color of state law for purposes of 42 U.S.C. §1983.

1118. The Plaintiff engaged in speech on matters of public concern outside the scope of his employment description and assigned duties by reporting the misuse of public resources and the potential commission of federal and state offenses as described in ¶¶ 295–300, 517–551, 552–581, 582–586, 956–963, 965–967.

1119. The Defendants, acting through the Plaintiff's direct supervisor and other institutional officials, subjected the Plaintiff to adverse actions in the form of disciplinary reprimands, performance documentation issued following his disclosures, administrative suspension, trespass restrictions, termination of employment, and separate criminal complaint initiated by his direct supervisor as part of this course of conduct.

1120. As a direct consequence of that criminal complaint, the Plaintiff was compelled to invoke his Fifth Amendment right against self-incrimination in a related criminal proceeding as described in ¶¶ 1036–1037.

1121. The Plaintiff's reporting and speech were a substantial and motivating factor in the Defendants' actions and absent his reporting the Defendants would not have taken these measures.

1122. These actions would deter a person of ordinary firmness from continuing to engage in the same protected speech.

1123. The Defendants' actions deprived the Plaintiff of rights secured by the First Amendment to the United States Constitution and enforceable through 42 U.S.C. §1983.

1124. The adverse actions described herein were taken pursuant to decisions and practices of officials with policymaking and supervisory authority for VMI and the VMI Board of Visitors, and were taken in part to advance the interests of the VMI Alumni Agencies.

1125. These decisions and actions reflect institutional policies, customs, or usages attributable to VMI, the VMI Board of Visitors, and by extension the VMI Alumni Agencies through their operational integration and joint action.

1126. As a direct and proximate result of actions taken by the Defendants, the Plaintiff suffered injury to his business and property in the form of loss of salary and benefits, diminished earning capacity, harm to his professional reputation, damage to his career opportunities, and other consequential and compensatory losses.

## COUNT II — DEPRIVATION OF DUE PROCESS RIGHTS

**(Fourteenth Amendment; 42 U.S.C. §1983)**

**Defendants: VMI, VMI Board of Visitors, VMI Alumni Agencies**

1127. The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1128. At all relevant times the Plaintiff was a salaried employee of the Virginia Military Institute working under an employment agreement.

1129. At all relevant times VMI and the VMI Board of Visitors acted under color of state law and coordinated with the VMI Alumni Agencies in the conduct described in the *Operational Integration Between Public and Private Entities* section.

1130. Through this coordination and operational integration, the VMI Alumni Agencies acted jointly and in concert with VMI and the VMI Board of Visitors, and therefore acted under color of state law for purposes of 42 U.S.C. §1983.

1131. The Plaintiff possessed a protected property interest in his continued employment with a public institution of higher education under his Employment Agreement as governed by the VMI Administrative and Professional Faculty Handbook standards as described in ¶¶ 20–26.

1132. On August 12, 2024, the Plaintiff received an Administrative and Professional Faculty Performance Evaluation with ratings between Fully Competent and Outstanding as described in ¶¶ 74–76.

1133. The Defendants, through the Plaintiff's direct supervisor and other institutional officials, deprived the Plaintiff of these property interests by initiating and relying on a series of adverse employment and criminal actions following his reporting to the Deputy Superintendent for Finance and Support and the Office of the Inspector General on November 18, 2024.

1134. On October 31, 2024, the Plaintiff reported a matter of public concern to the Director of Human Resources, and subsequently on November 18, 2024 reported the same concerns to the Deputy Superintendent for Finance and Support and the Office of

the Inspector General as described in ¶¶ 295–300, 517–551, 552–581, 582–586, 587, 588–587.

1135. Between November 22, 2024 and January 9, 2025, the Plaintiff received a total of twenty-three disciplinary reprimands as described in ¶¶ 666, 832, 936, 938, 949, 973.

1136. The Plaintiff was given a Notice of Improvement Needed/Substandard Performance during the second Performance Improvement Plan meeting on December 12, 2024 as described in ¶¶ 941–944.

1137. On January 24, 2025, the Plaintiff received the investigative findings despite having questioned the impartiality of Human Resources as described in ¶¶ 956–963, 965–967, 993–994.

1138. In response to the January 24, 2025 Human Resources investigative findings, the Plaintiff emailed Ms. Fargiano and copied General Counsel O'Leary on January 29, 2025 reiterating his request for review by a state or federal Inspector General or other independent authoritative body due to conflicts of interest involving Ms. Stores as described in ¶¶ 996–1002.

1139. On the afternoon of January 29, 2025, following the Plaintiff's email to Ms. Fargiano and General Counsel O'Leary, the Plaintiff received a meeting invitation with Colonel (Ret.) Homiak for the following morning at which he was notified that the Virginia Military Institute intended to terminate his employment as described in ¶¶ 1003.

1140. On the morning of January 30, 2025, Colonel Homiak notified the Plaintiff that the Virginia Military Institute intended to terminate his employment based on identified performance deficiencies annotated in the Notice of Improvement Needed/Substandard Performance as described in ¶¶ 1004–1005.

1141. Following the unwanted physical contact complaint, the Plaintiff filed with the Rockbridge County Sheriff's Office on January 30, 2025, Mr. Marcello filed a separate criminal complaint against the Plaintiff on January 31, 2025 concerning the same January 9, 2025 incident as described in ¶¶ 1016–1017.

1142. As a result of the recommendation from the VMI Threat Assessment Team, the Plaintiff was placed on administrative suspension on February 4, 2025 as described in ¶¶ 1021–1026.

1143. On the evening of February 4, 2025, the Plaintiff's institutional email access was revoked as described in ¶¶ 1027.

1144. On the afternoon of February 10, 2025, on behalf of the Virginia Military Institute and the VMI Police Department, the Rockbridge County Sheriff's Office issued the Plaintiff a trespass warning while he remained on administrative suspension as described in ¶¶ 1028.

1145. Taken together, these actions resulted in the deprivation of the Plaintiff's protected property interests without adequate notice, a neutral and impartial decision maker, or any meaningful opportunity to be heard.

1146. The Defendants' actions deprived the Plaintiff of rights secured by the Fourteenth Amendment of the United States Constitution and enforceable through 42 U.S.C. §1983.

1147. The adverse actions described herein were taken pursuant to decisions and practices of officials with policymaking and supervisory authority for VMI and the VMI Board of Visitors, and were taken in part to advance the interests of the VMI Alumni Agencies.

1148. These decisions and actions reflect institutional policies, customs, or usages attributable to VMI, the VMI Board of Visitors, and by extension the VMI Alumni Agencies.

1149. As a direct and proximate result of actions taken by the Defendants, the Plaintiff suffered injury to his business and property in the form of loss of salary and benefits, diminished earning capacity, harm to his professional reputation, damage to his career opportunities, and other consequential and compensatory losses.

## COUNT III — CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS

**(First and Fourteenth Amendment; 42 U.S.C. §1983)**

**Defendants: VMI, VMI Board of Visitors, VMI Alumni Agencies**

1150. The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1151. At all relevant times, the Plaintiff was a salaried employee of the Virginia Military Institute working under an employment agreement.

1152. At all relevant times, VMI and the VMI Board of Visitors acted under color of state law and coordinated with the VMI Alumni Agencies in the conduct described in the "Operational Integration Between Public and Private Entities" section.

1153. Through this coordination and operational integration, the VMI Alumni Agencies acted jointly and in concert with VMI and the VMI Board of Visitors, and therefore acted under color of state law for purposes of 42 U.S.C. §1983.

1154. Defendants VMI, the VMI Board of Visitors, and the VMI Alumni Agencies, through their agents, officers, and employees, entered into an agreement and mutual

understanding among themselves to deprive the Plaintiff of rights secured by the First and Fourteenth Amendments to the United States Constitution.

1155. The Defendants acted in a coordinated structure and in concert with one another with the shared purpose and mutual understanding of obstructing, discouraging, or interfering with the Plaintiff's efforts to report the misuse of public resources and the commission or possible commission of federal and state offenses to institutional authorities and law enforcement, and to prevent him from providing testimony in an official proceeding.

1156. After the Plaintiff addressed concerns regarding the misuse of public resources and related conduct to Mr. Marcello on October 31, 2024, Mr. Marcello and Mr. Walton filed a complaint against the Plaintiff with the Director of Human Resources, Ms. Stores as described in ¶¶ 295.

1157. On November 5, 2024, Mr. Marcello emailed the Plaintiff acknowledging that he had been unable to attend a meeting earlier that day involving Mr. Walton and Ms. Stores, as described in 313.

1158. Following the submission of his report on November 4, 2024, and following the response to the meeting request for November 5, 2024, a separate mediation meeting was scheduled with Ms. Stores for November 13, 2024 to address the complaint and his reported concerns.

1159. At the conclusion of that meeting, Ms. Stores stated that no resolution had been reached, but nevertheless placed the Plaintiff under Mr. Marcello's supervision despite his stated concerns about adverse actions following his reporting, as described in ¶¶ 496, 499.

1160. Four days after the Plaintiff's November 18, 2024 meeting with the Inspector General and Deputy Superintendent for Finance and Support Mr. Clark, the Plaintiff received seven written disciplinary reprimands on November 22, 2024 that were used as the basis for placing him on a Performance Improvement Plan as described in ¶¶ 666–670.

1161. Ms. Stores was included as a recipient of each disciplinary reprimand issued after each event between November 22 and December 13, 2024.

