**IN THE UNITED STATES DISTRICT COURT**

**FOR WESTERN DISTRICT OF VIRGINIA**

CLERK'S OFFICE U.S. DISTRICT. COURT
AT LYNCHBURG, VA
FILED

MAR 02 2026

LAURA A. AUSTIN, CLERK
BY: [signature]
DEPUTY CLERK

ONIER OSWALDO VARGAS )

Plaintiff )

)

v. ) **Civil Action No.:** 6:25-cv-00100

)

VIRGINIA MILITARY INSTITUTE )

VMI BOARD OF VISITORS )

VMI ALUMNI AGENCIES )

KEYDET CLUB )

VMI FOUNDATION )

VMI ALUMNI ASSOCIATION )

Defendants )

**<u>PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................8

FACTUAL BACKGROUND ....................................................................................................9

ARGUMENT ....................................................................................................12

I. PLAINTIFF'S LIKELIHOOD OF SUCCESS ON THE MERITS UNDER STATUTORY PROTECTIONS AND RACKETEERING ENTERPRISE OPERATIONS........13

A. Statutory Retaliation and Continuing Violation Under Va. Code § 40.1-27.3 ....................... 18

B. Enterprise Operation of Donor-Reward Structures and Facilitation of Donor-Conditioned Institutional Access .................................................................................................... 23

II. IRREPARABLE HARM TO PLAINTIFF FROM CONTINUING RETALIATORY ENFORCEMENT AND ENTERPRISE OPERATIONS ............................................... 25

A. Active Enterprise Operations and Evidentiary Risks ............................................... 27

B. Structural Distortion of Institutional Governance Through Donor-Conditioned Access ........29

III. MINIMAL BURDEN OF TEMPORARY RESTRAINT ON DEFENDANTS' OPERATIONS COMPARED TO CONTINUING RETALIATORY HARM TO PLAINTIFF ....................................................................................................41

IV. PUBLIC INTEREST IN ENFORCING VIRGINIA CODE § 40.1-27.3 AND PREVENTING MONETIZED ACCESS TO PUBLIC AUTHORITY WITHIN ......................................45

CONCLUSION....................................................................................................50

CERTIFICATE OF SERVICE ....................................................................................................52

# TABLE OF AUTHORITIES

*Cases*


*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) ....................39

*Bowman v. State Bank of Keysville*, 229 Va. 534 (1985) ....................49

*Boyle v. United States*, 556 U.S. 938 (2009) ....................14

*Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) ....................24

*Buckley v. Valeo*, 424 U.S. 1 (1976) ....................48

*Center for Applied Innovation, LLC v. Virginia Military Institute,* No. CL22-215 (Va. Cir. Ct. Rockbridge Cty. Oct. 4, 2023) ....................34

*Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) ....................33

*Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, 75 F.4th 224 (3d Cir. 2023) ....................40

*Evans v. United States*, 504 U.S. 255 (1992) ....................24

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966) ....................29

*Gonzalez v. Trevino* (referenced in text) ....................21

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999)............33

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989) ....................16

*Hughes Network Systems, Inc. v. InterDigital Communications Corp.*,17 F.3d 691 (4th Cir. 1994) ....................25

*King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003) ....................19

*Lawson v. FMR LLC*, 571 U.S. 429 (2014) ....................49

*Lettieri v. Equant Inc.*, 478 F.3d 640 (4th Cir. 2007) ....................20

*Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018) ....................21

*United States v. Monsanto* , 491 U.S. 600 (1989) ....................33, 43

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) ....................20

*Nken v. Holder*, 556 U.S. 418 (2009) ....................45

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) ....................50

*Real Truth About Obama v. FEC*, 575 F.3d 342 (4th Cir. 2009) ....................12

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ....................15

*RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016) ....................16

*Sabri v. United States*, 541 U.S. 600 (2004) .................... 32

*Salinas v. United States*, 522 U.S. 52 (1997) ....................32

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ....................16

*Silvestri v. General Motors Corp.*, 271 F.3d 583 (4th Cir. 2001) ....................29

*Sun Microsystems, Inc. v. Microsoft Corp.*, 21 F. Supp. 2d 1109 (N.D. Cal. 1998) ....................26

*United States v. Edlind*, 887 F.3d 166 (4th Cir. 2018) ....................39

*United States v. Jackson*, 610 F.3d 1038 (8th Cir. 2010) ....................40

*United States v. Pinson*, 860 F.3d 152 (4th Cir. 2017) ....................25

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ....................8, 12, 13, 41

*Statutes*

10 U.S.C. § 4701 ....................31

18 U.S.C. § 666 ....................13, 27–28

18 U.S.C. § 1512 ....................34, 37

18 U.S.C. § 1513 ....................34, 37

18 U.S.C. § 1961(3) ....................11

18 U.S.C. § 1961(4) ....................11

18 U.S.C. § 1962(c) ....................6, 10–12, 19, 21, 38

41 U.S.C. § 4712 ....................31

Virginia Code § 2.2-3011 ....................31

Virginia Code § 2.2-3103 ....................27

Virginia Code § 2.2-3112 ....................10, 26

Virginia Code § 18.2-112.1 ....................10, 25

Virginia Code § 18.2-439 ....................27

Virginia Code § 18.2-444 ....................27

Virginia Code § 40.1-27.3 ....................6, 10, 14–18, 21, 36, 39

*Regulations and Regulatory Materials*

5 C.F.R. § 2635.702 ....................42

Department of Defense Joint Ethics Regulation § 2-503 ....................42

IRS Form 990 (2019–2023 filings referenced) ....................13, 20, 28

IRS Schedule I (Leadership Grants Disclosure) ....................20, 28

## INTRODUCTION

Plaintiff submits this memorandum in support of his Motion for a Preliminary Injunction seeking temporary relief to restrain the continued enforcement of retaliatory actions under Virginia Code § 40.1-27.3 and to prevent further entrenchment of the association-in-fact enterprise operating through the Defendants' integrated fundraising, procurement, and governance framework under 18 U.S.C. § 1962(c).

As set forth below, Plaintiff satisfies the four requirements for preliminary injunctive relief established in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008): (1) a likelihood of success on the merits under Virginia Code § 40.1-27.3 and 18 U.S.C. § 1962(c); (2) a likelihood of irreparable harm absent interim relief due to ongoing retaliatory enforcement and structural entwinement; (3) that the balance of equities favors temporary restraint over continued statutory violation; and (4) that issuance of an injunction serves the public interest in enforcing whistleblower protections, safeguarding public resources, and preventing misuse of authority within a publicly funded institution.

## JURISDICTION

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391 as Defendants reside in this district and the events giving rise to the claims occurred here.

Federal courts possess inherent equitable authority to preserve the status quo and prevent irreparable injury pending final adjudication. Pursuant to 18 U.S.C. § 1964(a), this Court is authorized to prevent and restrain violations of § 1962 through appropriate equitable relief.

Virginia Code § 40.1-27.3 prohibits an employer from discharging or otherwise retaliating against an employee for good faith reporting of legal violations. Subsection (C) expressly authorizes a court to issue "an injunction to restrain continued violation of this section." The challenged termination and related restrictions remain in effect; therefore, the alleged statutory violation is ongoing. The statute therefore empowers this Court to issue interim injunctive relief to restrain continued enforcement pending final adjudication.

Each factor independently supports relief, and together they compel interim restraint.

## FACTUAL BACKGROUND

On the morning of November 18, 2024, the Plaintiff met with the Virginia Military Institute's Deputy Superintendent for Finance and Support and the Senior Finance Director to report concerns regarding the use of institutional resources in connection with the Keydet Club and its relationship to Institute officials.

