**IN THE UNITED STATES DISTRICT COURT**

**FOR WESTERN DISTRICT OF VIRGINIA**

CLERK'S OFFICE U.S. DISTRICT. COURT
AT LYNCHBURG, VA
FILED

MAR 30 2026

LAURA A. AUSTIN, CLERK
BY: [signature]
DEPUTY CLERK

ONIER OSWALDO VARGAS )

Plaintiff )

)

v. ) **Civil Action No.:** 6:25-cv-00100

)

VIRGINIA MILITARY INSTITUTE )

VMI BOARD OF VISITORS )

VMI ALUMNI AGENCIES )

KEYDET CLUB )

VMI FOUNDATION )

VMI ALUMNI ASSOCIATION )

Defendants )

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS**

## INTRODUCTION

This case arises from the Plaintiff's reporting of bribery and misuse of public resources involving the donor-tier pricing menu operated through the VMI Alumni Agencies and its relationship with officials at the Virginia Military Institute. After the Plaintiff reported these concerns to senior Institute officials and the Office of the Inspector General in November 2024, a series of disciplinary actions, investigations, and administrative measures were taken against him, which ultimately resulted in his termination, suspension, exclusion from campus, and forced invocation of his Fifth Amendment rights.

The Amended Complaint sets forth a detailed chronological account of the Plaintiff's disclosures, the individuals involved, the communications exchanged, and the actions taken against him following those disclosures. The Complaint separates each legal claim into distinct counts and identifies the factual basis supporting each claim. The issue before the Court at this stage is not whether the Plaintiff will ultimately prevail, but whether the Amended Complaint contains sufficient factual matter to state claims upon which relief can be granted.

When the facts are viewed in the light most favorable to the Plaintiff, the Amended Complaint plausibly shows that the Plaintiff engaged in protected activity by reporting bribery and misuse of public resources, and that the actions taken against him occurred shortly thereafter and were carried out by individuals who were the subjects of, or involved in, the matters he reported. The Amended Complaint further sets forth facts supporting the existence of an

association-in-fact enterprise and multiple predicate acts under federal law. For these reasons, the Defendants' Motion to Dismiss should therefore be denied.

## FACTUAL BACKGROUND

On November 18, 2024, the Plaintiff met with the Deputy Superintendent for Finance and Support and the Senior Finance Director to report concerns regarding bribery and the misuse of public resources in connection with the Keydet Club and its relationship with Institute officials. During that meeting, the Plaintiff presented information describing the donor-tier pricing menu, which provided escalating levels of access to senior Institute officials in exchange for large donations.

Following the Plaintiff's November 18, 2024 disclosure regarding bribery and misuse of public resources, the Plaintiff began receiving disciplinary reprimands. Between November 22, 2024 and January 10, 2025, the Plaintiff received twenty-three disciplinary reprimands that were later cited as the basis for his termination from his position as Director of Athletic Multimedia. Between December 4 and December 13, 2024, the Plaintiff submitted additional documentation to the Office of the Inspector General, including policy analysis, compiled communications, and documentation of events relevant to his reporting and subsequent workplace conduct.

The disciplinary actions, additional reporting, and subsequent termination all occurred within weeks of the Plaintiff's disclosure of bribery and misuse of public resources that led to his termination on March 4, 2025.

## STATEMENT OF FACTS

### A. Human Resources Control Over Complaint, Investigation, and Termination Process

***October 31, 2023***

On October 31, 2024, following the Plaintiff's email to both the Associate Athletic Director for External Operations and the Athletics Director (AC ¶¶ 288–294), the Plaintiff was contacted by the Director of Human Resources in response to the complaint filed by the Associate Athletic Director and the Athletics Director (AC 295).

During the call, the Director informed the Plaintiff that she was contacting him because the Associate Athletic Director and the Athletics Director had filed a complaint against him, and before any measures could be taken, needed to obtain his statement regarding the matter (AC 295). The Plaintiff explained that the issue concerned the Keydet Club fundraising video (AC ¶¶ 226–229, 289–291) and the technical failures that resulted in the cancellation of scheduled broadcasts (AC ¶¶ 146–148, 203–208, 231–232), and that the cancellations could have been prevented (AC 298). At the conclusion of the call, the Plaintiff informed the Director of Human Resources that he feared retaliation for reporting the misuse of state resources and operational

issues within the department (AC 299). In response to the Plaintiff, she requested his statement in writing (AC 300).

*November 13, 2024*

As a direct result of the October 31, 2024, phone call with the Director of Human Resources (¶¶ 295–301), the Plaintiff met with the Director, the Athletics Director, and Associate Athletic Director to mediate between the Plaintiff and the Associate Athletic Director on November 13, 2024 (¶¶ 322–499). During the meeting, the topics discussed were the operational workload and technical failures, ongoing supervisory conflicts (AC ¶¶ 378–381; 89–93), equipment and procurement issues, and the sustained workload demands. The Plaintiff explained he performed these functions alone (¶¶ 62, 69, 109, 144, 160–162, 176, 214–216), worked late into the evening and early morning hours (¶¶ 66, 110, 115, 163–164, 176, 183–184, 218, 269), and repeatedly transported and reconfigured equipment between venues (¶ 117, 185, 246–248, 259). The work conditions described led to the Plaintiff's first instance of requiring medical intervention (¶ 309).

After hearing the Plaintiff's account, the Director of Human Resources questioned the basis of his claim of retaliation based on his explanation (AC 332). To clarify the sequence of events, the Director of Human Resources asked whether the Plaintiff had raised his concerns with the Athletics Director directly (AC 336) and questioned why the Plaintiff did not feel comfortable addressing the matter with his direct supervisor (AC 340).

In explaining his discomfort communicating directly with his supervisor, the Plaintiff stated that his discomfort communicating directly with his supervisor stemmed from prior attempts to address operational and workload concerns that had been rejected and disregarded

(AC 341). As an example, the Plaintiff disclosed an incident that occurred in an isolated locker room between himself and the Associate Athletic Director at the conclusion of a filming event on August 23, 2024 (AC 342). He explained that the Associate Athletic Director sought to readdress a prior discussion he believed remained unresolved (AC 348) and that during this discussion the Associate Athletic Director's demeanor changed and he began approaching the Plaintiff physically (AC 349). When prompted for a response from the Director of Human Resources, the Associate Athletic Director stated his reasoning was that the video content was a recurring weekly social-media segment that was expected to be produced regularly. Bypassing the Plaintiff's operational concerns, he stated that the Plaintiff had not produced a segment for approximately five weeks, which he characterized as an excessive delay (AC ¶¶ 351–353).

As the meeting transitioned into the topic of procurement, the Plaintiff explained that he spoke with the Associate Athletic Director regarding procedures for purchasing equipment to replace faulty items and reviewed a list of equipment previously identified for replacement (AC ¶¶ 357–358). He explained that after evaluating the equipment, he determined that many items required maintenance rather than replacement and redirected efforts toward repairing equipment and replacing cables to maintain operational functionality (AC ¶¶ 360–361). Responding to the Director of Human Resources' question regarding budget and spending limits, the Associate Athletic Director stated that he had reviewed the equipment needs identified by the previous Director but wanted whoever filled the role to identify new priorities (AC 364). He explained that the department had made large purchases at the start of previous fiscal years to address urgent equipment failures, and emphasized that funds could not be spent freely and required strategic planning to preserve the budget for emergencies (AC 366).

After listening to both parties, the Director of Human Resources recognized that tension existed between the parties (AC 370).

While discussing the events surrounding the Plaintiff's VA appointment, both the Associate Athletic Director and the Plaintiff both confirmed that the Plaintiff had informed the Associate Athletic Director for External Operations of the upcoming appointment, but disagreed on the subsequent sequence of events (AC 375). After being questioned regarding the duration of the appointment, the Plaintiff explained that tensions escalated due to the increasing pressure to complete the fundraising video project for the Keydet Club (AC 376).

In response to the Plaintiff's earlier statement regarding fear of retaliation, the Director of Human Resources stated that such a basis did not justify approval of leave and explained that time off required prior authorization from the Plaintiff's supervisor (AC 431). The Plaintiff informed the Director that he sought emergency leave after the circumstances escalated to a level that required him to step away for his safety and well-being. He further explained that he had contacted the Athletics Director regarding the request, but did not receive a response approving or denying it (AC ¶¶ 431–433). The Athletics Director stated that following receipt of the Plaintiff's email requesting leave due to concerns about retaliation, he asked the Plaintiff to provide the correspondence between the Plaintiff and the Associate Athletic Director so that he could understand the situation (AC 460). Upon receipt of the email, the Athletics Director sought clarification from the Associate Athletic Director regarding the situation between the Associate Athletic Director and the Plaintiff (AC 464).

The Director of Human Resources responded to the Athletics Director that the Plaintiff's email both notified the Athletics Director of his absence and requested time off. She explained

that leave must be requested and approved in advance, and that an employee cannot inform a supervisor that they are taking time off without prior authorization. She explained that (AC 467). Responding to the Directors remarks, the Plaintiff stated that due to acute stress and physical symptoms he was experiencing, he attempted to notify leadership to the best of his ability and was not in a position to provide a more detailed explanation at that time (AC 468). In addressing the Plaintiff's statement, the Director stated that the Plaintiff was required to request leave in advance and that failure to communicate directly with his supervisor reflected negatively on the department (AC 469).

As the discussion turned to the parties' conflicting interpretations of the underlying events (AC 479), the Associate Athletic Director stated that the department had continued broadcasts while the Plaintiff was out and conflicting schedules had prevented a meeting with the Plaintiff until the present session (AC 484). He stated that the department sought to avoid interference with its operations (AC 485). The Plaintiff disagreed with the Associate Athletic Director's version of events (AC 487). He stated that he had been accused of intentionally disrupting broadcast transmissions and believed he was being removed from his office in a punitive manner, as the Associate Athletic Director had on multiple occasions attributed the blame to the Plaintiff for the failed broadcasts (AC 488; 248).

As the meeting concluded, the Director of Human Resources stated that the issues discussed remained unresolved and that significant tension remained between the parties (AC 491). She added that if concerns arose, the Associate Athletic Director would contact Human Resources and that any documentation created would be for managerial purposes (AC 492). She reiterated that the Plaintiff was required to direct all concerns to the Associate Athletic

Director (AC 493), that he must submit all leave requests in writing for "Documentation and tracked" (AC 498; to include VA appointments moving forward), and at the conclusion of the session, confirmed that the Plaintiff would return to the supervision of the Associate Athletic Director while the matters discussed remained unresolved (AC ¶¶ 491, 499).

***December 11, 2024***

On December 11, 2024, the Plaintiff, under the guidance of the Inspector General (AC 867), met with the Director of Human Resources to formally file a retaliation complaint after requiring medical intervention for a second time during his employment with VMI (AC ¶¶ 857–858). At the onset of the meeting, the Plaintiff disclosed that his working conditions had progressively worsened following their prior meeting on November 13, 2024, that he was once again relocated from his original office without reason (AC 871), and that the disciplinary actions began after their prior meeting when he received seven disciplinary actions in one day, five on a separate day, and that additional reprimands were still pending (AC ¶¶ 872–874).

Beginning his explanation on the reprimands, the Plaintiff explained that the Associate Athletic Director created and disseminated an open-door policy to the External Operations team (AC ¶¶ 880–881). He disclosed that environmental noise disrupted his concentration and ability to complete his video assignments (AC ¶¶ 878–879), and that no such door policy existed until after repeated disputes with the Associate Athletic Director over the need to keep his door closed to work effectively (AC ¶¶ 880–881). The Plaintiff informed the Director that he was given unattainable expectations and would then be disciplined for failing to meet them (AC 883). To

provide context, in his disclosure to the Director, he stated that he was directed by the Associate Athletic Director to refrain from accessing the video production equipment while still being required to meet submission deadlines that depended on video footage stored on that equipment (AC 884). Based on these circumstances, the Plaintiff explained that since October 31, the behavior toward him made it clear that efforts were being made to remove him, and that during the Performance Improvement Plan meeting, every issue he raised was dismissed (AC 899). He informed the Director that another Performance Improvement Plan meeting was scheduled for the following day (AC 900), and stated he believed the process was being used to move forward with termination (AC 901). The Plaintiff concluded that the situation was unclear to him because he was being told his performance was poor even though his evaluation from August rated him positively (AC 902; ¶¶ 74–76). Addressing his evaluation, the Director of Human Resources clarified that the evaluation he received was not a formal evaluation and should have instead been treated as a progress report (AC 903). She admitted to the Plaintiff that Human Resources failed to establish or enforce the correct process for evaluations and that she had already communicated with the Associate Athletic Director and the Athletics Director to address the confusion (AC 904).

Pivoting to payroll, the Director of Human Resources stated that she had been informed that employees had worked without receiving their wages and emphasized that no one should work without being compensated (AC ¶¶ 906–907). In response to the Director's remarks, the Plaintiff informed her that he had notified the Associate Athletic Director that he did not have the same parameters or access required to complete the payroll forms (AC 909). He added that despite knowing this, the Associate Athletic Director still placed responsibility on him for

completing the Personnel Action Forms (AC 910). Outlining the Athletics Department payroll process, the Plaintiff stated that he completed his portion of the process, that the Associate Athletic Director for External Operations was responsible for entering the information, and that the Associate Athletic Director for Internal Operations was responsible for approval (AC 911). The Plaintiff concluded the explanation by stating that until December 3, 2024, the Associate Athletic Director changed the process by instructing the Plaintiff that he would now be in charge of completing the Personnel Action Forms and ultimately the process failed due to access limitations (AC ¶¶911–912; ¶¶ 685–686). The Director of Human Resources noted that such access would have actually required approval from the Associate Athletic Director of External Operations (AC 915), and stated that she could approve access for the Plaintiff so long as he was present for duty (AC 917).

Returning to the Performance Improvement Plan, the Director of Human Resources stated that she did not believe the conditions described were being created intentionally to hinder his performance (AC 918) and that the goal of a Performance Improvement Plan was to assist an employee in improving performance (AC 919). The Plaintiff asserted that during the first Performance Improvement Plan he requested a clearly defined standard for video projects, but no clear standard was ever set and his request for video comparisons to establish one was denied (AC ¶¶ 920–922).

Following the Plaintiff's remarks, the Director redirected the discussion back to his retaliation complaint and informed him that retaliation was a serious matter, and asked what he believed the Associate Athletic Director and the Athletics Director were retaliating against (AC ¶¶ 923–924). In explaining the basis for his retaliation complaint, the Plaintiff explained that on

October 31, 2024, he objected to prioritizing a fundraising video project for the VMI Alumni Agencies while internal broadcast operations were failing (AC 925). He maintained that the Agencies were outside the institutional chain of command and that institutional resources should not be diverted to support their private fundraising initiatives (AC 926). He concluded his disclosure to the Director of Human Resources by asserting that only after raising these concerns were disciplinary actions taken against him (AC 927).

Following the Plaintiff's disclosure, she inquired with the Plaintiff as to when his next Performance Improvement Plan meeting was scheduled to take place. The Plaintiff informed her that it was scheduled for the following afternoon on December 12, 2024 (AC 930).

At the conclusion of the meeting, the Director of Human Resources informed the Plaintiff that she would conduct an investigation into his complaint and that if he had concerns of bias, she could assign the Human Resources Generalist to conduct the inquiry (AC ¶¶ 932–933). The Plaintiff agreed that the Human Resources Generalist should conduct the inquiry and requested that the inquiry be handled by the Generalist due to the Director's involvement in the matter since October 31, 2024 (AC 934).

***January 6, 2025***

On January 6, 2025, the Plaintiff emailed the Director of Human Resources and copied the Deputy Inspector and Inspector General to follow up on his formal retaliation complaint (AC ¶¶ 956–957). In the email, the Plaintiff reiterated that on October 31, 2024, he had raised a matter of public concern involving departmental inefficiencies, misuse of public resources, and

conflicts of interest involving senior leadership and the VMI Alumni Agencies through the Keydet Club (AC 958). He clarified his request that the investigation be reassigned to the Human Resources Generalist due to the Director of Human Resources' involvement from the beginning of the events, and that after he filed his retaliation complaint on December 11, 2024, he was issued a Notice of Improvement Needed/Substandard Performance during the Performance Improvement Plan (AC 961; also informed the Plaintiff that he faced termination if no improvement was made). He concluded his email by requesting intervention from a state or federal Inspector General or other authorized investigative body to ensure impartiality (AC 963).

***Internal Investigation, Rejection of Retaliation Complaint, and Termination Decision***

Three days after he sent his email to the Director of Human Resources, on January 9, 2025, the Human Resources Generalist conducted the inquiry into the Plaintiff's retaliation complaint. At the start of the meeting, the Plaintiff made a formal written request that the investigation be escalated to an external entity due to his belief that Human Resources could not conduct the investigation impartially. Additionally, he included in his written request that the Inspector General had already received his supporting documentation related to the matter (AC 966). Despite his request for an external investigation, the Plaintiff proceeded with the internal inquiry and provided a detailed account of events in good faith (AC 967).

Following the unwanted grab incident, on January 10, 2025, the Plaintiff played back the recording of the incident between the Plaintiff and the Associate Athletic Director, an interaction that occurred between the Plaintiff and the Assistant Director of Athletic Communications &

Creative Content (to support his allegation of coordination between general employees and senior leadership within the athletics department), as well as the December 11, 2024, Human Resources meeting regarding retaliation complaint and other related material. At the conclusion of the meeting, the Director of Human Resources ordered that the VMI Police Captain be present for this inquiry (AC ¶¶ 974–975). Immediately following the meeting, the Plaintiff and Human Resources Generalist retrieved the final report from the Office of the Inspector General (AC 976; the Plaintiff had previously provided three of the reports following the January 9, 2025 inquiry).

On the afternoon of January 10, 2025, the Plaintiff met with the Human Resources Generalist, a VMI Police Captain, and, at the Plaintiff's request, an additional VMI Police Officer (AC ¶¶ 977–978). At the start of the inquiry, the Plaintiff explained that law enforcement presence had been requested to ensure impartiality because the Director of Human Resources specifically requested the Captain following a contentious conclusion to the meeting earlier that day (AC 979). He then outlined the documentation he had prepared by explaining the structure of his four reports related to his reporting of misuse of public resources involving VMI and VMI Alumni Agencies (AC ¶¶ 980–981). During this meeting, the Plaintiff played back audio recordings of key events discussed in this complaint (AC 983). At the conclusion of the meeting, the Plaintiff requested not to be isolated with the Associate Athletic Director due to concerns of further physical escalation (AC 985). Following the inquiry, the Plaintiff emailed two transcripts of the interactions between the Associate Athletic Director (regarding the grab incident) and the Assistant Director of Athletic Communications (regarding coordination

between the Associate Athletic Director, Human Resources, and a general employee) (AC 987).

The Plaintiff followed up with the Human Resources Generalist on January 21, 2025, requesting information on his request for an external entity to investigate the Plaintiff's retaliation complaint (AC 993).

Four days following his email, the Human Resources Generalist delivered her findings rejecting all of the Plaintiff's complaints, including an allegation the Plaintiff never made that the Associate Athletic Director was receiving payment from the Keydet Club. The findings concluded that "no evidence has been provided that you have or are being retaliated against," despite the fact that the Plaintiff played back audio recordings, submitted four written reports, and provided recorded verbal statements during meetings held on January 9, 2025 and January 10, 2025 (AC ¶¶ 994, 966–967, 974–984).

In response to the findings, on January 29, 2025, the Plaintiff emailed the Human Resources Generalist and included General Counsel on the email, stating that he was inquiring about his request for an external investigative body to conduct an inquiry into his complaints (AC ¶¶ 996–997). The Plaintiff explained that he had previously requested intervention from an external investigative agency due to conflicts of interest involving the Director of Human Resources (AC 998). He reported that after the inquiry on January 9, 2025, that same afternoon the Associate Athletic Director escalated by using physical contact to block access to a disciplinary reprimand, and disclosed that he reported the incident the same day to both the Human Resources Generalist and the Inspector General (AC ¶¶ 999–1000). The Plaintiff concluded his email by reiterating his request for an external investigative agency to oversee the

matter and by formally requesting the return of all his reports, with assurance that his evidence had not been altered (AC ¶¶ 1001–1002).

On the morning of January 30, 2025, the Plaintiff was requested to meet with the newly appointed Chief of Staff, along with the Director of Human Resources, with security provided by the VMI Police Captain (AC 1004). The Chief of Staff informed the Plaintiff that as a result of his performance deficiencies, the Institute intended to terminate his employment 30 days from the meeting date, citing the Notice of Improvement Needed/Substandard Performance (AC 1005).

On February 4, 2025, the Chief of Staff, in the presence of the Director of Human Resources and the VMI Police Captain, informed the Plaintiff that he was being placed on administrative suspension. His explanation revolved around several employees reporting they could not come to work while the Plaintiff remained on duty (AC 1022), and he explained that the VMI Threat Assessment Committee met and made a recommendation to the Superintendent for the Plaintiff to be placed on administrative suspension due to his alleged behavior impacting Athletic Department operations. He confirmed that the Superintendent accepted the recommendation, and explained that the suspension would coincide with the thirty-day notice (AC ¶¶ 1023–1024). At the conclusion of the meeting, the Plaintiff was given a direct order prohibiting him from returning to work unless advance permission was expressly granted by the Chief of Staff (AC 1025).

On March 4, 2025, the Plaintiff received an email from the Director of Human Resources informing him that his employment had been terminated (AC 1034).

**B. Reporting of Bribery and the Misuse of Public Resources and Notice to Institutional and Executive Officials and Inspector General**

On November 18, 2024, the Plaintiff reported a matter of public concern to the Deputy Superintendent for Finance and Support and the Senior Finance Director (¶¶ 517–551), and separately to the Deputy Inspector General (¶¶ 552–581), regarding a donor-courtesy reward system that allowed private and exclusive access to the Athletics Director at $10,000 and to the Superintendent at $40,000, and the misapplication of property. The Plaintiff identified this as a bribery scheme involving institutional resources and access tied to decision-making authority within a publicly funded entity (AC ¶¶ 517–551, 552–581).

The Plaintiff provided the Deputy Inspector General with the IRS Form 990 of the Keydet Club (¶577) in connection with his written submission titled *"Addressing Managerial Challenges and Operational Analysis"* at the conclusion of the meeting (AC ¶¶ 582–586). Included in the Plaintiff's report was a section titled "Within the External Organizations and VMI" where he explained, based on his observations during the time of his employment, his concerns regarding the overlapping roles between institutional leadership and the VMI Alumni Agencies. In his explanation, he noted that the overlapping roles created conflicts of interest and increased the likelihood of bribery, misappropriation of funds, procurement fraud, and other concerns created by the overlap (AC ¶¶ 583–586). Included in the appendix of his submission was the donor courtesy access system to support his allegations. The Keydet Club's access system details an escalating donor-tier pricing menu structure linking high-dollar payments for

private and exclusive access to institutional leadership and institutional property under the care, custody, or control of agents acting under color of official authority (AC ¶¶585–586).

On November 19, 2024, the Plaintiff provided further information to the Inspector General about his allegations with the information available at the time (AC ¶¶ 587–589). During this meeting, the Inspector General informed him that if an inquiry were to be conducted, the Athletics Director would be notified.

During both meetings on November 18 and 19, 2024, the Plaintiff informed the Inspector and Deputy Inspector General that he had previously communicated with the Athletics Director regarding his concerns (AC ¶¶ 210–219), and described the operational failures the Athletics Department experienced on October 3 (AC ¶¶ 146–148), October 20 (AC ¶¶ 203–208), and October 25 (AC ¶232). The Plaintiff maintained that these failures were caused by faulty equipment. He explained during both meetings that his reporting was in relation to the prioritization of the Keydet Club's fundraising video (AC ¶¶ 135–142, 227–229, 283–294) during this period and the donor-tier pricing menu system he discovered (AC ¶¶ 582–586).

Following his reporting on November 19, 2024, that same afternoon, the Inspector General requested that the Plaintiff collect the institutional policies and state and federal regulations he believed were violated by senior officials (AC ¶¶ 588–589). In the early morning of November 23, 2024, the Plaintiff provided the Inspector General the first version of the requested materials (AC ¶¶ 671–672).

On the afternoon of December 4, 2024, the Plaintiff met with the Inspector General (AC ¶¶ 695–714) and submitted an updated version of *"Addressing Managerial Challenges and Operational Analysis"* (AC 695). In both the meeting and the updated submission, the Plaintiff described the deteriorating workplace conditions (AC 696) and adverse working conditions he was facing within the Athletics Department (AC 713). During his explanation, the Plaintiff informed the Inspector General that he did not trust the Director of Human Resources based on his interactions with her on October 31, 2024 (AC ¶¶ 703–705), and that he believed there was coordination between the Director, Athletics Director, and the Associate Athletic Director (AC 703). He explained to the Inspector General that the Director informed him that both the Associate Athletic Director and Athletics Director had reported him to her together, and that the three met on November 5, 2024. The Plaintiff further described his removal from his office (AC 697), the issuance of multiple disciplinary reprimands (AC 698), and that the workplace conditions were the cause of him requiring medical intervention (AC 706).

Despite the Plaintiff's disclosure of distrust and allegations of coordination, the Inspector General stated that allegations of retaliation were outside the scope of her office and directed the Plaintiff to pursue the matter through Human Resources, while noting that her assessment could change upon review of his updated submission. She further informed the Plaintiff that the Chief of Staff had been made aware of the matter and may be consulted prior to any final determination (AC 710). Towards the conclusion of the meeting, the Inspector General informed the Plaintiff that she would delay issuing her decision until she reviewed the updated submission and advised him to await further guidance (AC ¶¶ 711–712).

Between December 11 and December 13, 2024, the Plaintiff provided the Inspector General with two additional reports titled *"Addressing Managerial Challenges and Operational Analysis: A Comprehensive and Detailed Documentation of Events and Communications"* (AC ¶¶ 863–866) and *"Addressing Managerial Challenges and Operational Analysis: A Case Study in Leadership Accountability and Documentation."* (AC ¶¶ 945–948). To support his initial report and retaliation claim, the Plaintiff provided these documents after the Inspector General repeatedly denied him protection from retaliation, stating that it was not within her office's "purview."

The *"Addressing Managerial Challenges and Operational Analysis: A Comprehensive and Detailed Documentation of Events and Communications"* submission consisted of a comprehensive collection of emails covering the period between June 20, 2024, and approximately 72 hours of the report's submission (AC 864–866). Included within the report was a section stating that discussions within the Athletics Department indicated that senior leadership was advocating for the manipulation of official communications (AC 866).

The fourth and final submission titled "*Addressing Managerial Challenges and Operational Analysis: A Case Study in Leadership Accountability and Documentation*" contained audio recording transcripts prepared to reflect as accurately as possible the real-time statements made during contested employment events relating to his reporting and retaliation complaints, and to document those interactions and preserve the integrity of those events to avoid mischaracterization (AC 946). The recordings were created by the Plaintiff as a participant in the conversations and consistent with Virginia's one-party consent law under

Virginia Code § 19.2-62(B)(2). Recordings made post-submission were maintained for the same purpose, to document subsequent interactions as they occurred and to update the previously submitted materials with additional facts as they developed (AC ¶¶ 987–989).

The "Coordinated Efforts" section describes the Plaintiff's account that no adverse actions were taken against him until after October 31, 2024. He explains that he attributes his hospitalizations on November 4 and December 9, 2024 to the working conditions and the conduct of institutional leadership during that period. In his explanation, the Plaintiff states that there was a sudden and noticeable shift in his performance from his previously administered employee evaluation (AC ¶¶ 74–76) 90 days prior to the issuance of seventeen disciplinary reprimands between November 22 and December 12, 2024 (AC ¶¶ 666, 832, 936, 938). He further explains that his request for leave on October 31, 2024 was made in an effort to remove himself from a hostile work environment fostered by the Associate Athletic Director, enabled by the Athletics Director, and overlooked by Human Resources. The Plaintiff states in this section that the conditions described culminated in his need for medical intervention on November 4 and December 9, 2024.

In addition to these conditions, the Plaintiff identified legal violations and conflicts of interest that he witnessed, noting that there appeared to be a lack of boundaries and transparency between the Athletics Department and external organizations such as the Keydet Club (implying the VMI Alumni Agencies as a whole). Continuing his explanation, he stated that this lack of separation allowed departmental resources and institutional priorities to be directed toward

external interests in a manner that raises concerns regarding statutory violations related to financial disclosures and dual obligations.

Concluding the section, the Plaintiff explained that he anticipated leadership would begin establishing a pattern of conduct designed to silence or diminish his concerns and to force his separation from employment either through forced resignation or termination. He states that on December 12, 2024, leadership issued a Notice of Improvement Needed/Substandard Performance that relied on backdated information, raised issues that had not been previously identified, and presented events in a manner that did not accurately reflect prior communications or expectations. To conclude the section before providing supporting documentation, the Plaintiff asserts that leadership and Human Resources acted in coordination to discredit his concerns and to create a record that could justify adverse employment action.

The transcripts provided to the Inspector General correspond to the same events described in this Amended Complaint, and are as follows:

- October 3, 2024 Broadcast Cancellation
- October 7, 2024 Meeting with the Associate Athletic Director
- October 28, 2024 Meeting with the Associate Athletic Director
- November 13, 2024 Human Resources Mediation Session
- November 21, 2024 Meeting with the Athletics Director
- December 4, 2024 First Performance Improvement Plan Meeting
- December 5, 2024 Interaction with the Associate Athletic Director
- December 11, 2024 Human Resources Retaliation Complaint

• December 12, 2024 Second Performance Improvement Plan Meeting

• Additional supporting transcripts of related events documented within the same time period (AC ¶¶ 946–948).

On an official Office of the Inspector General letter dated December 10, 2024, the Inspector General notified the Plaintiff that her determination to open an inquiry into his allegations were based on a review of the Plaintiff's complaint submitted on November 23, 2024, and the reports provided on November 15 and December 5, 2024. In her letter, she notified the Plaintiff that an inquiry would be conducted into certain allegations of misuse of public resources and that the inquiry would include the actions of Institute officials as well as programs and policies related to the Keydet Club (AC 860). She included in the letter a list of allegations screened out, and explained that certain claims like the allegations of a hostile work environment and retaliation were excluded due to the claims falling outside the scope of her Office's purview and did not present potential policy violations (AC ¶¶ 861–862). Additionally, she stated that the information provided did not establish violations of civil rights laws, disability protections, or retaliation.

The Inspector General screened out the Plaintiff's allegations that the Associate Athletic Director for External Operations, the Associate Athletic Director for Internal Operations, and the Athletics Director breached fiduciary duties or engaged in negligent leadership, stating that the information provided lacked sufficient detail to establish violations of Virginia Code § 18.2-112. The determination further clarified that allegations made directly against the Keydet Club were

outside the Institute's jurisdiction as they are a private entity and, as such, would not be addressed.