1162. Between November 22, 2024 and January 9, 2025, the Plaintiff received a total of twenty-three disciplinary reprimands as described in ¶¶ 666, 832, 936, 938, 949, 973.

1163. Following the first Performance Improvement Plan meeting, Mr. Walton asked Ms. Murphy to remain following the conclusion of the meeting to review the notes taken during the meeting as described in ¶¶ 831.

1164. The Plaintiff was given a Notice of Improvement Needed/Substandard Performance during the second Performance Improvement Plan meeting on December 12, 2024 as described in ¶¶ 941–944.

1165. On January 9, 2025, the Plaintiff made Ms. Fargiano aware of his concerns regarding Human Resources impartiality and requested intervention from a state or federal Inspector General or other authoritative body authorized to conduct investigative inquiries as described in ¶¶ 965–967.

1166. On January 21, 2025, the Plaintiff emailed Ms. Fargiano to request an update on the status of his request that the matter be referred to a state or federal Inspector General or other authoritative body as described in ¶¶ 992, and on January 24, 2025 Human

Resources concluded its investigation and dismissed the Plaintiff's complaint as described in ¶¶ 993–994.

1167. On the afternoon the Plaintiff sent his January 29, 2025 email to General Counsel O'Leary and Ms. Fargiano reiterating his request for oversight, a meeting was scheduled with Colonel (Ret.) Homiak at which the Plaintiff was notified that Virginia Military Institute intended to terminate his employment as described in ¶¶ 1003.

1168. On the afternoon of January 30, 2025, the Plaintiff filed a criminal complaint alleging unwanted physical contact by Mr. Marcello as described in ¶¶ 1014, and on January 31, 2025 Mr. Marcello filed a separate criminal complaint against the Plaintiff concerning the same January 9, 2025 incident as described in ¶¶ 1016–1017.

1169. Following the Plaintiff's criminal complaint and Mr. Marcello's, the Plaintiff was placed on administrative suspension on February 4, 2025 as described in ¶¶ 1021-1026.

1170. On the afternoon of February 10, 2025, on behalf of the Virginia Military Institute and the VMI Police Department, the Rockbridge County Sheriff's Office issued the Plaintiff a trespass warning as described in ¶¶ 1028.

1171. As a result of the unwanted physical contact complaint, on April 18, 2025, the Plaintiff invoked his Fifth Amendment right against self-incrimination in a related criminal proceeding as described in ¶¶ 1036–1037.

1172. Each of the acts described in the preceding paragraphs constituted an overt act in furtherance of the agreement to deprive the Plaintiff of his constitutional rights.

1173. The Defendants, through the Plaintiff's direct supervisor and other institutional officials, coordinated their actions in issuing disciplinary reprimands, creating performance documentation following the Plaintiff's reporting, the initiation of a separate

criminal complaint against him by his direct supervisor, imposing administrative suspension and trespass restrictions, and terminating his employment.

1174. These actions were undertaken in furtherance of this agreement and of the scheme regarding the misuse of public resources and related federal and state offenses that the Plaintiff reported through institutional channels.

1175. The Defendants would not have imposed these adverse actions against the Plaintiff but for his reporting regarding the misuse of public resources and the commission or possible commission of federal and state offenses.

1176. The Defendants' coordinated actions following his disclosures deprived the Plaintiff of rights secured by the First Amendment by restricting his ability to report misconduct regarding matters of public concern to institutional authorities and law enforcement.

1177. The Defendants' coordinated actions deprived the Plaintiff of rights secured by the Fourteenth Amendment by interfering with his protected property interest in his continued employment with a public institution of higher education under the Employment Agreement as governed by the VMI Administrative and Professional Faculty Handbook standards, and by infringing his liberty interest in his reputation and ability to pursue his occupation.

1178. The Defendants' coordinated actions deprived the Plaintiff of rights secured by the First and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. §1983.

1179. The adverse actions described herein were taken pursuant to decisions and practices of officials with policymaking and supervisory authority for VMI and the VMI Board of Visitors, and were taken in part to advance the interests of the VMI Alumni Agencies.

1180. The adverse actions described herein were taken pursuant to decisions and practices of officials with policymaking and supervisory authority for VMI and the VMI Board of Visitors, and were taken in part to advance the interests of the VMI Alumni Agencies.

1181. These decisions and actions reflect institutional policies, customs, or usages attributable to VMI, the VMI Board of Visitors, and by extension the VMI Alumni Agencies.

1182. As a direct and proximate result of actions taken by the Defendants, the Plaintiff suffered injury to his business and property in the form of loss of salary and benefits, diminished earning capacity, harm to his professional reputation, damage to his career opportunities, and other consequential and compensatory losses.

**COUNT IV — RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (18 U.S.C. §1962(c))**

**Defendants: VMI, VMI Board of Visitors, VMI Alumni Agencies**

1183. The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1184. The Defendants violated the Racketeer Influenced and Corrupt Organizations Act.

1185. **Person:** Each Defendant identified in this Complaint is a "person" within the meaning of 18 U.S.C. §1961(3) and is capable of holding a legal or beneficial interest in property.

1186. Each Defendant, through its officers, agents, and employees, knowingly and willfully participated in the operation or management of the enterprise's affairs by directing, coordinating, approving, and implementing donor-tier access structures as a

means to bribe and reward agents of VMI and other public officials by authorizing financial disbursements to institutional leadership, coordinating interstate advancement travel, using mail and wire solicitations, and taking actions against a witness as described herein.

1187. By doing so, each Defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs within the meaning of 18 U.S.C. §1962(c).

1188. **The Enterprise:** Defendants Virginia Military Institute (VMI) and the VMI Board of Visitors, in coordination with (1) the VMI Alumni Agencies Board Inc., (2) the Keydet Club Inc., (3) the VMI Foundation, (4) VMI Investment Holdings LLC (a directly controlled entity of the VMI Foundation as reported on the VMI Foundation's IRS Form 990, Schedule R), and (5) the VMI Alumni Association together form an association-in-fact for the continual and financially beneficial purposes described herein and constitute an enterprise as defined in 18 U.S.C. §1961(4) for the continuation of racketeering activity.

1189. Each Defendant is a separate legal entity that is distinct from each Defendant as a person, and consists of the ongoing association-in-fact structure through which the Defendants acted.

1190. No single Defendant by itself constitutes the enterprise as described in ¶¶ 1038–1039, 1040–1042, 1043–1045.

1191. The entities comprising the enterprise operate in a coordinated and ongoing arrangement between a public institution of higher education and its associated private charities.

1192. **Pattern of Racketeering Activity:** A pattern of racketeering activity, as defined under 18 U.S.C. §1961(5), requires at least two qualifying predicate acts, one occurring after the statute's effective date and the last occurring within ten years of a prior act. The events set forth in this Complaint allege multiple predicate acts meeting this statutory framework, including Bribery Concerning Programs Receiving Federal Funds and Misapplication of Property, Mail Fraud and Wire Fraud, Interstate and Foreign Travel in Aid of Racketeering Enterprises, Laundering of Monetary Instruments Derived from Specified Unlawful Activity, Monetary Transactions in Criminally Derived Property, Obstruction of an Official Proceeding, and Retaliating Against a Witness.

1193. These acts occurred repeatedly over multiple years as reflected in IRS filings from 2019 through 2023, and in the events surrounding the Plaintiff's employment and termination between 2024 and 2025.

1194. They share a common purpose of securing and protecting donor-derived revenue and other financial benefits for the enterprise while maintaining institutional control over public resources, access to institutional leadership, and the continued operation of the advancement system in a manner that limits effective review by internal or external oversight bodies.

1195. The predicate acts are related in purpose, method, participants, and results and together are directed at preserving the enterprise's financial and institutional advantages.

1196. The racketeering activity is carried out through the ongoing operation of the advancement and fundraising systems and through the use of employment, disciplinary, and criminal measures against any person who reports, assists an inquiry, or attempts to

disrupt or expose the scheme by discouraging and suppressing witness cooperation in official proceedings.

1197. The enterprise has an ongoing decision-making framework through which associated entities coordinate fundraising operations, donor-tier access systems, financial disbursements, and employment-related measures that allow the racketeering acts described herein to continue and recur over time.

**Predicate Act One — Bribery Concerning Programs Receiving Federal Funds and Misapplication of Property (18 U.S.C. §666)**

1198. At all relevant times, the Virginia Military Institute is a governmental agency that receives grants, contracts, subsidies, loans, guarantees, insurance, or other forms of federal assistance from the Department of Defense and the Department of Education in excess of $10,000 during a one-year period, and its officers and employees act as agents of the Commonwealth of Virginia within the meaning of 18 U.S.C. §666(d)(1).

1199. As described in their materials, the Keydet Club and VMI Foundation both maintain a donor courtesy reward system that provides tier-based access to institutional personnel and leadership figures acting in their official capacities, as well as privileged access to athletic facilities and events.

1200. These systems functioned in coordination with public officials acting in their official capacities and provided preferential access to individuals who made financial contributions to the associated private charity.

1201. In his report, the Plaintiff explained that overlapping affiliations between VMI and its affiliated alumni organizations could increase the risk of favoritism in the procurement

process or procurement fraud, bribery, and the inappropriate allocation of donations and grants as described in ¶¶ 582–586.

1202. In response to the Plaintiff's report, VMI's Office of the Inspector General opened an inquiry into these allegations.