During the meeting, he presented information showing that the Keydet Club operated a donor tier structure offering direct access to the Athletics Director for a $10,000 donation and to the Superintendent for a $40,000 donation. The Plaintiff stated that he believed the donor-tier

reward system resembled a bribery scheme, and identified potential conflicts of interest between Institute officials and the affiliated private nonprofit organization.

At the conclusion of the meeting, the Deputy Superintendent declined to review the materials and escorted the Plaintiff to VMI's Office of the Inspector General to provide his disclosure.

On November 19, 2024, the Plaintiff returned to the Office of the Inspector General and met with the Inspector General to provide an expanded disclosure.

**Subsequent Reporting Activity**

Between December 4 and December 13, 2024, the Plaintiff submitted three additional documents in support of the second edition of *Addressing Managerial Challenges and Operational Analysis* to VMI's Office of the Inspector General:

(1) "*Addressing Managerial Challenges and Operational Analysis*: *A Summary of Allegations and Compliance Concerns";*

(2) "*Addressing Managerial Challenges and Operational Analysis: A Comprehensive and Detailed Documentation of Events and Communications";*

(3) "*Addressing Managerial Challenges and Operational Analysis*: *A Case Study in Leadership Accountability and Documentation"*.

The first document contained the requested compilation of institutional policies and statutory provisions for review by the Inspector General. The second contained email communications compiled between June and December 2024. The third contained transcripts of recorded events, transcribed to the best of the Plaintiff's ability, documenting events relevant to his reporting and subsequent conduct.

**Disciplinary Actions Following Lawful Reporting**

Following his November 18, 2024 report, the Plaintiff received seven disciplinary reprimands. Between November 22, 2024 and January 10, 2025, he received twenty-three reprimands in total. Those documented performance deficiencies were cited as the basis for his termination as Director of Athletic Multimedia at the Virginia Military Institute.

**Reporting of Unwanted Physical Contact and Related Criminal Proceedings**

On January 9, 2025, during a disciplinary meeting, the Plaintiff requested to review a reprimand he had just signed. When he attempted to retrieve the document from his desk, Mr. Marcello grabbed the Plaintiff's elbow, preventing him from doing so. The Plaintiff immediately rejected consent and, within minutes, reported the physical contact to the Inspector General.

The following day, January 10, 2025, the Plaintiff played the audio recording of the incident for the Human Resources investigator and the Director of Human Resources in support of his complaint.

On January 30, 2025, pursuant to the Inspector General's January 10 recommendation, the Plaintiff filed a criminal complaint regarding the incident. After providing a statement to VMI Police, he was escorted to a magistrate to swear out the complaint. During that process, he was informed that Mr. Marcello could file a complaint in response. Approximately twenty-five hours later, Mr. Marcello filed a counter-complaint arising from the same encounter.

Within days of the counter-complaint, the Plaintiff was placed on administrative suspension pursuant to a recommendation from VMI's Threat Assessment Team. With a criminal complaint pending against him, the Plaintiff retained counsel and produced audio recordings and transcripts related to the January 9 incident.

On April 18, 2025, both the Plaintiff and the Associate Athletic Director for External Operations invoked their Fifth Amendment right against self-incrimination in connection with the January 9, 2025 incident.

## ARGUMENT

For a Plaintiff to obtain a preliminary injunction, the plaintiff must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Real Truth About Obama v. Fed. Election Comm'n, 575 F.3d 342, 346-47 (4th Cir. 2009) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008))*. The Plaintiff satisfies each of the elements

needed to request the relief he seeks.

## I. PLAINTIFF'S LIKELIHOOD OF SUCCESS ON THE MERITS UNDER STATUTORY PROTECTIONS AND RACKETEERING ENTERPRISE OPERATIONS

To obtain preliminary injunctive relief, a plaintiff must demonstrate a likelihood of success on the merits of his underlying claims. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).

The Plaintiff is likely to succeed on the merits for injunctive relief first under Virginia Code § 40.1-27.3 (Retaliatory action against employee prohibited). The Plaintiff alleges that after engaging in protected reporting concerning misuse of public resources (Virginia Code § 18.2-112.1), conflict-of-interest concerns (Virginia Code §§ 2.2-3112, 2.2-3103), and institutional financial practices, the Defendants subjected him to adverse employment actions. Virginia Code 40.1-27.3(C) expressly provides the Court authority to issue injunctive relief to restrain the ongoing violation of the code.

To establish a claim under Virginia Code § 40.1-27.3, a plaintiff must show (1) engagement in protected reporting activity, (2) an adverse employment action, and (3) a causal connection between the reporting and the adverse action.

Second, the Plaintiff alleges violations of 18 U.S.C. § 1962(c) (Prohibited activities), and asserts that the Defendants function as an association-in-fact enterprise and operate through an

integrated financial and access structure tied to public authority and affiliated fundraising entities. *Boyle v. United States*, 556 U.S. 938 (2009).

To establish liability under 18 U.S.C. § 1962(c), a plaintiff must demonstrate (1) the existence of an enterprise affecting interstate commerce, (2) that each Defendant is a distinct "person" who conducted or participated in the operation or management of the enterprise, (3) through a pattern of racketeering activity consisting of at least two predicate acts, and (4) resulting injury.

The record reflects an association-in-fact enterprise composed of VMI, the VMI Board of Visitors, the VMI Alumni Agencies Board Inc., the Keydet Club Inc., the VMI Foundation (VMI Investment Holdings LLC as a controlled entity by the VMI Foundation), and the VMI Alumni Association. These entities operate through coordinated governance mechanisms, donor-tier access structures, financial disbursement pathways, advancement travel coordination, and interstate communications that affect institutional governance and financial operations. Accordingly, the described structure constitutes an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).

Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) and is legally distinct from the enterprise itself. Through their officers and agents, the Defendants directed, coordinated, approved, and implemented the enterprise's donor-tier access structures and related financial mechanisms. These actions constitute participation in the operation or management of the enterprise's affairs within the meaning of § 1962(c).

The predicate acts include violations of 18 U.S.C. §§ 666; 1341; 1343; 1512(b)(1), (b)(2)(A)–(B), and (b)(3); 1513(e); 1952(a)(3); 1956; and 1957, along with incorporated Virginia bribery and conflict-of-interest statutes. Documented donor-access mechanisms, interstate advancement travel, financial disbursements to institutional leadership, and retaliatory acts against a reporting witness collectively demonstrate relatedness and continuity sufficient to establish a pattern of racketeering activity.

The retaliatory measures imposed upon the Plaintiff were executed through the same enterprise mechanisms and, as such, constitute an injury directly flowing from racketeering activity. Moreover, the enterprise structure remains operational during litigation, and the predicate conduct reflects both closed-ended continuity and a risk of open-ended continuation. Plaintiff has therefore demonstrated a likelihood of success under § 1962(c).

Retaliatory acts under Virginia Code § 40.1-27.3 and 18 U.S.C. § 1513(e) were implemented through the same coordinated enterprise structure that forms the basis of the 18 U.S.C. § 1962(c) claim. These were not routine employment decisions. Instead, the adverse actions were carried out through the same supervisory authority, governance mechanisms, donor-tier access structures, and decision channels that constitute the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170 (1993). The enterprise remains operational in a manner that presents a threat of continued racketeering activity, thereby satisfying the open-ended continuity requirement under 18 U.S.C. § 1962(c). *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 241–42 (1989); see also *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985).