On the afternoon of January 9, 2025, the Plaintiff emailed the Inspector General to notify her of the unwanted physical contact that took place during a disciplinary session with the Associate Athletic Director (AC 968). The Inspector General replied to the Plaintiff, informing him that the unwanted physical contact fell out of the scope of her investigation into fraud, waste, and abuse (AC 969), and that the Plaintiff retained the right to report the incident to Human Resources or law enforcement (AC 970–971).

On January 16, 2025, the Plaintiff disclosed concerns regarding employee wage tampering through intentional payroll delays as a basis for retaliation connected to part-time staff Personnel Action Forms to the Deputy Superintendent for Finance and Support and the Senior Finance Director (AC 990). During the meeting, the Plaintiff provided the Deputy Superintendent a supporting document and a written statement stating that he had reason to believe that the Associate Athletic Director and other personnel within the Virginia Military Institute were using payroll delays and Personnel Action Form processing to carry out retaliatory actions against him following his reporting of the bribery scheme and the misuse of resources (AC 991). The Plaintiff explained that staff pay was intentionally withheld in order to manufacture disciplinary documentation (AC 936) and create a paper record of alleged performance deficiencies (AC ¶¶ 943–944) that was later used to justify adverse employment action (AC 1004) and termination (AC 1034).

In response to the Plaintiff's January 16, 2025 complaint submitted to the Deputy Superintendent for Finance and Support, the Inspector General informed the Plaintiff on February 10, 2025 that she received his complaint on January 23, 2025, the day before the Plaintiff received his HR Findings, and concluded that the Plaintiff's evidence was insufficient to support a claim of retaliation claiming he had not shown a connection between the Associate Athletic Director's actions and his role as a complainant and had not identified other involved employees with sufficient detail (AC ¶¶ 1032–1033). The letter he received was dated January 30, 2025, the day the Plaintiff was notified that the Institution was intending to terminate his employment (AC ¶¶ 1004–1005). Additionally, the Plaintiff received this notification a few hours after he was issued the VMI Trespass Warning Form (AC ¶¶ 1029–1030).

**Reporting to State Executive Officials Following Administrative Suspension**

On the afternoon of February 4, 2025, the Plaintiff reported the matter to the Office of the Governor, Office of the Attorney General, and the Office of the Secretary of Education (AC 1027) following his suspension (AC ¶¶ 1021–1026).

**C. Escalation of Disciplinary Actions by Athletics Leadership and Human Resources Following Plaintiff's Disclosures**

Following the Plaintiff's submission of his medical intervention paperwork, on November 5, 2024, the Associate Athletic Director emailed the Plaintiff acknowledging that the

Plaintiff was unable to attend the session with the Director of Human Resources and issued a written directive stating that the Plaintiff was removed from broadcast operations and was being reassigned from his office into a "temporary" workspace with a new directive to work on video assignments until their meeting with HR on November 13, 2024 (AC ¶¶ 313–314). The email included seven separate video assignments to be completed, one of which was the fundraising video for the Keydet Club (AC ¶¶ 315–316).

Upon arrival to his "temporary" workspace on November 12, 2024, the Plaintiff discovered that the workspace was not equipped with a chair (AC  317). With the directive barring the Plaintiff from entering his office, the Plaintiff located a plastic chair in the mechanical room of the building he worked in (AC  318, 320). Later that morning, the Associate Athletic Director reaffirmed his directive that the Plaintiff refrain from his office (broadcast workspace) and equipment until they met with HR on November 13, 2024 (AC 321).

On November 22, 2024, within four days of the Plaintiff's submission of "*Addressing Managerial Challenges and Operational Analysis*," the Plaintiff's direct supervisor, the Associate Athletic Director for External Operations, issued the Plaintiff a total of seven written reprimands (AC  666) approximately 90 days after his positive employee evaluation (AC ¶¶ 74–76) and 50 days after the first broadcast cancellation and equipment failure (AC ¶¶ 146–148). Following the session, the Associate Athletic Director emailed the Director of Human Resources and included the Plaintiff on the communication transmitting the disciplinary reprimands (AC ¶¶ 667–670). The seven disciplinary reprimands issued on November 22, 2024, were based on a

combination of the Plaintiff's Veterans Affairs appointment, which was previously communicated (AC ¶¶ 275–278), and missed submission deadlines caused by competing priorities (AC ¶¶ 315–316; 506; 510–514; ), overlapping deadlines, and equipment restrictions (AC ¶¶ 313–316, 321).

On November 26, 2024, the Associate Athletic Director issued directives via email to the Plaintiff regarding his office workspace being converted for the use of broadcast operations (AC ¶¶ 679–681). As a result of the directive, he was informed that he was reassigned into an alternate workspace pending the first Performance Improvement Plan to establish performance expectations (AC 682). Before the Plaintiff returned to the office following the Thanksgiving holiday, on December 1, 2024, the Associate Athletic Director implemented and distributed a new External Team Open Door Policy (AC ¶¶ 684–685) ten days after the Plaintiff was informed that no such policy existed.

Once the he returned on December 3, 2024, the Associate Athletic Director changed the part-time employee pay procedure by informing the Plaintiff that he would assume responsibility for an additional step, while acknowledging that the Plaintiff had already completed his portion of the payroll process (AC ¶¶ 685–686).

The following day, on December 5, 2024, the Plaintiff was issued five disciplinary reprimands, two of which were for the newly implemented "open door policy" and two for missing video submission deadlines (AC 832). Immediately following the issuance of the disciplinary reprimands, the Associate Athletic Director transmitted the documentation to the Director of Human Resources and included the Plaintiff in the communication (AC ¶¶ 833–834).

On the afternoon of December 4, 2024, during the first Performance Improvement Plan, the Plaintiff reported internet connectivity issues after being removed from his office (AC 777). He acknowledged that so long as the environment was operationally functional, he would have no difficulty completing the assigned tasks (AC 781). Between December 7 and 8, 2024 (AC ¶¶ 835–855), the Plaintiff attempted to complete the Personnel Action Forms but informed the Associate Athletic Director that he did not have access (AC ¶¶ 835–837) or system permissions required to complete and submit the forms (AC ¶¶ 848–849). The Plaintiff provided the information he had compiled and transmitted the forms he was able to locate to the Associate Athletic Director and requested the correct form, instructions on how he should proceed, and additionally requested that the Associate Athletic Director process the payroll information so that employees could receive their wages (AC ¶¶ 843–844). Concluding his email communications, the Plaintiff asked the Associate Athletic Director whether he was still required to submit a leave form for a day off, and disclosed that he worked into the early morning hours in order to complete his video assignment (AC 850). The plaintiff reminded him that he had exceeded a standard work week, and that requiring vacation time under those circumstances was inconsistent with the Director of Human Resources' instruction (AC 851).

In response to the Plaintiff's emails, the Associate Athletic Director directed the Plaintiff to submit his forms that evening (AC 847) and stated that the Plaintiff's lack of communication contributed to the ongoing issues (AC 852). He noted that a different employee had completed the forms without issues, and reminded the Plaintiff that staff were waiting to receive their wages for work already completed (AC 853). He concluded his response by instructing the Plaintiff to submit a leave request if he wished to have a day off (AC 855–856).

Following these events and the workload conditions described above, the Plaintiff sought medical intervention for a second time while employed at the Virginia Military Institute on December 9, 2024 (AC 857), and upon release was given a return to work day of December 11, 2024 (AC 858). On the same afternoon of the Plaintiff's return to work date, the Associate Athletic Director issued the Plaintiff four disciplinary reprimands; one for violating the "open door policy", two for the personnel action forms, and one for the late submission that the Plaintiff described in his email. (AC 936).

Prior to the start of the second Performance Improvement Plan on December 12, the Associate Athletic Director issued the Plaintiff an additional disciplinary reprimand for the "open door policy" (AC 938), and on on December 13, 2024, the Plaintiff was issued his final two disciplinary reprimands of the year; one for the "open door policy" and one for a late video submission (AC 949).

On the afternoon of January 9, 2025, the Plaintiff and the Associate Athletic Director met to discuss the video assignments for the month of January and the beginning of February. At the outset of the meeting, the Associate Athletic Director issued the Plaintiff four disciplinary reprimands for violation of the "open door policy," a missed creative deadline, an unapproved absence, and "acting outside of authority" in relation to part-time staff payroll (AC 973). During the session, the Associate Athletic Director grabbed the Plaintiff's elbow to stop him from retrieving and reviewing a reprimand until he signed a different reprimand first. Within minutes of the incident, and while the session was still in progress, the Plaintiff emailed the Inspector General to report the grab (AC 968).

Following the Plaintiff's internal reporting of the unwanted physical contact, the Athletics Director notified him that moving forward, the Plaintiff would be reporting directly to him (AC 986).

On the afternoon of January 31, 2025, the Plaintiff met with the Athletics Director and Executive Assistant to discuss the upcoming video production schedule (AC 1015). During this meeting, the Athletics Director instructed the Plaintiff to continue including the Associate Athletic Director in his work submissions and communications, even though the Plaintiff had been reassigned to report directly to the Athletics Director following the January 9, 2025 incident. Before responding to the new directive, the Plaintiff then raised concerns regarding the accuracy of the Executive Assistant's notes from prior meetings and stated that there were discrepancies between what had been discussed and was documented for the record. The Plaintiff requested that the Executive Assistants notes accurately reflect what was discussed. After addressing the inaccuracies in the official record, the Plaintiff responded to the Athletics Director by explaining that he had already been in discussions with the Associate Athletic Director on January 9, 2025 about the unrealistic video deadlines and workload expectations. In explaining his rebuttal, the Plaintiff asserted that the new schedule continued the unrealistic deadlines and workload expectations previously imposed by the Associate Athletic Director and required adjustment and renegotiation. He acknowledged that the change in supervisor appeared "neutral," but affirmed that the directive continued the same practices previously imposed by the Associate Athletic Director.

Later that evening, as a direct result of the video editing assignment schedule for the month of January, the Plaintiff required medical intervention for a third and final time while employed at the Virginia Military Institute (AC 1018).

In total, following the Plaintiff's report of a bribery scheme between the VMI Alumni Agencies (through the Keydet Club) on November 18, 2024, the Plaintiff received a total of twenty-three disciplinary reprimands (AC ¶¶ 666, 832, 936, 938, 949, 973) between November 22, 2024, and January 9, 2025 from his direct supervisor, the Associate Athletic Director for External Operations.

**Escalation of Disciplinary Proceedings, Law Enforcement Involvement, and Termination**

**November 13, 2024**

On the morning of November 21, 2024, the Plaintiff met with the Athletics Director to check in following the November 13, 2024 meeting (¶¶ 590–665). The Plaintiff explained the changes in treatment toward him (AC ¶¶ 595–599; 608–618) and that he was being isolated following his return to the office (AC ¶¶ 618–619, 632). In his explanation, he informed the Athletics Director that conflicting directives from the associate athletic director created conditions that made successful completion of his assigned video editing tasks impossible by denying him access to the equipment necessary (AC ¶¶ 600; 313).

When asked whether his Veterans Affairs appointments were new or ongoing, he informed the Athletics Director that he made it known and disclosed to various personnel and leadership that the Plaintiff is a disabled veteran (AC 603; ¶¶ 27, 31–32; additionally, the

Plaintiff had previously disclosed his ADHD diagnosis in AC 28). The Plaintiff informed the Associate Athletic Director at the outset of his employment that he would require periodic Veterans Affairs appointments, which were accepted and approved subject to reasonable notice (AC ¶¶ 603, 606; ¶¶ 29–30). He explained that prior to the events of October 31, 2024, the Plaintiff scheduled, traveled to, and attended Veterans Affairs medical appointments without issue or interference (AC ¶¶ 604–606; ¶¶ 221–223, 276–277, 282, 294). The Athletics Director acknowledged the Plaintiff's explanation before moving forward to a different topic regarding the upcoming schedules for the football and wrestling programs (AC 607).

Responding to his question, the Plaintiff informed the Athletics Director that he was no longer involved with the broadcasts and that the Independent Contractor was responsible for the broadcasts in his place. He disclosed that the Associate Athletic Director instructed him to remain in his office and focus solely on assigned projects (AC ¶¶ 610), and that to comply with this directive, he worked with his door closed to avoid distractions (AC ¶¶ 662). The Plaintiff notified the Athletics Director that there had been no improvement following the November 13, 2024 meeting, and that he now remained in his office in fear of additional confrontations with the Associate Athletic Director for External Operations (AC ¶¶ 619–620).

After listening to the Plaintiff's account, the Athletics Director stated that his and the Associate Athletic Director's reporting to Human Resources was coincidental and that he was attempting to remain impartial while evaluating both parties' positions, acknowledging that the situation was serious, and inquired as to when the issues began (AC ¶¶ 621–625). The Plaintiff responded to the question by describing an incident that occurred between him and the Associate

Athletic Director and the Plaintiff's inability to complete a video assignment while preparing for the upcoming fall broadcasts (AC 626–627). The incident occurred in the football stadium's away team locker room following the filming of an introduction video for the upcoming season, during which the Associate Athletic Director confronted and threatened the Plaintiff over delayed video content submissions despite the Plaintiff confirming the day prior that he would complete the task (AC 628). He explained that tensions worsened when the October 3, 2024 broadcast failure occurred, as the Associate Athletic Director later accused him of sabotaging the broadcast, which the Plaintiff denied (AC ¶¶ 629–631).

Following the Plaintiff's disclosure, the Athletics Director pivoted the conversation to an update regarding a leave form for the Plaintiff's upcoming Veterans Affairs appointment and whether he had spoken to the Associate Athletic Director about the appointment, to which the Plaintiff explained that the form was non-existent and not in circulation (AC ¶¶ 633–635). The Plaintiff responded to the Athletics Director by informing him that they had not spoken up to that point in time, and that their email exchange indicated that he would be receiving additional reprimands (AC 636). He concluded his statement by noting that, as a result of the work environment, he remained in his office (AC 637). After listening to the Plaintiff's explanation, the Athletics Director asked whether the Plaintiff would be comfortable with him communicating with the Associate Athletic Director as an intermediary regarding the upcoming appointment (AC 638), and instructed the Plaintiff to email the Director of Human Resources to request the document (AC 639), as she was the one who directed the Plaintiff to do so during the mediation session (AC 641).

After finishing the topic regarding the Plaintiff's Veterans Affairs appointment, the

Athletics Director explained that until recently, both he and the Associate Athletic Director had learned that no memorandum or policy had been issued requiring staff to keep their office doors open and that such a directive could not be selectively applied. He informed the Plaintiff that he had communicated this to the Associate Athletic Director and explained that his expectation was that assigned tasks be completed (AC 643).

As the meeting continued, the Athletics Director explained that he did not believe assigning the Plaintiff to the upcoming broadcasts was necessary given the circumstances and that he did not want to place the Plaintiff in an environment where he would feel isolated or unwelcome, and then asked the Plaintiff if VMI was the right fit for him (AC 646). In response to the Athletics Directors question, the Plaintiff stated that he felt that he was purposely being pushed out (AC ¶¶ 647–648). He informed the Athletics Director that the Associate Athletic Director was selectively applying an open door directive only to the Plaintiff (AC ¶¶ 643, 664). The Plaintiff explained that the directive interfered with his ability to perform his assigned video editing work (AC ¶¶ 662, 664). When questioned about the last interaction the Plaintiff had with the Associate Athletic Director, he explained that the Associate Athletic Director knocked, entered his office, and forcibly attempted to keep his office door open by propping it open with the nearest chair (AC 664).

Before the meeting concluded, the Athletics Director again asked the Plaintiff whether he would be comfortable with him communicating with the Associate Athletic Director regarding the Plaintiff's upcoming Veterans Affairs appointment (AC 638), and concluded the meeting by informing the Plaintiff that his appointment request had been approved (AC 665).

**December 4, 2024 Performance Improvement Plan Session**

Following the initial seven disciplinary reprimands, the first Performance Improvement Plan session took place on December 4, 2024 (AC ¶¶ 716–831), with the Plaintiff, Athletics Director, Associate Athletic Director for External Operations, Executive Assistant (Michelle Murphy), and the Director of Compliance present (AC ¶¶ 715–716). At the outset of the meeting, before the official discussion began, the Plaintiff stated for the record that the Director of Compliance was present solely in the capacity of a neutral observer for the contested session (AC 719). Immediately following that statement, at the official start of the meeting, the Athletics Director stated that the purpose of the meeting was to review the Performance Improvement Plan that had been discussed with the Director of Human Resources and to measure tasks that were "achievable, relevant, and time bound." (AC 720). He informed the group that his expectation for the Executive Assistant was to take notes and to prepare a summary of the session to "ensure alignment." (AC 725).

The Athletics Director acknowledged the Plaintiff's removal from his office and explained that the reassignment was "temporary", and that the purpose of the relocation was due to the upcoming renovations related to the video board, and uncertainty regarding the usage of the Plaintiff's office for additional future needs (AC ¶¶ 726–727). The Athletics Director included in his statement that the office the Plaintiff was relocated from would be exclusively used as the broadcast control room "exclusively" (AC 728). As he explained, the Athletics Director maintained his position that the current broadcast space was the best option, and that removing the Plaintiff from his office and placing him elsewhere would "reduce foot traffic,

minimize disruptions during the season, and assist the Plaintiff in meeting" his "deadlines" (AC 734).

In response to the Athletics Director's reasoning, the Plaintiff reaffirmed his position that the matter could have been resolved through alternative methods (AC 736). The Plaintiff questioned the timing of the decision made by the Athletics Director and Associate Athletic Director, stating that the timing was suspicious, and referred back to the events of October 31, 2024, and his request for emergency leave (AC 737). He stated that the timing was unusual in light of recent events (AC 738).

Transitioning from the topics of the Plaintiff's office, the Athletics Director confirmed that the Independent Contractor would assume full responsibility for the broadcast operations, as he and the Associate Athletic Director believed it would be "beneficial" for the Plaintiff to apply his video editing capabilities into creative content (AC ¶¶ 743–744). Continuing his explanation, the Athletics Director reiterated that the purpose of the Performance Improvement Plan was to track tasks, monitor progress, and review project deadlines to ensure all required items were addressed (AC 745).

Before the meeting progressed into the topic of multimedia projects, the Plaintiff requested clarification on what the expectation for video quality was and whether the focus was on meeting deadlines or on producing content that would strengthen institutional branding (AC 746). The Associate Athletic Director responded to the Plaintiff's question by stating that both quality and speed were the emphasis, but that delivery time was critical due to social media engagement and public attention span (AC ¶¶ 747–748). To conclude his directive, the Associate

Athletic Director stated that the primary focus was rapid content delivery (AC 749). In response, the Plaintiff rebutted by stating that the expectations did not align with what the Associate Athletic Director had described (AC 750). He informed the group that the video editing he was assigned included season recaps, game introductions, and "hype" videos, and directed attention to the deadline schedule the Associate Athletic Director presented. The Plaintiff explained that he addressed the expectation that he was supposed to submit a highlight video by 4:00 p.m. on December 3, 2024, but added that it overlooked the operational reality that the assignment required extensive time to identify usable video footage from the season, and concluded his remarks by stating that he was blocked from accessing the footage (AC ¶¶ 751–753).

The Associate Athletic Director rebutted the Plaintiff's claims and clarified that he was only denied access to the video production equipment that contained the footage necessary to complete his assignments (AC 754). The Plaintiff rejected the Associate Athletic Director's claim and stated that he maintained a copy of the email correspondence that would support his allegation that he was being denied access, and the Associate Athletic Director rebutted that he too maintained a copy of the correspondence in question (AC ¶¶ 755–756).

In response to the disagreement between the parties, the Athletics Director shifted the discussion to address the submission of all Personnel Action Forms for payroll, and asked the Associate Athletic Director if he had communicated the directive to the Plaintiff (AC ¶¶ 757–758). The Associate Athletic Director clarified that he had implemented the new directive onto the Plaintiff the previous day in an effort to expedite payroll processing, and stated that the

Plaintiff had all of the necessary information compiled (AC ¶¶ 759–760). He concluded his response by noting that the task could be completed in approximately one hour (AC 762). The Plaintiff responded to the Associate Athletic Director's explanation regarding completion time and noted that it might "not apply universally" and that the Plaintiff needed to ensure he maintained pay accuracy involving institutional funds, but the Associate Athletic Director rebutted the Plaintiff's explanation and stated it was not the Plaintiff's responsibility to review, verify, and approve the submitted information (AC ¶¶ 763–764). Responding to the status of the Personnel Action Forms, the Plaintiff informed the Athletics Director that this would be his first attempt at completion since his original duty was to enter payroll data into Microsoft Excel and that the Associate Athletic Director processed the Personnel Action Forms (AC ¶¶ 765–766). Additionally, the Plaintiff wanted the record to reflect that his part-time staff had raised concerns regarding wages being delayed for work completed prior to his arrival (AC 769).

In the course of this session, the Plaintiff stated that he was experiencing internet connectivity issues in his "temporary" workspace following his removal from his office (AC 777). He explained that he had been using his personal laptop to complete his assignments, and that prior to October 31, 2024, he continued working on assignments from home to meet project deadlines (AC ¶¶ 779–780). He concluded his explanation by noting that so long as the internet was functional in his "temporary" workspace, he would have no issue completing the assignments (AC 781). Responding to the Athletics Director's question on the progress of a video assignment, the Plaintiff again requested clarification on the department's expectation and explained his approach to video editing was intended to be visually appealing and engaging (AC ¶¶ 783–784). The Plaintiff addressed the fact that other personnel had recently created video

products, and for this reason he requested a comparison to those videos as video editing work could be subject to interpretation since the Associate Athletic Director was requesting specific standards (AC ¶¶ 785–786).

Following the Plaintiff's video comparison remarks, the Associate Athletic Director asserted that the Plaintiff had stated on various occasions that he was gathering video footage throughout the season and declared that this should have reduced the need for additional footage review (AC 787). Returning to the broadcast operations failures, the Plaintiff reminded the participants that he had been troubleshooting broadcast and video production equipment malfunctions since the summer, and claimed the Associate Athletic Director was altering facts and events as he had previously done (AC 790). He informed the participants that the ongoing malfunctions required him to repeatedly repair preventable and avoidable failures, and that he was already working late into the evening to complete his assignments (AC ¶¶ 791–792).

When asked by the Athletics Director if he had completed the video assignment in question, the Plaintiff informed him he was still actively working on a separate assignment (AC ¶¶ 795–797). The Athletics Director acknowledged that while the Associate Athletic Director had expectations regarding submission deadlines, all parties were expected to remain flexible (AC 797). He acknowledged the Plaintiff's video editing strengths and noted that there seemed to be a disconnect between those strengths and the ability to maintain submission deadlines, but he maintained his expectations for video quality standards and timely submission of the video projects while acknowledging that both he and the Associate Athletic Director were less experienced than the Plaintiff in video editing (AC ¶¶ 798–803). In addressing the Athletics

Directors statement, the Plaintiff stated that a productive resolution to deadline submissions was unlikely, and would continue to remain circular, stating that it would be best to address the issues as they arose (AC ¶¶ 808–809).

The Athletics Director acknowledged the Plaintiff's statement and added that if the Plaintiff believed that the expectations were unreasonable or unattainable, the matter could be re-evaluated to avoid creating a situation where the Plaintiff could not meet the expectations or lacked sufficient time to complete the assignments (AC ¶¶ 810–811). After a brief disagreement between the parties regarding the November 13, 2024 HR mediation session (AC ¶¶ 812–816), the Associate Athletic Director believed the assigned deadlines were in fact fair, and used his experience in video editing and employment history as a comparison (AC 817). He added that video submissions should be short in duration (approximately one minute), with the requirement that the assignment be submitted through a direct link through email correspondence (AC 818).

The Plaintiff again reiterated that the Associate Athletic Director barred him from access to the equipment containing the necessary video footage to complete his assignments, and that he needed a method to obtain the footage either through the network server or USB drive due to the Associate Athletics Director's order (AC 822). Immediately following the Plaintiff's statement, the Associate Athletic Director affirmed his position in restricting access by stating that either himself, the Associate Athletic Communications Director, or the Assistant Director of Athletic Communications & Creative Content could retrieve the material "efficiently." (AC ¶¶ 822–823).

The Athletics Director concluded the first Performance Improvement Plan meeting by stating that the group would reconvene the following week to review the Plaintiff's progress, and

noted that he would email the Associate Athletic Director the template in order to plan the upcoming tasks (AC 829). At the conclusion of the meeting, the Athletics Director requested that the Executive Assistant remain behind to review the notes she took during the Performance Improvement Plan (AC 831).

**December 12, 2024 Performance Improvement Plan Session**

On December 12, 2024, the Plaintiff, Athletics Director, Associate Athletic Director, Executive Assistant, and the Director of Compliance for the second Performance Improvement Plan (AC ¶¶ 939–940). During this session, the Athletics Director issued the Plaintiff a Notice of Improvement Needed/Substandard Performance and informed him that he had forty-five days to demonstrate noticeable improvement or face termination, as outlined in the Notice's "Summary of Past Performance Deficiencies." (AC ¶¶ 941–943). As explained in the notice, the Institute alleged that since the Plaintiff's most recent performance evaluation, a pattern of substandard performance had been noted and that he was in violation of the Employment Agreement and the VMI Administrative and Professional Handbook. The listed examples of violations were "missing team meetings, failing to meet creative or professional deadlines on a consistent basis, not coming to the office, keeping his office door closed, and poor attitude toward coworkers (AC 943).

In total, the Notice alleged a total of "forty observed instances" as a basis for support. Included as part of the "observable instance" were the seventeen disciplinary reprimands that were issued to the Plaintiff that began four days after the Plaintiff had reported the bribery

scheme to the Inspector General. The first "recorded" instance occurred nine days following the Plaintiff's positive evaluation on August 12, 2024 and concluded on the morning of the session (AC  944). Of the seventeen disciplinary reprimands issued that were used as support for the Notice, eight were for missed deadlines despite the Associate Athletic Director admitting he did in fact restrict the Plaintiff's access to the video production equipment (AC  754), four reprimands for violating an open door policy implemented after the November 21, 2024, meeting with the Athletics Director (AC ¶¶ 643, 684), and two were for changes to the procedures for part-time payroll processing made without giving the Plaintiff the appropriate access (AC  915), which resulted in part-time staff pay being delayed, after which responsibility for the delay was placed on the Plaintiff and was used to justify the discipline in the Notice.

**Institutional Use of Law Enforcement, Criminal Proceedings, Suspension, Trespass, and Termination Following Plaintiff's Reports**

On the afternoon of January 9, 2025, during a disciplinary reprimand session, the Associate Athletic Director grabbed the Plaintiff's elbow to stop him from retrieving and reviewing a reprimand before moving on to the next one. The Plaintiff had requested to review the reprimand before proceeding because he was actively contesting the disciplinary actions, as he had done with each of the twenty-three reprimands issued between November 22, 2024 and January 9, 2025. As the session progressed, approximately less than ten minutes after the grab occurred, the Plaintiff emailed the Inspector General to report the incident (AC  968). After the session concluded, the Plaintiff reported the incident to a colleague, and immediately following,

arrived at the Office of the Inspector General to report the incident. Shortly after the incident, the Inspector General notified the Plaintiff that the matter was not within the scope of her investigation into "fraud, waste, and abuse" (AC 969), and informed him that he retained the right to report the incident to law enforcement if he believed criminal activity was involved, as well as the option to report the incident through Human Resources or his supervisory chain (AC 970).

Consistent with the Inspector General's recommendation, the Plaintiff followed both reporting options, but first reported internally by notifying the Human Resources Generalist of the incident via electronic communication. On the late morning of January 10, 2025, the Plaintiff met with the Human Resources Generalist and the Director of Human Resources regarding the incident (AC 972). At the start of the meeting, the Director of Human Resources acknowledged that the meeting was between the Plaintiff and the Human Resources Generalist, and asked the Plaintiff not to mind her presence as the meeting was taking place in her office. To begin, the Plaintiff played back various recordings, including the disciplinary session in which he was grabbed, his December 11, 2024 meeting with the Director of Human Resources regarding a retaliation complaint, and other related recordings to show both the Director and the Human Resources Generalist the events leading up to the incident and his attempts to address the escalating situation (AC 974). In response to the recordings, the Director of Human Resources informed the Plaintiff that she was not directly involved in the Plaintiff's case, and that Legal was in fact handling the Plaintiff's case. As the discussion continued, a disagreement arose between the Director of Human Resources and the Plaintiff after the Plaintiff stated that he did not trust leadership to not manipulate professional documents, at which point the Director of

Human Resources accused the Plaintiff of lying. Responding to the Director's accusation, the Plaintiff requested to move the meeting from the Office of the Director of Human Resources to another location because he believed the discussion was no longer productive. Before adjourning the session, the Director of Human Resources explicitly named and requested VMI Police Captain David Henson to be present during the second meeting (AC 975).

Immediately following the session, the Plaintiff and the Human Resources Generalist retrieved the Plaintiff's report containing transcripts of the events that had been played during the meeting with the Director of Human Resources, as the Plaintiff had previously provided the first three reports on January 9, 2025 (AC ¶¶ 976, 966).

On the afternoon of January 10, 2025, the Plaintiff met with the Human Resources Generalist and the VMI Police Captain. Before the session commenced, the Plaintiff requested that an additional officer be present and explained that his request was based on the Director of Human Resources having explicitly requested the presence of the VMI Police Captain and her direct involvement in the underlying matters (AC 977). At the Plaintiff's request, the Captain contacted VMI Police Officer Ryan Knick (AC 978).

At the outset of the meeting, the Plaintiff explained that he requested the presence of an additional officer due to the Director of Human Resources having explicitly requested the presence of the Police Captain to ensure impartiality following the adversarial conclusion of the prior meeting. The Plaintiff then explained that he had prepared four documents consisting of a written account of events, a summary of violations of school policy and law by officials in their official capacity, supporting email correspondence, and audio transcripts of key events related to

his complaint (AC ¶¶ 979–980; in explaining the *"Addressing Managerial Challenges and Operational Analysis"* anthology). He explained that these documents were related to his truthful reporting in connection with a possible bribery scheme and the misuse of public resources involving VMI through its institutional leadership within the Athletics Department **AND** the Institute, as well as the VMI Alumni Agencies (AC  981). As the Plaintiff's documentary material included audio recordings in which he was a participant, the Plaintiff stated during the meeting that the Commonwealth of Virginia is a one-party consent state under Virginia Code § 19.2-62(B)(2), which the Police Captain confirmed (AC  982). Through the entirety of the session, the Plaintiff played back various different recordings, including the grab during the disciplinary session, and reaffirmed the bribery scheme in the presence of the Human Resources Generalist, the Police Captain, and the VMI police officer (AC  983). At the conclusion of the meeting, the Plaintiff requested that he no longer be isolated with the Associate Athletic Director moving forward, and as a result of his request, the Athletics Director notified the Plaintiff that he will be reporting to him directly moving forward (AC  984, 986).