1203. As organizations recognized as tax-exempt under Section 501(c)(3) of the Internal Revenue Code, the VMI Alumni Agencies, the VMI Foundation, the Keydet Club, and the VMI Alumni Association make their annual IRS Form 990 filings available for public inspection and publish these forms on their respective websites.

1204. As described in ¶¶ 577, the Plaintiff submitted publicly available Keydet Club IRS Form 990 records to the Office of the Inspector General to support his report and provide financial context for the donor courtesy and reward structures described in this Complaint.

1205. The VMI Foundation's IRS Form 990 filings from 2019 through 2023 report contributions from donors under Schedule B as follows:

- 2023:

  Number of Contributors: 8

  Total Person Contributions: $14,222,867.00

  Total Non-Cash Contributions: $1,000,000.00

- 2022:

  Number of Contributors: 6

  Total Person Contributions: $12,418,854.00

  Total Person/Non-Cash Contributions: $1,824,013.00

- 2021:

  Number of Contributors: 3

  Total Person Contributions: $8,641,569.00

- 2020:

  Number of Contributors: 6

  Total Person Contributions: $6,952,935.00

  Total Non-Cash Contributions: $1,995,518.00

- 2019:

  Number of Contributors: 5

  Total Person Contributions: $7,065,538.00

  Total Person/Non-Cash Contributions: $4,414,739.00

1206. The Keydet Club's IRS Form 990 filings from 2019 through 2023 report contributions from donors under Schedule B as follows:

- 2023:

  Number of Contributors: 6

  Total Person Contributions: $1,150,000.00

  Total Person/Non-Cash Contributions: $531,715.00

- 2022:

  Number of Contributors: 10

  Total Person Contributions: $4,370,000.00

  Total Person/Non-Cash Contributions: $200,000.00

- 2021:

  Number of Contributors: 5

  Total Person Contributions: $1,892,734.00

  Total Person/Non-Cash Contributions: $690,433.00

- 2020:

  Number of Contributors: 8

  Total Person Contributions: $2,746,234.00

  Total Person/Non-Cash Contributions: $331,148.00

- 2019:

  Number of Contributors: 7

  Total Person Contributions: $2,296,484.00

  Total Person/Non-Cash Contributions: $153,661.00

1207. The VMI Alumni Agencies's IRS Form 990 filings from 2019 through 2023 report contributions from donors under Schedule B as follows:

- 2023:

  Number of Contributors: 0

  Total Person Contributions: $0.00

  Total Person/Non-Cash Contributions: $0.00

- 2022:

  Number of Contributors: 2

  Total Person Contributions: $6,000.00

  Total Person/Non-Cash Contributions: $200,000.00

- 2021:

  Number of Contributors: 2

  Total Person Contributions: $7,058,775.00

  Total Person/Non-Cash Contributions: $0.00

- 2020:

  Number of Contributors: 2

  Total Person Contributions: $343,780.00

  Total Person/Non-Cash Contributions: $0.00

- 2019:

  Number of Contributors: 1

  Total Person Contributions: $763,000.00

  Total Person/Non-Cash Contributions: $0.00

1208. The VMI Alumni Association's IRS Form 990 filings from 2019 through 2023 report contributions from donors under Schedule B as follows:

- 2023:

  Number of Contributors: 1

  Total Person Contributions: $1,159,267.00

  Total Person/Non-Cash Contributions: $0.00

- 2022:

  Number of Contributors: 1

  Total Person Contributions: $1,000,024.00

  Total Person/Non-Cash Contributions: $0.00

- 2021:

  Number of Contributors: 1

  Total Person Contributions: $1,380,291.00

  Total Person/Non-Cash Contributions: $0.00

- 2020:

  Number of Contributors: 1

  Total Person Contributions: $1,044,991.00

  Total Person/Non-Cash Contributions: $0.00

- 2019:

  Number of Contributors: 1

  Total Person Contributions: $1,199,647.00

  Total Person/Non-Cash Contributions: $0.00

1209. The reported non-cash contributions consist of donations of publicly traded securities and are recorded in the Keydet Club and VMI Foundation's IRS Form 990 filings at their fair market value on the date of contribution.

1210. The donors reported on Schedule B for the VMI Alumni Agencies, the VMI Alumni Association, the Keydet Club, and the VMI Foundation include individuals or entities that contributed within the advancement system described above.

1211. Donors of the Keydet Club or the VMI Foundation who contribute $10,000.00 or more participate in or are eligible to participate in the donor tier systems that provide the tier-based access and benefits described.

1212. In addition, the VMI Foundation's IRS Form 990 filings from 2019 through 2023 report direct financial disbursements to institutional leadership under the 'Leadership' line in Schedule I as follows:

- 2023: $1,010,153.00
- 2022: $976,084.00
- 2021: $436,210.00
- 2020: $434,440.00
- 2019: $391,700.00

1213. For each year from 2019 through 2023, the aggregate amount reported under the 'Leadership' line exceeded $5,000 in a one-year period.

1214. These disbursements are reported in the Form 990 filings as cash and non-cash grant payments from the VMI Foundation to the Virginia Military Institute with the stated purpose of the grants listed as "Leadership".

1215. Based on the available IRS Forms 990 of the VMI Foundation, these grants are in addition to the salary and compensation received by institutional leadership through their institutional employment.

1216. The Schedule B contributor data and Schedule I disbursement figures are taken directly from the entities' publicly posted IRS Form 990 filings as posted on www.vmialumni.org.

1217. The donor-tier access systems operated by the Keydet Club and the VMI Foundation provided contributors with the use of VMI facilities, parking areas, hospitality spaces, and athletic event access, each of which constitutes property under the care, custody, or control of VMI.

1218. The provision of institutional facilities, reserved parking, and other resources owned by, or under the care, custody, or control of VMI to private contributors, where the value of the property provided exceeds $5,000 in a one-year period, constitutes an intentional misapplication of property within the meaning of 18 U.S.C. § 666(a)(1)(A).

1219. These donor access systems constitute conduct in which agents of VMI corruptly solicit, and accept or agree to accept, monetary contributions and other financial benefits from donors through the VMI Alumni Agencies, the VMI Foundation, and the VMI Keydet Club, with the intent to be influenced or rewarded in connection with institutional business and transactions involving $5,000 or more in a one-year period within the meaning of 18 U.S.C. §666(a)(1)(B).

1220. The operation of these donor tier and courtesy structures by the VMI Alumni Agencies, the VMI Foundation, and the Keydet Club constitutes conduct in which donors corruptly give, offer, or agree to give monetary contributions and other financial benefits through these entities to agents, officers, or employees of VMI with the intent to influence or reward those agents in connection with institutional business and transactions or a series of transactions involving anything of value of $5,000 or more within the meaning of 18 U.S.C. § 666(a)(2).

1221. The agents and donors described above engaged in conduct within the meaning of 18 U.S.C. §§ 666(a)(1)(A), 666(a)(1)(B), and 666(a)(2).

**Predicate Act Two — Mail Fraud (18 U.S.C. §1341) and Wire Fraud (18 U.S.C. §1343)**

1222. At all relevant times, the Virginia Military Institute, the VMI Alumni Agencies, the Keydet Club, and the VMI Foundation devised and intended to devise a scheme and

artifice to defraud donors of money and property by means of materially false and misleading representations and omissions.

1223. Fundraising solicitations were disseminated through broadcast media, online platforms, and electronic communications as described in ¶¶ 39–44, 124–129, 132–134, and 279–280.

1224. These solicitations included promotional and advertising materials aired during ESPN broadcasts, fundraising appeals integrated into live athletic events, public advertisements requesting financial contributions, and digital messaging distributed through institutional websites and social media accounts.

1225. These communications were disseminated or transmitted to donors or potential donors located both within and outside Virginia through interstate wires and where applicable, through mail-based correspondence and printed promotional materials.

1226. These solicitations were issued between 2019 and 2023 and they continued throughout the period of the Plaintiff's employment.

1227. The solicitations indicated that donated funds would be used to support VMI as a public educational institution by providing financial support for cadet programs, intercollegiate athletics, and institutional initiatives.

1228. The same advancement system used donor tier structures operated by the Keydet Club and the VMI Foundation to tie specific contribution levels to benefits such as tier-based access to institutional personnel and leadership, hospitality spaces, reserved parking, and events at which institutional personnel and leadership appeared in their official capacities.

1229. The solicitations did not disclose that donations at specified levels purchased preferential access to public officials and institutional resources, or that senior leadership would receive cash grant payments in addition to their public compensation.

1230. Taken together, these omissions rendered the solicitations materially misleading.

1231. These false and misleading representations and omissions were material to donors' decisions about whether and at what level to contribute, and donors in fact transferred funds in reliance on those solicitations.

1232. The Defendants continue to disseminate the solicitations described above without correcting or disclosing these material facts and do so through the use of the Postal Service and interstate wire communications in furtherance of that scheme.

1233. By using the Postal Service, private or commercial interstate carriers, and interstate wire, radio, and television communications to obtain donor funds on the basis of these false and misleading representations and omissions, the Virginia Military Institute, the VMI Alumni Agencies, the Keydet Club, and the VMI Foundation engaged in conduct within the scope of 18 U.S.C. §1341 and 18 U.S.C. §1343.