In addition, the injury in this action is domestic within the meaning of *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016). The Plaintiff was employed in the Commonwealth of Virginia by a state and federally funded institution established under Virginia law. Retaliatory harm was imposed in Virginia, and the resulting loss of employment, wages, and professional standing was sustained there. The affiliated alumni entities, four separate nonprofit organizations comprising part of the association-in-fact enterprise, are incorporated and conduct their principal activities in Virginia.

Accordingly, the foundation of Plaintiff's request for relief rests on (1) a Virginia whistleblower retaliation statute that expressly authorizes injunctive restraint , and (2) federal racketeering violations supported by enumerated predicate acts involving institutional governance and financial operations and federally funded program safeguards as supported by the documentary material submitted with this brief.

The Plaintiff's reporting is documented through his November 18, 2024 verbal disclosure to the Deputy Superintendent for Finance and Support and his referral to the Office of the Inspector General. To support his verbal reporting, the Plaintiff submitted the Second Edition of *"Addressing Managerial Challenges and Operational Analysis"* and related communications. These documents establish the content and timing of the disclosures to institutional oversight authorities. The subject matter of those disclosures is independently reflected in Defendants' own publications and filings. Publicly available donor-tier access structures, institutional fundraising materials, and IRS Form 990 filings (2019–2023) document the financial and

governance framework at issue. Federal funding references confirm the receipt of program funds relevant to 18 U.S.C. § 666.

The retaliation is supported by written documentation such as the Performance Improvement Plan, disciplinary memoranda, internal investigation findings, termination documentation, and related email correspondence. These records create a dated sequence of escalating adverse actions following Plaintiff's reporting.

Evidence relevant to the 18 U.S.C. § 1962(c) allegations appears in publicly posted donor-access structures, procurement-related communications, affiliated-entity financial disclosures, and governance materials. These documents were generated or published by the Defendants and are not speculative in nature.

Taken together, the record consists of internal emails, formal disciplinary records, Inspector General communications, IRS filings, public institutional publications, federal funding documentation, and termination materials. These materials establish documented reporting, documented institutional practices, and documented adverse actions. The claims therefore rest on identifiable records rather than conjecture.

## A. STATUTORY RETALIATION AND CONTINUING VIOLATION UNDER VA. CODE § 40.1-27.3

Virginia Code § 40.1-27.3(C) authorizes injunctive and reinstatement relief provided that a person who in good faith reports a violation of any federal or state law "may bring a civil action in a court of competent jurisdiction" and that "the court may order as a remedy to the employee (i) an injunction to restrain continued violation of this section, (ii) the reinstatement of the employee to the same position held before the retaliatory action or to an equivalent position, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs." The statute does not limit relief to post-trial damages as it expressly authorizes injunction and reinstatement as judicial remedies to restrain the continued violation.

The Plaintiff engaged in protected reporting activity under the statute on November 18, 2024 when he verbally disclosed concerns to the Deputy Superintendent for Finance and Support regarding the misuse of public resources, conflict-of-interest concerns, and the disclosure of a potential bribery scheme involving affiliated fundraising structures with institutional authority. That disclosure was referred to the Office of the Inspector General for review where he formally submitted "*Addressing Managerial Challenges and Operational Analysis.*" Additional supporting documents were provided to VMI's Office of the Inspector General on December 4, December 11, and December 13, 2024. The same four documents were later provided to Human Resources personnel on January 10, 2025 during the investigation into Plaintiff's retaliation complaint.

Following his November 18, 2024 disclosure to the Deputy Superintendent and referral to the Office of the Inspector General, the Plaintiff received 23 written disciplinary memoranda dated between November 22, 2024 and January 10, 2025, a Performance Improvement Plan dated December 4, 2024 with follow-up documentation dated December 12, 2024, a Notice of Improvement Needed / Substandard Performance advising that he had 45 days to correct identified issues or face termination, formal internal investigative findings rejecting his disclosures, physical exclusion from institutional facilities through a trespass warning dated February 10, 2025, and a formal termination. The disciplinary process intensified immediately after the November 18 disclosure to VMI's Office of the Inspector General. Written reprimands and performance-based allegations were issued within days of the protected reporting despite an August 12, 2024 performance evaluation reflecting satisfactory performance. The same supervisory chain implicated in the reported conduct initiated, documented, and controlled the disciplinary escalation that culminated in Plaintiff's termination notice on March 4, 2025.

The causal connection is supported by the temporal proximity and documented sequence of events; the fact that Plaintiff's termination followed his protected activity so closely "gives rise to a sufficient inference of causation to satisfy the prima facie requirement." See *King v. Rumsfeld,* 328 F.3d 145, 151 (4th Cir. 2003).

The restriction was imposed after Plaintiff had already been removed from duties and while termination proceedings were underway. The timing of the trespass warning closely followed Plaintiff's protected reporting. The warning was issued eleven days after the Plaintiff filed a criminal complaint alleging unwanted physical contact by Mr. Marcello during a

disciplinary reprimand meeting. This sequence reflects escalation rather than a response to a newly arising safety concern. At the time the trespass warning was issued, the suspension had already been imposed following the Threat Assessment Team recommendation. Physical separation from the workplace had already been achieved through administrative control. The subsequent trespass warning therefore introduced an additional layer of criminal enforcement that functioned as retaliatory escalation rather than a necessary safety measure.

In *Lettieri v. Equant Inc.*, 478 F.3d 640, 650–51 (4th Cir. 2007), the Fourth Circuit held that "evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation."

The warning imposed the threat of arrest tied to mere presence on property the Plaintiff was already avoiding. The action magnified the coercive effect of the restriction without addressing a documented safety concern. Taken together, the sequence of timing, lack of a new safety justification, and addition of criminal enforcement support the inference that the trespass warning operated as punitive escalation rather than a protective safety measure.

In *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 1726 (2019), the Supreme Court held that "the presence of probable cause should generally defeat a First Amendment retaliatory arrest claim" because probable cause ordinarily suggests that the officer's animus did not cause the arrest. The Court also recognized a narrow exception where a plaintiff presents objective evidence that similarly situated individuals not engaged in protected speech were not arrested, even though officers had probable cause.

Here, the arrest arising from the assault allegation did not occur in isolation. It followed protected reporting through internal channels and was initiated after the filing of a criminal complaint against a supervisory official. The subsequent suspension on February 4, 2025 and the trespass warning issued on February 10, 2025 followed that arrest and occurred while termination proceedings were underway. Officers indicated that custodial detention was unnecessary, reflecting discretionary enforcement rather than mandatory action. In combination, the progression from arrest to administrative suspension and then to formal trespass exclusion supports the inference of an escalating sequence rather than a narrowly tailored response to a discrete safety concern.

Accordingly, under *Nieves*, the absence of probable cause supports the retaliatory arrest theory. Even if arguable probable cause existed, the discretionary decision to initiate criminal process in the midst of an escalating employment dispute provides the objective evidence of atypicality required by *Gonzalez v. Trevino* to support an inference of retaliatory animus.

In *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954–55 (2018), the Supreme Court held that a retaliatory arrest claim may proceed where a plaintiff alleges an official municipal policy motivated by retaliation, even if probable cause existed for the arrest. The Court explained that "an official retaliatory policy is a 'particularly troubling and potent form of retaliation,' for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." Where an arrest is alleged to be part of a broader retaliatory plan adopted by municipal officials, probable cause does not categorically bar the claim.

The escalation from administrative restriction to criminal prosecution therefore demonstrates retaliatory enforcement within a continuing retaliatory structure rather than neutral safety regulation. During the paid suspension, the Plaintiff was expressly instructed that he was not permitted to return to work for any reason without advance permission. Workplace access during the suspension was governed through advance authorization requirements and escorted return procedures. The disciplinary framework already contained mechanisms to regulate presence on campus without invoking criminal prosecution. The trespass warning therefore shifted the character of enforcement from internal administrative control to external criminal exposure.