Later that same afternoon, the Plaintiff emailed the Human Resources Generalist four supporting documents related to his complaint, including two audio transcripts of recorded events related to his complaint, as well as supporting email correspondence (AC ¶¶ 987–989).

On the afternoon of January 24, 2024, the Plaintiff received the findings from the Human Resources Generalist. Included in the email was General Counsel, Director of Human Resources, and the Athletics Director (AC  993). The findings rejected the Plaintiff's claims for retaliation, stating that "no evidence has been provided that you have or are being retaliated against", the

allegation of the Associate Athletic Director "striking your body with his body – this accusation cannot be substantiated", could not be substantiated, and additionally, addressed an allegation the Plaintiff never made that the Associate Athletic Director received funds from the Keydet Club. The Plaintiff never made the allegation that he was receiving funds from an entity. The Plaintiff did not allege that the Associate Athletic Director was personally receiving funds from the Keydet Club. He explained the donor-tier pricing menu to the Human Resources Generalist during each meeting held on January 9 and January 10, 2025. As shown in IRS Form 990 Schedule I, payments to leadership are issued through the VMI Foundation, a "separate entity" under the VMI Alumni Agencies structure (AC 1212).

On January 29, 2025, the Plaintiff emailed the Human Resources Generalist and included General Counsel, inquiring about his prior request for an external investigative body to conduct an inquiry into his complaints (AC ¶¶ 996–997). The Plaintiff reiterated that he had requested intervention from an external investigative agency due to conflicts of interest involving the Director of Human Resources (AC 998). He further stated that he had reported the January 9, 2025 incident to both the Human Resources Generalist and the Inspector General, and again requested that an external investigative agency oversee the matter. The Plaintiff also formally requested the return of his reports and confirmation that his evidence had not been altered (AC ¶¶ 999–1002).

Following his email to the General Counsel and the Human Resources Generalist, the Plaintiff was requested to meet with the newly appointed Chief of Staff, Travis Homiak, on the morning of January 30, 2025 (AC 1003). During this meeting, the Plaintiff was informed that

he was being terminated, citing the deficiencies that had been contrived for and documented in the Notice of Improvement Needed/Substandard Performance (AC 1004). The Plaintiff explained to the Police Captain that the Institute planned on terminating his employment by relying on backdated deficiencies documented in the Notice of Improvement Needed/Substandard Performance to justify his termination (AC 1007), and that his retaliation claims had been denied after his evidence was deemed "insufficient." (AC 1009). Finishing his explanation, the Plaintiff stated that this began after he voiced his concerns regarding the prioritization of institutional resources for a video project for the VMI Alumni Agencies (AC 1008).

Following the Inspector General's second recommendation, the Plaintiff requested to pursue action regarding the unwanted physical contact incident that occurred on VMI property with the VMI Police Captain (AC 1009). The Police Captain explained that the incident qualified as a misdemeanor that did not occur in police presence, and advised the Plaintiff to file the matter with a magistrate. He informed the Plaintiff that assistance would be provided if he requested (AC 1010). The Plaintiff accepted the offer of assistance, and the Police Captain informed him that an officer would arrive later that morning to take his official statement (AC 1011).

Later that morning on January 30, 2025, the officer present on January 10, 2025, arrived at the Plaintiff's "temporary" office to take his statement regarding the unwanted physical contact incident that had taken place in the same room. At the conclusion of the statement, the

VMI Police officer provided the Plaintiff with information to move forward with his complaint and scheduled a time to meet that afternoon to proceed to the magistrate (AC 1012).

On the afternoon of January 30, 2025, Officer Ryan Knick escorted the Plaintiff to the Rockbridge County Sheriff's Office to appear before a magistrate to file a criminal complaint concerning unwanted physical contact (AC 1014). During the drive to the magistrate, the officer informed the Plaintiff that if he filed his complaint, the Associate Athletic Director would be able to file a separate complaint regarding the same incident. In his written statement, the Plaintiff used quoted portions of the audio recordings in his statement to support his account of the incident that occurred in connection with his reporting of the misuse of public resources and the commission or possible commission of federal and state offenses (AC 1014). Under penalty of perjury, the Plaintiff submitted a criminal complaint in connection with the unwanted physical contact that stemmed directly from his reporting of a bribery scheme and the misuse of public resources between VMI, through its institution's officers and agents, and the VMI Alumni Agencies.

Approximately twenty-five hours later, the Associate Athletic Director filed a counter-complaint arising from the same incident on January 9, 2025. The Plaintiff was served at his residence with a warrant for his arrest by two Rockbridge County Sheriff's Deputies and a VMI Police Officer, believed to be Jason Brockenbrough, and was instructed to appear at the Rockbridge County Courthouse for his pending legal proceedings (AC ¶¶ 1016–1017).

Five days after the Plaintiff filed his criminal complaint and four days after the Associate Athletic Director filed his counter-complaint, on the morning of February 4, 2025, the Chief of

Staff, with the Director of Human Resources and the VMI Police Captain also present, informed the Plaintiff that he was being placed on administrative suspension following a recommendation from VMI's Threat Assessment Team (AC 1021). The Chief of Staff explained that following the Notice of Intent to Terminate, several employees reported they could not come to work while the Plaintiff remained on duty (AC 1022). He further stated that the Threat Assessment Committee met and recommended to the Superintendent that the Plaintiff be placed on administrative suspension due to his alleged behavior impacting Athletic Department operations, which the Superintendent accepted (AC ¶¶ 1023). When asked if the Plaintiff had anything to add or any response, the Plaintiff stated that the events leading to his discipline and suspension began after he raised concerns that the Institute should not be involved in certain matters. Before the meeting concluded, the Plaintiff was notified that the suspension period would coincide with the thirty-day Notice of Intent to Terminate period, at the conclusion of which he would be terminated from his role (AC ¶¶ 1023–1024).

Six days into his suspension, and after he had already been instructed not to report to work, the Plaintiff was issued a VMI Trespass Warning Form delivered by a Rockbridge County Deputy Sheriff that prohibited him from entering VMI property (AC 1029). The notice was delivered on the Monday following the Board of Visitors convening and informed the Plaintiff that if he returned to VMI property, he would be arrested and charged with trespassing under Virginia Code § 18.2-119 (AC 1030).

On March 4, 2025, the Plaintiff was formally notified by the Director of Human Resources that his termination was in effect (AC 1034).

On the morning of April 18, 2025, the Plaintiff and the Associate Athletic Director appeared in Rockbridge County District Court (AC   1037). Following the counter-complaint, the Plaintiff retained private legal counsel to represent him in the criminal proceedings. The Plaintiff provided counsel with documentation and evidence related to the matter, including audio recordings, transcripts, and other documents that would have supported his defense. Counsel advised the Plaintiff that he intended to focus only on the physical contact incident and did not intend to raise the Plaintiff's reports concerning the commission or possible commission of state and federal offenses in the criminal proceedings. Upon the advice of counsel, both entered Fifth Amendment pleas to avoid self-incrimination in connection with the unwanted physical contact on January 9, 2025 (AC ¶¶ 1037–1038).

## ARGUMENT

### I. Proper Defendants, Capacity to Be Sued, Ex parte Young, and Immunity Doctrines

Under Va. Code § 23.1-2500(A), the Board of Visitors of Virginia Military Institute exists corporately under the name and style "Virginia Military Institute." The Complaint names both VMI and the Board of Visitors to reflect the governing structure through which final policymaking authority was exercised in connection with the actions challenged herein. The Board is not referenced as a mere operating division, but as the statutory governing body vested with supervisory and ratification authority over institutional decision making. The challenged

disciplinary, suspension, termination, and related enforcement actions were processed and approved through that governing structure.

Unlike cases where 'University of Virginia' was dismissed as a non-capacitated entity, here the Complaint names both 'VMI' and the Board of Visitors, consistent with § 23.1-2500(A)'s designation of the Board as the corporation styled 'Virginia Military Institute.' See *Doe v. Univ. of Va.*, 2024 U.S. Dist. LEXIS 57932, and to reflect that the actions challenged were not isolated supervisory acts but institutional decisions implemented through the governing structure itself. To the extent Virginia law treats the Board and VMI as a single corporate entity for purposes of capacity to be sued under Rule 17(b)(3), the claims asserted against the Board are properly understood as claims against the corporate entity styled "Virginia Military Institute." However, the Board's role remains legally relevant as the constitutional claims arise from decisions and actions implemented through officials exercising final policymaking authority within VMI's governing structure. The Rule 17 capacity doctrine addresses nomenclature, it does not negate the underlying allegations that the challenged actions were ratified and carried out through the Institute's governing body, nor does it convert those institutional decisions into acts shielded from individual liability under 42 U.S.C. § 1983.

The individually named defendants are sued in their individual capacities for damages arising from their personal involvement in the retaliatory actions following the Plaintiff's reports to the Inspector General. All damages claims are brought against defendants in their individual capacities, based on their knowing participation in a coordinated retaliatory campaign initiated after the Plaintiff's protected whistleblowing. To the extent that prospective or declaratory relief is sought, including orders to cease ongoing violations or to reform institutional practices, those

claims are asserted against the defendants in their official capacities as permitted under *Ex parte Young*, 209 U.S. 123 (1908), and its progeny, and are limited to forward-looking relief consistent with established Eleventh Amendment doctrine. Prospective injunctive relief to prevent ongoing violations of federal law is authorized under 42 U.S.C. § 1983 and is not barred by the Eleventh Amendment when asserted against state officials in their official capacities. Sovereign immunity does not bar claims for damages against state officials sued in their individual capacities for actions taken under color of state law.

The Complaint challenges not only past actions, but the ongoing enforcement and continuing effects of those actions, including termination status, trespass restrictions, and institutional determinations that remain in force. In the presence of ongoing violations and continuing enforcement actions, the claims for prospective relief fall within the *Ex parte Young* exception to Eleventh Amendment immunity. For these reasons, this action challenges ongoing enforcement actions, including termination status, trespass restrictions, and institutional determinations that remain in effect, and therefore seeks prospective relief to stop ongoing violations of federal law, bringing these claims within the *Ex parte Young* exception.

Following the enterprise structure described above, the individuals identified below are those who were directly involved in the Plaintiff's disclosures, subsequent internal handling, investigation, disciplinary escalation, suspension, threat assessment proceedings, and termination. At a minimum, the Plaintiff's case passed through or was acted upon by no fewer than twenty individuals occupying supervisory, investigative, legal, law enforcement, medical, and governing roles within the Institute's structure. These individuals are named not as rhetorical accumulation, but because each participated in, reviewed, ratified, implemented, or was formally

notified of actions arising from the Plaintiff's protected reporting. The use of collective references such as "Defendants" or "Institutional Officials" reflects this coordinated involvement; the names set forth below identify the specific actors whose authority intersected with the Plaintiff's case during the relevant period.

The following are the official titles of the individuals who were directly involved in the handling, investigation, review, ratification, or implementation of actions arising from the Plaintiff's protected disclosures:

1. Associate Athletic Director for External Operation
2. Executive Assistant (Athletics)
3. Athletics Director
4. Human Resources Generalist
5. Director of Human Resources (included on the Threat Assessment Team)
6. Deputy Inspector General
7. Inspector General
8. Senior Finance Director (included on the Threat Assessment Team)
9. Deputy Superintendent for Finance and Support (included on the Threat Assessment Team)
10. Chief of VMI Police Department (Threat Assessment Team)
11. Associate Dean for Academic Affairs (Threat Assessment Team)
12. Commandant (Threat Assessment Team)
13. Assistant Commandant for Cadet Government (Threat Assessment Team)
14. Director of Cadet Counselling (Threat Assessment Team)

15. Institute Physician (Threat Assessment Team)
16. Chaplain to the Corps of Cadets (Threat Assessment Team)
17. Chief of Staff (now the Assistant Superintendent for Operations and Planning)
18. Chief of Staff (appointed January 2025)
19. General Counsel (included on the Threat Assessment Team)
20. Superintendent

This list includes the people who directly handled the retaliation process and it does not include every official in the governing structure. However, the actions taken by these officials were carried out in their official capacities under color of state law, using institutional disciplinary authority, law enforcement involvement, and termination authority, and were taken for the benefit of, or on behalf of, the VMI Alumni Agencies after Plaintiff reported the bribery scheme and misuse of public resources. The appropriate phase of litigation will clarify the full scope of involvement, including the roles of additional officials whose involvement was supervisory, advisory, or ratifying in nature and whose participation is reflected in institutional review, approval, enforcement, or implementation decisions.

The current members of the Board of Visitors and senior leadership are included because the institutional authority exercised in connection with the actions challenged herein is ongoing and continuous. The governing structure of Virginia Military Institute does not reset with changes in appointment; it persists as a corporate body under Va. Code § 23.1-2500(A). To the extent membership has changed during the pendency of these events, the authority to enforce, maintain, or ratify the challenged actions remains vested in the sitting Board and its executive

leadership. The inclusion of current officeholders reflects the continuing nature of the enforcement structure at issue, not an allegation of new or independent misconduct. Institutional continuity, rather than personal transition, governs the analysis.

Qualified immunity protects government officials from personal liability only where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Under *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court established that the inquiry proceeds in two steps: (1) whether the Complaint plausibly claims a constitutional violation, and (2) whether the right at issue was clearly established at the time of the challenged conduct.

**Immunity Doctrines Do Not Require Dismissal at the Pleading Stage**

Qualified immunity is inappropriate at the motion to dismiss stage where the viability of the defense depends upon disputed facts or the reasonableness of officials' conduct under the circumstances described. Separate and apart from the factual disputes underlying Defendants' qualified immunity defense, the constitutional rights at issue were clearly established at the time of the events described in the Complaint. Dismissal on qualified immunity grounds is unwarranted at this stage.

In this case, at least twenty individuals between the Board of Visitors and Institute officials had direct knowledge of the Plaintiff's reporting and the underlying allegations, yet the actions described in the Amended Complaint proceeded under color of official authority. The

constitutional rights at issue were clearly established at the time of the events described in the Complaint. It has long been clearly established that state officials may not retaliate against an individual for engaging in protected speech on matters of public concern, including reporting a bribery scheme, misuse of public resources, or unlawful activity to supervisory or oversight authorities. It is clearly established that the use of official authority to discipline, terminate, or otherwise retaliate against an individual for such protected activity violates the First Amendment. See *Lane v. Franks*, 573 U.S. 228, 238–41 (2014) (holding that the First Amendment protects a public employee who speaks as a citizen on matters of public concern, including testimony and reporting related to public corruption). Accepting the allegations as true, the conduct described in the Complaint involves the use of official authority to impose adverse actions following protected reporting activity, which, if proven, would violate clearly established constitutional protections.

Changes in office do not alter that analysis. Under Federal Rule of Civil Procedure 25(d), when a public officer named in an official capacity ceases to hold office, the officer's successor is automatically substituted as a party. The rule reflects the principle that the authority exercised through a public office continues notwithstanding changes in the individual occupying that position. The Supreme Court recognized that litigation challenging official conduct does not become moot or insulated from review merely because personnel change during the pendency of the dispute. See, e.g., *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (distinguishing personal and official capacity liability and recognizing that officials remain accountable for actions taken under color of state authority); *Ex parte Young*, 209 U.S. 123 (1908). While the Commonwealth and its agencies are not "persons" for purposes of § 1983 damages claims, state officials sued in their

individual capacities for damages and in their official capacities for prospective injunctive relief are "persons" within the meaning of § 1983. Accordingly, even if the Commonwealth and its agencies are immune from damages under § 1983, the Complaint states claims against the individual defendants for damages in their individual capacities and for prospective injunctive relief in their official capacities.

Accordingly, the fact that some individuals may no longer occupy the same positions does not negate the allegations that the challenged actions were undertaken and ratified through the Institute's governing structure. If sovereign immunity operates as Defendants suggest, a state institution could channel operational activity through affiliated organizations, continue to benefit from those arrangements, and then argue that it bears no liability as sovereign immunity bars the ability to challenge the resulting constitutional violations. Such a rule would allow constitutional accountability to be avoided through institutional structuring rather than compliance with constitutional obligations.

To the extent the Court determines that the Eleventh Amendment bars Plaintiff's claims arising under Virginia law against the state defendants in this Court, the Plaintiff respectfully requests that those state law claims be dismissed without prejudice so that they may be refiled in a court of competent jurisdiction. The Plaintiff respectfully requests, to avoid intrusion into matters of state law reserved to the Commonwealth and consistent with Eleventh Amendment principles, that any Virginia state law claims barred in this Court be dismissed without prejudice so that they may be refiled in a court of competent jurisdiction. See *Pennhurst State School &*

*Hospital v. Halderman*, 465 U.S. 89, 106 (1984) (discussing Eleventh Amendment limitations on federal court enforcement of state law).

Although the Plaintiff has asserted claims under Virginia law that provide for prospective declaratory and injunctive relief, that same prospective declaratory and injunctive relief is available under 42 U.S.C. § 1983 for ongoing violations of federal constitutional rights, and such relief may be awarded against state officials acting in their official capacities notwithstanding Eleventh Amendment immunity under *Ex parte Young*. This federal authority for injunctive relief exists independent of, and in addition to, any relief available under state law.

At this stage, the Court is not asked to resolve the ultimate scope of sovereign immunity, qualified immunity, or the merits of the constitutional claims. When well-pleaded allegations are accepted as true and reasonable inferences are drawn in the Plaintiff's favor, the Amended Complaint describes institutional conduct that cannot be dismissed at the pleading stage simply by invoking sovereign immunity. The present inquiry is limited to whether the Amended Complaint plausibly states violations of federal law and ongoing enforcement sufficient to permit prospective relief against officials acting under color of state authority. Instead, the question before the Court is whether the Amended Complaint plausibly claims that the challenged actions were undertaken and enforced through coordinated conduct by officials acting under color of state authority within the Institute's governing structure, and whether the Complaint plausibly demonstrates ongoing violations of federal law sufficient to permit the appropriate relief under 42 U.S.C. § 1983.

## II. The Amended Complaint Provides Fair Notice and Is Not a Shotgun Pleading

**First**, the threshold question under Rule 8 is whether the pleading provides fair notice of the claims asserted and the grounds upon which they rest. The Defendants contend that the Amended Complaint should be dismissed because it is "prolix" and constitutes an impermissible "shotgun pleading." That characterization is incorrect. The structure of the Amended Complaint separates the claims into distinct counts, identifies the actors involved, and ties the factual allegations to the causes of action asserted. The Amended Complaint sets forth a chronological factual narrative, identifies the individuals and entities involved in the conduct, and specifies the legal claims arising from that conduct. Taken together, the pleading provides fair notice of the claims and the grounds upon which they rest, as required by Rule 8.

The suggestion that this structure amounts to a "shotgun" pleading reads more like a *Gatsby* of its own, an elaborate presentation focused on literary critique rather than the substance of the allegations themselves.

Using the Defendants' category structure, the four different categories of "shotgun" pleadings are as follows: Category (1) involves complaints in which each count adopts all preceding allegations, making it difficult to determine which facts support which claim. Category (2) refers to pleadings filled with conclusory, vague, or immaterial allegations not clearly connected to a particular cause of action. Category (3) consists of complaints that fail to separate different causes of action into distinct counts. Category (4) involves pleadings that assert multiple claims against multiple defendants without specifying which defendants are responsible for which acts. The Defendants' assertion that the Amended Complaint falls within these

categories is incorrect. The structure of the pleading demonstrates that none of the asserted shotgun categories are present.

Category (1): The Complaint separates the Plaintiff's claims into twelve distinct counts that tie those claims to the factual allegations set forth in the preceding sections of the pleading. Each count references specific paragraph citations identifying the factual allegations relevant to each claim, allowing the relationship between the facts and the causes of action to be readily discerned. While each count incorporates preceding paragraphs to maintain the factual nucleus, it also specifically identifies the particular acts and actors relevant to that specific cause of action within the count itself. The incorporation of prior paragraphs reflects that the claims arise from the same nucleus of operative facts and avoids repeating hundreds of paragraphs in each count. Moreover, the Defendants' ability to move for dismissal on the merits of each individual count further demonstrates that this incorporation did not obscure the nature of the claims.

Category (2): The factual narrative describes a single sequence of disclosures, institutional responses, and disciplinary actions involving multiple actors within the same set of events, rather than vague or immaterial allegations disconnected from the claims asserted. Defendants argue that the Amended Complaint constitutes a "shotgun pleading" because it is lengthy and detailed. Length alone, however, does not render a pleading deficient under Rule 8. The level of detail in the Amended Complaint reflects the number of documented events, communications, and institutional actions at issue, many of which are based on documentary materials, including books, papers, documents, records, recordings, or other materials referenced throughout the pleading. The inclusion of this detail is not intended to obscure the claims, but to provide Defendants with clear notice of the specific events, actors, and actions forming the basis

of each claim, including the identification of the individuals involved in specific communications, the dates of those communications, and the actions taken in response. Where a complaint is based on documented communications and a defined sequence of events, the inclusion of specific factual detail serves to clarify who was involved, what occurred, when the events took place, the substance of the communications between identified individuals, and the context in which the surrounding events occurred, and therefore supports, rather than undermines, compliance with Rule 8. It is consistent with prior rulings to deny the Defendants' Rule 8 challenges where a complaint identifies the relevant actors and describes the conduct at issue. Such detail supports, rather than undermines, compliance with Rule 8.

Category (3): The Amended Complaint does not collapse distinct causes of action into undifferentiated allegations. Instead, it separates the Plaintiff's claims into distinct counts, each identifying the legal basis for the claim and the conduct described to support it. The structure of the pleading therefore permits both the Court and Defendants to determine which factual allegations correspond to which claims.

Category (4): The Complaint identifies the individual defendants involved in the conduct and describes the actions attributed to each within a sequence of events arising from the same nucleus of operative facts. This level of factual identification and detail demonstrates that the pleading is not the type of undifferentiated pleading that the Defendants describe. The Third Circuit recognized that "[t]he level of factual detail will vary with the complexity of the claim asserted" and that "there can be no single 'proper length' for stating a particular claim." *Garrett v. Wexford Health*, 938 F.3d 69, 94 (3d Cir. 2019). The Third Circuit also acknowledged that dismissal under Rule 8 is a matter of discretion, particularly "where a plaintiff declines an

express invitation to better tailor her pleading." *Id.* at 94. If the Court determines that any portion of the Amended Complaint requires clarification, the appropriate course is amendment under Federal Rule of Civil Procedure 15(a)(2), and the Plaintiff will amend the complaint as permitted. Allowing the Plaintiff to amend will not prejudice the Defendants at the pleading stage, and leave to amend should be denied only where amendment would be prejudicial to the opposing party. See *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006).

Where a complaint describes joint conduct and a series of related events involving multiple actors, the Defendants VMI Alumni Agencies (collectively, the VMI Foundation, the VMI Alumni Association, the Keydet Club, and the VMI Alumni Agencies) are not peripheral actors, as actions taken by VMI officials in their official capacities were taken for the benefit of, or on behalf of, the Alumni Agencies following the Plaintiff's reporting of a bribery scheme between VMI officials and the Alumni Agencies.

Under Rule 8 and the pleading standards applied in the Fourth Circuit, the relevant question is whether a complaint provides fair notice of the claims asserted and the grounds upon which those claims rest. A pleading satisfies Rule 8 where it identifies the relevant actors, describes the conduct at issue, and provides sufficient factual detail to allow defendants to understand the allegations and prepare a response. The Defendants' ability to file a motion to dismiss for failure to state a claim demonstrates that they understood the allegations and were able to prepare a response, which satisfies Rule 8's fair notice requirement. The Amended Complaint sets forth a chronological sequence of events, identifies the individuals involved in the conduct, describes the communications and actions at issue, and separates the claims into distinct counts. The Defendants' motion itself demonstrates that the allegations are readily

understood, as it advances detailed arguments addressing specific counts and factual allegations throughout the pleading. A complaint that allows defendants to identify the claims asserted and argue why those claims fail cannot simultaneously be dismissed as incomprehensible under Rule 8.

**Second**, the Plaintiff is proceeding in this matter pro se and respectfully acknowledges that he does not have formal legal training. The Supreme Court held "with assurance that under the allegations of the pro se complaint, which we hold to less stringent standards than formal pleadings drafted by lawyers," the case should be evaluated under a liberal construction standard. *Haines v. Kerner*, 404 U.S. 519 (1972). The Plaintiff has attempted in good faith to set forth the facts, timeline, and legal claims as clearly as possible so that the Court and Defendants VMI and the VMI Alumni Agencies may understand the nature of the claims and the grounds upon which they rest. The Plaintiff is not an attorney and, prior to his termination, the Plaintiff was employed as a Director of Athletic Multimedia. The Amended Complaint reflects the Plaintiff's attempt to document events, communications, and institutional actions in a structured and chronological manner based on documentary material maintained during the course of his reporting activities, as well as publicly available documents and records.

At the pleading stage, dismissal is not appropriate where "[a] document filed pro se is 'to be liberally construed,'" *Estelle*, 429 U.S., at 106, and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976), quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

**III. Operational Entwinement Between VMI and the VMI Alumni Agencies Establishes State Action and Enterprise Participation**

The Defendants argue that the Alumni Agencies appear only a handful of times in the Amended Complaint and are therefore peripheral to the sequence of events giving rise to this action. That characterization ignores the operational role the Agencies played in the sequence of events giving rise to the Plaintiff's disclosures and the retaliation that followed. Their focus on the frequency of textual references is a mechanical approach that ignores the substance of the pleading. The relevant inquiry is not a word count or frequency in naming, but whether the conduct described reflects a material connection to the events.

They argue that the involvement of the VMI Alumni Agencies umbrella has already been litigated in a prior entwinement case and therefore cannot support liability here. See *Respess v. VMIAA*, No. 6:24-cv-00028, 2025 U.S. Dist. LEXIS 60658. The characterization misstates the theory and scope of this action.

The earlier litigation referenced by the Defendants concerned claims of alumni asserting that the affiliated agencies had been effectively captured by VMI, and that alumni governance rights had been displaced as a direct result. The case focused on institutional governance questions in which VMI alumni and VMIAA members pleaded in this court that the Agencies violated their due-process rights under the Fourteenth Amendment along with their free speech, free assembly, and voting rights under the First Amendment.

The present case advances a different theory grounded in operational conduct rather than governance structure. This action arises from operational integration between the Virginia Military Institute and the VMIAA umbrella organization. Unlike *Respess*, the AC does not assert

that one entity formally controls the other, but instead describes entities that function through coordinated operational mechanisms involving advancement strategy, donor-tier pricing menu structures, and institutional resource deployment. The Plaintiff's knowledge arises from his role as the Director of Athletic Multimedia within the Athletics Department of VMI. In his position, the Plaintiff was exposed to communications showing operational interactions between the Institute and the affiliated agencies. Unlike the alumni plaintiffs in the earlier litigation, the Plaintiff here was positioned within the operational workflow that implemented these directives.

As contained in ¶18 of the Amended Complaint, the Plaintiff met with a representative of the VMI Alumni Agencies during the interview process. That representative was the Senior Director of Digital Strategy of the VMI Alumni Agencies. During the interview, the Senior Director of Digital Strategy asked the Plaintiff questions regarding the position and participated in the interview alongside Institute personnel. His participation in the interview process demonstrates the operational integration of the VMI Alumni Agencies with VMI. Any observations or input from those present during the interview process would have been conveyed to the Associate Athletic Director for External Operations, who subsequently notified the Plaintiff that he had been selected for the position and later confirmed the hiring in writing (AC ¶¶19–20).

The AC contains communications in which the Senior Director of Digital Strategy of the VMI Alumni Agencies issued directives to athletics staff through the Associate Athletic Director for External Operations to distribute and produce media content for advancement and donor activities (AC ¶¶124–129, 132–134, 135–141, 184, 226–227, 228–229, 279–281). This conduct

reflects operational instruction and coordinated execution rather than abstract governance relationships.

Coordination between the Agencies and athletics staff extended to the placement and timing of advertising during athletic broadcasts as reflected in the email communications in the Amended Complaint. The Senior Director of Digital Strategy initially contacted Associate Athletic Director for External Operations to determine whether advertisements for the Keydet Club and VMI Foundation were appearing during ESPN broadcasts and on the in-stadium videoboard (AC ¶124). He further indicated that reports had been received that the advertisements were not appearing during the home football broadcast and advised that updated Keydet Club advertising materials would be provided (AC ¶125). The Associate Athletic Director for External Operations then expanded the email communications to include athletics operations personnel, including the Plaintiff, the Assistant Athletic Director for Corporate Partnerships, and the Director of Ticketing and Promotions (AC ¶128). In response to the Senior Director of Digital Strategy, Associate Athletic Director for External Operations confirmed that the external operations team would incorporate the advertisements into game day programming (AC ¶129). The Senior Director of Digital Strategy later followed up through the same email communications by providing updated advertising materials prepared for both ESPN broadcasts and the in-stadium videoboard (AC ¶¶132–133). The Associate Athletic Director for External Operations subsequently confirmed that the advertisements would be incorporated into both broadcast and in-venue displays (AC ¶134).

The scheduling of promotional content is illustrated through the Keydet Club's "Three-Legged Stool" fundraising program. The fundraising event required multimedia content

to be filmed and produced by athletics staff (AC ¶¶135–137). Associate Athletic Director for External Operations directed the Plaintiff to film scholarship nominee announcements using departmental equipment (AC ¶¶138–139) and later advised him that the Senior Director of Digital Strategy would provide the cadet-athlete interviews for inclusion in the final video product (AC ¶140). The video was intended to be shown at the fundraising event itself (AC ¶141). The Senior Director of Digital Strategy subsequently provided the interview media files through a Dropbox link after completing the nominee interviews (AC ¶¶228–229).

The distinction between *Respess* and this case is critical. The prior litigation examined whether alumni voting rights had been displaced through structural control. The present case concerns whether the operational coordination between the Institute and the VMI Alumni Agencies demonstrates entwinement through the donor-tier pricing menu structure reported by the Plaintiff that ultimately led to the retaliation described in the AC. Here, the facts arise from operational interactions occurring within the Athletics Department under the direction of the Associate Athletic Director for External Operations.