**Predicate Act Three — Interstate and Foreign Travel in Aid of Racketeering Enterprises (18 U.S.C. §1952(a)(3))**

1234. At all relevant times, VMI, the VMI Alumni Agencies, the Keydet Club, the VMI Foundation, and the VMI Alumni Association, through their officers, agents, and employees, traveled in interstate commerce and used facilities in interstate commerce, including electronic communication systems, for the purpose of promoting and carrying on the enterprise's financial advancement and donor-tier operations.

1235. As reflected in their IRS Forms 990 from 2019 through 2023, the VMI Alumni Agencies, the VMI Foundation, the Keydet Club, and the VMI Alumni Association report travel expenses as part of their total expenses.

1236. These travel expenses cover transportation, lodging, and related costs associated with donor engagement and advancement activities directed toward alumni and donors residing both within and outside the Commonwealth of Virginia and are as follows:

1237. Alumni Agencies:

- 2023: $27,872.00
- 2022: $27,661.00
- 2021: $45,976.00
- 2020: $11,570.00
- 2019: $59,081.00

VMI Foundation:

- 2023: $113,356.00
- 2022: $110,386.00
- 2021: $38,912.00
- 2020: $21,491.00
- 2019: $114,765.00

Keydet Club:

- 2023: $12,482.00
- 2022: $12,047.00
- 2021: $20,327.00

- 2020: $6,566.00
- 2019: $28,862.00

VMI Alumni Association:

- 2023: $32,908.00
- 2022: $20,584.00
- 2021: $38,912.00
- 2020: $13,568.00
- 2019: $36,730.00

1238. The interstate travel and use of interstate facilities were undertaken with the intent to promote, manage, establish, carry on, and facilitate "unlawful activity" within the meaning of 18 U.S.C. §1952(b), namely bribery in violation of Virginia Code §18.2-438 and related state bribery provisions.

1239. This unlawful activity consists of corruptly soliciting, giving, offering, or promising gifts or gratuities through donor-tier contributions to public officers and institutional leadership acting in their official capacities with the intent to influence their acts, decisions, and use of public resources on matters before them in violation of Virginia Code §18.2-438 and related state bribery provisions.

1240. Senior officers, fundraising staff, or organizational leadership of the VMI Alumni Agencies, the VMI Foundation, the Keydet Club, and the VMI Alumni Association traveled within Virginia and other states, and used interstate communication systems to meet with existing and prospective donors whose contributions qualified them for donor-tier benefits.

1241. Following such interstate travel and communications, the Defendants and their agents performed acts in furtherance of the unlawful activity by soliciting, securing, and accepting donations that qualified contributors for donor-tier benefits and by coordinating and providing the access, events, and institutional courtesies associated with those tiers, thereby promoting and carrying on the bribery scheme.

1242. VMI, the VMI Alumni Agencies, the Keydet Club, the VMI Foundation, and the VMI Alumni Association traveled in interstate commerce and used facilities in interstate commerce with the intent to promote and carry on this unlawful activity and then performed acts to carry it on in violation of 18 U.S.C. §1952(a)(3).

**Predicate Act Four — Laundering of Monetary Instruments Derived from Specified Unlawful Activity (18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(2)(B)(i))**

1243. At all relevant times, the VMI Alumni Agencies, the Keydet Club, and the VMI Foundation engaged in, and continue to engage in financial transactions involving the transfer of monetary instruments outside the United States.

1244. As described in ¶¶ 577, the Plaintiff submitted publicly available Keydet Club IRS Form 990 records to the Office of the Inspector General.

1245. The foreign expenditures, transfers and investment figures for the VMI Alumni Agencies, the VMI Foundation, and the Keydet Club are taken directly from their publicly posted IRS Form 990 filings as posted on www.vmialumni.org.

1246. These filings report monetary expenditures, transfers, and investments outside the United States.

1247. These international transactions occurred concurrently with the donor-tier access systems, coordinated fundraising activities, and financial disbursements to institutional leadership as described in Predicate Acts One, Two, and Three.

1248. The monetary instruments involved in these foreign transactions include resources obtained through conduct alleged to violate 18 U.S.C. §§ 666(a)(1)(A), 666(a)(1)(B), 666(a)(2), 18 U.S.C. §1341, 18 U.S.C. §1343, and Virginia Code §18.2-438, and therefore represent the proceeds of "specified unlawful activity" within the meaning of 18 U.S.C. §1956(c)(7).

1249. The VMI Alumni Agencies, Keydet Club, and the VMI Foundation are the same entities that receive donor contributions, while the Keydet Club and VMI Foundation operate the donor-tier access systems. The VMI Foundation disburses grants for "Leadership" as described in Predicate Acts One through Three.

1250. The foreign expenditures and investments reported in their Statements of Activities Outside the United States were made from general funds and investment pools that include donor-derived monetary instruments and other revenues.

1251. As reflected in their Statements of Activities Outside the United States from 2019 through 2023, the VMI Alumni Agencies, the Keydet Club, and the VMI Foundation reported foreign expenditures and financial investments in the "Central America and the Caribbean (Antigua and Barbuda, Aruba, Bahamas)" region, which are itemized as follows:

Alumni Agencies:

- 2023:

  Number of Offices in the Region: 0

Number of Employees, Agents, and Independent Contractors in the Region: 0

Total Expenditures for and Investments in the Region: $2,072,231.00

- 2022:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the Region: 0

  Total Expenditures for and Investments in the Region: $2,285,362.00

- 2021:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the Region: 0

  Total Expenditures for and Investments in the Region: $2,355,606.00

- 2020:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the Region: 0

  Total Expenditures for and Investments in the Region: $2,974,152.00

VMI Foundation:

- 2023:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the

Region: 0

Total Expenditures for and Investments in the Region: $16,858,175.00

- 2022:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the Region: 0

  Total Expenditures for and Investments in the Region: $16,969,700.00

- 2021:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the Region: 0

  Total Expenditures for and Investments in the Region: $17,144,698.00

- 2020:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the Region: 0

  Total Expenditures for and Investments in the Region: $16,519,808.00

- 2019:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the Region: 0

  Total Expenditures for and Investments in the Region: $13,694,715.00

Keydet Club:

- 2023:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the Region: 0

  Total Expenditures for and Investments in the Region: $2,632,877.00

- 2022:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the Region: 0

  Total Expenditures for and Investments in the Region: $2,889,920.00

- 2021:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the Region: 0

  Total Expenditures for and Investments in the Region: $2,870,126.00

- 2020:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the Region: 0

  Total Expenditures for and Investments in the Region: $2,833,222.00

- 2019:

  Number of Offices in the Region: 0

  Number of Employees, Agents, and Independent Contractors in the

Region: 0

Total Expenditures for and Investments in the Region: $2,233,344.00

1252. The financial transactions described above constitute financial transactions within the meaning of 18 U.S.C. §1956(c)(4) in that they involve the movement, transfer, and disposition of monetary instruments affecting interstate and foreign commerce.

1253. This includes the transfer of donor-derived monetary instruments and revenues from the United States to locations outside the United States for the purposes of advancement, investment, operations, or concealment.

1254. These foreign transfers were conducted by the VMI Alumni Agencies, the Keydet Club, and the VMI Foundation with knowledge that the property involved in the financial transactions represented the proceeds of unlawful activity and with the intent to promote the carrying on of the specified unlawful activity described in Predicate Acts One through Three.

1255. The conduct included the maintenance of donor-tier courtesy rewards that include access to public officials for the purpose of influencing, being influenced, or receiving rewards for the continued operation of the enterprise's coordinated fundraising and advancement operations in violation of 18 U.S.C. §1956(a)(1)(A)(i).

1256. These acts of transportation, transmission, or transfers are undertaken with knowledge that they are designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity described above in violation of 18 U.S.C. §1956(a)(2)(B)(i).

1257. The VMI Alumni Agencies, the Keydet Club, and the VMI Foundation engaged in the financial transactions described above knowing that the property involved represented

the proceeds of specified unlawful activity and did so with the intent to promote that unlawful activity and to conceal or disguise the nature, location, source, ownership, and control of those proceeds, and thereby engaged in conduct within the meaning of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(2)(B)(i).

**Predicate Act Five — Monetary Transactions in Criminally Derived Property (18 U.S.C. §1957)**

1258. At all relevant times, the VMI Alumni Agencies, the Keydet Club, and the VMI Foundation engaged in monetary transactions involving funds transferred within and outside the United States.

1259. The monetary transactions identified in ¶¶ 1251 between 2019 and 2023 each exceeded $10,000 and constitute monetary transactions within the meaning of 18 U.S.C. §1957(f)(1).

1260. The funds used in these monetary transactions were obtained through conduct alleged to violate 18 U.S.C. §§ 666(a)(1)(A), 666(a)(1)(B), 666(a)(2), 18 U.S.C. 1341, 18 U.S.C. 1343, and Virginia Code 18.2-438 and therefore represent the proceeds of specified unlawful activity within the meaning of 18 U.S.C. §1957(f)(3) and criminally derived property within the meaning of 18 U.S.C. §1957(f)(2).

1261. Each monetary transaction was conducted by or through financial institutions engaged in and affecting interstate or foreign commerce within the circumstances set forth in 18 U.S.C. §§ 1957(d)(1) or 1957(d)(2).

1262. By knowingly engaging in or attempting to engage in monetary transactions in criminally derived property valued at more than $10,000 and derived from specified

unlawful activity, the VMI Alumni Agencies, the Keydet Club, and the VMI Foundation engaged in conduct within the scope of 18 U.S.C. §1957(a).