From the time he received notice of intent to terminate his employment, the Plaintiff retained the ability to invoke the available appeal process and formally contest the termination decision before the Superintendent. The appeal mechanism remained available to the Plaintiff during the suspension and termination process as a distinct administrative channel separate from the suspension itself. Under these existing conditions, the trespass order was not necessary to maintain workplace safety. Instead, the warning functioned to restrict the Plaintiff's ability to meaningfully participate in any appeal process by subjecting him to the threat of arrest for mere presence on Institute property.

Virginia Code § 40.1-27.3(C) provides that a retaliatory employment action remains a violation so long as it continues to be enforced. The ongoing enforcement of the termination decision and trespass warning constitute continuing retaliatory acts within the meaning of the

statute.

**B. ENTERPRISE OPERATION OF DONOR-REWARD STRUCTURES AND FACILITATION OF DONOR-CONDITIONED INSTITUTIONAL ACCESS**

Lawful fundraising involves voluntary contributions that do not condition access to public officials or institutional decision-making authority on payment levels. The donor-tier structure links contribution amounts to enhanced access to senior institutional officials and institutional channels. That linkage transforms charitable giving into a system of transactional access, creating a risk that institutional decisions are influenced by financial contribution status rather than neutral educational or public considerations.

Certain activities that would be subject to direct public-institution scrutiny are administered through affiliated private entities. These entities receive donor funds, operate the donor-tier structures, and later disburse funds or benefits to the Institute. This intermediary structure separates the source of donor funds from the Institute's formal decision channels, reducing direct transparency and complicating oversight of the relationship between donor contributions and institutional access. Correspondence from the Office of the Inspector General produced in this matter reflects limits on direct oversight authority over the affiliated private entities operating the donor-tier structure. As a result, the access and funding mechanisms at issue operate without the same institutional constraints that apply to formal Institute processes. In turn, this intermediary arrangement permits the challenged structure to function through affiliated governance and fundraising channels.

To date, the donor-tier structure remains active and continues to shape institutional access channels and funding pathways as part of the ongoing institutional framework.

Senior institutional officials continue to appear in connection with donor-tier activities while this litigation is pending. In addition, retired commissioned officers who remain publicly identified by their former rank appear as part of donor-tier benefit programming. Their continued participation connects institutional authority and public stature to the donor access structure under challenge and are so pervasively entwined that "the nominally private character of the framework is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings." *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).

IRS Form 990 filings and related financial disclosures reflect that the Foundation, the Alumni Agencies, and the Keydet Club report revenue derived primarily from donor contributions. Schedule I filings further show that $3,248,587 in grants were provided to individuals classified as leadership between 2019 and 2023. Because donor participation is tied to tiered courtesy benefits that include enhanced institutional access, these financial disbursements operate within the same integrated fundraising and access structure challenged in this litigation. *Evans v. United States*, 504 U.S. 255, 274 (1992).

Published institutional materials reflect that alumni have participated in major capital renovation projects on campus. Several of the contractors and project managers identified in those materials are VMI alumni or work for firms with multiple alumni affiliations. During this

same period, the alumni organizations continued to promote and administer their donor-tier reward program that provides tiered institutional access. Both the capital project execution and the donor-tier programming operate through the same alumni network. This network functions as an operational intermediary that links fundraising programming, capital execution, and access channels to institutional decision-making authority. *United States v. Pinson*, 860 F.3d 152, 161–62 (4th Cir. 2017).

For these reasons, the Plaintiff has demonstrated a substantial likelihood of success on the merits under Virginia Code § 40.1-27.3 and 18 U.S.C. § 1962(c). This likelihood rests on express statutory authorization for injunctive relief and record evidence establishing protected reporting, adverse action, coordinated enterprise operation, and a pattern of racketeering activity.

## II. IRREPARABLE HARM TO PLAINTIFF FROM CONTINUING RETALIATORY ENFORCEMENT AND ENTERPRISE OPERATIONS

Under *Hughes Network Systems, Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 693–94 (4th Cir. 1994), a plaintiff must demonstrate that irreparable harm is likely in the absence of preliminary relief and that such harm cannot be adequately remedied by monetary damages.

The harm during the pendency of this litigation arises from four interrelated conditions:

(1) the continued enforcement of the retaliatory actions under Virginia Code § 40.1-27.3;

(2) the Plaintiff's physical exclusion from institutional property under threat of arrest;

(3) the concentration of supervisory authority over material witnesses in the same decision-makers whose conduct is at issue; and

(4) the continued operation and further integration of the enterprise framework under 18 U.S.C. § 1962(c).

Virginia Code § 40.1-27.3 expressly authorizes a court to restrain a retaliatory action that remains in effect. The measures taken against him have impaired his ability to participate in meaningful proceedings connected to his employment and appeal rights, altered his employment history, and presently restrict his access to evidence. The actions against the Plaintiff reflect the professional consequences of a retaliatory employment action imposed following protected reporting. As the challenged structure continues to operate and the retaliatory measures remain enforced, harm accrues that cannot be fully remedied through post-trial relief. These conditions produce structural, procedural, evidentiary, and institutional harm that progressively alters the conditions necessary for meaningful review.

Structurally, the challenged procurement, donor-access, and governance mechanisms continue operating and embedding in real time. Contracts are executed, financial decisions are implemented, and administrative practices normalize. Allowing continued execution of contracts, capital commitments, and governance integration during litigation materially alters that status quo by replacing the pre-dispute operational baseline with newly embedded structural conditions. The longer these systems operate unrestrained, the more deeply integrated they become and the more disruptive and impractical later unwinding would be. See *Sun Microsystems, Inc. v. Microsoft Corp.*, 21 F. Supp. 2d 1109 (N.D. Cal. 1998).

Evidentiary harm results from the Plaintiff's continued physical exclusion. Operational decisions, communications, and internal adjustments occur entirely within the Defendants' internal channels. This internalization of information flow limits external observation and restricts the ability to independently verify how events are characterized or preserved during litigation. Institutional communications continue to be routed exclusively through these same internal channels while the case is pending. As a result, the concentration of information within the Defendants' internal channels prevents independent contemporaneous documentation of operational decisions and evidentiary handling while the case is pending. Each such action fixes the structure more firmly in place and alters the evidentiary baseline, diminishing the ability to later isolate or unwind the conditions that existed when the challenged conduct occurred.

Procedurally, material witnesses remain under the supervisory and evaluative authority of individuals whose conduct is at issue. Even absent overt pressure, hierarchical dependency shapes how events are reported, ultimately diminishing safeguards for witnesses as litigation proceeds. Preserving the testimony of witnesses within this entrenched environment requires immediate protection to address the inherent structural risk created by active supervisory authority exercised over those witnesses during the pendency of this litigation.

## A. ACTIVE ENTERPRISE OPERATIONS AND EVIDENTIARY RISKS

The unifying harm addressed in this subsection is the evidentiary and operational consequence of the structure's continued activity. Ongoing changes to access channels, financial

flows, supervisory relationships, and institutional communications alter the factual conditions that must later be evaluated, increasing the risk that meaningful relief will be impaired if the structure is ultimately found unlawful.

Retaliation in this matter is not a completed past event as it continues each day that the termination remains in effect and every day the trespass warning remains active. While the termination and trespass order remain active, the Plaintiff remains removed from his role, prohibited from campus access, and subject to continued enforcement of a retaliatory action in violation of Virginia Code § 40.1-27.3. Due to the Plaintiff actively contesting the termination action, the retaliatory deprivation renews itself each day rather than ending on the date of termination.