The Plaintiff documented the Keydet Club donor-tier pricing menu and the access privileges associated with those levels in Appendix A of the report he submitted on November 18, 2024 (AC ¶585). The materials show that the Keydet Club organizes donor participation into a tiered contribution structure beginning at $2,000 and extending to contribution levels exceeding forty thousand dollars. As the contribution level increases, the access privileges provided to the donor also increase. At the $10,000 contribution level, donors enter the Athletic Director's Circle. The donor-tier structure provides donors with exclusive access to communications from the Athletic Director and invitations to participate in special

communications and direct access to meet privately. These communications and invitations are offered directly between the donor and the Institute's Athletic Director through the Keydet Club, which Defendants describe as a private organization (AC ¶586). Under the Keydet Club donor-tier structure, the benefit titled "Superintendent's Special Guest" begins at the $20,000 contribution level (AC ¶586). The materials state that the donor is invited to attend a home football game as a guest of the Superintendent and that the donor is seated in the Superintendent's box for the game. Participation at the highest donor contribution level includes the benefit titled the "Superintendent's Circle" (AC ¶586). With a donation starting at $40,000, the Keydet Club offers donors at this level the opportunity to participate in exclusive quarterly calls conducted by the Superintendent in his official capacity.

These materials illustrate the mechanism through which the Keydet Club facilitates structured access between private donors and senior Institute officials acting in their official capacities (AC ¶¶585–586). The Plaintiff disclosed those structures to the Office of the Inspector General during his meeting with Deputy Inspector General Anna Honig following his referral by Deputy Superintendent for Finance and Support, Brigadier General Clark (AC ¶¶564–565). The retaliation in this case flows directly from those disclosures (AC ¶¶564–565, 587–589). Absent the donor-tier structures established through the Keydet Club and the VMI Alumni Agencies, the Plaintiff would have had no reason to raise concerns regarding the integration. Absent those disclosures, the sequence of disciplinary escalation (AC ¶¶941–944), suspension (AC ¶¶1021–1024), termination (AC ¶1034), and the unwanted physical contact (AC ¶968) described in the Complaint would not have followed. The VMI Alumni Agencies therefore are not

peripheral actors but are part of the factual chain that produced the protected disclosure and the resulting retaliation.

The Agencies are not named as defendants merely for existing or for their financial support of the Institute. They are named due to the fact that the retaliation in this case arose from the Plaintiff's reporting of the donor-tier pricing menu system operated through the VMI Alumni Agencies, and the retaliatory actions occurred after the Plaintiff's disclosures were made to institutional and oversight authorities. Absent the VMI Alumni Agencies or their donor-tier pricing menu structure they operated, the events giving rise to the Plaintiff's disclosures and the adverse actions that followed would not have occurred.

The Amended Complaint further documents that the Office of the Inspector General opened an inquiry that referenced policies associated with the Keydet Club and related advancement structures (AC ¶¶859–860). The inquiry stated that the Office of the Inspector General would review certain matters concerning the misuse of public resources related to the actions of Institute officials and the policies connected to the Keydet Club (AC ¶860). In the notice, the Inspector General further explained that conduct attributed to the Keydet Club itself were screened out because the Institute lacked jurisdiction over external organizations. The notice further explained that the policies and actions of Institute officials associated with the Keydet Club however remained within the scope of the inquiry (AC ¶862).

The agencies themselves publicly present their operations as coordinated components of a unified advancement framework supporting the Institute. Their own materials explain that the Alumni Association, the Keydet Club, and the VMI Foundation were intentionally reorganized into a combined Agencies structure led by a single chief executive in order to improve support

for VMI (AC ¶1045). Official descriptions further explain that each affiliated organization operates through defined functional roles within that structure. The functional roles of each affiliated organization as they declare is fundraising, stewardship, advancement services, alumni engagement, and financial support for Institute programs (AC ¶1046). Governance of the Agencies is also described as consolidated through a board composed of leadership from the Foundation Board of Trustees, the Alumni Association Board of Directors, the Keydet Club Board of Governors, and a representative from the VMI Board of Visitors (AC ¶1046). The representations made by the VMI Alumni Agencies support the conclusions that the entities function together within a coordinated structure that integrates their operations with those of the Institute itself.

The same entwinement framework described in *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001), and *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), illustrates why the facts described here are materially different from the governance dispute addressed in Respess. The question at the pleading stage is not whether the Plaintiff has proven state action, but whether the operational coordination and integration plausibly demonstrate that the Agencies' conduct may be "fairly attributable to the State." Under *Brentwood*, entwinement exists where a private entity's operations are carried out through the participation of public officials or institutional personnel such that the organization functions in practical terms through the State's actors. The operational interactions described above illustrate the type of operational interaction between institutional officials and affiliated entities that *Brentwood* recognized as evidence of entwinement.

The relationship described here implicates the interdependence principles recognized in *Burton v. Wilmington Parking Authority*, where a private actor's conduct may constitute state action when the State and the private entity operate in a relationship of "mutual benefit" or coordinated activity. 365 U.S. 715, 724–25 (1961).

The AC shows that the VMI Alumni Agencies maintained their operational headquarters within Moody Hall on VMI property (¶1047), and that as construction of the new alumni and advancement center on VMI property proceeded, the Lexington City Council in January 2025 unanimously approved a conditional use permit authorizing the Agencies to operate under the zoning classification "Educational Facility, College/University," a designation reserved for institutions authorized by the Commonwealth to award degrees and the facilities associated with that use (¶¶1050–1053).

Under *Burton*, the relevant inquiry is whether the relationship between the public institution and the private entity reflects a structure of practical interdependence in which the entities operate for their "mutual benefit" such that the challenged conduct may "fairly be attributed to the State." 365 U.S. at 724–25. The state-action inquiry does not turn on how often an entity is named in a complaint, but whether the conduct shows joint participation, interdependence, or coordinated activity with state officials such that the private entity's conduct may be fairly attributable to the State.

The AC documents that the VMI Alumni Agencies were intentionally organized as a unified advancement structure designed to support the Institute through coordinated fundraising, stewardship, communications, private access, and advancement services (¶1045–1046). Official materials further describe the affiliated organizations as operating through defined functional

roles within this structure. The Keydet Club provides financial support for NCAA Division I cadet-athletes and athletics operations; the VMI Foundation manages fundraising and institutional giving programs and oversees endowment management through VMI Investment Holdings, LLC; and the VMI Alumni Association organizes alumni engagement and institutional support activities tied to the Institute's educational mission (¶1046).

Oversight of these functions occurs through a consolidated Agencies framework governed by representatives from the Foundation Board of Trustees, the Alumni Association Board of Directors, the Keydet Club Board of Governors, and a representative from the VMI Board of Visitors (¶1046). These facts collectively demonstrate a coordinated advancement system designed to generate financial support, exclusive and private access, and institutional promotion for the Institute itself.

When considered alongside the Agencies' physical presence on VMI property and the municipal recognition of their operations within the institutional framework of a degree-granting educational facility, the AC plausibly describes the type of mutually reinforcing relationship between a public institution and affiliated entities that *Burton* recognized as capable of constituting state action. 365 U.S. at 724–25.

The Plaintiff identifies that the corporate form of the Virginia Military Institute and its Board of Visitors (under the corporate name of VMI) as the operational shield through its sovereign immunity for the coordinated network, the VMI Alumni Agencies Board Inc., the Keydet Club Inc., the VMI Foundation, VMI Investment Holdings LLC, and the VMI Alumni Association as participants in an association-in-fact enterprise through the officers, agents, and employees of each participating organization. Officials of the Institute acting in their official

capacities are within this group alongside representatives of the VMI Alumni Agencies and the affiliated organizations. Through these entities and actors, the enterprise operates a coordinated governance mechanism for financial advancement using multiple donor-tier reward systems and interstate communications.

The financial scale of this "symbiotic and interdependent" system further underscores the operational integration evident in the coordinated activities described above. See *Burton* 365 U.S. at 725. Public filings reflect that between 2021 and 2023 the affiliated agencies collectively reported providing $83,803,064 to the Institute as disclosed in Schedule I of their IRS Form 990 filings (AC 1205–1208). These funds were reported for institutional purposes as listed:

- Professional chairs
- Academic support
- Leadership
- Faculty awards
- Instruction
- Student services
- Cadet awards
- Public support
- Library
- Trust distribution
- Athletic scholarships
- Other

Of the $83,803,064 total, $2,422,447 is listed and designated for leadership (AC 1212). These figures reflect financial support directed toward institutional leadership functions that supplement the state-funded salaries of senior Institute officials. The magnitude of these financial transfers illustrates the central role the affiliated agencies play in the Institute's funding structure. The agencies' fundraising efforts rely upon donor contributions tied to exclusive and private access and the participation of senior officials.

Taken together, these facts present a structural question regarding the relationship between the Institute and the affiliated agencies that the Defendants cannot resolve simply by asserting that the agencies are unrelated to the events described. The structure present in the Amended Complaint reflects one of two possibilities:

A) The Institute permitted the agencies to utilize institutional resources, facilities, and the appearance of senior officials in their official capacities because the agencies provide a substantial portion of the Institute's financial support. If that is the case, then the arrangement reflects a quid pro quo exchange under 18 U.S.C. § 1951 (Hobbs Act), where the officials' acceptance of financial support in return for official access constitutes extortion under color of official right. Under the Hobbs Act, extortion under color of official right does not require proof of an explicit demand by a public official. The Supreme Court explained in *Evans v. United States*, 504 U.S. 255 (1992), that "[a]n affirmative act of inducement by a public official, such as a demand, is not an element of the offense of extortion 'under color of official right.'" The principle that economic pressure may operate through circumstances rather than explicit demands is further reflected in *United States v. Avenatti*, 81 F.4th 171 (2d Cir. 2023), which,

relying on *United States v. Jackson* (*Jackson I*), 180 F.3d 55, 70 (2d Cir. 1999), recognized that "a threat to cause economic loss is not inherently wrongful; rather, it becomes wrongful only when it is used to obtain property to which the threatener is not entitled."

Or; B) Alternatively, the Institute and the affiliated agencies participate together in a coordinated advancement structure, in which case an association-in-fact enterprise may be inferred from coordinated conduct undertaken for a shared purpose, even where the participants retain separate organizational identities. See *United States v. Bergrin*, 650 F.3d 257, 268–70 (3d Cir. 2011) (reaffirming that a racketeering enterprise requires a "common purpose" and can be formed by an association of separate legal entities and individuals).

Under either explanation, the VMI Alumni Agencies cannot be dismissed as unrelated third parties. If financial leverage compels institutional participation, then the agencies exert meaningful influence over the institutional conduct at issue. If the relationship is voluntary, then the Institute and the agencies jointly operate a coordinated advancement strategy that gave rise to the Plaintiff's disclosures. In either case, the financial relationship between the Institute and the Agencies creates a structural question regarding the source of institutional participation in the donor-tier pricing menu system.

At the pleading stage, the Complaint plausibly demonstrates that the agencies and the Institute function through a coordinated structure involving advancement operations, donor-tier pricing menu mechanisms, and institutional participation by senior officials. The facts presented in this section distinguish this case from prior litigation concerning alumni governance disputes

and provide a factual basis for including the affiliated agencies within the enterprise and retaliation theories advanced in this action.

## IV. The Amended Complaint States Claims Upon Which Relief Can Be Granted

### Legal Standard

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In evaluating these allegations, all reasonable inferences must be drawn in favor of the plaintiff. See *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

### Argument

### The Amended Complaint Plausibly States Constitutional and Statutory Violations

The Plaintiff was a public employee working for a state institution whose employment was governed by a written employment agreement (AC ¶¶ 23–24), as well as the Institute's employee handbook (AC ¶¶ 25–26) and employment policies (AC ¶¶ 26–27), which established the terms (AC ¶¶ 23–24), conditions, and procedures governing his employment. Defendant VMI, through its officers, agents, and policymakers acting in their official capacities, acted under color of state law for purposes of 42 U.S.C. § 1983, as the actions taken against the Plaintiff were carried out by state officials exercising their official authority on the behalf of and in furtherance of the private financial interests of the VMI Alumni Agencies.

Under *Garcetti v. Ceballos* 547 U.S. 410 (2006), the threshold inquiry is whether the employee spoke as a private citizen or within the meaning of his role. The Plaintiff's report on the bribery scheme and misuse of funds between VMI and the VMI Alumni Agencies were not part of his "official duties" as a Multimedia Director, but were disclosures made as a private citizen regarding institutional corruption. Furthermore, Defendant VMI and its officers acted under color of state law for purposes of 42 U.S.C. § 1983, exercising authority on behalf of and in furtherance of the private financial interests of the VMI Alumni Agencies.

On March 4, 2024, a representative of the VMI Alumni Agencies participated in the Plaintiff's interview process alongside Institute personnel for his role of Director of Athletic Multimedia at the Virginia Military Institute (AC ¶18). Representatives of the Alumni Agencies also communicated directives regarding advertising placement, media production, and promotional content that were transmitted through Institute officials and executed by athletics staff using institutional resources and equipment (AC ¶¶124–129, 132–134, 135–141, 184, 226–227, 228–229, 279–281). These activities included coordinating advertising placement during ESPN broadcasts and in-venue displays and directing the production of media content for advancement and donor fundraising events. In order to conduct these activities, coordination between Alumni Agencies personnel and Institute officials was required, with the work being carried out through Institute personnel, institutional equipment, and official Institute media platforms. As such, the Alumni Agencies were willful participants in joint activity with state officials and are therefore subject to liability under 42 U.S.C. § 1983 under the joint action / nexus test.

**A. Plaintiff's Speech Addressed Matters of Public Concern**

Under the *Pickering-Connick* balancing test, reporting a $40,000 bribery scheme involving public resources carries high societal importance that outweighs any institutional interest in "workplace efficiency." See *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983) (clarifying that the threshold inquiry is whether the speech touches on a "matter of public concern"). The Plaintiff engaged in protected speech on matters of public concern by reporting potential violations of federal and state law, including a bribery scheme and the misuse of public resources involving VMI institutional leadership and the VMI Alumni Agencies, to the Deputy Superintendent for Finance and Support and the Senior Finance Director (AC ¶¶ 517–551), and to the Inspector General (AC ¶¶ 552–581, 582–586, 860).

**B. Defendants Took Adverse Actions Against Plaintiff**

Within days of the Plaintiff's initial disclosure of the misuse of public resources on October 31, 2024, to the Director of Human Resources (AC ¶¶ 295–301), the Associate Athletic Director removed the Plaintiff from broadcast operations, reassigned him from his office, and restricted his access to equipment necessary to complete his assigned duties (AC ¶¶ 313–321).

As a result of the Plaintiff's reporting on November 18, 2024, Defendants VMI took adverse employment and legal actions against Plaintiff, including removal of job duties, reassignment from his office and equipment, issuance of disciplinary actions and performance documentation, placement on a Performance Improvement Plan with threat of termination,

administrative suspension, exclusion from Institute property through a trespass warning, termination of employment, and criminal proceedings initiated by his direct supervisor.

Beginning on November 22, 2024, four days after the Plaintiff reported a bribery scheme and misuse of institutional resources between VMI and the VMI Alumni Agencies, the Associate Athletic Director issued seven written disciplinary reprimands and included the Director of Human Resources in each submission and receipt of the reprimands, with the exception of January 9, 2025 (AC ¶¶ 666–670). Additional disciplinary reprimands followed on December 5, December 11, December 12, December 13, and January 9, resulting in a total of twenty-three disciplinary reprimands issued between November 22, 2024 and January 9, 2025 (AC ¶¶ 832, 936, 938, 949, 973).

Following the initial disciplinary reprimands, the Plaintiff was placed on a Performance Improvement Plan through Institute leadership and Human Resources. The first Performance Improvement Plan session took place on December 4, 2024 with the Athletics Director, Associate Athletic Director, Executive Assistant, and Director of Compliance present (AC ¶¶ 716–831). During the second Performance Improvement Plan session on December 12, 2024, the Plaintiff was issued a Notice of Improvement Needed/Substandard Performance and informed that he had forty-five days to demonstrate improvement or face termination (AC ¶¶ 939–944).

After the Plaintiff filed a criminal complaint on January 30, 2025 for the unwanted physical contact that occurred during a disciplinary session on January 9, 2025 (AC 968), within twenty-five hours of his filing, the Associate Athletic Director filed a separate claim for the same incident (AC ¶¶ 1016–1017), the Plaintiff was placed on administrative suspension (AC

1021, 1026), issued a trespass warning excluding him from Institute property (AC ¶¶ 1029–1030), and subjected to criminal proceedings initiated by his direct supervisor (AC ¶¶ 1016–1017, 1037–1038).

The Defendants' actions, to include the disciplinary reprimands, negative performance evaluations, criminal accusations, trespass exclusion from Institute property, and termination, damaged the Plaintiff's reputation, employment prospects, and standing in the community in connection with the termination of his employment and exclusion from Institute property. These actions imposed a stigma that foreclosed future employment opportunities and altered the Plaintiff's legal status, thereby implicating protected liberty interests. See *Bd. of Regents v. Roth*, 408 U.S. 564 (1972) (the State may not terminate an employee in a manner that "imposes on him a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities").

**C. The Adverse Actions Were Causally Connected to Plaintiff's Protected Reporting**

The Plaintiff's speech was a substantial and motivating factor in Defendants' decision to take adverse action, as demonstrated by the close temporal proximity between his disclosures and the escalation of disciplinary actions. As a result of his reporting, the retaliatory actions taken against the Plaintiff were not limited to disciplinary measures, but included multiple forms of adverse action affecting the Plaintiff's employment, legal status, medical conditions, and compensation.

On October 31, 2024, after days of increasing pressure to complete a video project for the VMI Alumni Agencies' Keydet Club, the Plaintiff reminded the Associate Athletic Director that

ongoing equipment failures and necessary system repairs had delayed completion of the project and required significant time to restore broadcast functionality (AC ¶¶ 289–291). The Plaintiff reported to the Athletics Director the escalating tensions with the Associate Athletic Director and expressed concern that the work environment had become unmanageable and that he believed it was necessary to take leave to avoid retaliation (AC ¶¶ 292–294).

That same afternoon, the Plaintiff received a phone call from the Director of Human Resources informing him that the Associate Athletic Director and the Athletics Director had filed a complaint against him and that she was seeking his statement regarding the matter (AC 295). During the call, the Plaintiff reported that the department had experienced multiple broadcast cancellations due to faulty equipment (AC 298), along with the reduction of necessary equipment that would have prevented these incidents (AC 296). The Plaintiff explained he was given a directive by the Associate Athletic Director to produce a fundraising video for the VMI Alumni Agencies through the Keydet Club during this period (AC 297). He explained that internal resources should not be diverted for private benefit and disclosed that these actions were considered the misuse of public resources exceeding $5,000 (AC 297), and that he feared retaliation for his reporting (AC 299). The Director of Human Resources then requested that the Plaintiff submit his statement in writing (AC 300).

Between October 31 and November 4, 2024, following his call with the Director of Human Resources, the Plaintiff drafted the initial version of "Addressing Managerial Challenges and Operational Analysis" in response to the request for a written statement (AC 302), and on the morning of November 4, 2024, the Plaintiff submitted the first draft of "Addressing Managerial Challenges and Operational Analysis" to the Director of Human Resources (AC

308). Following the submission of his statement, later that morning, the Plaintiff sought medical treatment due to continued sleep deprivation resulting from sustaining broadcast operations, video editing responsibilities, and completion of the written statement requested by Human Resources (AC 309).

As a result of the Plaintiff's report, the Plaintiff received a calendar invitation to attend a follow-up meeting with the Director of Human Resources scheduled for November 5, 2024 (AC 310). The Plaintiff informed Human Resources that he had been discharged from the hospital and submitted medical documentation excusing him from work following his hospitalization (AC 311), and as a result, Human Resources then rescheduled the meeting with the Director of Human Resources for November 13, 2024 (AC 312).

Following the Plaintiff's submission of his statement, the Associate Athletic Director emailed the Plaintiff and acknowledged that the Plaintiff could not attend the November 5 meeting with the Athletics Director, the Associate Athletic Director, and the Director of Human Resources that day. Continuing his email, the Associate Athletic Director then directed the Plaintiff to refrain from participating in broadcast operations, informed the Plaintiff that his office would be used as the broadcast production space, and directed the Plaintiff to report to a different workspace and work on assigned video projects until they all met for the rescheduled Human Resources meeting on November 13, 2024 (AC ¶¶ 313–314).

As scheduled, the mediation was held on November 13, 2024 between the Plaintiff, the Director of Human Resources, the Athletics Director, and the Associate Athletic Director (AC ¶¶ 295–301; ¶¶ 322–499). During this meeting, the Plaintiff described the operational conditions under which he was required to perform his duties, including sustained workload demands,

ongoing technical failures, equipment and procurement issues, and continuing supervisory conflict (AC ¶¶ 378–381; 89–93). In the course of the meeting, the Director of Human Resources questioned the Plaintiff regarding the basis for his belief that he was experiencing retaliation (AC 332) and asked whether he had raised his concerns directly with the Athletics Director (AC 336) and why he did not feel comfortable addressing the issues directly with his supervisor (AC 340). The Plaintiff explained that prior attempts to address operational and workload concerns with his supervisor had been rejected or disregarded (AC 341), and he described a prior incident in which a discussion with the Associate Athletic Director escalated into a physical confrontation following a filming event (AC ¶¶ 342–349). When questioned as to why he responded this way, the Associate Athletic Director responded by focusing on delays in content production and attributed the delays to the Plaintiff rather than to the operational and equipment issues described (AC ¶¶ 351–353).

Discussed in the mediation session was the Plaintiff's request for leave associated with a VA appointment and the events that followed, including the Plaintiff's report that increasing pressure to complete the Keydet Club fundraising video contributed to the escalation of tensions (AC ¶¶ 375–376). When the Plaintiff explained that he had sought emergency leave due to acute stress and physical symptoms (AC 468), the Director of Human Resources stated that leave required prior approval from the Plaintiff's supervisor (AC 431) and that failure to obtain advance approval reflected negatively on the department (AC ¶¶ 467–469).

The Director of Human Resources acknowledged during the meeting that tension existed between the Plaintiff and the Associate Athletic Director (AC 370), and stated that the issues between the Plaintiff and the Associate Athletic Director remained unresolved and that tension

remained between the parties (AC 491). Before concluding the session, the Director of Human Resources further stated that any documentation created would be for managerial purposes (AC 492) and instructed that the Plaintiff was required to direct concerns to the Associate Athletic Director (AC 493), changed procedures regarding the Plaintiff's Veterans Affairs absences by requiring that future leave requests (including VA appointments) be submitted in writing for documentation and tracking (AC 498), and confirmed that the Plaintiff would return to the supervision of the Associate Athletic Director while the matters discussed remained unresolved (AC 499).

On the morning of November 18, 2024, the Plaintiff reported a bribery scheme and misuse of public resources to the Deputy Superintendent for Finance and Support and the Senior Finance Director (AC ¶¶ 517–551), and also reported the matter to the Deputy Inspector General (AC ¶¶ 552–581, 582–586). On November 19, 2024, the Plaintiff reported the same concerns to the Inspector General (AC 587–589). The Inspector General informed the Plaintiff that if an inquiry were to be opened into his allegations, she would have to formally notify the Athletics Director.

Three days following his reporting on November 18, 2024, the Athletics Director contacted the Plaintiff to meet on the morning of November 21, 2024, to check in following their previous meeting on November 13. In this meeting, the Plaintiff described changes in his work environment following his report, including being isolated from coworkers (AC ¶¶ 618–619), removed from broadcast responsibilities (AC ¶¶ 608–610), and subjected to conflicting directives that made completion of his assigned video editing tasks impossible due to denial of access to necessary equipment (AC ¶¶ 600; 313).

The Athletics Director was notified by the Plaintiff that he had disclosed his disabled veteran status and ongoing medical appointments at the outset of his employment and had attended those appointments without issue prior to the events that began at the end of October (AC 603; ¶¶ 27–32; ¶¶ 221–223, 276–277, 282, 294). In this same meeting, when the Athletics Director asked about the leave form for the upcoming Veterans Affairs appointment, the Plaintiff explained that no such form was in circulation or existed in practice (AC ¶¶ 633–635). The Athletics Director then asked whether he could communicate with the Associate Athletic Director as an intermediary regarding his upcoming VA appointment (AC 638). To ensure compliance with the Director of Human Resources newly implemented policy, the Athletics director instructed the Plaintiff to contact her to request the leave for which she directed the Plaintiff to submit during the mediation session (AC 639; 641; 498).

As the Plaintiff explained the door dispute early on in the meeting, the Athletics Director stated that both he and the Associate Athletic Director had recently learned that there was no memorandum or policy requiring staff to keep their office doors open and that such a directive could not be selectively applied. In the same statement, the Athletics Director informed the Plaintiff that he had communicated this information to the Associate Athletic Director, and that his primary concern was ensuring the Plaintiff's tasks were accomplished (AC 643). Immediately following the remarks about the door, the Athletics Director stated that he did not want to place the Plaintiff in an environment where he would feel isolated or unwelcome, and then asked the Plaintiff whether VMI was the right fit for him (AC 646).

The Plaintiff rebuked the Athletics Director's question and stated that he believed he was being purposely pushed out by the Associate Athletic Director through actions that made the

work environment untenable. He then informed the Athletics Director that the question was, in substance, a suggestion that the Plaintiff should consider resigning because conditions were not improving and the circumstances within his work environment had become increasingly adverse (AC ¶¶ 647–648).

The following afternoon, and three days after the Plaintiff met with the Inspector General, on November 22, 2024, his direct supervisor issued seven disciplinary reprimands and initiated formal performance documentation through Human Resources (AC ¶¶ 666–670). In his communications with the Director of Human Resources, the Associate Athletic Director stated that he was providing a document outlining seven examples of the Plaintiff allegedly failing to meet professional standards over the previous two weeks (AC 668). He added that the Plaintiff had not submitted any of the requested work during that period and that he planned to develop a "performance enhancement plan" to address what he described as performance deficiencies (AC 669), and concluded by informing the Director of Human Resources that the Plaintiff was copied on the email for the official record (AC 670).

Before the Plaintiff returned to VMI from the Thanksgiving holiday, on Sunday, December 1, 2024, the Associate Athletic Director implemented and distributed a new External Team Open Door Policy (AC ¶¶ 684–685) after the Plaintiff and the Associate Athletic Director had been disputing the door remaining open. The Plaintiff required the door closed due to his diagnosed ADHD to accurately concentrate and productively work on his video assignments without distraction or hostility from the Associate Athletic Director (AC 610, 619–620, 662, 664). This "policy" was issued approximately ten days after the Plaintiff was informed by the Athletics Director that until recently, both he and the Associate Athletic Director had learned that

no "open door" policy existed, that such a directive could not be selectively applied, and that the Athletics Director had communicated this information to the Associate Athletic Director (AC 643).

Shortly, after the Plaintiff completed his portion of the part-time employee payroll process, the Associate Athletic Director changed the procedure on December 3, 2024 by informing the Plaintiff that he would assume responsibility for the Personnel Action Form step of the process (AC ¶¶ 685–686).

On the afternoon of December 4, 2024, the Plaintiff delivered an updated version of *"Addressing Managerial Challenges and Operational Analysis: A Summary of Allegations and Compliance Concerns"* (AC 695). Contained in this document were updated statuses for the key personnel the Plaintiff had identified, and the Plaintiff placed the conduct of the individuals directly involved in the Plaintiff's complaints, who were acting for or on behalf of the VMI Alumni Agencies while serving in their official capacities within the Institute, within the framework of 18 U.S.C. § 371 for the bribery scheme and coordination between the VMI Alumni Agencies (through the Keydet Club) and the Institute.

During this disclosure, the Plaintiff made the Inspector General aware that his workplace conditions within the Athletics Department had continued to deteriorate (AC 696) and that he was experiencing adverse working conditions (AC 713). He informed both the Inspector General and the Deputy Inspector General of his distrust in the Director of Human Resources based on the events of October 31, 2024 and November 13, 2024, and asserted that the Director of Human Resources, the Athletics Director, and the Associate Athletic Director were coordinating and carrying out disciplinary actions against the Plaintiff following his reporting of

the bribery scheme and misuse of public resources (AC 703). Both the Inspector General and Deputy Inspector General were notified that the Director of Human Resources informed the Plaintiff that both the Athletics Director and the Associate Athletic Director reported him on October 31, 2024 after his email regarding the Keydet Club (AC ¶¶ 704–705; through the Keydet Club as its subsidiary, the VMI Alumni Agencies), and that the Director of Human Resources, Athletics Director, and the Associate Athletic Director met on November 5, 2024, to discuss the events of October 31, 2024 (AC ¶¶ 313–314). The Plaintiff made it known to the Inspector General and Deputy Inspector General that had been removed from his office (AC 697), subjected to seven disciplinary reprimands in one session (AC ¶¶ 698, 666), and that the working conditions had deteriorated to the point that he required medical intervention the same morning he submitted his first version of *"Addressing Managerial Challenges and Operational* to the Director of Human Resources on November 4, 2024 (AC ¶¶ 706; 308–309).

Despite having knowledge of the actions being taken against him by the Director of Human Resources, the Athletics Director, and the Associate Athletic Director and the adverse working conditions the Plaintiff was facing daily following his reporting of the bribery scheme, the Inspector General informed the Plaintiff that retaliation-related matters were outside the scope of her office (AC 710) and directed him back to the Director of Human Resources (AC 710), while also stating that the Chief of Staff had been made aware of the matter and she was convening with him to determine how to move forward (AC 710).

Despite these disclosures, the Inspector General informed the Plaintiff that retaliation-related matters were outside the scope of her office (AC 710) and directed him back

to Human Resources (AC 710), while also stating that the Chief of Staff had been made aware of the matter and could be consulted (AC 710).

In concluding the session, the Inspector General stated that she required additional time to review the Plaintiff's updated submission and that her assessment could change depending on the information contained in the updated materials (AC 711). She encouraged the Plaintiff and instructed the Plaintiff to await further guidance while she reviewed the updated submission (AC 712). The session concluded with the Inspector General providing him with institutional resources for licensed medical professionals to address the conditions he was experiencing (AC ¶¶ 713–714).

Immediately following the Plaintiff's meeting with the Inspector and Deputy Inspector General, and twelve days after the initial seven disciplinary reprimands, the first Performance Improvement Plan session took place on the latter half of the afternoon on December 4, 2024 (AC ¶¶ 716–831), with the Plaintiff, Athletics Director, Associate Athletic Director for External Operations, Executive Assistant (Michelle Murphy), and the Director of Compliance present (AC ¶¶ 715–716). At the outset of the meeting, before the official discussion began, the Plaintiff stated for the record that the Director of Compliance was present solely in the capacity of a neutral observer for the contested session (AC 719). The Athletics Director then stated for the record that the Executive Assistant would take notes and prepare a summary of the session to "ensure alignment." (AC 725).