**Predicate Act Six — Tampering with a Witness and Victim (18 U.S.C. §1512(b)(1), (b)(2)(A), (b)(2)(B), and (b)(3))**

1263. At all relevant times, one or more individuals within the Virginia Military Institute's leadership structure knowingly coordinated and engaged in conduct intended to retaliate against the Plaintiff for providing truthful information about the commission or possible commission of federal offenses involving Bribery Concerning Programs Receiving Federal Funds and Misapplication of Property (¶¶ 582–586) to institutional leadership (¶¶ 517–551), Human Resources (¶¶ 295–300, 956–963, 965–967, 996–1002), and the Office of the Inspector General (¶¶ 552–581, 587, 588–589).

1264. The Plaintiff reported unwanted physical contact by Mr. Marcello as described in ¶¶ 968–971 (VMI Inspector General), 972, 974–975, 977–983, 987–989, 996–1002 (Human Resources), 1006–1011, 1012, 1014 (law enforcement) to institutional leadership and Human Resources, the Office of the Inspector General, the Virginia Military Institute Police, and the Rockbridge County Sheriff's Office where he filed a criminal complaint alleging unwanted physical contact in violation of Virginia Code § 18.2-57.

1265. On January 29, 2025, the Plaintiff requested that the four reports he had submitted be returned to him in their entirety with assurance that his evidence had not been altered (¶¶ 1002).

1266. In response to the Plaintiff's criminal complaint, Mr. Marcello filed a separate criminal complaint against the Plaintiff on January 31, 2025 concerning the same January 9, 2025 incident as described in ¶¶ 1016–1017.

1267. As a result of Mr. Marcello's criminal complaint, the Plaintiff was placed on administrative suspension on February 4, 2025 as described in ¶¶ 1021–1026.

1268. On the same evening, VMI revoked the Plaintiff's institutional email communications access and removed his professional biography from the Athletics Department directory.

1269. On February 10, 2025, during his active suspension, the Plaintiff was issued a trespass warning by the Virginia Military Institute Police Department through the Rockbridge County Sheriff's Office (¶¶ 1029–1030), and he subsequently invoked his Fifth Amendment right against self-incrimination in an official court proceeding on April 18, 2025 as described in ¶¶ 1037–1038.

1270. During the related criminal proceedings Mr. Marcello's criminal complaint filed with VMI Police or the Rockbridge County Sheriff's Office was not provided or available to the Plaintiff or his criminal defense counsel.

1271. By invoking his Fifth Amendment right, the Plaintiff was unable to provide full testimony or additional statements that would have communicated to law enforcement officers and the court information relating to the commission or possible commission of federal offenses he had previously reported to institutional leadership and the Office of the Inspector General.

1272. As a result of Mr. Marcello's criminal complaint, the administrative suspension, email revocation, and the trespass restriction, the Plaintiff faced active criminal exposure and the risk of further adverse action if he provided testimony regarding the incident or the misconduct he had reported.

1273. These actions used the threat of criminal prosecution and employment consequences to intimidate and corruptly persuade the Plaintiff with the intent to influence, delay, or prevent his testimony in an official proceeding within the meaning of 18 U.S.C. §1512(b)(1).

1274. After the Plaintiff submitted written reports and supporting materials concerning Bribery Concerning Programs Receiving Federal Funds and the misapplication of institutional property, one or more of Virginia Military Institute's agents, officers, and employees acting within its leadership, in coordination with members of school and local law enforcement, knowingly used intimidation, threats of criminal prosecution (¶¶ 1016–1017, 1029–1030, 1037–1038), and employment consequences against him to corruptly persuade the Plaintiff with the intent to cause and induce him to withhold testimony, records, documents, and other objects or supporting materials from an official proceeding within the meaning of 18 U.S.C. §1512(b)(2)(A).

1275. By withholding and concealing Mr. Marcello's criminal complaint from the Plaintiff and his criminal defense counsel during the related criminal proceedings, and by failing to return the four reports the Plaintiff requested in their entirety (¶¶ 1002), the Defendants, through their officers, agents, and employees, in coordination with members of school and local law enforcement, acted with intent to impair the integrity or availability of these materials for use in an official proceeding within the meaning of 18 U.S.C. §1512(b)(2)(B).

1276. By taking administrative and criminal actions against the Plaintiff, one or more of Virginia Military Institute's agents, officers, and employees acting within its leadership,

in coordination with members of school and local law enforcement, knowingly used intimidation, threats of criminal prosecution, and employment consequences against him.

1277. These actions were taken with the intent to hinder, delay, and prevent his further communication of information relating to the commission or possible commission of federal offenses to law enforcement officers of the United States within the meaning of 18 U.S.C. §1512(b)(3).

1278. Taken together, the actions described constitute the knowing and attempted use of intimidation, threats, and corrupt persuasion toward the Plaintiff and were intended to influence, delay, and prevent his testimony.

1279. These actions interfered with the production of records, documents, and other objects and were undertaken with the specific intent to hinder and prevent the communication of information relating to the commission or possible commission of federal offenses and constitute conduct within the meaning of 18 U.S.C. §§1512(b)(1), 1512(b)(2)(A), and 1512(b)(3).

**Predicate Act Seven — Retaliation Against a Witness and Victim (18 U.S.C. §1513(e))**

1280. At all relevant times, one or more individuals within the Virginia Military Institute's leadership structure knowingly coordinated and engaged in conduct intended to retaliate against the Plaintiff for providing truthful information about the commission or possible commission of federal offenses involving Bribery Concerning Programs Receiving Federal Funds and Misapplication of Property (¶¶ 582–586) to institutional leadership (¶¶ 517–551), Human Resources (¶¶ 295–300, 956–963, 965–967, 996–1002), and the Office of the Inspector General (¶¶ 552–581, 587, 588–589).

1281. Following the Plaintiff's submission to VMI's Office of the Inspector General on November 18, 2024, he received a total of twenty-three written disciplinary reprimands between November 22, 2024 and January 9, 2025, as described in ¶¶ 666, 832, 936, 938, 949, 973.

1282. During the January 9, 2025 disciplinary reprimand meeting, the Plaintiff reported unwanted physical contact by Mr. Marcello to the Office of the Inspector General as described in 968–971.

1283. As described in ¶¶ 977–983, the Plaintiff informed VMI Police Captain Henson, Officer Knick, and Ms. Fargiano that the documents he had provided to Human Resources and the Office of the Inspector General contained truthful information relating to the alleged commission or possible commission of Federal and State offenses regarding Bribery Concerning Programs Receiving Federal Funds and Misapplication of Property in connection with VMI and a private charity.

1284. Following the Plaintiff's response to the investigative findings provided to General Counsel O'Leary and Ms. Fargiano (¶¶ 996–1002), Colonel (Ret.) Homiak notified the Plaintiff that VMI intended to terminate his employment through a Notice of Intent to Terminate based on performance deficiencies identified in the Notice of Improvement Needed/Substandard Performance as described in ¶¶ 1004–1005.

1285. Following his Notice of Intent to Terminate employment meeting, VMI Police Captain Henson requested additional information regarding the Plaintiff's meeting with institutional leadership. The Plaintiff explained that his evidence had been rejected, and alleged that backdated performance deficiencies were being used against him after he

objected to the misuse of public resources for the benefit of a private charity and that his retaliation complaints had been denied.

1286. During this conversation, the Plaintiff stated that because Mr. Marcello initiated unwanted physical contact, he wished to move forward with filing a criminal complaint regarding the January 9, 2025 incident. Captain Henson advised that the matter should be brought before a magistrate and that Officer Knick would take his official statement as described in ¶¶ 1006–1011.

1287. On the afternoon of January 30, 2025, VMI Police Officer Knick escorted the Plaintiff to the Rockbridge County Sheriff's Office to file a criminal complaint alleging assault and battery in violation of Virginia Code §18.2-57 arising from unwanted physical contact by Mr. Marcello on January 9, 2025.

1288. In his criminal complaint to the Rockbridge County magistrate, the Plaintiff stated that the January 9, 2025 disciplinary meeting occurred as part of a retaliation effort by Mr. Marcello, and he described the meeting and physical contact in that context.

1289. During the related criminal proceedings, Mr. Marcello's criminal complaint arising from the January 9, 2025 incident was maintained by the VMI Police Department and the Rockbridge County Sheriff's Office but was not provided to the Plaintiff or his criminal defense counsel.

1290. As Described in ¶¶ 1016–1017, Mr. Marcello filed a separate criminal complaint against the Plaintiff on January 31, 2025 concerning the same January 9, 2025 incident.

1291. As a result of Mr. Marcello's criminal complaint, Colonel (Ret.) Homiak informed the Plaintiff that he was being placed on administrative suspension pursuant to a

recommendation from the Virginia Military Institute Threat Assessment Team to Major General (Ret.) Wins, as described in ¶¶ 1021–1026.

1292. On March 4, 2025, Colonel (Ret.) Homiak notified the Plaintiff by official correspondence that his employment had been terminated with the Virginia Military Institute as described in ¶¶ 1034.

1293. Taken together, the actions described above, including the issuance of disciplinary reprimands, performance improvement measures, Mr. Marcello's criminal complaint, administrative suspension, trespass restrictions, and termination of employment, constitute actions harmful to the Plaintiff and interference with his lawful employment and livelihood and were knowingly undertaken with the intent to retaliate against him for providing truthful information to law enforcement officers relating to the commission or possible commission of Federal offenses within the meaning of 18 U.S.C. §1513(e).