Presently, impairment is immediate and ongoing as the Plaintiff is currently unable to enter Institute grounds to observe conditions, document facilities connected to the allegations, or respond in real time to developments relevant to the claims. This restriction limits his ability to assist in evidence preservation and case preparation during active litigation. The Plaintiff has alleged manipulation or alteration of records while employed, and he was denied return of his complete investigative materials. Under these circumstances, exclusive institutional control over physical locations and documents creates a risk to evidence integrity.

Physical access to the locations relevant to the case would allow the Plaintiff to observe, identify, and request preservation of materials relevant to the claims, reducing the risk of unilateral evidence control by the Defendants. By barring the Plaintiff from Institute property

under threat of arrest, the Defendants further entrench that unilateral control by restricting his ability to access locations, materials, and events relevant to his claims. The credible risk of arrest for physical presence creates a coercive barrier that deters lawful evidence gathering and participation in proceedings connected to this case. The continued enforcement of the retaliatory termination constitutes irreparable harm in this statutory context. Virginia Code § 40.1-27.3 expressly authorizes judicial restraint of a retaliatory action. So long as the termination continues to be enforced, the Defendants remain in violation of the statute.

As the Supreme Court recognized, interim relief is appropriate where failure to act would render a final decree 'futile.' *FTC v. Dean Foods Co.*, 384 U.S. 597, 607 n.5 (1966); *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001). No subsequent award of damages can undo the effect of a factual record curated by the party in control of that material.

## B. STRUCTURAL DISTORTION OF INSTITUTIONAL GOVERNANCE THROUGH DONOR-CONDITIONED ACCESS

The harm is not a mere policy disagreement but the ongoing use of public institutional resources in violation of Virginia Code § 18.2-112.1. The violation occurs in the coordination and direction of state employees and institutional property for purposes tied to private fundraising efforts. This coordination between state and private entities is a structured and continuing entwinement between the Institute and affiliated alumni-connected entities. Through

established communication channels, supervisory direction, and recurring operational practices, state personnel and publicly funded resources are functionally incorporated into the advancement activities of affiliated private entities. During the Plaintiff's tenure, the:

(1) Superintendent;

(2) General Counsel;

(3) Deputy Superintendent;

(4) outgoing Chief of Staff;

(5) incoming Chief of Staff;

(6) Senior Finance Director;

(7) Athletics Director; and

(8) Associate Athletic Director for Internal Operations.

These individuals exercised supervisory, financial, and operational authority over institutional transactions involving affiliated alumni-connected entities and directed state employees and institutional property for purposes tied to private fundraising efforts.

Where state officials exercise authority over transactions involving entities with which they maintain membership or affiliation relationships, Virginia conflict-of-interest law governs their participation. To the extent those transactions implicated entities within which they held membership or affiliation relationships, § 2.2-3112 required disqualification and recorded disclosure of any personal interest before participating in such transactions.

The planning and supervisory direction underlying this arrangement are documented through email communications between the Plaintiff, his supervising Associate Athletic Director for External Operations, and representatives of the affiliated alumni agencies regarding the production and broadcast placement of fundraising content. The coordinated use of public resources at issue includes:

(1) the direction of state-employed personnel to create and distribute promotional materials for affiliated private fundraising entities;

(2) the use of Institute-owned multimedia and broadcast equipment purchased and maintained with public funds;

(3) the use of publicly funded facilities and institutional property for the production of donor-focused events and media content;

(4) the deployment of state-compensated labor hours to film, edit, and prepare materials for fundraising initiatives; and

(5) the integration of those materials into publicly distributed broadcasts and institutional media channels, including ESPN-affiliated productions coordinated through the athletic department.

As an umbrella organization, the VMI Alumni Agencies exist to support the endowment and advancement of VMI. In practice, these charities operate through donor-tier mechanisms that grant exclusive access to institutional officials and decision-makers in exchange for high-dollar contributions.

The Virginia Military Institute receives federal benefits in excess of $10,000 annually through programs administered by the Department of Defense and the Department of Education thereby qualifying as an "organization" within the meaning of 18 U.S.C. § 666(b). Senior institutional officials act as "agents" of that federally funded organization for purposes of § 666(a).

Federal law is not standing alone as Virginia law imposes parallel constraints on the conduct of state officials. Virginia Code § 2.2-3103 bars state officials from using their public position for personal gain or from accepting anything of value for the performance of official duties. Accordingly, Virginia Code § 18.2-444 criminalizes corrupt influence upon an agent in connection with a transaction involving the agent's principal, and Virginia Code § 18.2-439 prohibits any officer from accepting a bribe in exchange for the exercise of official authority.

IRS Schedule I filings reflect that the VMI Foundation distributed funds categorized under "leadership" totaling approximately $3,248,587 between 2019 and 2023. These distributions occurred within the same charitable system that operates donor-tier mechanisms granting exclusive access to institutional decision-makers. *Sabri v. United States*, 541 U.S. 600 (2004) and *Salinas v. United States*, 522 U.S. 52 (1997) held that 18 U.S.C. § 666 does not require a direct link between the bribe and federal funds, but only that the institution receives over the $10,000 threshold in federal assistance. Where high-dollar contributions are exchanged for exclusive access to agents of a federally funded organization in connection with institutional transactions involving $5,000 or more, 18 U.S.C. § 666(a)(1)(B) and § 666(a)(2) supply the governing federal standard. Once high-dollar contributions are exchanged for exclusive access to

institutional agents, the disposition and movement of those donor-derived funds become central to statutory analysis and are documented in each charity's IRS Form 990 filings.

Funds raised by the affiliated entities are publicly represented as supporting the Institute's educational and advancement mission. Donors are directed to make unrestricted contributions to affiliated entities such as the VMI Foundation and the Keydet Club. Unrestricted donor contributions are described as supporting "VMI's most pressing needs", and are routed through the VMI Foundation, the VMI Alumni Agencies Board, and the Keydet Club. Repeated offshore transfers of donor-derived funds stand in direct contrast to the stated objective involving unrestricted contributions. The entities' own IRS filings reflect substantial annual "expenditures and investments" in Caribbean jurisdictions from 2019 through 2023 totaling approximately $104,333,936.

The VMI Alumni Agencies, the VMI Foundation, and the Keydet Club have engaged in repeated transfers of donor-derived funds within the same access-conditioned framework identified in this action as forming part of the pattern of racketeering activity asserted under 18 U.S.C. § 1962(c).

Where assets are traceable to unlawful conduct and face risk of dissipation, courts recognize authority to preserve their availability pending adjudication. See *United States v. Monsanto*, 491 U.S. 600, 612–16 (1989). While *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) limits injunctions in cases seeking purely money damages, the Plaintiff here seeks equitable remedies to recover the specific assets in question. As *Deckert*

*v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940) held, the Court is empowered to freeze such assets to maintain the status quo. This request is directly related to the Plaintiff's protected reporting under Va. Code § 40.1-27.3, in which he identified a potential bribery scheme involving the Keydet Club initially, but expanded to the VMI Alumni Agencies as an umbrella organization.

Procurement authority operates within the same institutional framework that governs donor-tier access and leadership expenditures. All procurement activity during the relevant period occurred in parallel with a donor-tier structure brokered by affiliated private charities that conditions exclusive access to senior institutional officials on high-dollar contributions. The same senior officials who exercised decision-making authority over institutional contracts and financial transactions were participants in, or beneficiaries of, the advancement structure through which access was monetized.