One of the contentious topics was raised by the Plaintiff before any discussion on multimedia projects took place, when the Plaintiff requested clarification regarding the standards by which his video work would be evaluated and whether the expectation was based on meeting

deadlines or on producing content intended to strengthen institutional branding (AC 746). The Plaintiff addressed the expectation that he was required to submit a highlight video by a concrete submission time to the hour, but explained that the deadline overlooked the operational reality that the assignment required extensive time to identify usable video footage from the season, and that he was denied access to the footage necessary to complete his assignments (AC ¶¶ 751–753). The record reflects that the Associate Athletic Director admitted that he denied the Plaintiff's access to the video production equipment that contained the footage necessary to complete the assignments he was expected to submit (AC 754).

On multiple occasions within this "Performance Improvement Plan" meeting, the Plaintiff reiterated that the Associate Athletic Director was barring him access to the equipment (AC 822), and each time the Associate Athletic Director reaffirmed his position, stating that if the Plaintiff needed any material from the production equipment, either the Associate Athletic Director, the Associate Athletic Communications Director, or the Assistant Director of Athletic Communications & Creative Content could retrieve the material "efficiently." (AC ¶¶ 822–823). Each time the Plaintiff addressed the time required to complete the assigned video submissions, the Associate Athletic Director maintained that the deadlines were fair and based that conclusion on his own experience in video editing and employment history, despite the Plaintiff's repeated statements that he did not have access to the footage required to complete the assignments (AC ¶¶ 817, 822–823).

A secondary topic discussed during the first Performance Improvement Plan meeting on December 4, 2024, was the implementation of a new directive assigned to the Plaintiff on December 3, 2024, now requiring him to complete Personnel Action Forms, which the Associate

Athletic Director represented had been implemented to "expedite" part-time staff payroll processing (AC ¶¶ 759–760). He asserted that the Plaintiff had the necessary "information compiled" (AC   761) and estimated that the task could be completed in approximately "one hour" (AC   762). The Plaintiff rebutted the Associate Athletic Director's assertion regarding completion time and explained that the estimated completion time might not apply universally and that he needed to exercise care to ensure pay accuracy involving institutional funds (AC 763), while the Associate Athletic Director rejected the Plaintiff's explanation and stated that it was not the Plaintiff's responsibility to review, verify, and approve the submitted Personnel Action Forms (AC   764; the Associate Athletics Director stating it was his responsibility to review and verify accuracy, not the Plaintiff's). When asked by the Athletics Director on the status of the Personnel Action Forms, the Plaintiff admitted to the participants that this was his first time completing these forms and explained that he was originally entered payroll data into Microsoft Excel, and that it was the Associate Athletic Director used to process the forms (AC ¶¶ 765–766). An important point the Plaintiff reported was the ongoing internet connectivity issues following his removal from his office (AC   777), and he explained that he could complete the assigned tasks so long as the work environment was operationally functional (AC   781). A final point on the matter the Plaintiff wanted reflected in the record was that employees had complained to him about delays in receiving their wages for work performed prior to his arrival in March (AC   769). At the conclusion of the meeting, the Athletics Director requested that the Executive Assistant remain behind to review the notes she took during the first session (AC 831).

Within twenty-four hours of the conclusion of the first Performance Improvement Plan, the Associate Athletic Director issued the Plaintiff five additional disciplinary reprimands following the contested Performance Improvement Plan session (AC 832). The reprimands included two alleged violations of the newly implemented "open door policy," which had been implemented four days earlier, two missed video deadline submissions that occurred while the Plaintiff had competing deadline priorities and restricted access to necessary production equipment, and one reprimand for writing an "accusatory" remark. The Plaintiff's "accusatory" remark referred to a statement he wrote on his office whiteboard on the day he was disciplined stating that "Phil Associate Athletic Director for External Operations and others are retaliating against me from 10/31–current for voicing concerns." In his email to the Director of Human Resources transmitting the disciplinary reprimands, the Associate Athletic Director stated that he and the Athletics Director were "working together to address the identified issues" (AC ¶¶ 833–834).

Between December 7 and 8, 2024, the Plaintiff attempted to complete the Personnel Action Forms but informed the Associate Athletic Director that he did not have access to the necessary systems or the required permissions to complete and submit the forms (AC ¶¶ 835–837, 848–849). The Plaintiff provided the information he had compiled, transmitted the forms he was able to locate, and requested the correct form, instructions on how to proceed, and requested that the Associate Athletic Director process the payroll information himself so that employees could receive their wages (AC ¶¶ 843–844). In the same communication, the Plaintiff informed the Associate Athletic Director that he had worked into the early morning hours to complete assigned video work, noted that he had exceeded a standard work week, and questioned

whether he was still required to submit leave for a day off under those circumstances, reminding him that under these circumstances was inconsistent with the Director of Human Resources' prior instruction (AC ¶¶ 850–851).

In response to the Plaintiff's emails, the Associate Athletic Director directed the Plaintiff to submit the forms that evening (AC 847), attributed the ongoing payroll issues to the Plaintiff's alleged lack of communication (AC 852), compared the Plaintiff to another employee who he stated had completed the forms without issue and emphasized that employees were waiting to receive wages for work already performed (AC 853), and instructed the Plaintiff to submit a leave request if he wanted a day off (AC ¶¶ 855–856). The Associate Athletic Director, Athletics Director, and the Director of Human Resources delayed payment to part-time staff and then used the resulting payroll issue as a manufactured infraction to justify the issuance of additional disciplinary reprimands to the Plaintiff in the period following his report of the bribery scheme.

Due to being overworked as a result of the Associate Athletic Director's unrealistic and impossible video submission expectations, and working late into the early morning between December 7 and 8, the Plaintiff sought medical intervention for the second time on December 9, 2024 due to the working conditions and hours (AC 857). Upon his return to work date, the Plaintiff was issued four disciplinary reprimands that included the payroll-related issues (AC 936).

As a result of the Plaintiff's reporting on November 18 and 19, 2024 (AC ¶¶ 517–589), the Inspector General opened an Inquiry into the bribery scheme and the misuse of public resources (AC 860–866). The IG Inquiry letter stated that the Plaintiff had made his report on

November 23, 2024 and referenced reports that it stated had been submitted on November 15, 2024. The Plaintiff never made the report on November 15, 2024, to her office; his initial report date was November 18, 2024, as contained in AC ¶¶ 517–589. In discussing the Inquiry, the Inspector General stated that VMI Alumni Agencies, through the Plaintiff's reporting of the Keydet Club, were screened out due to their status as a private entity, but the scope of her inquiry would include the "policies", including the donor-tier pricing menu that the Plaintiff provided and described on November 18 and 19, 2024.

One of the allegations screened out involved the Plaintiff's report that his disability and workplace conditions were being used as a method of retaliation against him, and his attempt to report that retaliation under Virginia Code § 40.1-27.3 and 42 U.S.C. § 12182(a) was screened out for "no information provided in your report that indicated potential violations" but that "[t]he conduct alleged may still be in potential violation of other employee conduct-related policies or regulations." To support the statements contained in "Addressing Managerial Challenges and Operational Analysis," the Plaintiff reported that the working conditions he was subjected to, including excessive work hours, late nights, early morning reporting times, and extended work periods without adequate rest, created workplace safety concerns and potential wage and hour violations, which he attempted to report as part of his complaint and which form the basis of Count X (AC ¶¶ 1351–1363) under 29 U.S.C. § 213(a)(1) (AC ¶¶ 62, 66, 69, 109–110, 115, 117, 144, 160–164, 176, 183–185, 214–216, 218, 246–248, 259, 269). Those allegations were screened out by the Inspector General as outside the scope of the IG's purview with instruction that such matters should be addressed through OSHA.

Contained within the Plaintiff's updated version of *"Addressing Managerial Challenges and Operational Analysis: A Summary of Allegations and Compliance Concerns"* (AC ¶¶ 695–714), the Plaintiff included a section addressing the Keydet Club, explaining that the organization had improperly benefited from VMI resources and described the bribery scheme involving the donor-tier pricing menu (AC ¶¶ 582–586), through which donor payments were exchanged for access to Institute officials. To describe the coordinated actions between the Agencies and the Institute, which now form part of the basis of the Plaintiff's claim under 18 U.S.C. § 1962(c), the Plaintiff described those coordinated actions as falling within the meaning of 18 U.S.C. § 371.

On the afternoon of December 11, 2024, on his return to work date following medical intervention (AC ¶¶857–858), the Plaintiff made a third disclosure to the Inspector General with the submission of his third report titled *"A Comprehensive and Detailed Documentation of Events and Communications"*. Due to the continual disputes over email exchanges and the existence of these correspondence, and the Plaintiff learned of leadership advocating to alter their email communications (AC ¶), the Plaintiff added a new statutory violation in reference of Virginia Code § 18.2-472. The Plaintiff explained that he learned that senior leadership within the Athletics Department were advocating for the manipulation of official communications and the alteration of email correspondence (AC 866).

Following the recommendation from the Inspector General to file a retaliation claim (AC 867; ¶¶ 863–864), the Plaintiff met with the Director of Human Resources and the Human Resources Generalist (AC ¶¶ 868–893). At the introduction of the session, the Plaintiff informed the Director of Human Resources that his working conditions worsened since they last met

twenty- eight days prior on November 13, 2024 (AC ¶¶ 871–874; 322–499). The Plaintiff informed her that nine days following their meeting, he received seven disciplinary reprimands in one session, and that he was pending additional reprimands (AC ¶¶ 872–875).

When questioned as to the legitimacy of the reprimands, and to address the recently implemented "open door policy," the Plaintiff explained that environmental noise disrupted his concentration and his ability to complete video assignments (AC ¶¶ 878–879; the Associate Athletic Director was aware of the Plaintiff's ADHD disclosure; AC 28), and that he had requested to keep his office door closed so that he could work effectively due to those conditions. The Plaintiff further explained that following repeated disputes over this issue, the Associate Athletic Director created and disseminated an open-door policy to the External Operations team (AC ¶¶ 880–881), and explained that no such policy existed prior to those disputes (AC ¶¶ 880–881). In continuing his description of his working conditions to the Director of Human Resources, the Plaintiff informed the Director that he was given unattainable expectations and would then be disciplined for failing to meet them (AC 883). He explained that the Associate Athletic Director gave the Plaintiff a directive to refrain from accessing the video production equipment while still being required to meet submission deadlines that depended on video footage stored on that equipment (AC 884). Concluding his explanation, the Plaintiff stated that he was confused as to how his performance was deficient when his August 12, 2024 four months prior reflected "Fully Competent" and "Excellent" in the listed performance categories (AC 902; ¶¶ 74–76). Only after the Plaintiff pointed to his evaluation for reference did the Director of Human Resources address the Plaintiff's evaluation and "clarify" that it should not have been treated as a formal evaluation, and acknowledged that she, as the Director of Human Resources,

had not properly established or enforced the correct evaluation process (AC 903). She further added that she had communicated this information to the Athletics Director and the Associate Athletic Director to address the issue (AC ¶¶ 904).

Addressing the Personnel Action Forms recently assigned to the Plaintiff, the Director of Human Resources stated that she had been informed that employees had worked without receiving their wages and emphasized that no one should work without being compensated (AC ¶¶ 906–907).

In response to the Director's remarks, the Plaintiff informed her that he had notified the Associate Athletic Director for External Operations that he did not have the same parameters or access required to complete the Personnel Action Forms (AC 909), and that despite knowing the Plaintiff was unable to complete the assignment, the Associate Athletic Director for External Operations still placed responsibility on him for completing the Personnel Action Forms (AC 910; even after the Plaintiff suggested the Associate Athletic Director complete the forms to pay part-time staff (AC ¶¶ 843–844). The Plaintiff concluded his explanation by stating that until December 3, 2024, the Associate Athletic Director for External Operations changed the process by instructing the Plaintiff that he would now be responsible for completing the Personnel Action Forms (AC ¶¶ 685–687), and that the process ultimately failed due to access limitations (AC ¶¶ 911–913).

After listening to the Plaintiff's explanation, the Director of Human Resources confirmed that the Plaintiff did not have the access necessary to complete the Personnel Action Forms on his own due to the fact that the access required approval from the Associate Athletic Director for External Operations (AC 915). She further acknowledged that she could resolve the access

issue only if the Plaintiff was present for duty (AC 917), confirming that the payroll process had been reassigned to the Plaintiff without the access required to complete the assignment. In response to her statement, the Plaintiff stated that the information she had just provided was critical because he was facing additional disciplinary reprimands for being unable to complete the assignment (AC 916).

As the meeting returned to address the Plaintiff's retaliation complaint, the Director of Human Resources stated that retaliation was a serious allegation and asked the Plaintiff to identify the specific conduct he believed had led to the disciplinary actions taken against him (AC ¶¶ 923–924). The Plaintiff answered by explaining that on October 31, 2024, he objected to prioritizing a fundraising video project for the VMI Alumni Agencies while internal broadcast operations were failing (AC 925), maintained that the Agencies were outside the institutional chain of command and that institutional resources should not be diverted to support their private fundraising initiatives (AC 926), and stated that disciplinary actions were taken against him only after he raised those concerns (AC 927).

Following the Plaintiff's explanation of when the retaliation began, the Director of Human Resources then asked the Plaintiff when his next Performance Improvement Plan meeting was scheduled to take place, with the Plaintiff responding that it was scheduled for the following afternoon, December 12, 2024 (AC 930).

At the conclusion of the meeting, the Director of Human Resources stated that she would conduct an inquiry into the Plaintiff's retaliation complaint and acknowledged that if there were concerns regarding impartiality, the matter could be assigned to the Human Resources Generalist for review (AC ¶¶ 932–933). The Plaintiff requested that the Human Resources Generalist

handle the inquiry due to the Director's involvement in the events and personnel actions affecting him since October 31, 2024 (AC 934), and stated that he believed the investigation should be handled by someone not directly involved in the matters he had reported, and that due to her involvement in the events he did not believe she could serve as a neutral investigator in the matter (AC ¶¶ 935).

Within twenty-four hours of the Plaintiff submitting his retaliation complaint on December 11, 2024 (AC ¶¶ 863–866, 945–948), the Associate Athletic Director issued the Plaintiff an additional disciplinary reprimand prior to the start of the second Performance Improvement Plan session for allegedly violating the "open door policy" (AC 938).

During the second "Performance Improvement Plan" Meeting, the Athletics Director and the Associate Athletic Director issued the Plaintiff a Notice of Improvement Needed/Substandard Performance on the afternoon of December 12, 2024 (AC ¶¶ 941–944), relying on reprimands issued that same day in conjunction with previously issued disciplinary documentation that began four days after his November 18, 2024, disclosures to the Deputy Superintendent for Finance and Support and the Senior Finance Director (AC ¶¶ 517–556), and the Deputy Inspector General (AC ¶¶ 557–581; ¶¶ 582–586 bribery and donor menu explanation). In addition to the seventeen disciplinary reprimands (AC ¶¶ 666; 832; 936; 938) that were issued between November 22, 2024, (four days after his reporting of the bribery scheme on November 18, 2024) and December 12, 2024, (the morning of his second performance improvement plan), the Associate Athletic Director and Athletics Director BACKDATED "deficiencies" as far as August 21, 2024 (nine days following his evaluation) and **falsified** various entries, to include October 29 (the Plaintiff was present for duty and did not depart for his scheduled VA

appointment until the evening of October 29, following the men's soccer broadcast; AC ¶¶ 221–222; ¶¶ 276–278; ¶¶ 282–283). Included in the document was the Associate Athletic Director attributing the October 3, 2024 broadcast cancellation to the Plaintiff, despite being aware of the ongoing technical faults and having authority over the procurement of the equipment needed to prevent the outage (AC ¶¶ 57–60; ¶¶ 70–71; ¶¶ 101; ¶¶ 119–121; ¶¶ 130–131; 192; 254 ), and still placed blame on the Plaintiff, who warned of the status of the equipment prior to the cancellation (AC ¶¶ 46–54; ¶¶ 67; ¶¶ 79–80; ¶¶ 94–105; ¶¶ 112–113; ¶¶ 146–176; ¶¶ 186–191; ¶¶ 238–250, Plaintiff is blamed for failure; ¶¶ 254–265). Included in the list was the fundraising video assignment "The Three-Legged Stool" for the VMI Alumni Agencies (AC ¶¶ 135–142; ¶¶ 226–229; ¶¶ 283–294).

Upon receiving and reviewing the document, the Plaintiff addressed those present and characterized the events listed between August 21 and October 30, 2024 as post-hoc justification and the document as retaliatory in nature (AC ¶¶ 939–944; statements made during the recorded event, as reflected in the documentary recording transcript of December 12, 2024, at approximately the 00:27:43 timestamp, contained in "*Addressing Managerial Challenges and Operational Analysis*: *A Case Study in Leadership Accountability and Documentation*"). He then informed the Athletics Director that he did not intend to sign the document, and in response to the Plaintiff, the Athletics Director told him that he had a choice whether he signed it or not, and that if he didn't sign it, that was on the Plaintiff (AC ¶¶ 939–944; statements made during the recorded event, as reflected in the documentary recording transcript of December 12, 2024, at approximately the 00:25:09 timestamp, contained in "*Addressing Managerial Challenges and Operational Analysis*: *A Case Study in Leadership Accountability and Documentation*"). Before

agreeing to sign the document, the Plaintiff informed the Athletics Director that he was rebutting the document and would indicate on the document that he disagreed with its contents and all points listed (AC ¶¶ 939–944; statements made during the recorded event, as reflected in the documentary recording transcript of December 12, 2024, at approximately the 00:25:19 timestamp, contained in "*Addressing Managerial Challenges and Operational Analysis: A Case Study in Leadership Accountability and Documentation*").

Twenty-six days following his formal retaliation complaint, while the complaint remained pending, on January 6, 2025, the Plaintiff emailed the Director of Human Resources and copied the Deputy Inspector and Inspector General (AC ¶¶ 956–957), reiterating that on October 31, 2024, he had raised a matter of public concern involving the misuse of public resources and conflicts of interest involving senior leadership and the VMI Alumni Agencies through the Keydet Club (AC 958). The Plaintiff emphasized he wanted the Human Resources Generalist to conduct the investigation due to the Director of Human Resources' involvement in the events at issue. He informed the group that after filing his retaliation complaint on December 11, 2024, he was issued a Notice of Improvement Needed/Substandard Performance during the Performance Improvement Plan and informed them that he had been advised he faced termination if no improvement was made (AC 961). He concluded by requesting intervention from a state or federal Inspector General or other authorized investigative body to ensure an impartial investigation (AC 963).

Three days after his January 6, 2025 email, the Human Resources Generalist initiated the inquiry into the Plaintiff's retaliation complaint on January 9, 2025 (AC 965). At the outset of the meeting, the Plaintiff submitted a written request seeking escalation of the investigation to an

external entity based on his concern that the matter could not be reviewed impartially through Human Resources. In that written request, the Plaintiff also noted that the Inspector General was involved in matters related to the underlying issues (AC 966). Notwithstanding his request for an external review, the Plaintiff participated in the internal inquiry and provided a detailed account of events in good faith (AC 967).

That same afternoon, less than four hours after the conclusion of the retaliation inquiry, the Plaintiff was grabbed by the Associate Athletic Director to stop him from reviewing a reprimand he had signed and was attempting to reexamine in order to ensure he was not missing anything in his rebuttal. During each session the Plaintiff wrote a variation of "I Reject" on the reprimands. The Associate Athletic Director issued multiple reprimands at a time, requiring the Plaintiff to review and respond to numerous allegations simultaneously within a short response period (AC ¶¶ 666, 832, 936, 949, 973). After repeated requests to review the document, the Plaintiff informed the Associate Athletic Director that he intended to retrieve the document from his desk, and in the process of reaching for the document, the Associate Athletic Director grabbed the Plaintiff's elbow and applied sufficient force to stop his forward movement and prevent him from retrieving the document, causing the Plaintiff to come to an immediate stop. Without hesitation, the Plaintiff immediately pulled his arm away from the Associate Athletic Director and firmly told him not to make physical contact with him again.

During the ongoing reprimand session, and within ten minutes of the incident, the Plaintiff emailed the Inspector General to report the incident and the events that were continuing to unfold during the disciplinary session (AC 968). Responding to his email at a later point in the afternoon, the Inspector General informed the Plaintiff that the unwanted physical contact fell

outside the scope of her investigation into fraud, waste, and abuse and advised him that he retained the right to report the incident to Human Resources or law enforcement. The Inspector General continually denied the Plaintiff protective intervention and routed him back into the same institutional chain of command that was involved in the ongoing disciplinary actions against him, which placed the reporting of the incident under the authority of the same officials responsible for the disciplinary actions (AC ¶¶ 969–971). The unwanted physical contact occurred within minutes of a contested disciplinary session that began only after the Plaintiff reported the bribery scheme to institutional leadership on November 18 and 19, 2024 (AC ¶¶ 517–556, Deputy Superintendent; ¶¶ 557–586, Deputy Inspector General; ¶¶ 587–589).

As a result of the incident, on January 10, 2025, the Plaintiff met with the Director of Human Resources and the Human Resources Generalist to report the unwanted physical contact made by the Associate Athletic Director during a contested disciplinary session (AC 974). At the start of the session, the Director of Human Resources explained that her office was only being used as the location for the meeting and that the session should proceed as if no third party were present. Within minutes of the session officially commencing, the Plaintiff played back the recordings of various events, including the incident with the Associate Athletic Director from the afternoon prior, a recording that took place earlier that day showing coordination among staff and leadership against him and the December 11, 2024, meeting among other recordings. In his explanation of the overall events that began on October 31, 2024, the Plaintiff declared that Human Resources failed at every step, and verbally, on recorded audio, requested that the matter be referred to an external oversight agency for independent review, stating on the record that his documentation demonstrated that the Human Resources Department lacked impartiality

beginning with the Director of Human Resources. In response to the Plaintiff's comment, the Director of Human Resources interjected and stated that *she* was not involved in his case, but that General Counsel was handling the matter. Despite her direct involvement in the matter, when the Plaintiff identified failures within the Human Resources Department, the Director of Human Resources stated that the issues were not her responsibility and attributed them to legal counsel.

In response to her demeanor toward the Plaintiff, the Plaintiff requested that the session scheduled with the Human Resources Generalist be moved to a separate location away from the Director. In response to the Plaintiff's request, the Director of Human Resources instructed the Human Resources Generalist to have the VMI Police Captain present during the session (AC 975).

That same afternoon, before the meeting with the Human Resources Generalist and the VMI Police Captain began, the Plaintiff requested that an additional officer be present, explaining that the request was necessary due to the Director of Human Resources' involvement in the matter and her direct request that the Captain attend the earlier meeting (AC ¶¶ 977). The Plaintiff requested that an additional officer be present and stated that the request was made to ensure impartiality (AC ¶¶ 978–979). The Plaintiff made the request as he believed that the law enforcement presence had been arranged by the Director of Human Resources as an intimidation tactic given her involvement in the matter.

During the meeting, the Plaintiff explained that the documents and recordings he presented were part of his reporting of the bribery scheme and the misuse of public resources involving VMI and the VMI Alumni Agencies (AC 980). He explained that the documentary

materials consisted of his written reports, supporting correspondence, and audio transcripts capturing the events related to his disclosures concerning the bribery scheme and the misuse of public resources (AC 981).

Explaining the circumstances that led to the meeting, the Plaintiff stated that the meeting was prompted by a disciplinary session during which the Associate Athletic Director grabbed his arm to restrain him from retrieving a document he was attempting to review. The Plaintiff explained in this session that this was not the first instance of intimidating conduct by the Associate Athletic Director and described an earlier confrontation in the football stadiums away team locker room in August 2024 in which the Associate Athletic Director approached him in a physically confrontational manner following a dispute (AC ¶¶ 90–93; 169; ¶¶ 342–353). Before the session concluded, the Plaintiff requested not to be isolated with the Associate Athletic Director as a result of the earlier physical incident and his concern that further physical escalation could occur (AC 985).

Continuing his reporting, on the morning of January 16, 2025, the Plaintiff reported to the Deputy Superintendent for Finance and Support and the Senior Finance Director that staff wages were being intentionally delayed to manufacture disciplinary infractions and to create a documented record of alleged performance deficiencies against him in retaliation for his reporting of the bribery scheme and the misuse of public resources (AC 990). He provided the Deputy Superintendent for Finance and Support with a document containing a written statement detailing this conduct and the retaliatory use of payroll delays, disciplinary actions, and withheld employee wages following his disclosures (AC 991).

On January 21, 2025, the Plaintiff later requested an update regarding his request for an external investigative agency (AC  993). The Plaintiff participated in the internal inquiry in good faith, but did not trust the internal process to investigate itself and resolve the matter impartially where the administrative officials identified in the Plaintiff's reports were part of the same administrative structure conducting the review. Due to this distrust, he sought to have the matter reviewed by an external investigative agency to ensure impartiality in the process.

Within three days of his request, on January 24, 2025, the Plaintiff, along with General Counsel, the Director of Human Resources, and the Athletics Director received the Human Resources' investigative findings rejecting his claims for retaliation, unwanted physical contact, and an allegation the Plaintiff did not raise (AC ¶¶ 993–994). The letter claims that the Plaintiff requested the investigation on January 9, 2025 (AC  994), overlooking the fact that the Plaintiff actually requested the investigation on December 11, 2024, twenty-nine days prior (AC ¶¶ 933–935;  964). The Human Resources Generalist stated early in the January 9, 2025, HR Inquiry that the delay was caused by the Director of Human Resources, who cited the Plaintiff's Veterans Affairs appointment as the reason for delaying the inquiry.

The Human Resources retaliation inquiry findings included an allegation that the Plaintiff never made regarding the Associate Athletic Director receiving payment from the Keydet Club. During the January 9, 2025 Human Resources inquiry, the Plaintiff disclosed the same donor-tier pricing structure that he had previously disclosed to the Deputy Superintendent for Finance and Support (AC ¶¶ 517–556), the Deputy Inspector General (AC ¶¶ 557–586), and the Inspector General (AC  586). In explaining the donor-tier pricing menu, the Plaintiff stated that a donor who pays $40,000 to the VMI Alumni Agencies receives access to the Superintendent of the

Institute acting in his official capacity, which is a position held by a retired United States Army General.

Notably, payments to leadership, including individuals directly involved in the Plaintiff's case, were not made by the Keydet Club but instead by the VMI Foundation, both entities operating under the same leadership and administrative control within the VMI Alumni Agencies structure (AC  1212).

Despite the Plaintiff providing a detailed breakdown of events in *"Addressing Managerial Challenges and Operational Analysis"* (AC ¶¶ 582–586), identifying allegations against key personnel, including the Director of Human Resources, in *"Addressing Managerial Challenges and Operational Analysis: A Summary of Allegations and Compliance Concerns"* (AC ¶¶ 695–696), submitting six months of email communications between June and December 2024 documenting events and a new allegation of document manipulation in *"Addressing Managerial Challenges and Operational Analysis: A Comprehensive and Detailed Documentation of Events and Communications"* (AC ¶¶ 863–866), and submitting the final document titled *"Addressing Managerial Challenges and Operational Analysis: A Case Study in Leadership Accountability and Documentation"* (AC ¶¶ 945–948), the Plaintiff was informed by Human Resources that he had provided no evidence to substantiate his complaint. After the Plaintiff submitted his reports, communications, and documentation described above, the Human Resources Generalist knowingly made the decision to reject the Plaintiff's complaint and take action that had the effect of preventing disruption to the donor funding structure, either at the direction of VMI leadership as identified in the VMI Foundation's IRS Form 990, Schedule I, or on behalf of the VMI Alumni Agencies.

Later that same day, on January 24, 2025, less than three hours after receiving the Human Resources' investigative findings, the Plaintiff received notification that his login credentials used for broadcasting events were revoked (AC 995). A representative of the Institution or athletics department contacted a representative of the Southern Conference or ESPN to revoke the Plaintiff's credentials within that same three-hour period, and the revocation of the Plaintiff's access within hours of the findings being issued indicated that the outcome had been determined before the investigative process concluded.

On the morning of January 29, 2025, the Plaintiff submitted a rebuttal to the findings and requested an update on his request for an external investigative agency to review his claims to the Human Resources Generalist and included General Counsel (AC 1002). In his rebuttal, the Plaintiff again requested that the matter be reviewed by an external investigative agency due to conflicts of interest involving the Director of Human Resources. He also documented that the disciplinary session on January 9, 2025 had escalated into physical contact when the Associate Athletic Director used physical force to block access to a reprimand, the same incident he reported to the Inspector General, the Human Resources Generalist, and the Director of Human Resources within twenty-four hours of the incident. The Plaintiff explained that since the "investigation" had concluded, he requested confirmation that the materials and evidence he had submitted would not be altered and no further documents related to his reports would be modified while in the possession, custody, or control of VMI officials involved in the investigation and disciplinary process, particularly in light of the twenty-three fabricated disciplinary documents and the Notice of Improvement Needed/Substandard Performance. Concluding his email, the Plaintiff also requested the return of his materials (AC 1003).

Approximately four hours later he was requested to meet with the Chief of Staff the following morning (AC 1004).

On the morning of January 30, 2025, the Plaintiff was called to a meeting with the newly appointed Chief of Staff, attended by the Director of Human Resources with the Captain of the VMI Police Department present, where the Plaintiff was informed that the Institute intended to terminate his employment within thirty days, citing the Notice of Improvement Needed/Substandard Performance as the basis for the termination decision (AC ¶¶ 1004–1005). The Notice relied on disciplinary documentation that was created only after the Plaintiff reported the bribery scheme and misuse of public resources, and the Notice was then used to form the basis for and justify the termination decision (AC ¶¶ 941–944, 1005).

Following the termination meeting on January 30, 2025 (AC 1013), the Plaintiff received an email from the Director of Human Resources that included the General Counsel, the Chief of Staff, the Inspector General, and the Deputy Superintendent, which contained a memorandum for record stating that payroll timesheets for wage employees had not been processed, that the payroll manager reported the timesheets had instead been processed by the Associate Athletic Director for External Operations and the Associate Athletic Director for Internal Operations.

The letter fails to acknowledge that the payroll process had been reassigned to the Plaintiff on December 3, 2024 (AC ¶¶ 685–687, 759–760). When questioned by the Athletics Director regarding the status of the Personnel Action Forms, the Plaintiff stated that this was his first time completing the forms (AC ¶¶ 765–766). These issues were discussed with senior

athletics officials on December 4, 2024 during the first Performance Improvement Plan meeting and were documented as part of that meeting (AC ¶¶ 716–831).

Accordingly, in contrast to the Director of Human Resources Memorandum, between December 7 and 8, 2024 (AC ¶¶ 835–858), the Plaintiff informed the Associate Athletic Director that he did not have access to the necessary systems or the required permissions to complete and submit the Personnel Action Forms (AC ¶¶ 835–837, 848–849). The Plaintiff provided the information he had compiled and requested that the Associate Athletic Director use that information to process the payroll so that employees could receive their wages (AC ¶¶ 843–844).