1294. These seven predicate acts together constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

1295. The Defendants, through their officers, agents, and employees, conducted or participated, directly or indirectly, in this pattern of racketeering activity and in the conduct of the enterprise's affairs in violation of 18 U.S.C. §1962(c).

1296. The Plaintiff's injuries were proximately caused by the Defendants' operation and management of the enterprise through the predicate acts alleged herein, resulting in the adverse employment and legal consequences described below.

1297. As a direct and foreseeable result of the racketeering activity described herein, the Plaintiff incurred expenses and other economic losses in seeking to protect his rights and address the misconduct alleged in this Complaint, and is therefore a person injured in his

1302. At all relevant times, the Virginia Military Institute was a contractor, grantee, or subgrantee receiving funds under one or more contracts, grants, or other agreements with the Department of Defense within the meaning of 10 U.S.C. §4701.

1303. This federal award status is confirmed by its registration as a federal award recipient under the following Unique Entity Identifier: GRLAJDNYPWF1 with contracts, grants, or other agreements with the Department of Defense as follows:

- Delivery Order (DO) PIID N6835521F0002:
  Start Date Mar 12, 2021 — End Date May 19, 2021
- Delivery Order (DO) PIID N6835522F0001
  Start Date Oct 18, 2021 — End Date Jan 11, 2022
- Delivery Order (DO) PIID N6835522F0002
  Start Date Mar 04, 2022 — End Date May 19, 2022
- Delivery Order (DO) PIID N6835524F0001
  Start Date Oct 04, 2023 — End Date Jan 12, 2024
- Delivery Order (DO) PIID N3560A24F0083
  Start Date Mar 04, 2024 — End Date May 20, 2024
- Delivery Order (DO) PIID N3560A25F0050
  Start Date Nov 08, 2024 — End Date Jan 06, 2025
- Delivery Order (DO) PIID N3560A25FB068
  Start Date Apr 11, 2025 — End Date May 16, 2025

1304. At all relevant times, the Plaintiff was an employee of the Virginia Military Institute, a Department of Defense contractor or grantee under one or more contracts, grants, or other agreements within the meaning of 10 U.S.C. §4701 as described in ¶¶ 20–26.

1305. The Plaintiff disclosed information that he reasonably believed evidenced violations of law, rule, or regulation, or abuse of authority in connection with Department of Defense contracts and programs to VMI's Deputy Superintendent for Finance and Support, VMI's Office of the Inspector General, and later to the Department of Defense Office of Inspector General as described in ¶¶ 295–300, 517–551, 552–581, 582–586, 587, 587–588, 671–672.

1306. Following the Plaintiff's disclosures, the Defendants subjected him to reprisal by reassigning his duties, issuing disciplinary reprimands and performance documentation, issuing a Notice of Improvement Needed/Substandard Performance, placing him on administrative suspension after he reported unwanted physical contact by a supervisor to law enforcement, restricting his access to institutional property through a trespass warning, and terminating his employment.

1307. On August 25, 2025, the Department of Defense Office of Inspector General closed his complaint by letter and offered no further relief through the federal Inspector General process.

1308. The adverse actions described above were taken in reprisal for, and because of, the Plaintiff's disclosures concerning Department of Defense contracts, grants, or funds, in violation of 10 U.S.C. §4701.

1309. The Defendants, through their officers, agents, and employees, were aware of the Plaintiff's disclosures at the time they imposed these adverse actions.

1310. As a direct and proximate result of actions taken by the Defendants, the Plaintiff suffered injury to his business and property in the form of loss of salary and benefits, diminished earning capacity, harm to his professional reputation, damage to his career opportunities, and other consequential and compensatory losses.

## COUNT VI — REPRISAL AGAINST EDUCATION CONTRACTOR WHISTLEBLOWER

**(41 U.S.C. §4712)**

**Defendants: VMI, VMI Board of Visitors**

1311. The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1312. At all relevant times, the Virginia Military Institute was a contractor, grantee, or subgrantee of an executive agency, the United States Department of Education, receiving funds under one or more contracts, grants, or other agreements within the meaning of 41 U.S.C. §4712.

1313. This federal award status is confirmed by its registration as a federal award recipient under Unique Entity Identifier GRLAJDNYPWF1 and by Department of Education awards including, but not limited to:

- Direct Payment for Specified Use FAIN P063P230408

  Start Date not provided — End Date Aug 31, 2029

- Direct Payment for Specified Use FAIN P063P240408

  Start Date not provided — End Date Aug 31, 2030

- Direct Payment for Specified Use FAIN P063P210408

  Start Date not provided — End Date Aug 31, 2027

- Direct Payment for Specified Use FAIN P063P220408

  Start Date not provided — End Date Aug 31, 2028

- Direct Payment for Specified Use FAIN P063P250408

  Start Date not provided — End Date Aug 31, 2031

- Formula Grant FAIN P425F203194

  Start Date May 18, 2020 — End Date Jan 18, 2022

1314. At all relevant times, the Plaintiff was an employee of the Virginia Military Institute, a Department of Education contractor or grantee under one or more contracts, grants, or other agreements within the meaning of 41 U.S.C. §4712 as described in ¶¶ 20–26.

1315. The Plaintiff disclosed information that he reasonably believed evidenced violations of law, rule, or regulation, and abuse of authority in connection with Department of Education contracts and programs, to VMI's Deputy Superintendent for Finance and Support, VMI's Office of the Inspector General, and later to the Department of Education Office of Inspector General as described in ¶¶ 295–300, 517–551, 552–581, 582–586, 587, 587–588, 671–672.

1316. Following the Plaintiff's disclosures, the Defendants subjected him to reprisal by reassigning his duties, issuing disciplinary reprimands and performance documentation,

issuing a Notice of Improvement Needed/Substandard Performance, placing him on administrative suspension after he reported unwanted physical contact by a supervisor to law enforcement, restricting his access to institutional property through a trespass warning, and terminating his employment.

1317. On September 13, 2025, the Department of Education Office of Inspector General closed his complaint by letter and offered no further relief through the federal Inspector General process.

1318. The adverse actions described above were taken in reprisal for, and because of, the Plaintiff's disclosures concerning Department of Education contracts, grants, or funds, in violation of 41 U.S.C. §4712.

1319. The Defendants, through their officers, agents, and employees, were aware of the Plaintiff's disclosures at the time they imposed these adverse actions.

1320. As a direct and proximate result of actions taken by the Defendants, the Plaintiff suffered injury to his business and property in the form of loss of salary and benefits, diminished earning capacity, harm to his professional reputation, damage to his career opportunities, and other consequential and compensatory losses.

## COUNT VII — REPRISAL AGAINST VIRGINIA WHISTLEBLOWER FOR REFUSING TO ENGAGE IN ILLEGAL ACTS

**(Virginia Code §40.1-27.3)**

**Defendants: VMI, VMI Board of Visitors**

1321. The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1322. Plaintiff made a good faith report of a federal or state law violation to senior leadership and administrative channels within the Virginia Military Institute.

1323. The information disclosed by the Plaintiff concerned a suspected matter of public concern, violations of law, gross mismanagement, waste of funds, and abuse of authority within the Virginia Military Institute as contained in ¶¶ 285–288, ¶¶ 505–573, ¶¶ 847–849.

1324. In the course of his employment, the Plaintiff was instructed or pressured to prioritize the use of his time, multimedia operations, and institutional resources for fundraising and promotional projects designed to benefit the VMI Alumni Agencies and their affiliated charities in furtherance of the enterprise's coordinated donor-tier fundraising operations that he reasonably believed constituted misuse of public resources implemented through the Keydet Club and VMI Foundation donor courtesy reward system.

1325. The Plaintiff informed one or more of these officials that he refused to engage in the requested conduct and would not divert institutional resources, production capacity, or his work efforts to support what he reasonably believed to be Bribery Concerning Programs Receiving Federal Funds, Misapplication of Institutional Property, and related misuse of public resources for the benefit of the private fundraising entities in violation of federal and state law.

1326. The Plaintiff refused the directives due to his belief that the conduct could subject him to personal criminal liability and informed his employer through one or more officials that his refusal was based on those concerns in circumstances protected by Virginia Code §40.1-27.3.

1327. Following the Plaintiff's reports and his refusal to engage in the described conduct, the Defendants subjected him to adverse actions by reassigning and restricting his duties, initiating and escalating disciplinary reprimands, issuing a Notice of Improvement Needed/Substandard Performance, and placing him on administrative suspension in response to Mr. Marcello's criminal complaint after the Plaintiff reported unwanted physical contact by a supervisor to law enforcement.

1328. Following the Plaintiff's suspension, the Defendants imposed trespass restrictions barring him from institutional property and subsequently terminated his employment.

1329. As a result of the criminal complaint and related criminal exposure, the Plaintiff was compelled to invoke his Fifth Amendment right against self-incrimination in an official proceeding.

1330. The adverse actions described above were taken in response to the Plaintiff's good-faith reports and because he refused to engage in or to assist in what he reasonably believed to be criminal acts and violations of law in violation of Virginia Code §40.1-27.3.

1331. The Defendants, through their officers, agents, and employees, were aware of the Plaintiff's reports and his refusal to engage in the described conduct at the time they imposed these adverse actions.

1332. As a direct and proximate result of actions taken by the Defendants, the Plaintiff suffered injury to his business and property in the form of loss of salary and benefits, diminished earning capacity, harm to his professional reputation, damage to his career opportunities, and other consequential and compensatory losses.