In recent capital project developments, the Alumni Agencies and Foundation facilities have proceeded with demolition to construct a new alumni and advancement center scheduled for completion around 2028. Unlike prior renovation projects, this development consolidates advancement operations into a purpose-built structure designed to centralize fundraising, alumni engagement, and donor-access programming. By replacing existing facilities with a dedicated alumni and advancement complex, the donor-tier system becomes embedded within permanent institutional architecture. Capital procurement, physical construction, and advancement programming will operate within the same structural framework that conditions exclusive access to state officials on high-dollar contributions.

In *Center for Applied Innovation, LLC v. Virginia Military Institute*, No. CL22-215 (Va. Cir. Ct. Rockbridge Cty. Oct. 4, 2023), the court sanctioned VMI $15,000 after finding that it made false representations regarding the award of a contract to NewPoint Strategies while issuing a $10,000 purchase order that functionally bypassed competitive bidding requirements. The court characterized the conduct as "arbitrary and capricious," rejected assertions of sovereign immunity, and confirmed that VMI is subject to the Virginia Public Procurement Act.

VMI represented to the court that it did not intend to award a contract under the challenged RFP. Evidence later revealed that a $10,000 purchase order had already been issued to NewPoint Strategies under alternate procurement authority. The original proposal totaled $30,000, but the amount was reduced so that it would fall below VMI's small purchase threshold. Although the court acknowledged that VMI possessed small purchase authority, it nevertheless sanctioned VMI in the amount of $15,000 after determining that the procurement activity had not been disclosed to the court and stating that "someone at VMI knew that this was going on."

The broader financial infrastructure of the Defendants intersected with the Plaintiff's employment duties and internal reporting obligations. In the course of preparing for the November 13, 2024 HR meeting with the Director of Human Resources, the Plaintiff discovered the donor courtesy reward structure linking high-dollar contributions to enhanced access to senior institutional officials. Following the discovery, the Plaintiff reported the findings as a matter of public concern to the Deputy Superintendent for Finance and Support on November 18, 2024.

2025. These reports were directed to the Virginia Military Institute Office of the Inspector General, Human Resources in connection with retaliation complaints, the Deputy Superintendent for Finance and Support, the Senior Finance Director, the Office of the Governor, the Office of the Attorney General, the Office of the Secretary of Education, the Department of Defense Office of Inspector General, and the United States Department of Education Office of Inspector General. The Plaintiff made these submissions in good faith pursuant to § 2.2-3011 (Discrimination and retaliatory actions against whistle blowers prohibited), § 40.1-27.3 (Retaliatory action against employee prohibited), 10 U.S.C. § 4701 (Department of Defense whistleblower protections), and 41 U.S.C. § 4712 (Enhancement of contractor protection from reprisal for disclosure of certain information).

After the November 18, 2024 report, the Inspector General advised the Plaintiff that opening an inquiry would require notifying the Athletics Director, a direct beneficiary from the enterprise. The notification of a pending inquiry to the Athletics Director preceded the onset of formal disciplinary action. Within four days of the initial protected report, the Plaintiff received seven written reprimands covering a range of alleged deficiencies. Between the date of the protected disclosures and the termination decision, the Plaintiff received a total of twenty-three reprimands. The disciplinary measures escalated in frequency and severity following each protected disclosure.

On the afternoon of January 9, 2025, during a disciplinary meeting, the Plaintiff requested to review a reprimand he had just signed. Mr. Marcello declined to allow review of the document and instead directed the Plaintiff to sign the next reprimand, stating that he could

review the prior document later. The Plaintiff then informed Mr. Marcello that he intended to retrieve the document from his desk. As the Plaintiff reached for the document, Mr. Marcello grabbed the Plaintiff's elbow, preventing him from obtaining it. The Plaintiff immediately rejected consent to the grab. Within minutes of the physical contact, the Plaintiff emailed the Inspector General to report the incident.

The following afternoon, on January 10, 2025, the Plaintiff played the audio recording of the unwanted physical contact to the Director of Human Resources, the HR investigator, a VMI Police Captain and police officer to support his claim.

On January 24, 2025, the Plaintiff received the written findings of the Human Resources investigation into his retaliation and physical contact complaints. The findings were issued by the General Counsel, the Director of Human Resources, and the Athletics Director.

The written HR determination concluded as follows:

- Retaliation – no evidence has been provided that you have or are being retaliated against.
- Marcello receiving funds from the Keydet Club – this accusation is not substantiated.
- Mr. Marcello striking your body with his body – this accusation cannot be substantiated.

The Plaintiff did not allege that Mr. Marcello received funds from the Keydet Club. The Plaintiff's protected disclosures concerned misuse of public resources, donor-tier access mechanisms, and institutional governance risks. The investigative findings addressed an

allegation of personal receipt of funds that was not asserted by the Plaintiff in his written submissions.

Following issuance of the investigative findings, the Plaintiff followed the recommendation of the Inspector General and requested assistance from VMI Police Captain Henson on January 30, 2025, in pursuing a criminal complaint regarding the unwanted physical contact. The Plaintiff made his statement through VMI Police Officer Ryan Knick. That same afternoon, he was escorted to the magistrate to swear out the complaint arising from the January 9, 2025 incident. The Plaintiff was not provided a physical copy of his complaint by VMI Police. During his escort with VMI Police Officer Ryan Knick regarding the criminal complaint process, the Plaintiff was informed that Mr. Marcello could seek a complaint before a magistrate in response. Approximately twenty-five hours following the Plaintiff's complaint, Mr. Marcello filed a complaint against the Plaintiff arising from the same incident. Five days following the Plaintiff's criminal complaint and four days following Mr. Marcello's complaint, the Plaintiff was notified by the newly appointed Chief of Staff and VMI alumnus that he was being placed on administrative suspension pursuant to a recommendation from VMI's Threat Assessment Team to the Superintendent.

With a criminal complaint pending against him, the Plaintiff was compelled to retain counsel to protect his rights and defend against potential criminal exposure arising from the same January 9, 2025 incident. The Plaintiff provided his counsel with the audio recording and transcripts referenced in his complaint and produced all materials in his possession relevant to the event. Counsel relayed to the Plaintiff that he subsequently attempted to obtain a copy of Mr.

Marcello's criminal complaint from the Sheriff's Office, but was informed that it could not be located. In the Commonwealth's case against the Plaintiff, Mr. Marcello was listed as a complaining witness along with an additional witness identified in the court record as "Jason Brokenbrow." On the contrary, in the Commonwealth's case against Mr. Marcello, the Plaintiff was listed as complainant and witness, and no additional institutional witnesses were identified. VMI Police maintains an officer by the name of Jason Brockenbrough. The discrepancy between the court-listed name and the known officer's name is reflected in the criminal case information. The resulting asymmetry in access to complaint materials, witness designation, and record clarity occurred while the Plaintiff faced active criminal exposure arising from the same incident he had reported as retaliatory and from events immediately following his protected reporting.

Federal courts have recognized that 18 U.S.C. § 1512(b) reaches conduct intended to influence, delay, or prevent testimony or communication to law enforcement through intimidation, threats, or corrupt persuasion, and that the statute does not require success in silencing the witness so long as the defendant acted with the requisite intent. See *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703–06 (2005) (discussing "corrupt persuasion" and intent under § 1512(b)); see also *United States v. Edlind*, 887 F.3d 166, 174–75 (4th Cir. 2018) (holding that § 1512(b) applies where conduct is designed to influence or shape testimony). Relatedly, 18 U.S.C. § 1513(e) prohibits retaliatory action against a person for providing truthful information relating to the commission or possible commission of a federal offense to law enforcement. The Plaintiff's disclosures concerned potential violations of 18 U.S.C. §§ 666(a)(1)(A), 666(a)(1)(B), and 666(a)(2). Courts have recognized that retaliatory

employment actions and threats of legal harm may satisfy these statutes where undertaken with retaliatory intent. See *United States v. Jackson*, 610 F.3d 1038, 1043–44 (8th Cir. 2010). The statutory focus is on intent to retaliate or interfere with participation in official proceedings, not on whether the intimidation ultimately succeeded.