In either forgetting the session that occurred on December 11, 2024, in which she admitted that the Plaintiff did not have access and that such access required the Associate Athletic Director's approval, and that she could approve that access for the Plaintiff (AC ¶¶ 915, 917), or the memorandum was used in justification for discipline after the Plaintiff reported the payroll process failures and the delayed payment of staff wages associated with that reassigned process (AC ¶¶ 685–687, 906–907, 911–913, 916, 936).

Accordingly, in issuing the Memorandum and distributing it to the Plaintiff, the General Counsel, the Chief of Staff, the Inspector General, and the Deputy Superintendent, the Director of Human Resources omitted material information regarding the reassignment of payroll responsibilities, the Plaintiff's lack of system access, and the access limitations and working conditions reported to Human Resources prior to the issuance of disciplinary reprimands.

After the Plaintiff filed a criminal complaint for unwanted physical contact by his supervisor on January 9, 2025 (AC  968), a VMI Police Officer informed the Plaintiff during the drive to the Sheriff's Office that if he moved forward with his complaint, the Associate

Athletic Director would be able to file his own separate complaint regarding the same event (AC 1014). Approximately twenty-five hours after the Plaintiff filed his complaint on January 30, 2025, a criminal complaint was filed against him by the Associate Athletic Director on January 31, 2025 (AC ¶¶ 1016–1017). Four days later, on February 4, 2025, the Plaintiff was placed on administrative suspension (AC ¶¶ 1021–1025). The same institutional officials who were directly involved in his case (Director of Human Resources, Deputy Superintendent for Finance and Support, Senior Finance Director, General Counsel, and through the VMI Police Captain, the VMI Chief of Police), sat on the same Threat Assessment Team, which made the recommendation to the Superintendent that resulted in the Plaintiff's administrative suspension (AC 1026).

On the same afternoon, the Plaintiff reported the matter to the Office of the Governor, Office of the Attorney General, and the Office of the Secretary of Education (AC 1027), and within hours of making those reports, his institutional email access was blocked and his professional biography was removed from the Institute's official athletics website (AC 1028).

Six days later, on February 10, 2025, the immediate Monday after the Board of Visitors convened, the Plaintiff was issued a trespass warning (AC ¶¶ 1029–1030) on the same day he received the Inspector General's letter stating that he had provided insufficient evidence to support his retaliation claim (AC ¶¶ 1032–1033). The letter from the Inspector General explained that she received the complaint from the Deputy Superintendent for Finance and Support on January 23, twenty-four hours before the Plaintiff received the findings from his retaliation complaint for reporting the bribery scheme and the misuse of public resources (AC 1033). Despite having previously received and reviewed the evidence provided by the Plaintiff, once the

same evidence was transferred to Human Resources (AC ¶¶ 966; 976), only then did the Inspector General declare that the Plaintiff "failed to provide sufficient information" (AC 1033). Significantly, the Inspector General's letter was dated January 30, 2025, the same day the Plaintiff was notified that the Institute intended to terminate his employment (AC ¶¶ 1004–1005). The letter was not provided to the Plaintiff until February 10, 2025, the same day he was issued a trespass warning (AC ¶¶ 1029–1033).

Finally, as a result of the aforementioned events and the unwanted physical contact incident of January 9, 2025, the Plaintiff was placed in a position where he was required to invoke his Fifth Amendment right to avoid self-incrimination. This proceeding had become the Plaintiff's last available avenue to report the bribery scheme and misuse of public resources, but as a result of the Defendants' actions, he was forced to invoke his constitutional right instead of continuing to report on the matter. All of the events described herein arose as a direct result of the disciplinary process that was initiated four days after the Plaintiff reported the bribery scheme and misuse of public resources.

The Fourth Circuit affirmed that "[t]o make out a prima facie case of retaliation, [the plaintiff] must show (1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action… [m]oreover, that his termination came so close upon his filing of the complaint gives rise to a sufficient inference of causation to satisfy the prima facie requirement." King v. Rumsfeld, 328 F.3d 145, 151 (4th Cir. 2003) (citing Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989)).

To satisfy these elements, **(1)** the Plaintiff reported a bribery scheme and the misuse of public resources between VMI and the VMI Alumni Agencies; **(2)** within four days of his report, the Plaintiff received seven disciplinary reprimands (AC 666). The disciplinary reprimands were issued fourteen weeks after the Plaintiff received a positive employee evaluation (AC ¶¶ 74–76), seven weeks after the Plaintiff disclosed the first broadcast failure caused by faulty equipment to senior leadership within the Athletics Department (AC ¶¶ 146–149), four weeks after the Plaintiff raised operational concerns to the Athletics Director (AC ¶¶ 210–219), three weeks after the October 31 phone call with the Director of Human Resources (AC ¶¶ 295–301), and nine days after the November 13 mediation session (AC ¶¶ 322–499). Most notably, the disciplinary reprimands were issued only four days after the Plaintiff reported a bribery scheme to the Deputy Superintendent for Finance and Support and the Deputy Inspector General (AC ¶¶ 517–556; ¶¶ 557–581; ¶¶ 582–586). Between November 22, 2024, and January 9, 2025, approximately 7 weeks following his reporting, the Plaintiff received a total of 23 disciplinary reprimands (AC ¶¶ 666, 832, 936, 938, 949, 973). Within three and a half months of his November 18, 2024 report, the Plaintiff's employment was terminated on March 4, 2025 (AC 1034); **(3)** All of these actions, including the disciplinary reprimands, administrative suspension, trespass warning, and termination, and the Plaintiff's invocation of his Fifth Amendment right, occurred only ***AFTER*** the Plaintiff reported the bribery scheme and misuse of public resources involving VMI leadership and the VMI Alumni Agencies.

**D. Defendants' Actions Would Deter a Person of Ordinary Firmness from Engaging in Protected Activity**

The adverse actions taken against the Plaintiff were sufficiently severe that they would deter a person of ordinary firmness from engaging in the same protected speech the Plaintiff engaged in. The manipulation of his workload to create impossible deadlines, the deliberate exploitation of his disability-related limitations to induce medical harm, the implementation of internal disciplinary procedures to fabricate a record of performance issues in rapid succession, the inducement of fear of physical reprisal for reporting the bribery scheme and misuse of public resources, the use of retaliatory arrest and prosecution following the Plaintiff's lawful report of unwanted physical contact, the use of a Threat Assessment Team after his lawful report of unwanted physical contact to provide justification for his administrative suspension, the use of a trespass order enforced by law enforcement to bar the Plaintiff from campus and isolate him from his workplace, the placement of the Plaintiff in legal jeopardy, requiring him to invoke his Fifth Amendment right during what became his last available avenue to report the bribery scheme and misuse of public resources, and the termination of his employment, which forced the Plaintiff out of his profession and into lower-paying retail employment. These actions occurred after and in response to the Plaintiff's speech and formed an escalating course of conduct with each additional report he made.

Such actions would chill, silence, or deter a person of ordinary firmness from continuing to report misconduct, bribery, and misuse of public resources.

**E. Defendants Are Liable for Actions Taken Pursuant to Institutional Policy and Decisionmaker Authority**

The Plaintiff's allegations do not concern isolated acts by his supervisor, the Associate Athletic Director for External Operations. Human Resources became involved on October 31, 2024, after the Associate Athletic Director and the Athletics Director jointly reported the Plaintiff, and the Director of Human Resources then directed the manner in which his complaints, supervision, and documentation would proceed (AC ¶¶ 295, 491–493, 499). In every correspondence, with the exception of January 9, 2025, the Director of Human Resources remained involved in the disciplinary process (AC ¶¶ 295, 667–670, 833–834, 936–938) and participated in the retaliatory actions that resulted in the Plaintiff's termination (AC ¶¶ 932–934, 1004, 1034).

In addition to Human Resources' involvement, the Athletics Director participated in the Plaintiff's mediation (AC ¶¶ 322–499), the Performance Improvement Plan meetings (AC ¶¶ 715–716, 831, 939–944), and the Notice of Improvement Needed/Substandard Performance (AC ¶¶ 941–944). Once he took over as the Plaintiff's supervisor (AC 986), the same video production schedule implemented by the Associate Athletic Director for External Operation was continued by the Athletics Director until his suspension (AC 1015; ¶¶ 1021–1026).

Involved in the Plaintiff's reporting were senior institute officials such as the Inspector General and Deputy Inspector General (AC ¶¶ 557–589; 695–714; ¶¶ 945–948; 968), and the Deputy Superintendent with the Senior Finance Director (AC ¶¶ 517–556; 990–991).

Formal institutional mechanisms were used to implement the adverse actions rather than informal workplace disputes. The Notice of Improvement Needed/Substandard Performance was issued through Institute leadership and relied on disciplinary documentation created after the Plaintiff's protected reporting (AC ¶¶ 941–944).

Only after the Plaintiff filed his criminal complaint was a separate criminal complaint filed against him approximately twenty-five hours later (AC 1012, 1014; ¶¶ 1016–1017). Within four days of his complaint, the Chief of Staff informed the Plaintiff that the Threat Assessment Committee had convened and made a recommendation to the Superintendent, who, acting as the final policymaker for the Institution, approved the Plaintiff's suspension (AC ¶¶ 1021–1026).

The members of the Threat Assessment Committee included individuals who had direct involvement in the Plaintiff's employment, reporting, investigation, and disciplinary proceedings, or who were aware of the Plaintiff's protected disclosures through their own involvement or through the actions and reports of their subordinates. Of the eleven members of the Threat Assessment Team (AC 1026), the following individuals had direct knowledge or indirect knowledge through their staff and are as follows:

Chief of the VMI Police Department, acting through the involvement of the VMI Police Captain in the Plaintiff's case (AC ¶¶ 977–984, 1006–1012, 1014, 1016–1017, 1026); the Deputy Superintendent for Finance and Support (AC ¶¶ 517–551, 990–991, 1026); the Senior Director for Finance and Support (AC ¶¶ 517–551, 990–991, 1026); the Commandant, as part of the Chief of Staff and Superintendent's command structure (AC 1026); the Director of Human

Resources (AC ¶¶ 295–301, 322–499, 667–670, 832–834, 868–935, 936–938, 974–975, 1004, 1026, 1034); and the Institute General Counsel (AC ¶¶ 993–994, 996–997, 1004, 1026).

During his suspension, VMI issued a Trespass Warning Form against the Plaintiff, and had it delivered by a Rockbridge County Deputy Sheriff. The warning prohibiting him from entering Institute property and warning that he would be arrested and charged with trespassing under Virginia Code § 18.2-119 if he returned to VMI property (AC ¶¶ 1029–1030), and the Director of Human Resources later informed him that his termination was in effect (AC 1034).

The Supreme Court explained that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents" but "[i]nstead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government, as an entity, is responsible under § 1983…" Monell v. Department of Social Services, 436 U.S. 658, 694 (1978). In addition to the Supreme Court ruling in *Monell,* the Fourth Circuit explained that "municipal fault for allowing such a developed custom or usage to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices… [t]he inculpating knowledge, whether actual or constructive, may be either that of the municipal governing body itself, or of municipal officials having final policymaking authority." *Spell v. McDaniel*, 824 F.2d 1380, 1386–87 (4th Cir. 1987).

In this case, through repeated reports, the Plaintiff notified officials within the institutional chain of command who had authority to review, address, and stop the conduct

described herein. These reports placed responsible policymakers on actual notice and provided repeated opportunities for intervention. Rather than correct course, further adverse actions were taken against the Plaintiff by individuals within the same chain of command who had been informed of his reports of a bribery scheme and the misuse of public resources. These actions were taken to protect an $83,803,064 revenue stream in which access to Department of Defense rank and institutional authority functioned as the commodity through which Enterprise activities were carried out.

The actions taken against the Plaintiff were not isolated decisions by low-level employees, but actions taken within the institutional chain of command by officials who had been informed of the Plaintiff's reports, possessed authority to act on that information, personally participated in the actions taken against the Plaintiff, and directed subordinate employees to carry out additional actions. These actions were taken through the institutional chain of command and pursuant to institutional decision-making authority, and were approved and carried out within the governance structure that includes the Superintendent and the Board of Visitors, through execution of institutional policy or custom.

***a. Count I – The Complaint States a Plausible First Amendment Retaliation Claim***

To state a claim for First Amendment retaliation, a plaintiff must show that (1) he engaged in protected speech on a matter of public concern, (2) the defendants took an adverse action against him that would deter a person of ordinary firmness from continuing to engage in protected speech, and (3) the protected speech was a substantial or motivating factor in the defendants' decision to take adverse action.

***First,*** The Plaintiff reported a bribery scheme and the misuse of public resources involving institutional officials and affiliated entities, including disclosures made to the Director of Human Resources, the Athletics Director, the Deputy Superintendent for Finance and Support, the Senior Finance Director, the Deputy Inspector General, and the Inspector General. These disclosures involved the misuse of public resources, conflicts of interest, and a donor-tier pricing menu system that provided paid access to institutional officials acting in their official capacities. The Plaintiff's speech exposing corruption, misuse of public funds, and abuse of official authority constitutes speech on a matter of public concern protected by the First Amendment.

***Second,*** following his disclosures, the Defendants took multiple adverse actions against the Plaintiff, including the issuance of disciplinary reprimands, removal of job responsibilities, reassignment of workspace, denial of access to equipment necessary to perform assigned duties, placement on a Performance Improvement Plan, issuance of a Notice of Improvement Needed/Substandard Performance, administrative suspension, revocation of professional credentials, issuance of a trespass warning, and termination of employment. The actions taken against the Plaintiff is sufficient to deter a person of ordinary firmness from engaging in protected speech.

***Third,*** the timeline described above demonstrates that the Plaintiff's disclosures were a substantial and motivating factor in the Defendants' actions. Within four days of the Plaintiff's November 18, 2024 disclosure of the bribery scheme, the Plaintiff received seven disciplinary reprimands, and a total of twenty-three reprimands were issued in the weeks that followed. The Notice of Improvement Needed/Substandard Performance relied on disciplinary documentation created only after the Plaintiff's disclosures and was later used as the basis for the termination

decision. The close temporal proximity between the Plaintiff's protected activity and the escalating adverse actions is sufficient to establish causation at the pleading stage.

For these reasons, the Plaintiff has sufficiently pled that the Defendants retaliated against him for engaging in protected speech in violation of the First Amendment, and Count I (AC ¶¶ 1114–1126) should proceed.

***b. Count II – The Complaint States a Plausible Fourteenth Amendment Due Process Claim***

To state a procedural due process claim, a plaintiff must show (1) a protected property or liberty interest, (2) deprivation of that interest by state action, and (3) that the procedures employed were constitutionally inadequate.

At all times, the Plaintiff was a state employee of the Virginia Military Institute with contractual employment rights governed by his employment agreement and the Institute's employee handbook, which established the procedures required for discipline and termination (AC ¶¶ 17–26).

The Defendants deprived the Plaintiff of his due process and property interest rights through the retaliatory disciplinary proceedings, administrative suspension, revocation of professional credentials, issuance of a trespass warning, termination of employment, and innovation of the Fifth Amendment in a criminal proceeding to avoid self incrimination all after reporting a bribery scheme and misuse of resources on November 18, 2024.

On August 12, 2024, the Plaintiff received a performance evaluation with ratings between Fully Competent and Outstanding. Following the Plaintiff's reports of a bribery scheme and

misuse of public resources on November 18, 2024, the Defendants initiated a series of disciplinary actions between November 22, 2024 and March 4, 2025, in which the Plaintiff received a total of twenty-three disciplinary reprimands during his employment with VMI.

In response to the Plaintiff's reporting, the Plaintiff was deprived of his due process rights through disciplinary proceedings, administrative suspension, revocation of professional credentials, issuance of a trespass warning, termination of employment, and invocation of his Fifth Amendment right.

The procedures used to carry out these actions were constitutionally inadequate in that the internal procedures used were weaponized by the same officials who were the subjects of the Plaintiff's complaints controlled the disciplinary process, the retaliation investigation, and the decisions that resulted in the Plaintiff's suspension and termination. His repeated attempts and requests to have the matter be referred to an external and impartial investigative body due to the clearly present conflicts of interest were either ignored or passively denied.

On December 11, 2024, the Plaintiff requested an inquiry into his retaliation claims, but the Director of Human Resources delayed the investigation. When an investigation was finally conducted by Human Resources on January 9, 2025, the Plaintiff's retaliation complaint was investigated by a subordinate of the Director of Human resources, and decided by institutional officials directly involved in the underlying events. Within six days of the findings on January 24, 2025, and the day after rebuttaling the report to General Counsel and the investigator on January 29, 2025, the Plaintiff was notified of his pending termination on the morning of January 30, 2025.

During the termination meeting with the Chief of Staff, the Plaintiff was informed that the termination decision was based on the Notice of Improvement Needed/Substandard Performance, which itself relied on post-hoc performance deficiencies and seventeen disciplinary reprimands issued after the Plaintiff's disclosures on November 18, 2024. When the Plaintiff was issued the Notice of Improvement Needed/Substandard Performance on December 12, 2024, he was informed that he would have forty-five days to correct the alleged deficiencies. Ambiguously unmentioned was whether the forty-five day period referred to business days or calendar days, and what the clearly defined standard for measuring improvement would be.

However, the Defendants did not account for the period between December 13, 2024 and January 5, 2025, during which the Plaintiff was on leave for a Veterans Affairs appointment and the Institute was operating under its mandated winter furlough. This period accounted for approximately twenty-four days of the forty-five day improvement window, leaving only approximately twenty-one days for the Plaintiff to allegedly correct the identified deficiencies. The Plaintiff returned to work on January 5, 2025, and was notified of the Institute's intent to terminate his employment on January 30, 2025, only twenty-five calendar days after his return.

The Plaintiff was not given the full amount of time provided in the Notice of Improvement Needed/Substandard Performance, and the decision to proceed with termination occurred in close temporal proximity to the Plaintiff's protected reporting activity, indicating that the improvement period functioned as a pretextual step preceding termination rather than a genuine opportunity to improve.

On the afternoon of January 9, 2025, the Plaintiff reported the unwanted physical contact incident by the Associate Athletic Director to the Inspector General during a disciplinary session within minutes of the event. Following the guidance of the Inspector General, the Plaintiff filed a criminal complaint for the unwanted physical contact on January 30, 2025. Within approximately twenty-five hours of the Plaintiff's complaint, a criminal complaint was filed against the Plaintiff by the Associate Athletic Director concerning the same incident on January 31, 2025. The timing of these filings indicates that the Plaintiff's report occurred first, unless the Associate Athletic Director filed his complaint faster than the Plaintiff reported the incident. Institutional action against the Plaintiff followed shortly thereafter, including the recommendation that resulted in the Plaintiff's administrative suspension on February 4, 2025.

All of these actions occurred within approximately three and a half months of the Plaintiff's November 18, 2024 report of a bribery scheme and misuse of public resources and culminated in his termination on March 4, 2025. At no point was the Plaintiff given the opportunity for an impartial hearing to contest the decision, as his employment email access was revoked on the evening of his suspension, he was barred from campus through the trespass warning issued on February 10, 2025, and the termination decision was made final on March 4, 2025. The Plaintiff was not provided a pre-termination hearing before a neutral decisionmaker, nor was he provided a meaningful post-termination grievance or appeal process through which he could challenge the decision. As a result, the Plaintiff was deprived of his protected property interest in his employment without a meaningful opportunity to be heard, without a neutral and impartial decisionmaker, and through procedures controlled by the same officials who were involved in the underlying events and disciplinary actions.

For these reasons, the Plaintiff has sufficiently pled that the Defendants deprived him of due process in violation of the Fourteenth Amendment, and Count II (AC ¶¶ 1127–1149) should proceed.

***c. Count III – The Complaint States a Plausible § 1983 Conspiracy Claim***

The Plaintiff has plausibly described a coordinated agreement among institutional officials to retaliate against him and deprive him of constitutional rights after he reported a bribery scheme and misuse of public resources involving VMI and the VMI Alumni Agencies.

After the Plaintiff's first hospitalization on November 4, 2024, the Director of Human Resources, the Athletics Director, and the Associate Athletic Director met on November 5, 2024 without the Plaintiff present. When the parties met again on November 13, 2024, the Plaintiff was returned to the supervision of the Associate Athletic Director despite the unresolved conflict already documented in the mediation. Five days later, on November 18, 2024, the Plaintiff reported the bribery scheme and misuse of public resources between VMI officials and the VMI Alumni Agencies. Within four days of that report, the Plaintiff was issued seven disciplinary reprimands, to which those reprimands were used to place him into a Performance Improvement Plan.

As a result of the reprimands, the first Performance Improvement Plan session took place on December 4, 2024. During this session, the Athletics Director stated that the Executive Assistant's presence was intended to take notes of the event to ensure "alignment." At the conclusion of the session, the Athletics Director kept the Executive Assistant behind to review her notes taken and to discuss the session. These facts support the inference that the disciplinary

process was not operating as a neutral personnel function, but as a coordinated mechanism for generating a record to be used against the Plaintiff after his disclosures, especially where the Plaintiff later identified inconsistencies in the Executive Assistant's notes on January 31, 2025.

Defendant VMI's coordinated pattern continued when, within twenty-four hours of the Plaintiff's retaliation complaint on December 11, 2024, he was issued the Notice of Improvement Needed/Substandard Performance. Included in the Notice were "deficiencies" that occurred within ten days of the Plaintiff's positive evaluation, and included all of the disciplinary reprimands that were issued between November 22, 2024, and the morning of the second Performance Plan on December 12, 2024. All of this occurred after the Director of Human Resources had asked the Plaintiff when his next Performance Improvement Plan meeting would occur during the December 11, 2024 complaint intake.

On the afternoon of January 24, 2025, the Plaintiff, along with VMI's General Counsel, the Athletics Director, and the Director of Human Resources, received the investigation's findings rejecting all of the Plaintiff's claims. The findings included an allegation the Plaintiff did not make, namely, that the Keydet Club provided direct payment to the Associate Athletic Director. In response, the Plaintiff rebutted the investigative findings on January 29, 2025, and by the following morning, January 30, 2025, he was notified that VMI intended to terminate his employment.

On the same day, January 30, 2025, the Plaintiff filed his criminal complaint concerning the unwanted physical contact incident that occurred on January 9, 2025, during the disciplinary session with the Associate Athletic Director. Within approximately twenty-five hours, the Associate Athletic Director filed a criminal complaint against the Plaintiff concerning the same

event. Four days later, on February 4, 2025, the Plaintiff was placed on administrative suspension following a Threat Assessment Team recommendation made by officials, several of whom were directly involved in the Plaintiff's reporting, investigation, discipline, or review process.

The same coordinated sequence is reflected in the Inspector General's February 10, 2025 letter, which was dated January 30, 2025, the same day the Plaintiff was notified of termination, and was based on a complaint provided to the Inspector General on January 23, 2025, twenty-four hours before the Plaintiff received Human Resources findings. On that very same day, the findings were delivered to the Plaintiff and the trespass warning issued. Taken together, these actions demonstrate concerted action, shared knowledge, and overt acts taken in furtherance of a common objective to retaliate against the Plaintiff for his disclosure

These facts support the inference that the Defendants VMI were not acting independently, but in concert and for a common purpose: to protect the institutional and VMI Alumni Agencies enterprise exposed by the Plaintiff's reporting. The coordinated disciplinary actions, investigative handling, criminal counter-complaint, suspension, dated but withheld Inspector General letter, and trespass warning all followed the Plaintiff's disclosures threatening the enterprise's revenue stream tied to the VMI Alumni Agencies.

For these reasons, the Plaintiff has sufficiently pled that the Defendants engaged in a constitutional conspiracy to deprive him of rights secured by the First and Fourteenth Amendments, and Count III (AC ¶¶ 1150–1182) should proceed.

***d. Counts V and VI – The Complaint States Plausible Claims Under Federal Whistleblower Protection***

The same course of conduct described above constitutes protected activity and unlawful retaliation under 10 U.S.C. § 4701, and 41 U.S.C. § 4712. The Plaintiff's disclosures involved reporting a bribery scheme, misuse of public resources, and abuse of authority to the Inspector General, Director of Human Resources and her office the Deputy Superintendent for Finance and Support and Senior Finance Director, Office of the Governor of Virginia, Office of the Attorney General, Office of the Secretary of Education, the DoD Inspector General, and the Department of Education.

For these reasons, the Plaintiff has sufficiently pled that the Defendants retaliated against him for engaging in protected disclosures in violation of 10 U.S.C. § 4701 and 41 U.S.C. § 4712, and Counts V (AC ¶¶ 1301–1320) and Count VI (AC ¶¶ 1311–1320) should proceed.

***e. Count IX – The Complaint States a Plausible Americans with Disabilities Act Claim***

The Plaintiff is a disabled veteran and a qualified individual with a disability within the meaning of the Americans with Disabilities Act and was able to perform the essential functions of his position with or without reasonable accommodation. At all relevant times, the Virginia Military Institute was the Plaintiff's employer within the meaning of the Americans with Disabilities Act, and was aware of the Plaintiff's disability and the limitations associated with his condition.

After the Plaintiff made internal reports regarding misuse of public resources and related misconduct, the Defendants, despite having knowledge of his disabilities and previously approved accommodations, rescinded those accommodations, altered workplace procedures, refused to provide additional reasonable accommodations, and failed to engage in a fair interactive process to identify effective accommodations.

Instead of maintaining those accommodations or providing reasonable alternatives, the Defendants created working conditions that magnified the Plaintiff's disability by imposing artificially heightened environmental stimuli that exacerbated his sensory hypersensitivity and work schedules that resulted in intentional sleep deprivation.

The Defendants worsened the Plaintiff's disability-related limitations and inflicted mental anguish by withdrawing and denying reasonable accommodations and using his limitations as a basis for adverse treatment, escalating demands, performance documentation, disciplinary action, and termination of his employment. As a direct and proximate result of the Defendants' retaliatory actions, the Plaintiff was hospitalized three times, on November 4, 2024, December 9, 2024, and January 3, 2025.

As a result of Defendants VMI's conduct, the Plaintiff filed a complaint with the Equal Employment Opportunity Commission. Due to the complexity of the case and the number of overlapping issues and proceedings, the EEOC dismissed the complaint without resolving the merits. The response submitted on behalf of Defendants VMI was prepared and submitted by the General Counsel who was directly involved in the events forming the basis of the Plaintiff's complaint. As a result, the response submitted to the EEOC was not a neutral institutional

response, but a response made by an involved party whose interests were directly implicated in the matters raised by the Plaintiff.

For these reasons, the Plaintiff has sufficiently pled that the Defendants failed to provide reasonable accommodations for a known disability in violation of 42 U.S.C. § 12112(b)(5)(A), and Count IX (AC ¶¶ 1342–1350) should proceed.

***Counts X and XI – The Complaint States Plausible Claims Under the Fair Labor Standards Act***

At all relevant times, the Virginia Military Institute was the Plaintiff's employer and an enterprise engaged in commerce within the meaning of the Fair Labor Standards Act, and exercised control over the Plaintiff's work, duties, and conditions of employment. The Plaintiff was employed in a salaried position centered on technical audiovisual operations, live event support, video production, equipment management, and broadcast and institutional production support. His duties were primarily technical and operational in nature, governed by institutional standards, broadcast requirements, and supervisory directives, and consisted largely of routine, deadline-driven work that did not require invention, imagination, originality, or talent in a recognized field of artistic or creative endeavor.

Throughout his employment, the Plaintiff regularly worked more than forty hours in a workweek, including extended evenings, early mornings, weekends, and event days, yet he was paid on a fixed salary basis and was not paid overtime compensation. The Defendants classified the Plaintiff as an exempt professional despite the absence of primary duties that satisfied the requirements for the creative professional exemption. The Defendants knew or recklessly

disregarded that the Plaintiff's primary duties were technical and operational and that he was working in excess of forty hours per week without overtime pay. The Plaintiff's exempt status was used as a mechanism to impose excessive hours without additional compensation and was later used as a method of retaliation by increasing workload, changing schedules, and expanding demands after his protected reports.

Following the Plaintiff's internal reports regarding the bribery scheme and misuse of public resources between VMI officials and the VMI Alumni Agencies, the Defendants changed the procedures for paying part-time staff assigned to the Plaintiff without providing him the required system permissions or access necessary to process payroll forms. The Plaintiff made repeated good-faith efforts to complete the required forms, notified his supervisor that he lacked the required access and that the forms available to him differed from those used in training, and requested corrected access or assistance so that employees would receive their wages for work already performed. The wage delays that affected student workers and staff resulted from the change in the process without providing the Plaintiff the required system access and were not caused by any failure by the Plaintiff to perform his duties.

On January 16, 2025, the Plaintiff made a good-faith report regarding delayed payment of wages, missing compensation, and failures to timely process payroll forms for student workers and staff that he reasonably believed violated federal wage and hour requirements. After this report, the Defendants continued to treat the wage delays as misconduct by the Plaintiff and used those delays as a basis for disciplinary reprimands, performance documentation, and adverse employment actions, including additions to the Notice of Improvement Needed/Substandard Performance and eventual termination. These actions were imposed in reprisal for the Plaintiff's

protected wage and hour complaint on January 16, 2025, and his prior reporting on November 18, 2024, and would not have occurred but for those complaints.

For these reasons, the Plaintiff has sufficiently pled that the Defendants misclassified him and retaliated against him for engaging in protected activity in violation of 29 U.S.C. § 213(a)(1) and 29 U.S.C. § 215(a)(3), and Counts X (AC ¶¶ 1351–1363) and XI (AC ¶¶ 1364–1378) should proceed.

**V. The Complaint States a Plausible Civil RICO Claim Under 18 U.S.C. § 1962(c)**

18 U.S.C. § 1961(4) defines an enterprise broadly to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The Supreme Court has emphasized that this definition reaches "any … group of individuals associated in fact" and reflects Congress's intent that the enterprise concept be interpreted expansively. *Boyle*, 556 U.S. at 944 (2009); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985).

To establish liability under 18 U.S.C. § 1962(c), a plaintiff must demonstrate:

(1) the existence of an enterprise affecting interstate commerce;

(2) that each Defendant is a distinct "person" who conducted or participated in the operation or management of the enterprise;

(3) through a pattern of racketeering activity consisting of at least two predicate acts; and

(4) resulting injury to the plaintiff's business or property.

The Supreme Court has explained that an association-in-fact enterprise must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Consistent with the Court's definition, this complaint sets forth facts establishing violations of 18 U.S.C. § 1962(c) (prohibited activities) by the Defendants and asserts that they function as an association-in-fact enterprise operating through an integrated financial and access structure tied to public authority and affiliated fundraising entities.