**COUNT VIII — REPRISAL AGAINST STATE EMPLOYEE WHISTLEBLOWER**

**(Virginia Code §2.2-3011)**

**Defendants: VMI, VMI Board of Visitors**

1333. The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1334. At all relevant times, the Plaintiff was a state employee within the meaning of Virginia Code §2.2-3011 as described in ¶¶ 20–26.

1335. At all relevant times, the Virginia Military Institute was the Plaintiff's employer and a public institution of higher education and an agency or instrumentality of the Commonwealth of Virginia within the meaning of Virginia Code §2.2-3011.

1336. The Plaintiff made good-faith reports to senior leadership, Human Resources, the Deputy Superintendent for Finance and Support, and VMI's Office of the Inspector General regarding what he reasonably believed were federal and state offenses involving Bribery Concerning Programs Receiving Federal Funds, Misapplication of Institutional Property, and related misuse of public resources within the Virginia Military Institute.

1337. Following the Plaintiff's reports, the Defendants subjected him to adverse actions by reassigning and restricting his duties, initiating and escalating disciplinary reprimands, issuing a Notice of Improvement Needed/Substandard Performance, and placing him on administrative suspension in response to Mr. Marcello's criminal complaint after the Plaintiff reported unwanted physical contact by a supervisor to law enforcement.

1338. Following the Plaintiff's suspension, the Defendants imposed trespass restrictions barring him from institutional property and subsequently terminated his employment.

1339. The Defendants, through their officers, agents, and employees, were aware of the Plaintiff's reports at the time they imposed these adverse actions.

1340. The adverse actions described above were taken in response to the Plaintiff's good-faith reports of wrongdoing and abuse of authority and would not have occurred but for those reports in violation of Virginia Code §2.2-3011.

1341. As a direct and proximate result of actions taken by the Defendants, the Plaintiff suffered injury to his business and property in the form of loss of salary and benefits, diminished earning capacity, harm to his professional reputation, damage to his career opportunities, and other consequential and compensatory losses.

## COUNT IX — FAILURE TO PROVIDE REASONABLE ACCOMMODATION

**(42 U.S.C. §12112(b)(5)(A))**

**Defendants: VMI, VMI Board of Visitors**

1342. The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1343. The Plaintiff is a disabled veteran and a qualified individual with a disability within the meaning of the Americans with Disabilities Act and was able to perform the essential functions of his position with or without reasonable accommodation as described in ¶¶ 27–30 and 31–32.

1344. At all relevant times, the Virginia Military Institute was the Plaintiff's employer and was an employer within the meaning of 42 U.S.C. §12111(5) and 42 U.S.C. §12112(b)(5)(A).

1345. The Defendants were aware of the Plaintiff's disability and of the limitations associated with his condition as described in ¶¶ 27–30.

1346. The Plaintiff requested reasonable accommodations to enable him to perform the essential functions of his position, and certain accommodations were initially approved and implemented as described in ¶¶ 27–30.

1347. After the Plaintiff made his internal reports regarding misuse of public resources and related misconduct, the Defendants, despite having knowledge of his disabilities and previously approved accommodations, rescinded those accommodations, altered workplace procedures, refused to provide additional reasonable accommodations requested by the Plaintiff, and failed to engage in a fair interactive process to identify effective accommodations.

1348. Instead of maintaining those accommodations or providing reasonable alternatives, the Defendants created working conditions that magnified the Plaintiff's disability by imposing artificially heightened environmental stimuli that exacerbated his sensory hypersensitivity and work schedules that resulted in intentional sleep deprivation as described in ¶¶ 62–65, 66–69, 85–86, 109–110, 111–115, 117, 143–145, 165–166, 168, 172–174, 186, 191, 195, 198–199, 202, 214, 217, 262, 309, 314, 596–597, 602–605, 611–614, 643, 661–664, 666, 684, 685–687, 691, 832, 835–856, 857, 871, 876–878, 880–881, 883–884, 896, 936, 938, 949, 973, 993–994, and 1018.

1349. The Defendants worsened the Plaintiff's disability-related limitations and inflicted mental anguish and emotional duress by withdrawing and denying reasonable accommodations and using his limitations as a basis for adverse treatment, escalating

demands, performance documentation, disciplinary action, and termination of his employment.

1350. As a direct and proximate result of the Defendants' failure to provide reasonable accommodation and related adverse actions, the Plaintiff suffered injury to his business and property in the form of loss of salary and benefits, diminished earning capacity, harm to his professional reputation, damage to his career opportunities, and other consequential and compensatory losses.

**COUNT X — FLSA MISCLASSIFICATION AS EXEMPT EMPLOYEE**

**(29 U.S.C. §213(a)(1))**

**Defendants: VMI, VMI Board of Visitors**

1351. The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1352. At all relevant times, the Virginia Military Institute was the Plaintiff's employer and was an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the Fair Labor Standards Act.

1353. At all relevant times, the Virginia Military Institute, the VMI Board of Visitors, acting through the Plaintiff's direct supervisor and other institutional officials, exercised control, directly or indirectly, over the Plaintiff's work, duties, and conditions of employment.

1354. The Plaintiff was employed in a salaried position centered on technical audiovisual operations, live event support, video editing, institutional communications, equipment management, and production support for mandatory broadcasts and other administrative

directives as described in ¶¶ 23–24, 33, 36–38, 41, 46, 55, 57, 62, 66, 72, 74–76, 79–83, 84, 86, 87, 90–92, 109–110, 111–115, 143–145, 165–166, 172–174, 186, 195, 196–202, 203–207, 214, 216–217, 262, 315–316, 450, 666, 676–683, 851, and 905.

1355. The Plaintiff's duties were primarily technical and operational in nature and did not require invention, imagination, originality, or talent in a recognized field of artistic or creative endeavor as defined by 29 C.F.R. §541.302.

1356. The Plaintiff's work was governed by established institutional branding standards, broadcast requirements, and supervisory directives and consisted largely of routine, repetitive, and deadline-driven tasks executed in accordance with instructions from supervisors and institutional leadership.

1357. The Plaintiff did not exercise creative discretion comparable to actors, writers, composers, news editors, or other exempt creative professionals, as his work product was directed, reviewed, and constrained by institutional requirements and approval processes.

1358. Throughout his employment, the Plaintiff regularly worked more than forty hours in a workweek, with extended evenings, weekends, and event days as described in ¶¶ 217, 262, 450, 851, and 905.

1359. The Defendants paid the Plaintiff on a fixed salary basis and did not pay overtime compensation at one and one-half times his regular rate of pay for hours worked over forty in a workweek.

1360. The Defendants classified the Plaintiff as an exempt creative professional under 29 U.S.C. §213(a)(1) despite the absence of primary duties that satisfied the requirements for the creative professional exemption under 29 C.F.R. §541.302.

1361. The Defendants knew or recklessly disregarded the fact that the Plaintiff's primary duties were technical and operational rather than creative within the meaning of the regulation and that he was working in excess of forty hours per week without overtime pay.

1362. By misclassifying the Plaintiff as exempt under 29 U.S.C. §213(a)(1) and failing to pay overtime compensation for hours worked in excess of forty in a workweek, the Defendants violated the overtime requirements of 29 U.S.C. §207.

1363. As a direct and proximate result of the Defendants' misclassification and failure to pay overtime, the Plaintiff suffered financial harm in the form of unpaid overtime wages, loss of use of those wages, and related economic damages.

**COUNT XI — RETALIATION FOR WAGE AND HOUR COMPLAINTS**

**(29 U.S.C. §215(a)(3))**

**Defendants: VMI, VMI Board of Visitors**

1364. The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1365. At all relevant times, the Virginia Military Institute was the Plaintiff's employer and an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the Fair Labor Standards Act.

1366. Following the Plaintiff's November 18, 2024 reports regarding the misuse of public resources, the Defendants changed the procedures for paying part-time staff assigned to the Plaintiff as described in ¶¶ 685–687.

1367. As described in ¶¶ 835–856, the Plaintiff then made repeated good-faith efforts to complete the Personnel Action Forms, but did not have the same system permissions or form options that Mr. Marcello had used and could not submit the forms as directed.

1368. The Plaintiff notified Mr. Marcello that the form available to him differed from the version used during the block of instruction, that he lacked the authorization required to complete the requested entries, and requested either corrected access, a usable form, or that Mr. Marcello process the forms so that employees would receive their wages for work already performed.

1369. The wage delays that affected student workers and staff resulted from the Defendants changing the process without providing the Plaintiff the required system access and were not caused by any failure by the Plaintiff to perform his duties.

1370. As described in ¶¶ 906–917, the Director of Human Resources was informed that employees had worked without receiving wages and that the Plaintiff lacked the necessary system permissions, yet the Defendants treated the wage delays as misconduct by the Plaintiff rather than correcting the access problem.

1371. The Defendants used the delayed payment of wages as a basis for disciplinary reprimands and performance-related documentation as described in ¶¶ 906–917, 936, 943–944, and 1013.

1372. On January 16, 2025, the Plaintiff filed a complaint within the meaning of 29 U.S.C. §215(a)(3) by making a good-faith oral and written report to the Deputy Superintendent for Finance and Support regarding delayed payment of wages, missing compensation, and failures to timely process Personnel Action Forms for student workers

and staff that he reasonably believed violated federal wage and hour requirements as described in ¶¶ 951–955.