The Defendants characterize the allegations as involving "various interactions with coworkers, human resources managers, and leadership at VMI." This characterization is a material misrepresentation of the roles and authority of the individuals identified in the pleadings. The allegations concern actions taken by institutional agents vested with financial, disciplinary, procurement, and governance authority within the Virginia Military Institute and its affiliated entities on behalf of and furtherance of the enterprise's financial operations. The evidence provided in this case is concrete, non-speculative, and tied directly to the Defendants' own records, IRS filings, and internal emails. This satisfies the 'clear showing' standard in *Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, 75 F.4th 224, 238 (3d Cir. 2023), which requires that claims be supported by more than 'affidavits drafted by lawyers.' Here, the facts are established by the Defendants' own documentation and the Plaintiff's contemporaneous reporting, not by mere legal argument.

The same institutional leadership structure identified in the underlying allegations retains supervisory authority, institutional control, and operational influence over the witnesses, documents, and conditions relevant to this case. Allowing those witnesses to remain under the exclusive supervisory authority of the same institutional decision-makers implicated in the

allegations creates an ongoing risk of subtle or overt influence over testimony, evidence preservation, and participation in official proceedings.

It is necessary to: (1) suspend the continued enforcement of the retaliatory termination and related restrictions, (2) stabilize the conditions under which identified witnesses remain employed, and (3) preserve documentary and institutional materials in their present state pending judicial review.

## III. MINIMAL BURDEN OF TEMPORARY RESTRAINT ON DEFENDANTS' OPERATIONS COMPARED TO CONTINUING RETALIATORY HARM TO PLAINTIFF

In assessing the balance of equities, the Court must weigh the injury to the Plaintiff if relief is denied against the hardship to the Defendants if relief is granted. In the manner of this case, "the balance of equities tips in the plaintiff's favor when the injury he is likely to incur in the absence of an injunction exceeds the harm the defendant would suffer under the injunction." See *Winter*, 555 U.S. 7, 20 (2008).

If the continued enforcement of the retaliatory action prohibited by Virginia Code § 40.1-27.3 and the associated racketeering enterprise mechanisms operating through the Defendants' integrated fundraising, procurement, and governance framework continue to operate during litigation, the Plaintiff will suffer ongoing retaliatory, evidentiary, and procedural harm,

whereas temporary compliance with statutory obligations imposes only a limited and temporary administrative burden on the Defendants.

First, the Plaintiff remains physically excluded from the institutional environment where relevant evidence develops in real time. This exclusion compounds with time and limits meaningful participation in fact development. This exclusion imposes a continuing hardship on the Plaintiff because the Plaintiff cannot participate in evidence development on equal footing. By contrast, restraining the continued enforcement of the retaliatory exclusion under Virginia Code § 40.1-27.3 would not disrupt core institutional operations. The Defendants would only need to cease enforcement of the challenged retaliatory measures rather than implement new operational changes. Those statutory restraints would reduce the asymmetry in evidence development during litigation.

Second, witnesses remain under the supervisory authority of individuals implicated in the Plaintiff's disclosures. Prolonged exposure to internal messaging, finalized institutional positions, and reporting hierarchies creates continuing pressure within the same enterprise structure that implemented the retaliation. The Plaintiff carries the burden of litigating against a Defendant that retains supervisory control of material witnesses. That control increases the Plaintiff's hardship as witness conditions and reporting lines remain controlled by the same institutional chain. Restraining continued enforcement of retaliatory supervisory actions and restoring compliance with statutory protections would reduce that hardship. Such relief would require only adherence to existing legal obligations rather than structural reorganization. The retaliatory counter-complaint and subsequent criminal exposure must be evaluated in light of the

statutory prohibitions against interference and retaliation codified in 18 U.S.C. §§ 1512 and 1513, as previously addressed.

Third, procurement, financial, and donor-access structures continue operating as components of the association-in-fact enterprise under 18 U.S.C. § 1962(c). The longer these systems remain undisturbed, the more difficult it becomes to isolate or unwind their effects without broad collateral disruption. As these enterprise mechanisms continue to operate and integrate into institutional decision-making, preservation of assets and operational channels traceable to unlawful conduct becomes necessary to prevent further entrenchment pending adjudication. Temporary restraint of assets alleged to be traceable to unlawful conduct is a recognized pre-adjudication preservation mechanism in cases involving criminally derived property. Courts have recognized that pretrial restraint of assets traceable to criminal conduct preserves the availability of forfeitable property pending adjudication and does not operate as punishment. See *Monsanto*, 491 U.S. 600, 612–16 (1989).

The Plaintiff does not seek to halt ordinary institutional functions. He seeks only to restrain ongoing statutory violations and prevent the continued enforcement of retaliatory measures that affect witness independence, structural neutrality, and meaningful litigation participation. The requested interim restraints would not prevent Defendants from operating as an educational institution or performing core functions. Classes, student services, athletics, payroll, campus safety, and routine maintenance can continue uninterrupted because the relief does not target ordinary institutional operations, but instead targets the enterprise channels through which donor-conditioned access and procurement influence are coordinated.

The relief is narrowly tailored to restrain enforcement of retaliatory actions and prevent further entrenchment of the challenged enterprise mechanisms at issue in this litigation: donor-tier access structures, influence-linked procurement alignments, and forward-moving capital or governance actions that materially entrench the challenged integrated framework through which the Defendants conduct the affairs of the enterprise under 18 U.S.C. § 1962(c) and Virginia Code § 40.1-27.3. It does not seek to halt ordinary fundraising or routine procurement necessary for daily operations.

Any institutional burden from the relief is primarily administrative rather than operational. The Defendants may need to temporarily adjust discretionary programming, access practices, and discretionary procurement sequencing that form part of the enterprise's operational pattern, but they would not be forced to suspend core educational services or essential institutional functions.

The requested pause is forward-looking and limited. If those mechanisms continue to integrate during litigation, each additional contractual commitment, governance decision, and operational normalization increases the degree of entrenchment of the racketeering enterprise's operational framework. As consolidation progresses, later corrective measures become more complex, more disruptive, and less precise. In balancing hardship, preventing incremental entrenchment of the enterprise structure is less burdensome than attempting structural unwinding after consolidation has occurred and institutional reliance has increased.

## IV. PUBLIC INTEREST IN ENFORCING VIRGINIA CODE § 40.1-27.3, PREVENTING MISUSE OF PUBLIC RESOURCES, AND PREVENTING MONETIZED ACCESS TO PUBLIC AUTHORITY WITHIN AN ASSOCIATION-IN-FACT ENTERPRISE

The final determination the Court must make in considering a Plaintiff's request for a preliminary injunction is whether the requested relief serves the public interest. See *Nken v. Holder*, 556 U.S. 418, 426 (2009).

The public interest favors enforcement of Virginia Code § 40.1-27.3. The statute expressly authorizes a court to issue an injunction to restrain a retaliatory action. This statutory authorization reflects a clear legislative determination that protecting whistleblowers advances lawful governance, institutional accountability, and compliance with ethical workplace standards. When protected reporting is followed by retaliation, the broader public good is best protected by judicial intervention to ensure statutory compliance during litigation rather than permitting a continuing violation to remain operative.