***First***, in this case, the enterprise consists of an association-in-fact that utilizes the corporate form of (1) the Virginia Military Institute and its Board of Visitors (under the corporate name of VMI) as the operational shield through its sovereign immunity for the coordinated network and includes (2) the VMI Alumni Agencies Board Inc., (3) the VMI Foundation, (4) VMI Investment Holdings LLC (a directly controlled entity of the VMI Foundation as reported on the VMI Foundation's IRS Form 990, Schedule R), (5) the VMI Alumni Association, and (6) the Keydet Club Inc. Taken together, the entities and their agents functioned as a continuing unit with a common purpose of generating revenue through the donor-tier pricing menu system, maintaining the financial and access structure associated with that system, and protecting those operations through coordinated institutional action. These entities operate through coordinated

governance mechanisms, donor-tier pricing menu structures, financial disbursement pathways, advancement travel coordination, and interstate communications and commerce involving the promotion (digital advertisement), solicitation, and receipt of high-dollar payments in exchange for private and exclusive access to institutional leadership holding official Department of Defense ranks and titles, as well as access to institutional property under the care, custody, or control of agents acting under color of official authority.

To be held liable under 18 U.S.C. § 1962(c), a defendant must participate in the operation or management of the enterprise itself. The Supreme Court has explained that liability "depends on showing that the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). This standard requires that the defendant take part in directing or carrying out the affairs of the enterprise through which the racketeering activity occurred.

***Second***, the conduct described in the Amended Complaint involves individuals exercising senior institutional authority within the corporate form of the Virginia Military Institute and its governing structure and includes but is not limited to senior leadership, management, and general employees within the athletics department, the human resources department, the Office of the Inspector General, the Institute's financial administration, the Virginia Military Institute Police Department, the Office of the Chief of Staff, the Office of the General Counsel, the Office of the Superintendent, and other institutional offices and personnel whose roles intersected with the events and decisions described in this matter.

Consistent with the Supreme Court's ruling, the conduct described reflects participation in the operation and management of the enterprise through the corporate form of each entity through which the enterprise's affairs are carried out. Each Defendant, through their officers and agents, is a "person" within the meaning of 18 U.S.C. § 1961(3) and remains legally distinct from the enterprise itself.

Participation in the enterprise affairs through the corporate form does not eliminate the legal distinction between the persons conducting those affairs and the enterprise itself. Applying this principle, the Supreme Court held that the "distinctness principle" of § 1962(c) is satisfied where a "natural person" conducts the affairs of a corporation, because "[T]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).

Consistent with this legislative purpose, 18 U.S.C. §§ 1961 et seq. was designed to address unlawful conduct carried out through ongoing enterprise activity rather than isolated criminal acts. Rather than focusing solely on isolated criminal acts, the statute was designed to address unlawful conduct carried out through ongoing enterprise activity in which illegal practices served the economic objectives of the organization. Congress defined the Act broadly to reach enterprises that generate revenue through recurring criminal or illicit activity regardless of the institutional form through which the enterprise operates or the technological methods used

to carry out that activity. As commercial activity and communication systems have evolved, the mechanisms used to carry out prohibited conduct have likewise adapted.

To accomplish this, Congress identified certain criminal offenses that constitute "racketeering activity" when committed as part of an enterprise. A pattern of racketeering activity requires at least two acts of racketeering activity that are related to one another and reflect the operation of the enterprise's affairs rather than isolated misconduct. These acts must share common purposes, participants, victims, methods of commission, or other characteristics demonstrating that they function as part of the enterprise's continuing course of conduct and operations rather than isolated or sporadic misconduct.

In order "[t]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity" and that "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct or to past conduct that, by its nature, projects into the future with a threat of repetition". *H.J. Inc. v. NW Bell Tel. Co.*, 492 U.S. 229 (1989); (citing *Barticheck v. Fidelity Union Bank/First National State*, 832 F.2d 36, 39 (3d Cir. 1987) for the closed- and open-ended continuity framework).

The conduct described occurred over a period of years and involved repeated predicate acts carried out through the same enterprise structure, satisfying closed-ended continuity, and the ongoing nature of the donor-tier pricing menu and fundraising system further demonstrates a threat of continued criminal activity sufficient to establish open-ended continuity.

***Third***, within the present association-in-fact enterprise, the pattern of racketeering activity reflects a common purpose of the solicitation, promotion (digital advertisement), and receipt of high-dollar payments in exchange for private and exclusive access to institutional leadership and institutional property under the care, custody, or control of agents acting under color of official authority and includes the use of that official authority to retaliate against or intimidate individuals whose actions threaten, expose, or interfere with those operations.

The events set forth in the Amended Complaint describe multiple predicate acts that carry out and sustain their system. These predicate acts consist of Bribery Concerning Programs Receiving Federal Funds and Misapplication of Property, Mail Fraud and Wire Fraud, Interstate and Foreign Travel in Aid of Racketeering Enterprises, Laundering of Monetary Instruments Derived from Specified Unlawful Activity, Monetary Transactions in Criminally Derived Property, Obstruction of an Official Proceeding, and Retaliating Against a Witness.

**Predicate Act One – Federal Program Theft, Embezzlement, and Bribery in Violation of 18 U.S.C. § 666**

**§ 666(a)(1)(A) Embezzlement**

The Defendants' Motion to Dismiss provides no basis to dismiss 18 U.S.C. § 666(a)(1)(A) as a predicate act supporting the pattern of racketeering activity under 18 U.S.C. § 1962(c).

18 U.S.C. § 666(a)(1)(A) prohibits an agent of an organization receiving benefits from a federal program from embezzling, stealing, obtaining by fraud, or intentionally misapplying

property valued at $5,000 or more that is owned by, or under the care, custody, or control of the organization.

While *Snyder v. United States* (2024) significantly limited the bribery and "reward" language of § 666(a)(1)(B), the decision did not disturb the separate theft and misapplication provisions contained in § 666(a)(1)(A). The Amended Complaint sets forth how that through the VMI Alumni Agencies donor-tier pricing menu structure the Defendants "embezzle[d], st[ole], obtain[ed] by fraud, or otherwise without authority knowingly convert[ed] to the use of any person other than the rightful owner or intentionally misapplie[d] property" belonging to an organization receiving benefits under a federal program.

Through the donor-tier pricing menu payment structure, the VMI Alumni Agencies themselves assign monetary value to access to institutional facilities, property, and other tangible and intangible benefits. The donor-tier pricing menu payment levels establish the price required to obtain the access offered and therefore place a quantifiable value on the use of tangible institutional property beginning at $5,000 (AC 586), even though the donor-tier pricing menu system itself begins at a $2,000 contribution level.

The valuations set by the Agencies establish a fair market value for the use of property belonging to a state institution receiving benefits under a federal program. The Defendants knowingly converted that institutional property for the use of persons other than the rightful owner (the Commonwealth) to advance their pay-for-access scheme. Taken together, the Defendants leverage the resources and property of a state institution receiving federal program benefits to solicit high-dollar payments from donors, with the VMI Alumni Agencies acting as the intermediary between donors and VMI.

Focusing on the institutional property provision of 18 U.S.C. § 666(a)(1)(A) is critical because the Defendants do not address the statutory elements and instead attempt to isolate a single item within the donor-tier pricing menu structure and characterize it as "innocuous actions by a government agent like '[s]etting up a meeting, hosting an event, talking to another official, [or] sending a subordinate to a meeting.'" *United States v. Lindberg*, 39 F.4th 151, 159, 175, 175 n.19 (4th Cir. 2022) (citation omitted). Their argument focuses exclusively on private access to institutional officials in their official capacities while ignoring the remainder of the donor-tier pricing menu structure reflected in their materials and the § 666(a)(1)(A) theory raised in the Amended Complaint (¶¶ 1198–1200, 1217–1218, 1221).

In interpreting § 666, the Ninth Circuit held that "Section 666(a) provides for the imposition of criminal penalties against any agent of a state government who embezzles property 'valued at $5,000 or more' that 'is owned by, or under the care, custody, or control of' that government, provided that the requirements of section 666(b) are satisfied." This interpretation reflects Congress's broader purpose in enacting § 666. As the Supreme Court explained, "the language of subsection (b) reveals Congress' expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs." *United States v. Kranovich,* 401 F.3d 1107, 1112–13 (9th Cir. 2005) (quoting *Fischer v. United States,* 529 U.S. 667, 678 (2000)).

Additionally, the Sixth Circuit recognized that "where multiple conversions are part of a single scheme, it seems appropriate to aggregate the value of property stolen in order to reach the $5,000 minimum required for prosecution." *United States v. Sanderson*, 966 F.2d 184, 189 (6th

Cir. 1992). The same principle recognized in *Sanderson* applies to the theft, embezzlement, or intentional misapplication of institutional property under § 666(a)(1)(A).

Their own donor-tier pricing menu shows that monetary payments to the Alumni Agencies are exchanged for privileged use of VMI athletic facilities and related institutional property of the Commonwealth as it relates to athletic events and other functions. These items represent controlled access to tangible institutional property rather than the routine interactions with public officials described in *Lindberg*.

This distinction is dispositive as § 666(a)(1)(A) addresses the misuse of property belonging to an organization receiving benefits under a federal assistance program. The 9th Circuit clarified in Kranovich (2005) that "the government was not required to establish any connection between the embezzled funds and a federal interest, apart from the express requirement in section 666(b) that the government entity received federal benefits in excess of $10,000."

**§ 666(a)(1)(B) and (a)(2) Bribery:**

The allegations here do not describe casual interactions or isolated hospitality. The Amended Complaint sets forth facts describing a structured financial system linking escalating contributions to privileged access to officials who exercise authority over institutional operations and specific areas of institutional business such as athletics administration, allocation of institutional resources, scheduling and use of institutional facilities, and decision-making affecting program operations. Each of these areas involves determinations that direct the use of authority and operational resources that produce concrete institutional outcomes and policy decisions. Access occurs during interactions in which institutional matters, policy positions, new

institutional hires, and operational decisions are discussed and actions are considered by officials acting within their official capacities (see donor-tier pricing menu). The donor-tier pricing menu structure ties financial contributions directly to interactions with officials acting within these defined areas of institutional responsibility rather than to purely ceremonial or informational contact.

The federal programs bribery statute prohibits an agent of an organization receiving benefits under a federal program from corruptly accepting or agreeing to accept anything of value intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of that organization involving anything of value of $5,000 or more. 18 U.S.C. § 666. The Supreme Court has explained that "setting up a meeting, hosting an event, or calling an official … merely to talk about a research study or to gather additional information … does not qualify as a decision or action on the pending question, so long as the public official does not intend to exert pressure on another official or provide advice intended to form the basis for an official act." *McDonnell v. United States*, 579 U.S. 550, 572 (2016). The allegations here go beyond such incidental contact held in *McDonnell* by describing a system in which financial contributions determine access to officials acting within defined areas of institutional business. Access is directed towards officials in a manner that places donors who provide high-dollar financial contributions in proximity to institutional decision-making where those officials are positioned to influence, direct, or determine institutional actions within their authority.

This structure operates as a forward-looking pay-to-access gatekeeping system rather than a reward issued after the fact. Here, the VMI Alumni Agencies donor-tier pricing menu is directed to officials who exercise authority over institutional operations and resource allocation.

The access provides a direct pathway to those who control institutional outcomes, and its value therefore lies in obtaining proximity to decision-making authority in matters affecting institutional business, through which access enables donors to affect ***or*** direct institutional decisions made by officials exercising discretion over institutional outcomes.

The value being exchanged in this structure is not merely a social gathering, but access to individuals in their official ranks, with the Department of Defense rank, title, and authority of commissioned and general officers constituting the thing of value exchanged through the donor-tier access system. Likewise, section 666(a)(2) separately prohibits any person from corruptly giving, offering, or promising anything of value to an agent of an organization receiving federal program benefits with the intent to influence or reward that agent in connection with the organization's business or transactions involving $5,000 or more.

The Complaint identifies three critical components of a bribery framework:

***First***, the donor-tier pricing menu structure conditions exclusive and private access to senior officials on escalating financial contributions (¶ 586). By restricting these interactions to defined payment thresholds, the system creates a pay-conditioned access structure unavailable to the general public. This restricted and tiered structure assigns measurable value to access that is not otherwise available and reflects that access to authority carries significance beyond routine or incidental interaction. Donors make high-dollar financial payments to the VMI Alumni Agencies (totaling $81,269,997 between 2019 and 2023), and in return receive direct access to institutional officials acting within their respective authority. Those officials exercise authority over institutional business, including athletics administration, resource allocation, and the use of institutional facilities, such that the access provided gives donors a channel through which each

donor's financial contribution translates into the ability to affect or direct institutional decisions within the scope of the officials' authority (AC ¶¶ 1205–1208).

***Second***, the Defendants question whether any connection to institutional business exists, but they overlook VMI's own recent history concerning the exercise of institutional authority over public resources. The authority in question includes control over procurement, allocation of institutional resources, and administration of institutional programs, as reflected in *Center for Applied Innovation, LLC v. Virginia Military Institute*, No. CL22-215 (Va. Cir. Ct. Rockbridge Cty. Oct. 4, 2023). The court sanctioned VMI after finding that the Institute made false representations in connection with a contract award while issuing a purchase order that bypassed competitive bidding requirements under the Virginia Public Procurement Act. This recent enforcement action illustrates that VMI officials exercise authority over concrete institutional transactions and the use of public resources within the scope of institutional business.

***Third***, public filings for the VMI Alumni Agencies identify revenue derived primarily from donor payments and investment income generated from those payments. The Agencies operate as intermediaries between donors and the institution. Donor payments are funneled through the Agencies rather than made directly to institutional officials as disclosed on the VMI Foundation's IRS Form 990 Schedule I. Between 2019 and 2023, cash and non-cash grants were made to "leadership" as additional compensation beyond base salary (labeled on the Foundation's Schedule I) totaling $3,248,587.00 during the same period in which the donor-tier pricing menu system operated (AC  1212). This structure connects high-dollar financial payments made by donors to the Agencies that ultimately reach institutional leadership. By routing donor payments through the VMI Alumni Agencies rather than providing those payments

directly to institutional officials, the structure separates the source of the funds from the officials who ultimately receive financial benefit. This intermediary "donation" arrangement allows value derived from donor payments to reach institutional leadership through an indirect channel while maintaining the access relationship tied to those same payments. These payments are directly linked to the access offered to these officials acting on institutional matters within the scope of their official authority through the escalating donor-tier pricing menu structure.

These grants were made during the same period in which the donor-tier pricing menu system operated and are funded by the same donor payments made to the Agencies (donor payments to the Agencies and related leadership payments from the Agencies, AC ¶¶ 1205–1212). The Plaintiff relies on publicly available filings and disclosures produced by the VMI Alumni Agencies. Their IRS Form 990 filings, submitted under penalty of perjury and subject to IRS review, reflect that the revenue derived from donor payments corresponds to the access structure described. These materials are subject to submission as exhibits under Federal Rule of Civil Procedure 10(c) and consideration as matters of public record.

In explaining the corrupt intent required under the statute, the Supreme Court has clarified that 18 U.S.C. § 666 is strictly a bribery statute that forbids a covered official from accepting anything of value with "the intent to be influenced in the official act" in connection with government business. *Snyder v. United States*, 603 U.S. ___ (2024). The Court also affirmed "the statute applies to all cases in which an 'organization, government, or agency' receives the statutory amount of benefits under a federal program." *Salinas v. United States*, 522 U.S. 56–57 (1997). The Court further explained that "the statute [does not] limit the type of bribe offered" but instead "prohibits accepting or agreeing to accept 'anything of value,'" a phrase

which "encompasses all transfers of personal property or other valuable consideration in exchange for the influence or reward." *Salinas*, 522 U.S. at 57.

Viewed in light of these principles, the allegations describe a system in which financial contributions are linked to privileged access to institutional officials exercising authority over government business. As the Supreme Court explained, "the business or transaction in question, the statute forbids acceptance of a bribe by a covered official who intends 'to be influenced or rewarded in connection with any business, transaction, or series of transactions' of the organization, government, or agency," and "[t]he prohibition is not confined to a business or transaction which affects federal funds." *Salinas*, 522 U.S. at 57.

The Second Circuit further explained that the term "business" under § 666 includes both "commercial and noncommercial activity" and applies to university operations. *United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021). The Court rejected the defendants' attempts to separate university programs from the institution itself and concluded that payments made to influence actions connected to the administration and operation of a university's athletic program fall within the statute's prohibition. This principle confirms that payments directed toward officials exercising authority over institutional operations and athletics administration concern the "business" of a federally funded institution within the meaning of 18 U.S.C. § 666.

The Supreme Court has recognized that transparency and disclosure requirements "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity," and that "it is unnecessary to look beyond the Act's primary purpose — to limit the actuality and appearance of corruption resulting from large individual financial contributions." *Buckley v. Valeo*, 424 U.S. 1, 26–27, 67 (1976). The Court

has further clarified that "Our cases have held that Congress may regulate campaign contributions to protect against corruption or the appearance of corruption." "Any regulation must instead target what we have called 'quid pro quo' corruption or its appearance." *McCutcheon v. Federal Election Commission*, 572 U.S. 185, 192, 206 (2014). Although *McCutcheon* and *Buckley* arise in the context of campaign contributions, they establish that the law may intervene where financial contributions are used to obtain access to public officials and create a system of quid pro quo corruption. As in the context of campaign fundraising, where contributions cannot be used to buy specific official acts, the VMI donor-tier pricing menu reflects the same prohibited exchange by conditioning financial contributions on access to officials who exercise authority within their official capacity. The allegations set forth above establish the quid pro quo relationship between institutional leadership, the VMI Agencies as the intermediary, and high dollar contributors.

***Finally***, the Plaintiff's allegations are grounded in his report to the Office of the Inspector General, in which he identified the Keydet Club's donor-tier pricing menu structure as a bribery scheme (AC ¶¶ 551–581). His reporting to the Inspector General was deliberately limited to the Keydet Club and confined to matters within the athletics department based on the Plaintiff's role, which involved direct communications with the Keydet Club and its VMI Alumni Agencies Director of Digital Content. As a result of the Plaintiff's report, any internal determination by the Inspector General purporting to find no wrongdoing remains a contested issue, as the Office of the Inspector General operates within the Institute's chain of command. Additionally, the Inspector General explicitly stated that they could **not** investigate the Keydet Club as it is a private organization (AC ¶¶ 860–862).

In response to the Plaintiff's reporting, Defendant VMI engaged in the conduct described in Predicate Acts Six and Seven by taking adverse legal and employment actions directed toward the Plaintiff that began four days **after** his meeting with the Deputy Inspector General where he reported the identified bribery scheme involving VMI and the VMI Alumni Agencies.

The Commonwealth's invocation of sovereign immunity does not negate the structure described; rather, sovereign immunity functions as a protection mechanism within the enterprise to enable the continuation of the donor-tier pricing menu system and the actions taken to silence internal reporting to protect the enterprise's revenue stream.

With the facts established involving VMI's exercise of institutional authority, the absence of discovery regarding the specific official acts influenced by these payments does not defeat plausibility. By conditioning access to decision-makers on escalating financial payments, the VMI Alumni Agencies' donor-payment structure establishes the very quid pro quo framework that the Supreme Court in *McCutcheon* and *Salinas* identified as the core of actionable corruption.

For these reasons, the Plaintiff has sufficiently pled violations of 18 U.S.C. §§ 666(a)(1)(A), 666(a)(1)(B), and 666(a)(2) (AC ¶¶ 1198–1221), and these predicate acts should proceed.

**Predicate Act Three – Interstate Travel and Use of Interstate Facilities to Promote Unlawful Activity in Violation of 18 U.S.C. § 1952 (Travel Act)**

Within the Commonwealth of Virginia, a series of anti-corruption statutes regulate the conduct of public officials. Virginia law prohibits public officials from using their positions for

personal benefit or accepting things of value in connection with the performance of official duties. Related criminal provisions prohibit corrupt influence over an agent in connection with a transaction involving the agent's principal and prohibit the acceptance of a bribe in exchange for the exercise of official authority.

Among those provisions, Va. Code § 18.2-444 addresses corrupt influence over an agent in connection with the business of the agent's principal. The statute prohibits both the offering and the acceptance of gifts or gratuities intended to influence an agent's conduct in matters affecting the principal's business. It bars any person from giving, offering, or promising anything of value to an agent, employee, or servant without the knowledge and consent of the principal with the intent to influence the agent's actions to the detriment of the principal's interests.

The statute likewise prohibits an agent or employee from requesting or accepting such gifts or benefits under an agreement or understanding that the agent will act in a particular manner affecting the principal's business. If an agent is authorized to procure materials, supplies, or labor for the principal, the statute further prohibits that agent from receiving, directly or indirectly, any commission, discount, bonus, or other financial benefit from the person supplying those materials, goods, or services.

Separate provisions address the conduct of public officials themselves. Under Va. Code § 18.2-439, an executive, legislative, or judicial officer may not accept any gift, gratuity, or promise of a benefit under an agreement or understanding that the officer's vote, opinion, judgment, appointment, or other official action will be exercised on a particular side of a matter that may come before the officer in his official capacity.

Although codified as part of Virginia's conflict-of-interest framework, Va. Code § 2.2-3103 functions as an additional anti-corruption safeguard by prohibiting officers or employees of a state or local governmental or advisory agency from engaging in various conduct while in the duty of public office.

Virginia Code § 2.2-3103 prohibits public officers and employees from using their official positions for private gain or allowing financial incentives to influence the performance of their duties. The statute bars officials from soliciting or accepting compensation outside their official salary for actions taken within the scope of their public responsibilities, using their position to obtain contracts or benefits for private parties, and accepting gifts, favors, or opportunities that could reasonably influence or appear to influence their decision-making. The provisions also prohibit officials from using their public position to retaliate or threaten retaliation against any person for expressing views on matters of public concern.

These provisions establish a unified anti-corruption standard: they prohibit the exchange of benefits for official action that compromises an agent's duty to the principal. This same prohibition against corrupt quid pro quo exchanges is codified at the federal level in 18 U.S.C. § 666(a)(1)(B) and § 666(a)(2).

The Amended Complaint describes a structured donor-tier pricing menu system operated by the VMI Alumni Agencies and VMI that links escalating financial contributions to private access to institutional leadership in their official capacities (AC ¶¶ 586, 525–528). The institutional leadership offered exclusive and private access through the donor-tier pricing menu system consists of VMI senior officials within both the Institute and the athletics department who

exercise authority over institutional operations, athletics administration, and the allocation and use of institutional resources (AC 860). Escalating financial contributions function as the mechanism through which donors obtain private access to these officials who control institutional decision-making.

Financial disclosures show that the Agencies' revenue from donor-derived payments between 2019 and 2023 totaled $81,269,997, while VMI leadership received grants and other payments through the VMI Foundation's Schedule I filings totaling $3,248,587.00 during the same period in which the donor-tier pricing menu system operated (AC 1212). The payments made to the Agencies establish that donor funds move through intermediary entities and are used to pay institutional leadership rather than donors paying VMI officials directly.

As presented in the Amended Complaint, the Plaintiff and other members of the athletics department regularly traveled for athletic competitions, media operations, and institutional events requiring interstate travel (AC 122–123). The VMI Alumni Agencies and their affiliated entities likewise traveled in connection with athletic events, alumni engagement activities, and fundraising initiatives designed to promote financial contributions to the Agencies (AC ¶¶ 1234–1237).

The Amended Complaint identifies travel expenditures reported in publicly filed IRS Form 990 disclosures from 2019 through 2023 for the VMI Alumni Agencies (AC ¶¶ 1235–1237). IRS Form 990 filings report expenditures for transportation, lodging, and related travel costs associated with donor solicitation involving alumni and contributors residing both

within and outside Virginia (AC ¶¶ 1236–1237). Collectively, the filings report total travel expenditures of $794,056 between 2019 and 2023 associated with donor solicitation activities.

These interstate travel activities and the use of interstate communication facilities were undertaken with the intent to promote the continuation and facilitation of unlawful activity within the meaning of 18 U.S.C. § 1952(b). Such unlawful activity consists of the Commonwealth's bribery and corrupt influence prohibited under the anti-corruption statutes Virginia Code §§ 18.2-444, 18.2-439, and 2.2-3103.

The Supreme Court explained that the Travel Act "makes it a federal offense to travel or use a facility in interstate commerce to commit 'extortion [or] bribery . . . in violation of the laws of the State in which committed or of the United States.'" The Court further explained that "[b]ecause the offenses are defined by reference to existing state as well as federal law, it is clear beyond doubt that Congress intended to add a second layer of enforcement supplementing what it found to be inadequate state authority and state enforcement." *Perrin v. United States*, 444 U.S. 37, 42 (1979).

When evaluating 18 U.S.C § 1952, the First Circuit stated: "In defining an 'unlawful activity,' Congress has clearly stated its intention to include violations of state as well as federal bribery law." *United States v. Fitzpatrick*, 892 F.2d 162 (1st Cir. 1989) (quoting Perrin v. United States, 444 U.S. 37, 50, 100 S. Ct. 311, 318, 62 L. Ed. 2d 199 (1979)). Application of the Travel Act therefore turns to the key elements required to establish a violation of the statute. As the Fourth Circuit explained, "[a] violation of the Travel Act requires proof of three elements. The defendant must (1) travel in interstate or foreign commerce or use an interstate or foreign facility,

such as the mail; (2) intend thereby to promote an unlawful activity; and (3) subsequently promote or attempt to promote that unlawful activity." *United States v. Hayes*, 775 F.2d 1279, 1282 (4th Cir. 1985).

The Travel Act liability is not limited to the individual who personally performs the interstate travel. As the Fourth Circuit explained, "Interstate travel by others that results in the commission of a crime may give rise to a substantive violation of the Travel Act by the one who ordered or instigated the travel." *United States v. Arcia*, 14 F.3d 597 (4th Cir. 1993) (citing *United States v. West*, 877 F.2d 281 (4th Cir. 1989)). Violation of the Travel Act likewise attaches to the district in which the unlawful activity occurs as the Fourth Circuit recognized that "[t]raveling in interstate commerce to carry on an illegal business enterprise may be tried in any district where the crime took place . . . ." *United States v. Arcia*, 14 F.3d 597 (4th Cir. 1993) (citing *United States v. Davis*, 666 F.2d 195, 199 (5th Cir. 1982)).

Senior officers, fundraising staff, and organizational leadership of the VMI Alumni Agencies, the VMI Foundation, the Keydet Club, the VMI Alumni Association, and senior leaders and employees of VMI traveled within the Commonwealth of Virginia and other states to promote their donor-tier pricing menu system in order to solicit financial contributions.

To execute this system, the Agencies and VMI leadership utilized interstate electronic communications as the primary logistical framework to coordinate donor-tier events and interstate travel undertaken to promote the donor-tier pricing menu scheme. IRS Form 990 filings for the Agencies report combined travel expenditures totaling $794,056 between 2019 and 2023 incurred in perpetuating the donor-tier pricing menu system. During this same period, the

Agencies report donor-derived contributions totaling $81,269,997 as reflected in their IRS Form 990 Schedule B disclosures, while Schedule I disclosures for the VMI Foundation show that VMI leadership received grants and other payments totaling $3,248,587.00.

Acting through a coordinated structure, the VMI Alumni Agencies and VMI officials and employees utilized interstate commerce to orchestrate and carry on a pay-for-access donor scheme with subsequent acts undertaken to further that unlawful activity in violation of 18 U.S.C. § 1952(a)(3).

At the pleading stage, the Court does not determine whether the bribery scheme ultimately occurred; the question is whether the Complaint plausibly shows that Defendants used interstate travel or facilities with the intent to promote unlawful activity and whether acts were subsequently performed to carry out that activity. The actions taken by Defendants involving interstate travel, donor solicitation, and the operation of the donor-tier pricing menu system satisfy that plausibility standard under 18 U.S.C. § 1952(a)(3).

For these reasons, the Plaintiff has sufficiently pled violations of 18 U.S.C. § 1952(a)(3) (AC ¶¶ 1234–1257), and this predicate act should proceed.

**Predicate Act Two – Mail Fraud and Wire Fraud (18 U.S.C. §§ 1341 and 1343)**

The Amended Complaint does not rely on generalized allegations of advertising, but on a specific fundraising and advertising system that linked donor payments to donor-tier pricing menu benefits involving access to institutional officials, institutional facilities, and institutional events (AC ¶¶ 39–44, 124–134, 279–280). The communications used to promote and operate this

system included ESPN broadcast advertising, live event fundraising promotions, institutional websites, social media accounts, and electronic communications directing the placement and promotion of donor-related advertising and fundraising content (AC ¶¶ 39–44, 124–134). These communications represented that donor funds supported institutional programs and initiatives, while omitting that specified contribution levels were tied to donor-tier pricing menu benefits involving access to institutional officials acting in their official roles and the use of institutional resources and facilities (AC ¶¶ 124–134, 279–280). The Plaintiff was directly involved in the production, placement, and broadcast of these advertisements and fundraising materials, and was instructed by institutional and Alumni Agencies personnel regarding the placement, promotion, and integration of donor-related content into interstate broadcasts and digital media (AC ¶¶ 39–44, 124–134). These communications were transmitted through interstate wires, broadcast media, and electronic platforms in furtherance of the donor-tier pricing menu fundraising system (AC ¶¶ 39–44, 124–134, 279–280). The omission of the relationship between specified donor payments and donor-tier pricing menu access to institutional officials and institutional resources rendered these fundraising communications materially misleading to donors deciding whether and at what level to contribute (AC ¶¶ 582–586).

The Supreme Court clarified the scope of honest services fraud under 18 U.S.C. § 1346, holding that "Congress intended at least to reach schemes to defraud involving bribes and kickbacks. . . [w]e therefore hold that §1346 covers only bribery and kickback schemes." *Skilling v. United States*, 561 U.S. 358, 404, 408–09 (2010). The Plaintiff on November 18, 2024, reported the donor-tier pricing menu as a bribery scheme and misuse of public resources (AC ¶¶

582–586) to the Deputy Superintendent for Finance and Support, the Senior Finance Director, and the Deputy Inspector General (AC ¶¶ 517–581), aligning with the Supreme Court's decision.

For these reasons, the Plaintiff has sufficiently pled violations of 18 U.S.C. §§ 1341 and 1343 (AC ¶¶ 1222–1233), and these predicate acts should proceed.

**Predicate Act Four and Five – Money Laundering and Monetary Transactions in Criminally Derived Property (18 U.S.C. §§ 1956 and 1957)**

Under 18 U.S.C. § 1961(1), racketeering activity includes violations of federal offenses involving theft and embezzlement (e.g., 18 U.S.C. §§ 659, 664), bribery offenses (e.g., 18 U.S.C. §§ 201, 224), prohibiting the use of interstate commerce to promote unlawful activity (18 U.S.C. § 1952), as well as offenses relating to monetary transactions involving property derived from specified unlawful activity (18 U.S.C. §§ 1956 and 1957). The term "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7). The statute provides that the term includes violations of 18 U.S.C. § 666 relating to theft or bribery concerning programs receiving federal funds. The statutory framework therefore requires examination of the entities through which donor-derived funds connected to the 18 U.S.C. § 666 conduct described in the Amended Complaint are received, administered, transferred, withdrawn, or disbursed.