1373. On January 30, 2025, the Defendants issued a memorandum that characterized the wage delays as a concern with the Plaintiff's handling of timesheets, despite the Plaintiff having requested assistance and identified access limitations as described in ¶¶ 1013.

1374. The Defendants, through their officers, agents, and employees, were aware of the Plaintiff's complaints to the Deputy Superintendent for Finance and Support and VMI's Office of the Inspector General at the time they changed the payroll procedures and imposed these adverse actions.

1375. The payroll changes, the use of wage delays as a basis for discipline, the additions to the Notice of Improvement Needed/Substandard Performance, and the related adverse actions were undertaken in reprisal for the Plaintiff's November 18, 2024 reports to the Deputy Superintendent for Finance and Support and VMI's Office of the Inspector General regarding potential Bribery Concerning Programs Receiving Federal Funds and Misapplication of Institutional Property, and would not have occurred but for those reports.

1376. After the Plaintiff reported on January 16, 2025 that student workers and staff had not been paid, the Defendants continued to treat those wage delays as misconduct by the Plaintiff and used them as a basis for further discipline and adverse actions.

1377. These actions were imposed in reprisal for the Plaintiff's November 18, 2024 reports to the Deputy Superintendent for Finance and Support and VMI's Office of the Inspector General and his January 16, 2025 wage and hour complaint to the Deputy

Superintendent for Finance and Support and would not have occurred but for those complaints in violation of 29 U.S.C. §215(a)(3).

1378. As a direct and proximate result of the Defendants' conduct, the Plaintiff suffered financial harm in the form of lost wages and related economic damages.

## COUNT XII — NEGLIGENT RETENTION OF SUPERVISORY EMPLOYEE

**(Virginia Common Law)**

**Defendants: VMI, VMI Board of Visitors**

1379. The Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1380. The Defendants owed a duty to exercise reasonable care in the supervision and retention of employees in positions of authority to prevent foreseeable harm to the Plaintiff in the workplace.

1381. The Defendants were aware that Associate Athletic Director for External Operations Mr. Marcello engaged in intimidating conduct toward the Plaintiff during the August 23, 2024 locker room interaction immediately after a football video shoot as described in ¶¶ 91, 342, 348–349, 628, and 967.

1382. The Defendants were notified that Mr. Marcello engaged in unwanted physical contact with the Plaintiff during a disciplinary meeting as described in ¶¶ 968–970, 974, and 977–984.

1383. On the afternoon of January 10, 2025, the Plaintiff provided the Human Resources Generalist with a transcript of the incident prepared to the best of his ability to support her investigation as described in ¶¶ 987–989.

1384. After receiving the Plaintiff's reports and supporting recording and transcript, the Defendants completed an internal review, but retained the supervisory employee in his position of authority.

1385. On the afternoon of January 30, 2025, the Plaintiff filed a criminal complaint regarding the unwanted physical contact with law enforcement as described in ¶¶ 1014.

1386. In response to the Plaintiff's complaint, Mr. Marcello filed a separate criminal complaint against the Plaintiff on January 31, 2025 concerning the same January 9, 2025 incident.

1387. The Defendants accepted and relied on that accusation and through the Threat Assessment Team placed the Plaintiff on administrative suspension as described in ¶¶ 1021–1026.

1388. On April 18, 2025, under advice of counsel, both the Plaintiff and Mr. Marcello invoked their Fifth Amendment right against self-incrimination in connection with the unwanted physical contact incident.

1389. The Defendants, despite having actual notice of Mr. Marcello's prior intimidating conduct, the Plaintiff's reports of unwanted physical contact, and the supporting recording and transcript, retained Mr. Marcello in his position of authority even though they knew that a criminal complaint arising from the January 9, 2025 incident had been filed.

1390. By keeping Mr. Marcello in a supervisory position after receiving the Plaintiff's reports, recording, and transcript, the Defendants left him in a position to file a counter-assault accusation and to influence the institutional response, and Mr. Marcello's

actions led to the Plaintiff's administrative suspension, trespass restriction, and exposure to criminal proceedings arising from the January 9, 2025 incident.

1391. This failure to take reasonable steps to supervise, restrict, or remove Mr. Marcello after receiving the Plaintiff's reports caused the Plaintiff to experience intimidation, workplace instability, emotional distress, and legal and professional duress that placed him in a position where he was compelled to invoke his Fifth Amendment right against self-incrimination in a related proceeding.

1392. As a direct and proximate result of the Defendants' negligent retention of Mr. Marcello, the Plaintiff suffered injury to his business and property in the form of loss of salary and benefits, diminished earning capacity, harm to his professional reputation, damage to his career opportunities, and other consequential and compensatory losses.

## <u>Prayer for Relief</u>

### I. Injunctive Relief:

1393. **A:** An order placing the two identified witnesses referenced in Addressing Managerial Challenges and Operational Analysis: A Summary of Allegations and Compliance Concerns on paid administrative leave for the duration of this litigation, due to the substantial risk of interference, intimidation, or influence affecting their participation.

1394. **B:** An order freezing all domestic and international financial transfers, disbursements, or asset movements by the VMI Alumni Agencies, the Keydet Club, and the VMI Foundation for the duration of this litigation, including funds identified in their Statements of Activities Outside the United States, to prevent dissipation of assets

potentially subject to judgment and to preserve the status quo regarding transactions alleged to be connected to the enterprise's operations.

1395. **C:** An order suspending all pending vendor proposals, contract awards, procurement actions, and related financial commitments undertaken by the Virginia Military Institute and the VMI Alumni Agencies for the duration of this litigation.

1396. This relief is warranted by the demonstrated risks identified in Predicate Act One and the procedural history in CAI v. Virginia Military Institute and NewPoint Strategies that identified vulnerabilities in VMI vendor selection processes and a susceptibility to undue influence.

1397. In addition to these procurement vulnerabilities, the donor-tier access structures maintained by the Keydet Club and the VMI Foundation created preferential pathways to institutional leadership that overlap with procurement decision-making authority. These tier-based systems provided enhanced access to senior officials based on financial contributions, raising substantial concerns that vendor selection, contract evaluation, and institutional purchasing decisions may be influenced by donor status rather than objective criteria. The presence of tier-based access mechanisms operating alongside documented procurement weaknesses further heightens the risk of improper influence in contracting matters.

1398. Temporary suspension of procurement activities is therefore necessary to prevent the continuation or expansion of potentially compromised contracting channels, preserve the integrity of institutional financial decisions, and maintain the status quo while allegations concerning donor-tier influence, institutional entwinement, and enterprise-level coordination are adjudicated.

1399. **D:** An order directing Defendants Virginia Military Institute and the VMI Board of Visitors to rescind the February 10, 2025 trespass warning issued against the Plaintiff, and to cease dissemination or enforcement of any related trespass restrictions.

**II. Referral of Commissioned and Retired Officers for UCMJ Review**

1400. An order requesting that the conduct of the commissioned and retired military officers identified in this Complaint be referred to the Department of Defense Office of Inspector General, the Department of the Army Office of the Judge Advocate General, or other appropriate military authority for review under the Uniform Code of Military Justice, including potential violations of Articles 78, 81, 92, 93, 107, and 133, as identified in *Commissioned Officers and UCMJ Jurisdiction*, with a recommendation that upon substantiation of the alleged misconduct, the reviewing military authority impose appropriate disciplinary action, including reduction of rank to E-1.

**III. Monetary Relief**

1401. **E. Back Pay:** An award of all lost back wages, overtime premiums, and employment benefits from the date of adverse action through the date of judgment, including lost retirement contributions, leave accruals, and institutional benefits.

1402. **F. Front Pay**: An award of front pay, to be presented by the Plaintiff at trial, including future lost earnings, career-trajectory impairment, and loss of employment opportunities reasonably expected absent Defendants' conduct.

1403. **G. Treble Damages:** An award of treble damages pursuant to 18 U.S.C. §1964(c) for the injuries sustained by the Plaintiff as a result of Defendants' violations of 18 U.S.C. §1962(c).

1404. **H. Statutory Damages:** An award of all statutory damages available under federal and state law.

1405. **I. Punitive Damages:** An award of punitive damages in an amount sufficient to punish Defendants for their misconduct and to deter similar conduct in the future.

1406. **J. Attorneys' Fees and Costs:** An award of reasonable attorneys' fees and costs pursuant to the applicable statutory provisions.

1407. **K. Pre-Judgment Interest and Post-Judgment Interest:** An award of pre-judgment interest on all monetary damages, calculated from the date of the initial harm to the date of judgment, to compensate for the time value of money, economic delay, and financial losses incurred prior to judgment.

1408. An award of post-judgment interest pursuant to 28 U.S.C. §1961 from the date judgment is entered until full payment is made, to ensure compensation for any delay in satisfaction of the judgment.

1409. **L. Any Further Relief:** Such other and further relief as the Court deems just, proper, and necessary.

**IV. Referral for Criminal Investigation**

1410. **M.** An order requesting that, to the extent the facts alleged in this Complaint or developed in subsequent proceedings indicate that the conduct of any Defendant or affiliated person may constitute violations of one or more federal or state criminal statutes identified in this Complaint, the record in this matter be transmitted to the United States Department of Justice, the United States Attorney for the Western District of Virginia, the Attorney General of Virginia, and the appropriate state and local prosecuting authorities

for evaluation, investigation, and any action they deem warranted.

**<u>Trial By Jury</u>**

1411. Plaintiff demands a trial by jury.