Accordingly, public accountability concerns are heightened when allegations arise within a state and federally funded institution involving the misuse of public resources and conflict-of-interest risks tied to affiliated fundraising structures. Employees covered under state and federal whistleblower laws are instructed to report concerns through formal oversight channels at both the state and federal level. In this case, the Plaintiff's reporting was directed through those formal oversight channels. These channels include:

(1) the Virginia Military Institute Office of the Inspector General;

(2) VMI's Director of Human Resources;

(3) VMI's Deputy Superintendent for Finance and Support and Senior Finance Director;

(4) the Office of the Governor of Virginia;

(5) the Office of the Attorney General of Virginia;

(6) the Office of the Secretary of Education of Virginia;

(7) the Department of Defense Office of Inspector General; and

(8) the United States Department of Education Office of Inspector General.

In his initial reporting, the Plaintiff submitted a primary report titled "Addressing Managerial Challenges and Operational Analysis," together with three supplemental documents supporting the same subject matter. Included in the collection were published materials of the Keydet Club's donor courtesy reward access system linking contribution levels to enhanced access to senior institutional officials and institutional channels, as well as email communications, disciplinary reprimands, and transcripts of recorded events created and provided in good faith to contemporaneously document and preserve the Plaintiff's claims of retaliation.

The oversight bodies identified above were charged with duties requiring them to protect reporting employees from retaliation and to ensure the integrity of the grievance and oversight system established by statute. Instead of fulfilling those obligations, the Plaintiff was met with the following:

(1) Twenty-three disciplinary reprimands issued within forty-nine days of his November 18, 2024 protected disclosure.

(2) Medical harm arising during the escalation period that followed the reporting.

(3) Suspension imposed by an eleven-member administrative body that included five individuals directly related to or involved in the Plaintiff's case within five days of filing a criminal complaint for unwanted physical contact against his direct supervisor.

(4) Termination less than four months after the November 18, 2024 protected report, specifically on March 4, 2025.

(5) Criminal exposure resulting from a retaliatory criminal complaint tied to the same incident the Plaintiff reported.

These actions occurred while the oversight bodies charged with investigating and protecting reporting employees failed to execute the statutory responsibilities imposed upon them.

At the core of the complaint was the diversion of public institutional resources from state responsibilities. The Plaintiff was directed by an agent of the VMI Athletics Department to create and produce a fundraising video project for affiliated private charitable organizations during a period marked by ongoing technical failures attributable to management and contractor decisions regarding multimedia equipment that predated the Plaintiff's arrival.

Lawful fundraising permits charitable solicitation and collaboration between a public institution and affiliated nonprofit entities. What distinguishes lawful fundraising from the conduct challenged here is the absence of diversion of public resources from core state responsibilities and the absence of contribution-conditioned access to institutional authority. It likewise does not include the use of retired military General and commissioned officer rank or

title in a manner that suggests endorsement or private advantage as restricted under 5 C.F.R. § 2635.702, with additional governing authority under § 2-503 of the Department of Defense Joint Ethics Regulation.

Where private donor funding intersects with state and federal funding, the public interest supports restraining conduct that reflects an abuse of public authority or creates a reasonable perception of impropriety. The Supreme Court has recognized that transparency and disclosure requirements "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Buckley v. Valeo*, 424 U.S. 1, 67 (1976). When contribution-based access to institutional authority operates through layered affiliated entities rather than transparent public channels, the public interest in preventing corruption and its appearance weighs in favor of judicial restraint during litigation.

The public interest encompasses the Commonwealth's interest in enforcing its whistleblower and conflict-of-interest statutes, as well as the federal government's and the Department of Defense's interest in safeguarding federally funded institutions and former commissioned officers from corrupt influence and the misapplication of public assets. For these reasons, interim restraint is warranted to preserve transparency, prevent continued institutional entrenchment, and maintain public confidence in the lawful administration of state and federally funded institutions during litigation.

## V. NO BOND SHOULD BE REQUIRED

Federal Rule of Civil Procedure 65(c) permits the Court to require security "in an amount that the court considers proper." The amount of any bond rests within the sound discretion of the Court. See *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999).

The relief requested here is narrowly tailored to restrain continued enforcement of a retaliatory employment action and to preserve the status quo pending adjudication. It does not halt core institutional operations, suspend academic functions, or impose structural shutdown. Rather, it requires temporary compliance with existing statutory obligations and a pause on discretionary mechanisms under review. Under these circumstances, the risk of monetary injury to Defendants arising from issuance of the requested injunction is minimal.

The public interest is directly implicated in the enforcement of Virginia Code § 40.1-27.3 and in preserving transparency and accountability within a state and federally funded institution. See *Lawson v. FMR LLC,* 571 U.S. 429 (2014) (used to recognize that enforcement of whistleblowing protections designed to safeguard public interests serves a public purpose); cf. *Bowman v. State Bank of Keysville*, 229 Va. 534 (1985) (establishing that the public interest is served by protecting employees who exercise a statutory right). Courts have recognized that where injunctive relief enforces statutory protections and serves the public interest, imposition of a substantial bond is unnecessary. Plaintiff is presently employed in a retail position and earns limited monthly income. Requiring a bond would impose a disproportionate hardship and would

materially impair access to the statutory injunctive remedy expressly authorized by Virginia Code § 40.1-27.3(C). See *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013).

For these reasons, Plaintiff respectfully requests that the Court exercise its discretion to waive the bond requirement. In the alternative, should the Court determine that security is necessary, Plaintiff requests that any bond be set in a nominal amount not exceeding one-half of Plaintiff's current monthly earnings.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant his Motion for Preliminary Injunction and enter an order:

(1) Restraining continued enforcement of Plaintiff's termination and restoring him to paid administrative status during the pendency of this action;

(2) Terminating enforcement of the trespass warning issued against Plaintiff;

(3) Placing the identified material witnesses on paid administrative status or otherwise insulating them from supervisory authority implicated in the challenged conduct;

(4) Temporarily suspending donor-tier access privileges that provide exclusive or preferential access to institutional decision-makers in exchange for high-dollar contributions;

(5) Preserving donor derived assets and financial instruments traceable to the coordinated governance and financial mechanisms described herein, restraining capital expansion or procurement commitments that would further formalize or expand the challenged integration during litigation, and requiring maintenance and preservation of documentation relating to agreements and affiliated entity agreements pending adjudication;

(6) Granting such other and further relief as the Court deems just and proper.

Respectfully submitted this 26th day of February, 2026.

Respectfully signed,

Plaintiff, Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of February, 2026, a true and correct copy of the Motion for Preliminary Injunction and accompanying Memorandum of Law via United States Mail to the following:

**Richard Reza Shayegan**
Office of the Attorney General
Employment Unit
202 North 9th Street
Richmond, VA 23219
804-823-6336
Email: rshayegan@oag.state.va.us
*ATTORNEY: Virginia Military Institute, VMI Board of Visitors, VMI Foundation*

**William David Paxton**
Gentry Locke Rakes & Moore
P.O. Box 40013
Roanoke, VA 24022-0013
540-983-9334
Fax: 540-983-9400
Email: paxton@gentrylocke.com
*ATTORNEY: VMI Alumni Agencies, VMI Foundation, VMI Alumni Association, Keydet Club*

***Jessiah Steven Hulle***
*Gentry Locke Attorneys*
*10 Franklin Road, SE, Ste. 900*
*Roanoke, VA 24011*
*540-983-9416*
*Fax: 540-983-9400*
*Email: hulle@gentrylocke.com*
*ATTORNEY: VMI Alumni Agencies, VMI Foundation, VMI Alumni Association, Keydet Club*

Respectfully signed,

Plaintiff, Pro Se