The VMI Alumni Agencies publicly describe themselves as a combined organization under unified leadership, yet the VMI Foundation, the VMI Alumni Association, and the Keydet Club retain separate legal identities as independent charitable organizations that allow activities to be carried out "individually" while operating under a unified structure. "The CTA provides for

the 'collection of beneficial ownership information' of designated reporting companies." *National Small Business United v. U.S. Department of the Treasury*, Court of Appeals, 11th Circuit (2025). Under the law, those companies must disclose information about "each beneficial owner" and "each applicant" to the Department of the Treasury's Financial Crimes Enforcement Network. The use of legally distinct corporations operating under a coordinated leadership structure allows fundraising to be conducted through the VMI Foundation and the Keydet Club as intermediary entities under unified leadership, while the VMI Alumni Association receives internal transfers from those affiliated entities.

By dividing their operations and mission scope across legally distinct entities under unified leadership, the affiliated organizations create a structure in which functions and activities may shift between entities while still advancing the same overall objective. This structure allows one entity to carry forward an activity while another entity provides support or institutional separation. Responsibility for individual and coordinated action is directed by a single chief executive officer overseeing the unified structure, while the operating officers of each organization execute those directives. This structure permits each organization to operate within the coordinated framework while the shared and individual objectives remain unaffected.

To explain the structure, the Supreme Court recognized that "the partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." *Salinas v. United States*, 522 U.S. 52, 63–64 (1997) (citing *Pinkerton v. United States*, 328 U.S. 640, 646 (1946) ("And so long as the partnership in crime continues, the partners act for each other in carrying it forward")).

VMI and the VMI Alumni Agencies operate a donor-tier pricing menu system that conditions access to leadership and institutional property under the care, custody, or control of VMI and to institutional leadership on high-dollar financial contributions. *United States v. Frazier*, 53 F.3d 1105, 1111 (10th Cir. 1995) (setting forth the elements required to establish a violation of 18 U.S.C. § 666(a)(1)(A)). Donors obtain that access only after making the required payments. See *United States v. Abbey*, 560 F.3d 513 (6th Cir. 2009) ("the statute does not require the government to prove that a defendant contemplated a specific act when the bribe was received"); *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005) ("quid pro quo of money for a specific act is sufficient to violate the statute"). Those payments move through the affiliated entities, are transferred among the agencies, and are later disbursed to institutional leadership as reflected in the VMI Foundation's Schedule I filings, while their Schedule F reflects substantial foreign expenditures and investments in the Caribbean and Central America region.

"Most relevant to this case is 18 U. S. C. §1956(a)(1)(A)(i), which criminalizes transactions to promote criminal activity." *United States v. Santos*, 553 U.S. 507, 514 (2008). Revenue for the VMI Alumni Agencies is largely derived from donor payments generated through the donor-tier pricing menu system and investment income derived from those payments. These payments arise from the same conduct described in the §666 section above. The laundering statutes therefore apply to financial transactions involving property derived from the proceeds of "specified unlawful activity," including violations of 18 U.S.C. §666, as defined in 18 U.S.C. §1956(c)(7).

Donors made high-dollar payments between 2019 and 2023 through the VMI Alumni Agencies in the combined amount of $81,269,997 as reflected in their IRS Form 990 Schedule B (AC ¶¶ 1205–1208), with the Agencies functioning as the intermediary between donors and the institution. Foreign expenditures and investments totaling $104,333,936 were reported between 2019 and 2023 by the VMI Alumni Agencies, the Keydet Club, and the VMI Foundation. These transactions were made from general funds or investment pools containing donor-derived monetary instruments and other revenues. The entities reported these transactions in their respective IRS Form 990 filings (Schedule F) as foreign expenditures and investments in the Central America and Caribbean region. As these expenditures relate to violations of 18 U.S.C. § 666, the Defendants made these transactions with knowledge that the funds involved are either the proceeds of, or commingled with the proceeds of, "specified unlawful activity."

"This provision uses the term 'proceeds' in describing two elements of the offense: the Government must prove that a charged transaction 'in fact involve[d] the proceeds of specified unlawful activity' (the proceeds element), and it also must prove that a defendant knew 'that the property involved in' the charged transaction 'represent[ed] the proceeds of some form of unlawful activity' (the knowledge element). §1956(a)(1)." *Id.* at 514.

The Fourth Circuit explained that "[i]n the common understanding, money laundering occurs when money derived from criminal activity is placed into a legitimate business in an effort to cleanse the money of criminal taint. The money laundering statute, however, as codified at 18 U.S.C. § 1956(a)(1), proscribes a much broader range of conduct . . . If this 'proceeds' element is satisfied, a money laundering violation occurs when a defendant conducts or attempts

to conduct a financial transaction." *United States v. Bolden*, 325 F.3d 471 (4th Cir. 2003) (describing financial transactions involving criminal proceeds, including transactions intended to promote unlawful activity, evade tax laws, conceal criminal proceeds, or avoid reporting requirements).

"Section 1957 prohibits 'monetary transaction[s] in criminally derived property.' 'Monetary transaction' is defined to mean 'the deposit, withdrawal, transfer, or exchange … of funds or a monetary instrument … by or through a financial institution,' see 18 U.S.C. § 1957(f)(1), and 'criminally derived property' is defined as 'any property constituting, or derived from, proceeds obtained from a criminal offense,' see id. § 1957(f)(2)." *United States v. Moore*, 27 F.3d 969, 977 (4th Cir. 1994).

Due to the fact that the Agencies operate as charitable organizations capable of receiving both ordinary donations and funds derived from the donor-tier pricing menu system described above constituting specified unlawful activity under 18 U.S.C. § 666, the Fourth Circuit has explained that "[t]o satisfy this burden where the funds used in the particular transaction originated from a single source of commingled illegally-acquired and legally-acquired funds or from an asset purchased with such commingled funds, the government is not required to prove that no 'untainted' funds were involved, or that the funds used in the transaction were exclusively derived from the specified unlawful activity." The court further recognized that "money is fungible, and when funds obtained from unlawful activity have been combined with funds from lawful activity into a single asset, the illicitly-acquired funds and the legitimately-acquired funds … cannot be distinguished from each other … that is, they cannot be

traced to any particular source." As a result of the commingling of funds, "it may be presumed in such circumstances … that the transacted funds, at least up to the full amount originally derived from crime, were the proceeds of the criminal activity or derived from that activity." *Id.* at 977.

Accordingly, the Agencies' pooling of donor payments connected to the §666 conduct into the same accounts used for transfers, investments, and foreign expenditures means that the transactions described above constitute financial transactions involving proceeds of specified unlawful activity within the meaning of 18 U.S.C. §§1956 and 1957.

As reflected in the IRS Form 990 filings of each charity, the transactions made are transfers and investments exceeding $10,000 and conducted through financial institutions affecting interstate and foreign commerce. These transactions were undertaken with knowledge that the property involved represented the proceeds of unlawful activity and with the intent to promote that activity and to conceal or disguise the nature, location, source, ownership, and control of those proceeds.

Where funds are derived from conduct violating 18 U.S.C. §§ 666(a)(1)(A), 666(a)(1)(B), 666(a)(2), and 1952(a)(3), and are subsequently involved in domestic and international monetary transactions (AC ¶¶ 1243–1257, 1258–1262), such transactions constitute offenses under 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(2)(B)(i), and 1957, and therefore qualify as racketeering activity under 18 U.S.C. § 1961(1).

For these reasons, the Plaintiff has sufficiently pled violations of 18 U.S.C. § 1952(a)(3) and 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(2)(B)(i) (AC ¶¶ 1243–1262), and these predicate acts should proceed.

**Predicate Act Six and Seven – Witness Tampering and Retaliation Against a Witness (18 U.S.C. §§ 1512 and 1513)**

After the Plaintiff disclosed the misuse of public resources and a bribery scheme on October 31, 2024, and again in written form on November 4, 2024, his job duties, workspace, and access to equipment were altered, and he was removed from core broadcast responsibilities (AC ¶¶ 295–300; ¶¶ 308–309; ¶¶ 313–314). Four days after his November 18 and 19, 2024 disclosures, his supervisors initiated formal disciplinary actions and performance documentation (AC ¶¶ 666–670). Over the following weeks, the Plaintiff received a total of twenty-three disciplinary reprimands and formal performance notices, many of which relied on incidents that had occurred months earlier or on conditions created by denial of access to necessary equipment and resources (AC ¶¶ 666; ¶¶ 832; ¶¶ 936; ¶¶ 938; ¶¶ 941–944).

Following these disclosures, the Plaintiff informed the Inspector General and Deputy Inspector General that the Director of Human Resources, the Athletics Director, and the Associate Athletic Director were coordinating disciplinary actions against him after his reporting of the bribery scheme and misuse of public resources (AC 703). The Plaintiff reported that these officials had already met on November 5, 2024 to discuss the events related to his disclosures (AC ¶¶ 313–314; ¶¶ 704–705), that he had been removed from his office, subjected to seven disciplinary reprimands in a single session, and that his working conditions had

deteriorated to the point that he required medical intervention (AC ¶¶ 697–698; ¶¶ 706; ¶¶ 308–309).

Despite being informed that the Plaintiff was experiencing retaliation after reporting criminal conduct, the Inspector General directed the Plaintiff back to the Director of Human Resources, who was one of the officials the Plaintiff had identified as participating in the retaliatory conduct, thereby routing the Plaintiff's report back into the same chain of command implicated in the reported misconduct (AC 710).

On December 4, 2024, the Plaintiff submitted a written report documenting the bribery scheme and coordination between institutional officials and the VMI Alumni Agencies (AC 695–696). On December 11, 2024, the Plaintiff submitted an additional report to the Inspector General and reported that senior leadership were advocating for the alteration and manipulation of official email communications related to the matters he had reported (AC 865–866).

During a disciplinary session held after these disclosures on January 9, 2025, the Associate Athletic Director physically grabbed the Plaintiff's arm to prevent him from retrieving and reviewing a disciplinary document that he was attempting to examine and rebut. Within minutes of this incident, the Plaintiff reported the physical contact and the ongoing disciplinary actions to the Inspector General. The Inspector General declined to intervene and directed the Plaintiff to report the matter through the same institutional chain of command involved in the disciplinary actions, thereby placing the reporting of the incident under the authority of the same officials responsible for the actions being reported (AC ¶¶ 968–971).

When the Plaintiff requested on the early afternoon on January 10, 2025, that the retaliation-related meeting be moved to a neutral location due to the involvement of the Director of Human Resources in the underlying events, the Director of Human Resources instead arranged for the presence of the VMI Police Captain at the meeting (AC 975). The Plaintiff requested the presence of an additional officer because he believed the law enforcement presence had been arranged as an intimidation tactic due to the Director of Human Resources' involvement in the matter (AC ¶¶ 977–979).

On January 24, 2025, the Plaintiff, along with the General Counsel, the Director of Human Resources, and the Athletics Director, received the Human Resources investigative findings rejecting his complaints for retaliation, unwanted physical contact, and an allegation the Plaintiff did not raise (AC ¶¶ 993–994). The findings stated that the Plaintiff requested the investigation on January 9, 2025 (AC 994), despite the Plaintiff having requested the investigation on December 11, 2024, twenty-nine days earlier (AC ¶¶ 933–935, 964). Prior to the issuance of those findings, the Plaintiff had submitted multiple reports identifying misconduct and specific personnel involved, provided documented communications spanning June through December 2024, and submitted additional documentation including a report identifying document manipulation and other conduct (AC ¶¶ 582–586, 695–696, 863–866, 945–948). Despite these submissions, the Plaintiff was informed that he had provided no evidence to substantiate his complaint. Within hours of receiving the Human Resources findings related to his complaints, the Plaintiff's professional broadcasting credentials were revoked through contact with external broadcast partners (AC 995).

On the morning of January 29, 2025, the Plaintiff rebutted the findings of the HR inquiry, and subsequently requested confirmation that documents and evidence he had submitted would not be altered or modified while in the possession, custody, or control of institutional officials involved in the investigation and disciplinary process, particularly in light of disciplinary documents that he identified had been fabricated or backdated (AC ¶¶ 996–1002). Within hours of the rebuttal, the Plaintiff was requested to meet with the Chief of Staff the following morning on January 30, 2025 (AC 1003).

On the morning of January 30, 2025, the Plaintiff was called to a meeting with the newly appointed Chief of Staff, attended by the Director of Human Resources with the Captain of the VMI Police Department present. At this meeting, the Plaintiff was informed that the Institute intended to terminate his employment within thirty days, citing the Notice of Improvement Needed/Substandard Performance as the basis for the termination decision (AC ¶¶ 1004–1005). The termination decision relied on the Notice of Improvement Needed/Substandard Performance and related disciplinary documentation that had been created after the Plaintiff's disclosures of the bribery scheme and misuse of public resources (AC ¶¶ 1004–1005; ¶¶ 941–944).

After the Plaintiff filed a criminal complaint regarding the physical contact incident on January 30, 2025, a VMI Police Officer informed him that if he proceeded with the complaint, the Associate Athletic Director could file a criminal complaint against him in response. A criminal complaint was subsequently filed against the Plaintiff by the Associate Athletic Director on January 31, 2025, approximately twenty-five hours after the Plaintiff filed his complaint. Four days following, on February 4, 2025, the Plaintiff was then placed on administrative suspension

based on a recommendation from a Threat Assessment Team composed of the same institutional officials involved in the Plaintiff's reports and disciplinary actions (AC ¶¶ 1014, 1016–1017, 1021–1026). On February 10, 2025, the Plaintiff was issued a trespass warning that barred him from campus and carried the threat of arrest for mere presence on Institute property (AC ¶¶ 1029–1030).

The Fourth Circuit held that "evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650–51 (4th Cir. 2007). The sequence of events following the Plaintiff's protected disclosures reflects recurring retaliatory actions over a defined period of time rather than isolated disciplinary decisions. After the Plaintiff reported bribery and misuse of public resources and filed a criminal complaint regarding the physical contact incident, a counter-complaint was filed against him within approximately twenty-five hours. That criminal process was followed by administrative suspension on February 4, 2025, revocation of institutional access, and the issuance of a trespass warning on February 10, 2025 that carried the threat of arrest for mere presence on property he had already been instructed not to access without permission. The progression of criminal process, employment action, and physical exclusion occurred in close temporal proximity to the Plaintiff's disclosures and requests for external oversight and therefore supports an inference of recurring retaliatory animus and causation under *Lettieri*.

In *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 1726 (2019), the Supreme Court explained that "the presence of probable cause should generally defeat a First Amendment retaliatory arrest claim" due to the fact that probable cause ordinarily suggests that the officer's animus did not

cause the arrest. However, the Court recognized a narrow exception where objective evidence shows that similarly situated individuals not engaged in protected activity were not subjected to the same enforcement action. Here, the criminal process initiated against the Plaintiff did not occur in isolation. It followed protected disclosures regarding bribery and misuse of public resources, occurred after the Plaintiff filed a criminal complaint against a supervisory official, and was followed by administrative suspension on February 4, 2025 and trespass exclusion on February 10, 2025 while termination proceedings were underway. Officers indicated that custodial detention was unnecessary, reflecting discretionary enforcement rather than a mandatory arrest decision. The progression from criminal process to suspension and then to formal trespass exclusion supports the inference of discretionary and escalating enforcement rather than a narrowly tailored response to a discrete safety concern.

The Supreme Court has held that a retaliatory arrest claim may proceed where a plaintiff alleges an official municipal policy motivated by retaliation, even if probable cause existed for the arrest, explaining that "an official retaliatory policy is a 'particularly troubling and potent form of retaliation,' for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954–55 (2018). Where an arrest and related enforcement actions are part of a broader retaliatory plan adopted by officials within an institutional structure, probable cause does not categorically bar the claim. The sequence of events here shows that criminal process, administrative suspension, revocation of institutional access, and trespass exclusion were imposed by officials operating within the same institutional structure after the Plaintiff reported bribery and misuse of public resources and requested external oversight. This progression supports the inference that the

criminal and administrative actions were part of a continuing retaliatory and coercive structure rather than independent responses to unrelated events.

Following the suspension on the morning of February 4, 2025, the Plaintiff later reported the conduct of retaliation to the Office of the Governor, the Office of the Attorney General, and the Office of the Secretary of Education (AC 1027). Within hours of making those external reports, his institutional email access was revoked and his professional biography was removed from the Institute's official website (AC ¶1028).

During the related criminal proceedings, the Associate Athletic Director for External Operations criminal complaint was withheld from the Plaintiff and his criminal defense counsel (AC 1070), and as a result of the criminal complaint, the administrative suspension, the revocation of his institutional email access, and the trespass restriction, the Plaintiff faced active criminal exposure and the risk of further adverse action if he provided testimony regarding the incident or the bribery scheme and misuse of public resources he had previously reported.

As a result of the criminal complaint, the administrative suspension, the revocation of his institutional email access, and the trespass restriction, the Plaintiff was placed in a position where providing further testimony or statements regarding the bribery scheme and the misuse of public resources he had reported carried the risk of additional criminal exposure and adverse employment consequences. The Plaintiff was ultimately required to invoke his Fifth Amendment right against self-incrimination during related proceedings rather than provide further testimony regarding the bribery scheme and misuse of public resources he had reported to institutional officials, inspectors general, and external government offices. The combined effect of the

criminal complaint, the administrative suspension, the revocation of institutional access, and the trespass restriction was to discourage, delay, or prevent the Plaintiff from providing further information and testimony regarding the bribery scheme and misuse of public resources he had reported. These actions occurred after and in close temporal proximity to the Plaintiff's disclosures of bribery and misuse of public resources to institutional officials, inspectors general, and external government offices (AC ¶¶ 517–556; ¶¶ 557–581; ¶¶ 1027; 1034).

Had the Plaintiff been able to provide full testimony and documentation without the risk of criminal exposure created by the actions described above, and had the Plaintiff's repeated requests for review by an external investigative or oversight agency not been ignored or denied by senior institutional officials, his testimony and evidence could have been provided to federal law enforcement officers or federal oversight authorities for review of potential violations of federal law.

For these reasons, the Plaintiff has sufficiently pled violations of 18 U.S.C. § 1512(b)(1), (b)(2)(A), (b)(2)(B), and (b)(3), and 18 U.S.C. § 1513(e) (AC ¶¶ 1263–1293), and these predicate acts should proceed.

These seven predicate acts constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5). The Defendants, through their officers, agents, and employees, conducted or participated directly or indirectly in that pattern and in the conduct of the enterprise's affairs in violation of 18 U.S.C. § 1962(c).

***Fourth***, Civil RICO provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The statute authorizes recovery of treble damages, costs, and fees for injuries caused by racketeering conduct.

At the time of his termination, the Plaintiff served as Director of Athletic Multimedia within an NCAA Division I athletic program. He was responsible for the production and distribution of institutional broadcast and multimedia content for ESPN and other digital communication networks. The termination of his employment disrupted his established career in multimedia production and his projected career trajectory in collegiate athletics media and broadcast operations, and as a direct result of the enterprise, it resulted in the loss of position, professional standing, and future opportunities that thus constitutes a concrete economic harm to his business and property.

Following his termination, the Plaintiff was forced to obtain lower-paying employment outside his established multimedia field as a retail salesperson and remains in that position at the time of filing this memorandum. This transition reflects direct economic loss and a continuing downward shift in earning capacity caused by the Defendants' conduct.

Taken together, the facts support a reasonable inference that the harm incurred in this Complaint was caused by the enterprise's conduct. The Plaintiff's termination arose under circumstances that followed and were connected to his reporting of the enterprise's revenue-generating operations. These allegations permit a reasonable inference that the adverse action was not independent or coincidental but was undertaken in response to that reporting as

part of the enterprise's conduct. The termination removed the Plaintiff from his position within the institutional structure through which the enterprise's broadcast, advertising, and promotional activities were carried out and prevented further reporting and documentation of the enterprise's revenue-generating operations, thereby protecting the enterprise's ongoing activities.

The Plaintiff has therefore suffered injury to his business or property by reason of the Defendants' violations of 18 U.S.C. § 1962, and the damages include, but are not limited to, loss of employment income, loss of employment benefits, loss of retirement and related employment contributions, loss of future earnings and diminished earning capacity, loss of professional opportunities and professional standing, and other economic losses flowing from the termination of his employment and damage to his professional career. These injuries constitute concrete financial loss to business or property within the meaning of 18 U.S.C. § 1964(c). Pursuant to 18 U.S.C. § 1964(c), the Plaintiff is entitled to recover threefold the damages he sustained, together with the costs of this action.

In 2024, the Supreme Court held that a plaintiff "cannot recover for his pain and suffering. But if his injuries force him to shut his doors, he can recover for the loss of his business. In short, a plaintiff can seek damages for business or property loss regardless of" the source of the injury. *Medical Marijuana, Inc. v. Horn*, 601 U.S. ___, slip op. at 6–7 (2024). In addition, the injury to the Plaintiff's business or property in this action is domestic within the meaning of *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016), in that the Plaintiff was employed in the Commonwealth of Virginia by a state and federally funded institution

established under Virginia law, the retaliatory conduct occurred in Virginia, and the resulting loss of employment, wages, and professional standing was sustained in Virginia.

The racketeering activity described resulted in the termination of the Plaintiff's employment with the Virginia Military Institute and the loss of salary, benefits, and associated economic interests tied to his employment. As a direct and proximate result of the Defendants' operation and management of the Enterprise, the economic losses described above, including loss of employment income, loss of career opportunities, and diminished earning capacity, constitute injury to business or property within the meaning of 18 U.S.C. § 1964(c), and were incurred by reason of the Defendants' violations of 18 U.S.C. § 1962.

For these reasons, the Plaintiff has sufficiently pled violations of 18 U.S.C. § 1962, injury to his business or property under 18 U.S.C. § 1964(c), and damages resulting from racketeering conduct, and the civil RICO claim should proceed.

**VI. Referral of Misconduct by Commissioned and Retired Officers for Review Under the Uniform Code of Military Justice**

The Defendants characterize the references to the Uniform Code of Military Justice as "an accusation untethered from any of his civil claims", but that characterization does not account for the unique military structure under which both the Plaintiff and the Institute operate (Commissioned and Retired Officers and UCMJ Jurisdiction AC ¶¶ 1066–1111). The Plaintiff is a disabled veteran who previously served as an enlisted soldier (AC ¶¶27–32), and the individuals whose conduct is described in the Amended Complaint include commissioned

officers, retired officers, and Institute officials who continued to operate under their official rank and title within the institutional structure.

Under Section 2-503 of the Department of Defense Joint Ethics Regulation, retired military members are subject to 5 C.F.R. § 2635.702, which prohibits the use of public office, official title, or position for private gain or for the endorsement of any product, service, or enterprise (AC ¶1076). Through the donor-tier pricing menu, the payee does not simply pay for private and exclusive access to the Superintendent, the Athletics Director, or other senior officials, but instead pays for access to individuals acting in their official capacities, using institutional authority, position, and title in connection with those interactions (AC ¶¶ 582–586).

The VMI Alumni Agencies operate a donor-tier pricing menu under which high-dollar contributions provide private and exclusive access to the Superintendent, Athletics Director, and other institutional officials (AC 586). As part of this donor-tier pricing structure, the Superintendent appears in his official capacity using his official rank and title as [Rank] (Ret.) [Surname]. The VMI Foundation provides payments, in addition to official compensation, to institutional officials through "grants" disclosed on its publicly available IRS Form 990 Schedule I (AC 1212), and those payments are made to officials who participate in the donor-tier pricing menu structure while acting in their official capacities and using their official titles and positions.

On November 18 and 19, 2024, the Plaintiff reported a bribery scheme and misuse of public resources to the Deputy Superintendent for Finance and Support (a civilian in Department of Defense uniform and insignia), the Senior Finance Director (a former United States Army officer and DEA agent), the Deputy Inspector General (an attorney), and the Inspector General (a Colonel in the Virginia National Guard) (AC ¶¶ 517–586). In his reporting to these institutional

officials, he explained that under the donor-tier pricing menu, if an individual paid the VMI Alumni Agencies $40,000, the individual received private access to the Superintendent, [Rank] (Ret.) [Surname] (AC 586; ¶¶ 526–527) (at the time of the Plaintiff's employment the rank held was Major General, while the current rank is Lieutenant General AC 1067).

As a result of the Plaintiff's reporting, institutional officials acting under color of state law and while using Department of Defense rank and official title (AC 710; ¶¶ 859–862; ¶¶ 1003–1005; ¶¶ 1020–1026; ¶¶ 1032–1033) initiated and carried out the adverse actions described in the Amended Complaint, conduct the Plaintiff identified as corresponding to Article 81, Conspiracy under 10 U.S.C. § 881 (AC ¶¶ 1084–1086); Article 92, Failure to Obey Order or Regulation under 10 U.S.C. § 892 (AC ¶¶ 1087–1091); Article 93, Cruelty and Maltreatment under 10 U.S.C. § 893 (AC ¶¶ 1092–1097); Article 107, False Statements under 10 U.S.C. § 907 (AC ¶¶ 1098–1105); and Article 133, Conduct Unbecoming an Officer and a Gentleman under 10 U.S.C. § 933 (AC ¶¶ 1106–1111).

The Plaintiff pleaded in the Amended Complaint a violation of 18 U.S.C. § 1962(c) (Racketeer Influenced and Corrupt Organizations Act) with seven predicate acts demonstrating both open-ended and closed-ended continuity, arising from the Plaintiff's lawful reporting and the actions taken by the Enterprise against him in response to his reporting (AC ¶¶ 1183–1300). The Enterprise consists of individuals who are authorized to wear their official rank and title while conducting official business for the Virginia Military Institute. The Commissioned and Retired Officers and UCMJ Jurisdiction section of the Amended Complaint (AC ¶¶ 1066–1111) sets forth the military command structure, the roles of the commissioned and retired officers involved, and the standards of conduct governing those individuals while acting in their official

capacities, which correspond to the same underlying conduct forming the predicate acts under 18 U.S.C. § 1962(c).

The Defendants' characterization of the Amended Complaint also does not negate the fact that the Defendants acted within their official capacities, while using their rank and official titles, when the retaliatory actions described in the Amended Complaint were carried out for the benefit of, or on behalf of, the VMI Alumni Agencies, their affiliated non-profit organization in a manner prohibited by 5 C.F.R. § 2635.702. By using official capacity, rank, and title in connection with the actions described in the Amended Complaint, the Defendants created the appearance of official endorsement or sanction by the Department of Defense. The actions taken by the Defendants are contrary to the standing orders, regulations, and policies governing the conduct of officers and officials acting in their official capacities as prescribed under Section 2-503 of the Department of Defense Joint Ethics Regulation.

Retired officers of the United States Armed Forces fall within the meaning of 10 U.S.C. § 802 and remain subject to recall to active duty, and remain subject to trial by court-martial for violations of the Uniform Code of Military Justice under 10 U.S.C § 688. In 2024, the Supreme Court denied a petition for a writ of certiorari in *Larrabee v. United States*, 144 S. Ct. 815 (2024) (mem.), leaving in place the lower court's ruling recognizing that retired members of the armed forces remain subject to the Uniform Code of Military Justice and may be recalled to active duty and tried by court-martial. The Plaintiff's reference to the Uniform Code of Military Justice is grounded in the authority structure under which several of the individuals described in the Amended Complaint operated while using their official rank and titles within the institutional framework of the Virginia Military Institute.

The Plaintiff's request related to the Uniform Code of Military Justice is therefore not an attempt to have this Court enforce military law, but is instead a request, as part of the prayer for relief, that the Court refer the conduct described in the Amended Complaint to the appropriate authority for review and determination of whether jurisdiction under the Uniform Code of Military Justice is appropriate.

The Defendants compared the length of the Amended Complaint to *The Great Gatsby*, but the factual record described in the Amended Complaint more closely resembles the chain-of-command retaliation structure depicted in *A Few Good Men*, where senior officials used their authority to retaliate against a junior service member after misconduct within the command structure was reported. Use of official rank and authority cannot be invoked to provide access, influence, and institutional benefit, while simultaneously asserting that the regulations governing the use of that rank, title, and authority are "untethered" when the conduct described in the Amended Complaint implicates those regulations. When acting under official rank and title, those actions are subject to the Uniform Code of Military Justice.

The donor-tier pricing menu described in the Amended Complaint is not incidental to the Enterprise, but is the mechanism through which the Enterprise operates and carries out the actions described herein. Official rank and title function as the commodity through which the Enterprise derives value, as donors are not paying for a purely private interaction, but for access to individuals acting under official rank, title, and institutional authority. Reduction of official rank and title removes the thing of value being sold and the authority used to carry out the Enterprise functions. For this reason, the Plaintiff respectfully requests that the Court, upon any finding of wrongdoing arising from the actions of past and present commissioned and retired

officers, including general officers, who acted under official rank and title within the Virginia Military Institute and its affiliated Alumni Agencies, refer the matter to the appropriate military authority for review under the Uniform Code of Military Justice, with a recommendation that, upon substantiation of the misconduct, appropriate disciplinary action be imposed, including reduction in rank to E-1 (AC 1400).

## VII. CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that the Court deny the Defendants' Motion to Dismiss in its entirety and permit the Plaintiff's claims to proceed to discovery.

Respectfully submitted this 27th day of March, 2026.

Respectfully signed,

Plaintiff, Pro Se

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Motion for Preliminary Injunction and accompanying Memorandum of Law via United States Mail to the following:

**Richard Reza Shayegan**
Office of the Attorney General
Employment Unit
202 North 9th Street
Richmond, VA 23219
804-823-6336
Email: rshayegan@oag.state.va.us
*ATTORNEY: Virginia Military Institute, VMI Board of Visitors, VMI Foundation*

**William David Paxton**
Gentry Locke Rakes & Moore
P.O. Box 40013
Roanoke, VA 24022-0013
540-983-9334
Fax: 540-983-9400
Email: paxton@gentrylocke.com
*ATTORNEY: VMI Alumni Agencies, VMI Foundation, VMI Alumni Association, Keydet Club*

***Jessiah Steven Hulle***
*Gentry Locke Attorneys*
*10 Franklin Road, SE, Ste. 900*
*Roanoke, VA 24011*
*540-983-9416*
*Fax: 540-983-9400*
*Email: hulle@gentrylocke.com*
*ATTORNEY: VMI Alumni Agencies, VMI Foundation, VMI Alumni Association, Keydet Club*

Respectfully signed,

Plaintiff, Pro Se