CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
9/30/2026
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | | |
|---|---|---|
| **ONIER OSWALDO VARGAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 6:25-cv-00100** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **VIRGINIA MILITARY INSTITUTE,** | ) | |
| **VMI BOARD OF VISITORS,** | ) | **By: Michael F. Urbanski** |
| **VMI ALUMNI AGENCIES,** | ) | **Senior United States District Judge** |
| **KEYDET CLUB,** | ) | |
| **VMI FOUNDATION, and** | ) | |
| **VMI ALUMNI ASSOCIATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

Pending before the court are two motions to dismiss pro se plaintiff Onier Oswaldo Vargas's amended complaint. One motion to dismiss was filed by defendants Virginia Military Institute ("VMI") and VMI Board of Visitors ("Board of Visitors") and another motion to dismiss was filed by defendants VMI Alumni Agencies ("VMI Alumni Agencies Board"), VMI Alumni Association ("VMIAA"), VMI Foundation, and Keydet Club (collectively, "Alumni Agencies"). See Mot. to Dismiss, ECF No. 19 and Mot. to Dismiss, ECF No. 22. Also pending before the court is plaintiff's motion for preliminary injunction. Mot. for Prelim. Inj., ECF No. 27.

Vargas's amended complaint spans 227 pages and includes 1141 numbered paragraphs. The court has reviewed the amended complaint as well as the summary of facts prepared by counsel for the Alumni Agencies for the court's convenience. See ECF No. 20-1. After a fulsome review of the allegations in the amended complaint, the court **GRANTS** defendants'

motions to dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. ECF Nos. 19, 22.

## I. Background

Vargas was hired in March 2024 to work at VMI in the Athletics Department as the Director of Athletics Multimedia. Am. Compl., ECF No. 4, ¶ 20. He was ultimately terminated from this position in April 2025. The events giving rise to Vargas's claims took place throughout the year of his employment at VMI, consisting of disagreements with his direct supervisor, challenges associated with his job responsibilities, and frustration with departmental priorities.

In his role as Director of Athletics Multimedia, Vargas was responsible for producing live video broadcasts of all home athletic events for ESPN+, as well as developing creative video content for use by the Athletics Department for promotional and advertising purposes. Id. ¶ 24. Vargas's supervisor was Phil Marcello, the Associate Athletic Director for External Operations. Id. ¶¶ 19, 25. When Vargas first met with Marcello, he disclosed that he was a verified disabled veteran and requested reasonable accommodations for his disability and ADHD,[1] including an accommodation to travel to North Carolina for Veteran's Affairs (VA) medical appointments. Id. ¶¶ 27-29, 31. Vargas alleges that Marcello "accepted the accommodation requests" and instructed Vargas "to provide reasonable notice of upcoming medical appointments and requests." Id. ¶ 30.

One of Vargas's first creative content assignments at VMI involved a video promoting the Keydet Club's "Compete to Win" fundraising campaign. Id. ¶¶ 39-44. Vargas and Marcello

[1] The amended complaint does not detail the nature of Vargas's verified disability.

filmed the cadet-athletes in uniform and training apparel and ultimately posted video content on the official VMI Wrestling social media account to encourage donor participation in the Keydet Club's fundraising campaign to support VMI's athletic programs. Id. ¶¶ 41-43.

Aside from creating promotional videos, however, Vargas primarily focused on managing the live broadcasts and setting up equipment for the broadcasts prior to sporting events. Id. ¶¶ 33, 34. He alleges he had intermittent assistance from an independent contractor throughout his employment, but not during the summer months. Id. ¶¶ 35, 64-66. When Vargas asked Marcello about using "part-time staff for broadcast setup and operations outside of events," Marcello explained that "historically, the person in the role of Director of Athletic Multimedia worked unassisted, with operational support only provided by the Independent Contractor during the fall and spring seasons." Id. ¶¶ 63-64. As a result, Vargas alleges that "[c]ompleting the broadcast setup process unassisted required extended hours of work during July and August amid high temperatures." Id. ¶ 66.

In August, Vargas received his first performance review from Marcello. On a scale of 1 to 5, Marcello scored Vargas's performance as ranging from a 3 ("Fully Competent") to a 4 ("Excellent"). Id. ¶¶ 74-76. After the performance review, Marcello raised concerns with Vargas about the timely completion of the promotional video segments and inquired as to the status of the videos. Id. ¶¶ 79-81. Vargas admitted that "video projects had been delayed due to time spent setting up, repairing, and servicing broadcast equipment." Id. ¶ 80. One of the videos that Marcello inquired about was a "football hype video for the start of home games," which Vargas informed Marcello would be filmed shortly. Id. ¶¶ 82-83. Vargas requested assistance from Marcello and other staff in moving equipment to the football stadium for the

video shoot with the football team captains, but ultimately completed the video production setup unassisted. Id. ¶¶ 85-86. Marcello checked in with Vargas after the event ended while Vargas was breaking down the production equipment; Marcello reiterated his instruction that the completion of creative content should be done in a timely manner. Id. ¶¶ 89-93.

Throughout his amended complaint, Vargas mentions a number of occasions during which the broadcast for sporting events was disrupted or failed due to technical issues or faulty equipment. The first of these incidents occurred in April 2024, when "broadcast operations experienced a technical failure resulting in a computer malfunction," but Vargas and other employees were able to remedy the issue. Id. ¶¶ 36-38. In "late May to early June," Vargas reported to Marcello that several audio-video (AV) cables had sustained "significant damage," and that "video production equipment was being transported between venues without protective transport equipment." Id. ¶¶ 46-48. Vargas requested new cables and Marcello directed Vargas to solicit vendor proposals for new video equipment, including cables. Id. ¶¶ 50, 59-60. Vargas reviewed multiple vendor proposals throughout the summer, as "[d]uring this period, the department's audio and video cable reserves were nearly depleted, with the remaining equipment showing increasing signs of wear." Id. ¶¶ 94-95. Much of the Athletic Department's cable inventory was used to broadcast soccer games, which meant that there were insufficient cables for reliable broadcasts of football games. Id. ¶ 96. Vargas submitted proposals for new cables to Marcello and VMI's Director of Business Operations, but while these proposals were pending, Vargas had to use the same cables for both soccer and football events, moving them between venues for each event. Id. ¶¶ 100-117. Relocating equipment

between venues continued until the conclusion of the men's soccer season at the end of October. Id. ¶ 117.

A second instance of broadcast failure occurred while Vargas was out of state on a work-related trip in September. Id. ¶¶ 122-23. The independent contractor reported "that the broadcast transmission had been lost during a portion of the game." Id. ¶ 123. Broadcast problems continued the following week, when the Director of Digital Content for the VMI Alumni Agencies informed Marcello that the Alumni Agencies' "advertisements were not appearing during broadcasts or in-venue during the home football game." Id. ¶ 124.

Simultaneously, Vargas alleges that he was still being asked to film and prepare creative content while managing ongoing broadcasting issues. The Keydet Club requested a video that would be played during a fundraising banquet which would announce the nominees for an annual scholarship award. Id. ¶¶ 135-41. Marcello directed Vargas to create "three impact videos featuring the scholarship award nominees for the Keydet Club," and indicated that Vargas could use the previous year's video as a template. Id. ¶¶ 141-42.

At the same time, Vargas began missing operations team meetings. He alleges that he missed a meeting on October 3 because he was preparing for a soccer game broadcast without the help of the independent contractor, who had recently undergone a medical procedure. Id. ¶¶ 143-44. He acknowledged that he did not communicate his absence from the team meeting in advance. Id. ¶ 145. Half an hour before the soccer broadcast was to begin, Vargas contacted ESPN Transmission and "informed a representative that the event needed to be canceled due to technical issues that could not be resolved before the start of transmission." Id. ¶ 146. Vargas also informed Director of Intercollegiate Athletics Jamaal Walton and Deputy Athletics

Director Lenny Brown that the soccer broadcast problems and cancellation were due to "insufficient" video equipment. Id. ¶ 147-150.

When Marcello asked what happened, Vargas explained that the "method prior to his arrival at VMI had been to leave [cables] unprotected and largely exposed to the elements" and the damage to the cables caused one of the connectors to disconnect from a camera. Id. ¶¶ 152-53. Vargas hoped to design and install "weatherproof terminal boxes" so that this issue would be resolved in the future. Id. ¶ 153. Marcello agreed that a solution was necessary to protect the remaining cables from the elements. Id. ¶ 154. The next day, Marcello chastised plaintiff for "[going] around him" by emailing Walton and Brown about the equipment issues relating to the soccer broadcast. Id. ¶ 160.

A few days later, Vargas informed Marcello that he would miss another team meeting due to his continued efforts to troubleshoot the broadcasting equipment at the soccer venue. Id. ¶ 165-166. After missing the meeting, Vargas went to Marcello's office in the afternoon to follow up on the failed broadcast and explain his priorities. Id. ¶ 167-69. Vargas alleges that he explained to Marcello that "the issues with women's soccer reflected the buildup of ongoing operational problems he had been addressing," and he also described "the difficulty of maintaining and repairing the video broadcast systems under those conditions." Id. ¶ 170. He alleges that he told Marcello that "his priority was keeping the broadcasts running since they were the department's core responsibility, but instead attention was being diverted to other multimedia projects." Id. He also told Marcello that "he spent the weekend troubleshooting and repairing the replay system and emphasized that priority should be placed on essential operations tasks." Id. ¶ 173.

Vargas alleges that Marcello was frustrated by Vargas's lack of attendance at meetings, his tendency to make "independent decisions" without consulting leadership, and his inability to finish or deliver video projects, among other things. Id. ¶¶ 177-85. Even though Marcello stated that he believed he had been lenient regarding video project expectations, more than a month had passed without a new segment being produced. Id. ¶¶ 183-85.

The following week, during an ESPN broadcast of a football game on October 19, a commentator lost audio communications during the game, and Vargas was unable to fix it. Id. ¶¶ 196-202. The next day, during a broadcast of a soccer game, the same thing happened; again, Vargas could not fix it. Id. ¶¶ 203-08. Vargas alleges that these failures could have been prevented if the AV cable purchases had been approved sooner. Id. ¶ 213.

Vargas alleges that after these additional broadcast failures, he met with Walton to express frustration that Marcello "was placing the department's focus toward video content creation, while neglecting the contractually obligated ESPN broadcasts." Id. ¶ 212. Vargas alleges that during this meeting with Walton, he requested to report directly to Walton rather than to Marcello because he "feared reprisal or additional escalation" from Marcello. Id. ¶¶ 217-18. Vargas states that he further explained that completing video projects and setting up broadcast events with faulty equipment "simultaneously without assistance had become increasingly difficult." Id. ¶ 214.

Vargas alleges that later that week, on October 24, Marcello followed up to ask for an update on the Keydet Club scholarship video project which Vargas had not submitted. Id. ¶ 220. Vargas alleges that he explained to Marcello that "he had not yet begun the project because he had been actively troubleshooting and reestablishing broadcast operations." Id.

Marcello reminded Vargas that the video would be due soon. Id. Separately, Vargas alleges that he informed Marcello that he needed to travel for a medical appointment and would be away from October 30 through November 1. Id. ¶¶ 221-223. Vargas further alleged that after his brief conversation with Marcello, he received emails from Marcello about the Keydet Club video and informing him that the video was due on October 29. Id. ¶¶ 226-227. The following day, on October 25, the broadcast of the women's soccer game had to be canceled due to equipment failure. Id. ¶ 231.

Vargas alleges that on October 28, he met with Marcello for their regularly scheduled department meeting, and covered topics such as equipment problems, video editing project deadlines, and Vargas's absence from other team meetings. See generally id. ¶¶ 237-278. On the morning of October 30, Marcello texted Vargas to ask if the fundraising video for the Keydet Club had been completed. Id. ¶ 283. Vargas told him the video would be completed by the end of the day, but then was unable to meet that deadline. Id. ¶ 283-86. Marcello asked again if the video was complete on October 31, and Vargas told Marcello that he "sent an email addressing the matter." Id. ¶ 288. Vargas alleges that the email he sent to Marcello explained that his inability to complete the Keydet Club video was due to "prior departmental negligence" and the need to "repair multiple preventable system failures." Id. ¶ 289. His email also stated that he believed Marcello's concerns "were less about athletic operations and more about an attempt to accost him for the delayed video." Id. ¶ 292. Vargas also emailed Walton to say that tensions between him and Marcello had "escalated to an unmanageable level." Id. ¶ 293.

Marcello and Walton independently filed complaints against Vargas with Human Resources. Id. ¶ 295. Director of Human Resources Valerie Stores informed Vargas of these complaints, and Vargas responded that Marcello was misusing public resources. Id. ¶ 295-97. Specifically, Vargas alleged that Marcello "reduced an equipment order" that would have prevented broadcast problems while at the same time directing Vargas to create a video for the Keydet Club's fundraiser "without an available Memorandum of Understanding." Id. ¶ 297. Vargas also informed Stores that he feared retaliation for reporting the misuse of state resources and operational issues within the department. Id. ¶ 299.

Stores requested Vargas's allegations in writing, so Vargas drafted a statement titled "Addressing Managerial Challenges and Operational Analysis" in response to Stores's request. Id. ¶ 300-02. The statement "highlight[ed] the systemic shortcomings in technical understanding and managerial approaches that have hindered departmental performance and contributed concerns about institutional fiscal responsibility." Id. ¶ 304. A follow-up meeting with Stores was scheduled for November 5. Id. ¶ 310-11.

Vargas alleges that after he submitted this statement to Stores on November 4, he sought medical treatment and was hospitalized for "continued sleep deprivation from sustaining broadcast operations, video editing, and completion of the written statement requested by Ms. Stores." Id. ¶ 308-09. In response to news that Vargas had been hospitalized, HR moved the follow-up meeting to November 13. Id. ¶ 312. Marcello also emailed Vargas to inform him that he should refrain from participating in broadcast operations until the HR meeting and outlined several video projects for Vargas to work on instead. Id. ¶ 313-15.

Marcello informed Vargas that his office would be used for broadcasting so Vargas should do video editing in a temporary workspace that would be arranged upon his return. Id. ¶ 314.

On November 13, Vargas met with Stores, Walton, and Marcello to discuss the HR complaints. The meeting was "a formal mediation session" facilitated by Stores to discuss "ongoing tensions and disagreement between Mr. Marcello and the Plaintiff concerning equipment malfunction, workload management, and video editing assignments." Id. ¶ 323. During the meeting, Vargas reiterated his frustration that Marcello prioritized Vargas finishing video projects when broadcast equipment remained damaged. Id. ¶¶ 327-349. Marcello insisted that many of the video projects were "sponsored" and needed to be completed weekly, and Vargas had not produced one for five weeks. Id. ¶¶ 350-55.

The rest of the meeting consisted of discussion regarding general work conditions, communication issues, and Vargas's performance issues, with Vargas expressing concern at Marcello's use of an "aggressive tone" and "demands for immediate completion of tasks." Id. ¶¶ 379-80. Marcello accused Vargas of violating policies, delaying video projects, and not following proper procedure for requesting time off. Id. ¶¶ 375-499. Vargas alleges that Stores told them both to "remain present for their assignments and to monitor the tone of their interactions," emphasizing that "professional respect was required even without personal rapport." Id. ¶ 492.

Following the meeting, Marcello emailed Vargas to ask that Vargas check in with him each day and directed Vargas to continue working on specific video projects, explaining that the independent contractor would take the lead in broadcasting operations. Id. ¶¶ 503-06, 515-

16. Marcello also instructed Vargas to leave his office door open unless "he received specific approval" from Marcello to close it. Id. ¶¶ 510-11.

After the HR complaints and subsequent meeting, Vargas alleges he took additional steps to report Marcello's conduct and the department's "misuse of public resources." Id. ¶¶ 500. Vargas sought out the Deputy Superintendent for Finance and Support, Dallas Clark, to report "waste of departmental resources, conflicts of interest, retaliatory conduct following those discoveries, and a potential bribery scheme involving [the Keydet Club]." Id. ¶ 521.

As to the "potential bribery scheme" Vargas alleged, he informed Clark that during his production of the video for the Keydet Club, he learned that the Keydet Club "offers a donor courtesy reward system, and that a $10,000 donation provided direct access to the Athletics Director," while a $40,000 donation provided access to the Superintendent. Id. ¶¶ 525-27. Further, Vargas alleges that "his duties as a state employee [at VMI] required prioritizing institutional operations" and Marcello's prioritization of the Keydet Club video instead of addressing the "significant technical problems that led to three canceled broadcasts" exemplified a conflict of interest between the Alumni Agencies and VMI. Id. ¶¶ 531-35. Vargas also alleged that an athletics staff member had a Keydet Club leadership sticker on her car. Id. ¶ 536. Even though he admitted he did not know the full scope of this staff member's role, Vargas asserted that "her dual role within the Keydet Club and the institution presented an additional conflict of interest." Id. ¶¶ 536-42. Vargas alleges that "insufficient separation" and "blurred" responsibilities between the Alumni Agencies and VMI "could lead to additional conflicts of interest." Id. ¶¶ 546-47.

Clark suggested that Vargas report these concerns to VMI's Office of Inspector General, so Vargas met with Deputy Inspector General Anna Honig to reiterate the allegations of waste, abuse, and the "potential bribery scheme." Id. ¶ 550.

Vargas alleges that the following week, Walton met with Vargas for a post-mediation update. Id. ¶¶ 590-91. Vargas told Walton that his working relationship with Marcello had "worsened immediately following the HR meeting" as Marcello required him to keep his door open and only ordered half of the requested new AV cables. Id. ¶¶ 590-665. In particular, Vargas told Walton that "he felt isolated from colleagues, that [Marcello] repeatedly undermined and misrepresented his concerns, and that he had been removed from managing broadcasts without explanation." Id. ¶ 598.

Vargas alleges that on November 22, Marcello issued seven disciplinary reprimands to Vargas for taking unapproved time off, missing five video project deadlines, and missing an operations team meeting. Id. ¶ 666. Marcello informed Vargas that he was failing to meet professional standards and noted that Vargas had not submitted any of the requested work during the preceding two weeks, and as a result, Marcello would be putting him on a "performance enhancement plan." Id. ¶¶ 668-69.

On December 1, Marcello implemented a new "External Team Open Door Policy" for the Athletics Department. Id. ¶¶ 684. On December 3, after Vargas received training from Marcello dealing with Personnel Action Forms and payroll, Vargas alleges that Marcello asked him why he wrote a particular statement on his office whiteboard. Id. ¶¶ 687-88. In his complaint, Vargas does not include the statement at issue, but asserts that he told Marcello

the statement was "an accurate representation of the departmental environment." Id. ¶ 689. Vargas alleges that Marcello characterized the whiteboard statement as "accusatory." Id. ¶ 690.

On December 4, Vargas was put on a Performance Improvement Plan, with the goal of improving his "communication, clarity, time management, teamwork, responsiveness, professionalism, and respect." Id. ¶ 724.

On December 5, Marcello issued five more disciplinary reprimands to Vargas for violating the open-door policy, missing two video project deadlines, and writing "inappropriate and accusatory comments." Id. ¶¶ 832-34.

On December 9, Vargas "sought medical intervention for sleep deprivation for a second time while employed by the Virginia Military Institute." Id. ¶ 857.

Vargas alleges that the Performance Improvement Plan process was being used to advance terminating his employment with VMI. Id. ¶ 901. He alleges that he voiced these concerns with HR and also raised a retaliation complaint. Id. ¶¶ 923-29. In Vargas's view, after he informed Marcello that "they should not prioritize a fundraising video project for the VMI Alumni Agencies umbrella organizations while internal operations were falling apart," disciplinary actions were taken against him. Id. ¶¶ 926-27.

On December 12, Vargas had another meeting with Marcello, Walton, and others to discuss his progress under the Performance Improvement Plan. Id. ¶¶ 939-40. Walton informed Vargas at this meeting that "he was being issued a Notice of Improvement Needed/Substandard Performance for failing to meet duties and responsibilities outlined in his contract and the employee handbook." Id. ¶ 941. The notice summarized "a total of forty observed instances" of Vargas's performance issues—including "missing team meetings,

failing to meet creative or professional deadlines on a consistent basis, not coming to the office, keeping office door closed, [and] poor attitude towards coworkers"—and required that Vargas demonstrate noticeable improvement within 45 days or face termination. Id. ¶¶ 941-944.

Between December 16 and January 5, Vargas was out of the office for a VA appointment and "the winter furlough." Id. ¶ 950. On January 6, Vargas emailed Stores to follow up on his retaliation complaint, stating that he raised the issue on October 31, reiterated the concerns on November 13 and December 11, and he had not heard any status update on the issue. Id. ¶¶ 956-59. Instead, he alleges the Notice of Improvement Needed/Substandard Performance that was issued to him on December 12 further indicated the retaliatory treatment he received for trying to report "departmental inefficiencies, misuse of public resources, and potential conflicts of interest involving senior leadership and a private charity." Id. ¶¶ 958-61.

Vargas alleges that there was an incident between him and Marcello during which Marcello "initiated unwanted physical contact to prevent him from reviewing a disciplinary reprimand." Id. ¶ 968. Vargas does not allege particular details about this incident, but states that he reported it to both the Inspector General at VMI and the Human Resources department. Id. ¶¶ 968-72. On January 10, Vargas "presented and played back audio recordings documenting the unwanted physical contact and additional incidents to substantiate his complaints" to the HR department. Id. ¶ 974.

On January 16, Vargas met with Clark "to report employee wage tampering, payroll delays, and retaliation connecting to the Personnel Action Forms." Id. ¶ 990. He alleges that

Marcello and others were "tampering" with employee payrolls in a "coordinated retaliation effort" against him. Id. ¶ 991.

On January 24, the HR department concluded its investigation and reported that Vargas provided no evidence of retaliation, as well as no evidence that Marcello received funds from the Keydet Club or struck Vargas's body. Id. ¶¶ 993-94.

On January 30, the newly appointed Chief of Staff, Colonel (Ret.) Travis Homiak, notified Vargas, in the presence of Stores, Walton, and the VMI Police, that VMI intended to terminate his employment due to identified performance deficiencies. Id. ¶¶ 1003-05. Later that same day, Vargas reported the "unwanted physical contact" incident with Marcello to the VMI police, and ultimately to the Rockbridge County Sheriff's Office. Id. ¶¶ 1010-12, 1014.

On January 31, Vargas was served with an arrest warrant arising from the "unwanted physical contact" incident, which Marcello had separately reported to police. Id. ¶¶ 1016-17. That evening, Vargas sought medical intervention for sleep deprivation a third time. Id. ¶ 1018. When Vargas returned to work from his medical treatment, he was notified that he was being placed on administrative suspension at the recommendation of VMI's Threat Assessment Team for 30 days, which corresponded with the date of the Notice of Intent to Terminate ending on March 1. Id. ¶¶ 1021-24. Vargas alleges he was subsequently directed not to return to work during the suspension period unless granted express advance permission. Id. ¶ 1025. He received a trespass warning form on February 10. Id. ¶ 1029-30.

Vargas's employment was officially terminated on March 4, 2025. Id. ¶ 1034. He appeared in Rockbridge County District Court a month later on his criminal charge, but

"[u]pon the advice of counsel," pleaded his Fifth Amendment right "to avoid self-incrimination in connection with the unwanted physical contact" incident. Id. ¶¶ 1037-38.

After providing the chronological events leading to his termination, Vargas alleges that there is "Operational Integration Between Public and Private Entities" in a section of his amended complaint that begins on page 151. Id. ¶¶ 1039-65. Vargas alleges that VMI is a state institution and the Alumni Agencies are private 501(c)(3) organizations. Id. ¶¶ 1039-41. In his view, the two are closely related for six reasons. First, VMI's Superintendent and Board of Visitors President are "Ex-Officio Non-Voting members" on "one or more" boards of the VMI Foundation, Keydet Club, and Alumni Agencies Board. Id. ¶ 1044. Second, the Alumni Agencies put fundraising advertisements on VMI sports game broadcasts. Id. ¶ 1049. Third, the City of Lexington approved a conditional use permit for the Alumni Agencies under its "Educational Facility, College/University" zoning classification. Id. ¶¶ 1050-53. Fourth, VMI leadership has participated in Keydet Club fundraisers while wearing VMI uniforms. Id. ¶¶ 1054-60. Fifth, VMI has hosted job postings for the Alumni Agencies on its .edu website. Id. ¶¶ 1061-62. Sixth, VMI and the Alumni Agencies coordinate and align on fundraising. Id. ¶ 1063.

In his amended complaint, Vargas asserts twelve counts. Four counts are alleged against all defendants: Deprivation of First Amendment Rights under 42 U.S.C. § 1983 (Count I), Deprivation of Fourteenth Amendment Due Process under 42 U.S.C. § 1983 (Count II), Conspiracy to Deprive Constitutional Rights under 42 U.S.C. § 1983 (Count III), a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (Count IV). Against VMI and the VMI Board of Visitors, Vargas alleges: reprisal against Department of

Defense contract awardee whistleblower in violation of 10 U.S.C. § 4701 (Count V), reprisal against education contractor whistleblower in violation of 41 U.S.C. § 4712 (Count VI), reprisal against Virginia Whistleblower for refusing to engage in illegal acts in violation of Virginia Code § 40.1-27.3 (Count VII), reprisal against state employee whistleblower in violation of Virginia Code § 2.2-3011 (Count VIII), failure to provide reasonable accommodation in violation of 42 U.S.C §12112(b)(5)(A)) (Count IX), Fair Labor Standards Act Misclassification as an exempt employee under 29 U.S.C. § 213(a)(1) (Count X), retaliation for wage and hour complaints under 29 U.S.C. § 215(a)(3) (Count XI), and negligent retention of supervisory employee under Virginia common law (Count XII).

Vargas asks for a variety of relief in this case. First, he seeks injunctive relief involving placing Marcello on paid administrative leave for the duration of the litigation due to "the substantial risk of interference, intimidation, or influence affecting their participation." Am. Compl., ECF No. 4, ¶ 1393. He also requests "[a]n order freezing all domestic and international financial transfers, disbursements, or asset movements by the VMI Alumni Agencies, the Keydet Club, and the VMI Foundation for the duration of this litigation." Id. ¶ 1394. Similarly, he seeks "[a]n order suspending all pending vendor proposals, contract awards, procurement actions, and related financial commitments undertaken by the Virginia Military Institute and the VMI Alumni Agencies for the duration of this litigation." Id. ¶ 1395.

As for monetary relief in this case, Vargas seeks back pay, front pay, treble damages, statutory damages, punitive damages, attorneys' fees and costs, as well as pre-judgment interest and post-judgment interest. Id. ¶ 401-09.

Vargas also seeks a referral for criminal investigation, and a referral of commissioned and retired officers for Uniform Code of Military Justice review. Id. ¶¶ 400, 410.[2]

## II. Standard of Review

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to file a motion to dismiss for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A defendant may bring a facial challenge to subject matter jurisdiction by arguing "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." Kim v. Rector & Visitors of the Univ. of Va., No. 3:25-cv-00054, 2025 WL 3046192, at *20 (W.D. Va. Oct. 31, 2025) (quoting Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009)). Here, VMI raises a facial challenge to the claims against it by contending that the Eleventh Amendment bars Vargas's claims.

Federal Rule of Civil Procedure 12(b)(6) requires that a complaint be dismissed when it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To survive a motion to dismiss, a complaint must allege enough facts "to raise a right to relief above the speculative level." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Twombly, 550 U.S. at 555). "Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." Id. (quoting Iqbal, 556 U.S. at 679).

[2] Vargas spends nearly ten pages explaining the alleged violations by VMI's leadership of Uniform Code of Military Justice provisions. See generally ¶¶ 1066-1111. As this court is not a military tribunal, the court will not assess or analyze these allegations. "Just as military society has been a society apart from civilian society, so military law is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." Parker v. Levy, 417 U.S. 733, 744 (1974).

A pro se complaint is "'to be liberally construed,' and . . . 'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" Id. (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)). "While pro se complaints may 'represent the work of an untutored hand requiring special judicial solicitude,' a district court is not required to recognize 'obscure or extravagant claims defying the most concerted efforts to unravel them.'" Weller v. Dep't of Soc. Servs. for City of Baltimore, 901 F.2d 387, 391 (4th Cir. 1990) (quoting Beaudett v. City of Hampton, 775 F.2d 1274, 1277 (4th Cir. 1985)). "The 'special judicial solicitude' with which a district court should view such pro se complaints does not transform the court into an advocate. Only those questions which are squarely presented to a court may be properly addressed." Id. Accordingly, a pro se complaint "still must contain 'enough facts to state a claim for relief that is plausible on its face.'" Thomas v. The Salvation Army S. Territory, 841 F.3d 632, 637 (4th Cir. 2016) (quoting Twombly, 550 U.S. at 570).

## III. Virginia Military Institute and VMI Board of Visitors

As an initial matter, the court notes that Vargas has named both "Virginia Military Institute" and "VMI Board of Visitors" as defendants in this case. Counsel for VMI argues in its motion to dismiss that "VMI Board of Visitors" lacks capacity to be sued and should be dismissed from the suit.

Virginia Code § 23.1-2500(A) establishes that "[t]he board of visitors of Virginia Military Institute (the board) is a corporation under the name and style of 'Virginia Military Institute' and has, in addition to its other powers, all the corporate powers given to corporations . . . . The board shall at all times be under the control of the General Assembly." In contrast, Virginia Code § 23.1-2200(A) establishes that "[t]he board of visitors of the

University of Virginia (the board) is a corporation under the name and style of 'the Rector and Visitors of the University of Virginia' and has, in addition to its other powers, all the corporate powers given to corporations . . . . The board shall at all times be under the control of the General Assembly."

In Doe v. University of Virginia, the plaintiff named both "The University of Virginia" and "the Rector and Visitors of the University of Virginia" as defendants. Doe v. Univ. of Va., No. 3:23-cv-18, 2024 WL 1346913, at *6 (W.D. Va. Mar. 29, 2024). The court dismissed "The University of Virginia" because it was not a proper legal entity, and the case proceeded against the proper legal entity, "the Rector and Visitors of the University of Virginia." Id.[3]

Counsel for VMI argues for an analogous result here. The proper legal entity under the Virginia Code appears to be "Virginia Military Institute" and there is no need to refer to the VMI Board of Visitors as a separate party. But see Doe v. Bd. of Visitors of Virginia Military Inst., 494 F. Supp. 3d 363, 367 (W.D. Va. 2020) (proceeding with Board of Visitors of Virginia Military Institute as named defendant, without VMI as named defendant, but treating Board of Visitors of VMI and VMI as one and the same).

Accordingly, for the purposes of this case, named defendant Virginia Military Institute effectively encompasses the VMI Board of Visitors, and to the extent VMI Board of Visitors is considered a separate entity, it is dismissed from this suit.

## IV. Motion to Dismiss Under Federal Rule of Civil Procedure Rule 8

[3] Similarly, in Paschall v. University of Virginia School of Medicine | Commonwealth of Virginia, No. 3:24-cv-00026, *4-5 (W.D. Va. Dec. 2, 2024), the court dismissed the named defendant from the case because the proper party would have been "the Rector and Visitors of the University of Virginia."

Both VMI and the VMI Alumni Agencies have moved to dismiss this suit pursuant to Federal Rule of Civil Procedure Rule 8. Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Rule also instructs that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).

The court agrees that Vargas's complaint is lengthy and overinclusive. Even though the court is required to construe the complaint liberally as Vargas is proceeding pro se, the complaint he filed is far longer than necessary to establish the factual background for the claims he brings. The court declines to dismiss the complaint on the basis of Rule 8, however, and has reviewed the complaint in its entirety. The defendants' motion to dismiss under Rule 8 is **DENIED AS MOOT**, given that the claims are dismissed under Rule 12(b)(6).

## V. Counts I, II, III, and IV

Counts I, II, III, and IV are brought against all defendants, while Counts V through XII are brought against only VMI. The court will begin by addressing the first four counts.

### a. Claims against the Alumni Agencies

Counts I, II, and III against the Alumni Agencies are claims under 42 U.S.C. § 1983. Vargas alleges that the Alumni Agencies deprived him of his First Amendment rights, deprived him of his due process rights, and conspired with VMI to deprive him of his constitutional rights.

Vargas's § 1983 claims cannot proceed against the Alumni Agencies because none of the four named entities are state actors. To state a claim under § 1983, a plaintiff must allege that he was "deprived of a right secured by the Constitution or laws of the United States, and

that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). The color of state law requirement "excludes from its reach merely private conduct, no matter how discriminatory or wrongful." Id. at 50 (internal quotations omitted). In rare cases, the state can "so dominate[] [private] activity as to convert it to state action." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 181 (4th Cir. 2009).

The Alumni Agencies are four private charities, and Vargas has not alleged any facts that even remotely suggest that these defendants' actions were attributable to the state. Though he includes a section titled, "Operational Integration Between Public and Private Entities," in which he asserts six reasons VMI and the Alumni Agencies are intertwined, none of these reasons are sufficient to show the type of entwinement that could give rise to state action. See Respess v. VMI Alumni Ass'n, No. 6:24-cv-00028, 2025 WL 978228, at *7-13 (W.D. Va. Mar. 31, 2025) (explaining that VMI Alumni Association is not "pervasively entwined" with VMI such that VMI Alumni Association engaged in state action for the purposes of Section 1983).

Beyond his conclusory statements that VMI "acted under color of state law and coordinated with the VMI Alumni Agencies" or that "VMI Alumni Agencies acted jointly and in concert with VMI," Vargas cannot show that conduct by any of VMI's Alumni Agencies is "fairly attributable to the state." Philips, 572 F.3d at 181; see Am. Compl., ECF No. 4, ¶¶ 1116-17, 1129-30, 1152-53. Without state action, Vargas has no viable § 1983 claims against the VMI Alumni Agencies.

Even Vargas's claim that VMI conspired with VMI Alumni Agencies cannot survive dismissal. For conspiracy to deprive constitutional rights, a plaintiff "must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy.' Without more,

parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." Barrett v. PAE Gov't Servs., 975 F.3d 416, 434 (4th Cir. 2020) (citing A Soc'y Without a Name v. Virginia, 655 F.3d 342, 346 (4th Cir. 2011)). The facts Vargas alleges fail to show any joint action between VMI and VMI Alumni Agencies that is directed at him, let alone any agreement between the defendants to violate his constitutional rights. As a result, his claim of conspiracy cannot stand.

Finally, Vargas spends more than 25 pages attempting to allege facts that would give rise to a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. § 1962, which states that "[i]t shall be unlawful for any person" to engage in or profit from racketeering. 18 U.S.C. § 1962(a)-(d); see Am. Compl., ECF No. 4, ¶¶ 1183-1310. Specifically, Vargas alleges coordination between "a public institution of higher education and its associated private charities." Am. Compl., ECF No. 4, ¶ 1191.

To survive a motion to dismiss, Vargas "must show that each RICO defendant conducted an enterprise through a pattern of racketeering activity, and that [Vargas] was injured in [his] business or property as the result of such conduct." Palmetto State Med. Ctr., Inc. v. Operation Lifeline, 117 F.3d 142, 148 (4th Cir. 1997) (citation modified). Initially, Vargas "must show an enterprise, which is defined as an ongoing organization, formal or informal, in which the various [defendants] function as a continuing unit." Id. (citation modified). To allege a "pattern of racketeering activity," a plaintiff must show that "two or more predicate acts" were committed in a ten-year period, and the two acts were "related" and "constitute or pose a threat of continued criminal activity." Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225, 238 (4th Cir. 2000). RICO liability is reserved for "ongoing unlawful

activities whose scope and persistence pose a special threat to social well-being." Id. (citation modified).

Though Vargas describes seven "predicate acts" that qualify under the RICO statute, he fails to allege any facts that tend to show that VMI Alumni Agencies committed these acts. Vargas accuses the Alumni Agencies of committing federal programs bribery, mail or wire fraud, interstate or foreign travel in aid of racketeering, money laundering, monetary transaction in criminally derived property, witness tampering, and/or witness retaliation. See Am. Compl., ECF No. 4, ¶¶ 1183-1310. Even when construed in the light most favorable to Vargas, there are no facts that would indicate that the Alumni Agencies had any involvement in a racketeering enterprise. Boiled down, Vargas alleges that a racketeering enterprise exists because the Keydet Club and VMI Foundation provide large donors with special access to VMI's Athletics Director and/or Superintendent, which Vargas describes as a "potential bribery scheme," see, e.g., id. ¶¶ 565, 586, 1198-1221, and that the Keydet Club did not disclose this opportunity to alumni, see, e.g., id. ¶¶ 1222-1233. There are no facts that support the inference that any of the Alumni Agencies actually paid or received bribes, laundered money, or committed fraud. Further, Vargas's accusation that the Keydet Club misrepresented the "donor courtesy tiers" to alumni is contradicted by his admission that the donor tiers were accessible "on the organization's website." Id. ¶¶ 565-66.

Given that the Alumni Agencies are mere background actors in this dispute between Vargas and his employer, there is no viable RICO claim on these facts as alleged. Count IV must be dismissed.

**b. Claims against VMI**

Vargas also brings Counts I, II, III and IV against VMI, alleging the same § 1983 and RICO violations. VMI argues that it is entitled to sovereign immunity and therefore the claims must be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

Sovereign immunity is a jurisdictional issue. Rsch. Triangle Inst. v. Bd. of Governors, 132 F.3d 985, 987, 990 (4th Cir. 1997). The Eleventh Amendment embodies the principle of sovereign immunity and prohibits suit by private parties against states in federal courts unless a state has waived its immunity. Weller v. Dep't of Soc. Servs. for City of Balt., 901 F.2d 387, 397 (4th Cir. 1990); see Jones v. Va. Commonwealth Univ., No. 3:20-cv-792, 2021 WL 51542, at *7 (E.D. Va. Jan. 6, 2021) ("State sovereign immunity protects the state from actions at law for damages and from suits in equity to restrain or compel government action."). This immunity extends to state agents and state instrumentalities, in addition to the state itself. Jones, 2021 WL 51542, at *7 (citing Rector & Visitors of Univ. of Va. v. Carter, 267 Va. 242, 245, 591 S.E.2d 76, 78 (2004)).

A claim against a state agency in federal court may overcome state sovereign immunity in three ways: (1) Congress abrogating state immunity; (2) a state expressly consenting to suit or waiving its immunity; or (3) a plaintiff seeking only prospective or injunctive relief against a state agent. See Jones, 2021 WL 51542, at *7 (collecting cases).

**i. Counts I, II, and III Against VMI**

Vargas brings three counts under 42 U.S.C. § 1983—deprivation of First Amendment rights, deprivation of due process rights, and conspiracy to deprive constitutional rights. Section 1983 allows suit against a "person who, under color of any statute, ordinance,

regulation, custom, or usage, of any State" violates another's statutory or constitutional rights. 42 U.S.C. § 1983. "[N]either a State nor its officials acting their official capacities are 'persons' under § 1983." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Additionally, "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity." Id. at 66.

VMI qualifies as a state agency and enjoys the privileges of sovereign immunity. See Doe v. Board of Visitors of VMI, 494 F. Supp. 363, 379 (W.D. Va. 2020) (equal protection claim against VMI barred by sovereign immunity as agency of the state); see also Moon Young Kim v. Rector & Visitors of the Univ. of Va., 2025 WL 3046192, No. 3:25-cv-00054, at *20 (W.D. Va. Oct. 31, 2025). Because Congress has not abrogated nor has Virginia waived its sovereign immunity as to claims under § 1983, VMI is entitled to sovereign immunity on these claims. Furthermore, as VMI is not a "person" who can be sued under § 1983, counts I, II, and III against VMI must be dismissed.

**ii. Count IV against VMI**

Sovereign immunity also forecloses Vargas's RICO claims against VMI. Section 1962 does not explicitly and by clear language or by statutory history evince an intention to waive State sovereign immunity. See Conte v. Virginia, No. 3:20-cv-00038, 2023 WL 3121220, at *4 (W.D. Va. Apr. 27, 2023) (citing Stewart v. Univ of N.C. Sys., 673 F. App'x 269, 270 (4th Cir. 2016) (unpublished) (affirming that RICO claims against a state university system and its employees were barred by Eleventh Amendment immunity)); see also Holloman v. Va. Dep't

of Corr., No. 7:22-cv-0048, 2022 WL 17477924, at *1-2 (W.D. Va. Dec. 6, 2022) (concluding that claims against the Virginia Department of Corrections and the Commonwealth of Virginia under the civil RICO statute are barred by the Eleventh Amendment).

Accordingly, Count IV against VMI must be dismissed.

## VI. Counts V and VI – Federal Whistleblower Claims

Vargas brings federal whistleblower claims pursuant to 41 U.S.C. § 4712 (National Defense Authorization Act's whistleblower provision) and 10 U.S.C. § 4701 (Defense Contractor Whistleblower Protection Act or "DCWPA").

In order to survive a motion to dismiss, Vargas's DCWPA claim must allege facts "sufficient to plausibly show that he engaged in a protected disclosure, that his employer was on notice of that disclosure, and that, as a result of the disclosure, he was subjected to an adverse employment action, such as a constructive discharge." Greer v. Gen. Dynamics Info. Tech., Inc., 808 Fed. App'x 191, 193 (4th Cir. 2020) (citing United States ex rel. Cody v. Mantech Int'l Corp., 207 F. Supp. 3d 610, 621 (E.D. Va. 2016) ("[A] whistleblower plaintiff must establish that: (1) he engaged in protected activity; (2) his employer knew or was reasonably on notice that he was engaged in protected activity; and (3) his employer took adverse action against him as a result of his protected activity.")).

Under the DCWPA, a protected disclosure includes information that the employee reasonably believes is evidence of the following:

> A) Gross mismanagement of a Department of Defense contract or grant, a gross waste of Department funds, an abuse of authority relating to a Department contract or grant, or a violation of law, rule, or regulation related to a Department contract (including the competition for or negotiation of a contract) or grant.

> B) Gross mismanagement of a National Aeronautics and Space Administration contract or grant, a gross waste of Administration funds, an abuse of authority relating to an Administration contract or grant, or a violation of law, rule, or regulation related to an Administration contract (including the competition for or negotiation of a contract) or grant.
>
> C) A substantial and specific danger to public health or safety.

10 U.S.C. § 4701(a)(1).

Vargas alleges that VMI was a "contractor, grantee, or subgrantee receiving funds under one or more contracts, grants, or other agreements with the Department of Defense within the meaning of 10 U.S.C. § 4701." Am. Compl., ECF No. 4, ¶ 1302. He alleges that he disclosed information "that he reasonably believed evidenced violations of law, rule, or regulation, or abuse of authority in connection with Department of Defense contracts" and after he made these disclosures, "[d]efendants subjected him to reprisal by reassigning his duties, issuing a Notice of Improvement Needed/Substandard Performance, placing him on administrative suspension after he reported unwanted physical contact by a supervisor to law enforcement, restricting his access to institutional property through a trespass warning, and terminating his employment." Id. ¶ 1305-06.

VMI responds that none of the concerns that Vargas alleges to have raised falls within any of the three categories in the statute because "none of his concerns related to a contract or grant." Defs. Mem. in Support of Mot. to Dismiss, ECF No. 23, at 20. Even if the concerns Vargas raised did fall within the statute, VMI argues that Vargas "has failed to allege causation by virtue of the many independent causes alleged in his Amended Complaint." Id.

Vargas has not alleged facts sufficient to plausibly show that he engaged in a protected disclosure. The bulk of Vargas's allegations of mismanagement of funds deal with his

frustration that his supervisor prioritized fundraising with the Keydet Club rather than the purchase of new equipment for broadcasting sporting events. In fact, Vargas alleges that Marcello reduced an equipment order, see Am. Comp., ECF No. 4, ¶ 296, which cuts against any allegation of waste. Vargas seems to believe that the lack of new equipment led to the "misuse of public resources valued at over $5,000." Id. ¶ 297. Although Vargas alleges that he believed violations existed in connection with Department of Defense contracts, he does not identify those contracts.

Even if VMI receives funds from the Department of Defense in some capacity, the alleged disclosure by Vargas in this case does not rise to the level of gross mismanagement of a contract, gross waste of department funds, abuse of authority relating to a contract, or a violation of law related to a contract, as required by the DCWPA statute. Furthermore, the allegation that Vargas was subjected to reprisal as a result of the disclosures he made is too conclusory to satisfy the causation element. Count V must be dismissed.

Similarly, Vargas alleges a violation of 41 U.S.C. § 4712, which protects "employees of federal contractors from retaliation by their employers when those employees have made disclosures of certain statutorily-defined information." Ficarra v. SourceAmerica, No. 1:19-cv-01025, 2020 WL 1606396, at *3 (E.D. Va. Apr. 1, 2020). "[T]o plead a plausible claim of unlawful retaliation under 41 U.S.C. § 4712, [Vargas] must plead facts that demonstrate that (1) he reasonably believed he was disclosing evidence described by the statute; (2) he made the protected disclosure to a person described by the statute; and (3) the protected disclosure was a contributing factor to an adverse personnel action." Patel v. Credence Mgmt. Sols., 1:20-cv-

00427, 2021 WL 1439675, at *9 (E.D. Va. Mar. 15, 2021). To be "evidence described by the statute," the disclosure would have to be

> evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a)(1).

Vargas alleges that VMI is "a contractor, grantee, or subgrantee of an executive agency, the United States Department of Education, receiving funds under one or more contracts, grants, or other agreements within the meaning of 41 U.S.C. § 4712." Am. Compl., ECF No. 4, ¶ 1312.

Again, even if VMI receives funds from the Department of Education, Vargas has not alleged a particular federal contract or grant that is being mismanaged or otherwise subject to legal violations. Therefore, his alleged disclosures do not constitute protected activity. In addition, Vargas cannot show that the alleged disclosures were contributing factors to the adverse personnel actions he alleges he faced. Count VI must be dismissed.

## VII. Counts VII and VIII – State Whistleblower Claims

Vargas alleges two state law whistleblower claims—a violation of Virginia Code § 40.1-27.3(A)(1) and a violation of Virginia Code § 2.2-3011.

Virginia Code § 40.1-27.3 provides, in pertinent part, that "[a]n employer shall not discharge . . . an employee . . . because the employee . . . in good faith reports a violation of any federal or state law or regulation to a supervisor." Va. Code § 40.1-27.3(A)(1). Accordingly, to state a claim under the statute, the plaintiff must allege facts to show that "(1) he made a

good faith report of a federal or state violation to a supervisor, (2) was discharged by his employer, and (3) his report was the 'but for' cause of his discharge." Workman v. LHC Grp., Inc., No. 1:23-cv-048, 2024 WL 3572305, at *3 (W.D. Va. July 29, 2024). A "good faith" report requires a showing not only that the plaintiff subjectively believed that the reported conduct violated the law, but also that this belief was objectively reasonable. Id.

VMI argues that Vargas did not allege that he made a report of a federal or state violation. Defs. Mem. in Support of Mot. to Dismiss, ECF No. 23, at 21. Specifically, VMI asserts that Vargas specifically points to three sections of his complaint as evidence that he made a qualifying report under the statute, but none of the identified sections discusses a report.

In the paragraphs of his complaint in which discusses making his good faith report, Vargas makes conclusory statements that he identified "waste of departmental resources" and "conflicts of interest" and after identifying these things, he experienced "retaliatory conduct." Am. Compl., ECF No. 4, ¶ 521. He also points to a "potential bribery scheme involving a private charity." Id.; see also id. ¶ 505-73. To that end, he alleges that he was "pressured to prioritize the use of his time, multimedia operations, and institutional resources for fundraising and promotional projects designed to benefit the VMI Alumni Agencies and their affiliated charities in furtherance of the enterprise's coordinated donor-tier fundraising operations," and that following these instructions would "subject him to personal criminal liability." Id. ¶¶ 1324-26. These allegations are too thin to survive a motion to dismiss—though Vargas may not have agreed with his supervisor's use of departmental resources, it is not objectively reasonable to believe that the supervisor's choices were in violation of the law or that following

those instructions would give rise to criminal liability. Count VII must be dismissed for failure to state a claim.

Vargas also brings a state law whistleblower claim under Virginia Code § 2.2-3011. The VFAWPA "provides that it is the 'policy of the Commonwealth that . . . employees of governmental agencies be freely able to report instances of wrongdoing or abuse committed by governmental agencies or independent contractors of governmental agencies.'" Wood v. Bristol Va. Util. Auth., 661 F. Supp. 3d 538, 551 (W.D. Va. 2023) (quoting Va. Code Ann. § 2.2-3009)). Specifically, "[n]o employer may discharge, threaten, or otherwise discriminate or retaliate against a whistle blower whether acting on his own or through a person acting on his behalf or under his direction." Va. Code § 2.2-3011(A).

To qualify as a "whistle blower" under the VFAWPA, the plaintiff must be: 1) an employee, 2) "who witnesses or has evidence of wrongdoing or abuse," 3) who makes a good faith report of "the wrongdoing or abuse to one of the employee's superiors, an agent of the employer, or an appropriate authority." See Va. Code § 2.2-3010. The VFAWPA defines "wrongdoing" as "a violation, which is not of a merely technical or minimal nature, of a federal or state law or regulation, local ordinance, or a formally adopted code of conduct or ethics of a professional organization designed to protect the interests of the public or employee." Id.

Vargas alleges he made "good-faith reports" of "what he reasonably believed were federal and state offenses" involving bribery, misapplication of institutional property, and misuse of public resources. Am. Compl., ECF No. 4, ¶ 1336. While this allegation recites elements of the statute, there is no factual support for Vargas's supposed reasonable belief. His complaint repeatedly references a "potential bribery scheme" involving the Keydet Club

and his disagreement with Marcello's instructions for prioritization of resources in the Athletics Department, but none of these factual assertions can reasonably be considered wrongdoing under the statute. Accordingly, Count VIII must be dismissed for failure to state a claim.

## VIII. Count IX – ADA Title I Claim

Vargas further claims that his employer failed to accommodate his disability under Title I of the Americans with Disabilities Act ("ADA"). See 42 U.S.C. § 12112(b)(5)(A). Under the ADA, an employer is prohibited from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).

> In order for a plaintiff to establish a prima facie case against his employer for failure to accommodate under the ADA, the plaintiff must show: (1) that he was an individual that had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position, and (4) that the employer refused to make such accommodations.

Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013).

VMI argues that Vargas fails to allege that he was an individual who had a disability within the meaning of the ADA or that VMI refused to make any reasonable accommodations. Defs. Mem. in Support of Mot. to Dismiss, ECF No. 23, at 23. Additionally, VMI notes that Vargas failed to plead that he exhausted his administrative remedies by filing a charge with the EEOC before filing suit in federal court. Id. The court agrees.

Vargas does not allege enough facts to show that VMI refused to make accommodations for any alleged disability. Vargas alleges that he informed Marcello that he had a verified disability rating through the Department of Veteran's affairs and he would need

to travel to North Carolina for medical appointments. Am. Compl., ECF No. 4, ¶ 27-29. He also "disclosed a diagnosis of ADHD" and "requested reasonable accommodations as necessary to perform the essential functions of his position effectively." Id. ¶ 28. Regardless of whether these allegations are sufficient to show that Vargas was an individual that had a disability within the meaning of the statute, Vargas actually alleges that the accommodations he requested were granted. He alleges: "Mr. Marcello accepted the accommodation requests, and instructed the Plaintiff to provide reasonable notice of upcoming medical appointments and requests." Id. ¶ 30. Vargas later alleges that VMI "rescinded those accommodations" and "refused to provide additional reasonable accommodations requested by the Plaintiff," id. ¶ 1347, but there are no facts that support these statements. Vargas does not provide facts to show the nature of his requested accommodations, whether those requests were reasonable, or whether VMI refused to provide them.

Therefore, Count IX must be dismissed for failure to state a claim.

### IX. Counts X and XI – FLSA Claims

Vargas brings two claims under the Fair Labor Standards Act—misclassification as an exempt employee and retaliation. Vargas claims he was misclassified as an exempt employee and as a result, he was not eligible for overtime pay when he worked more than forty hours in a week. Am. Compl., ECF No. 4, ¶ 1362. Vargas also brings a claim of retaliation under FLSA, alleging that he reported delays in processing "personnel action forms" which led to wage delays, and that he was subsequently terminated as a result of making these reports. Id. ¶¶ 990-991, 1372.

VMI argues that the FLSA claims against it must be dismissed because VMI is entitled to sovereign immunity. See Abril v. Virginia, 145 F.3d 182, 189 (4th Cir. 1998). The court agrees (finding that Congress could not abrogate a state's Eleventh Amendment immunity from suit under the FLSA).

Because the Commonwealth has not consented to suit for claims arising under the FLSA, this court lacks jurisdiction over any such claim, and Vargas's FLSA claims are dismissed pursuant to the doctrine of sovereign immunity.

"Sovereign immunity, simply stated, means that 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State,' Edelman v. Jordan, 415 U.S. 651, 663 (1974), and it also protects 'state agents and state instrumentalities,' Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997)." McNamee v. Rector & Visitors of Univ. of Va., No. 3:06-cv-43, 2006 WL 3053264, at *2 (W.D. Va. Oct. 26, 2006). "The Fair Labor Standards Act is Article I legislation and Congress lacks the power under Article I to abrogate states' sovereign immunity from suits in federal court." McNamee, 2006 WL 3053264, at *3 (citing Alden v. Maine, 527 U.S. 706, 711 (1999)). The Commonwealth of Virginia has not consented to a waiver of its sovereign immunity with respect to FLSA claims. See Commonwealth v. Luzik, 259 Va. 198, 524 S.E.2d 871, 878 (Va. 2000). As Virginia Military Institute is an instrumentality of the state, it is immune from suit under FLSA. See Tigrett v. Rector & Visitors of the Univ. of Va., 97 F.Supp.2d 752, 756 (W.D. Va. 2000); Ghayyada v. Rector & Visitors of the Univ. of Va., No. 3:11-cv-00037, at *5 (W.D. Va. Sept. 12, 2011). Accordingly, Counts XI and XI must be dismissed.

## VI. Count XII – Negligent retention

Lastly, Vargas alleges a claim of negligent retention under Virginia common law. He asserts that VMI was negligent in allowing Marcello to continue working at VMI after Vargas notified HR of Marcello's "intimidating conduct toward [Vargas]" and the "unwanted physical contact" incident. Vargas complains that VMI's decision to keep Marcello in his position after receiving these reports was negligent because it allowed Marcello "to file a counter-assault accusation and to influence the institutional response," and also led to Vargas's "administrative suspension, trespass restriction, and exposure to criminal proceedings arising from the [unwanted physical contact] incident." Am. Compl., ECF No. 4, ¶ 1390-91.

VMI argues that Vargas's negligent retention claim fails because financial damage alone is not sufficient to establish a prima facie claim of negligent retention.

In Virginia, a claim for negligent retention exists "for harm resulting from the employer's negligence in retaining a dangerous employee who the employer knew or should have known was dangerous and likely to harm [others]." A.H. by next friends C.H. v. Church of God in Christ, Inc., 297 Va. 604, 629, 831 S.E.2d 460, 474 (Va. 2019) (quoting Se. Apartments Mgmt., Inc. v. Jackman, 257 Va. 256, 260-61, 513 S.E.2d 395, 397 (Va. 1999)). "The allegations and eventual proof must show that the employer was negligent in failing to terminate the dangerous employee." Id. (citation modified).

This court has held that a plaintiff alleging negligent retention must allege physical harm:

> Although the Virginia Supreme Court has not squarely addressed the question of whether a plaintiff must plead physical harm to state a negligent retention claim, based upon the weight of the authority from other courts and the Virginia Supreme Court's

> language, a plaintiff alleging negligent retention must allege serious and significant physical harm.

Snapp v. Lincoln Fin. Sec. Corp., No. 5:17-cv-00059, 2018 WL 1144383, at *8 (W.D. Va. Mar. 2, 2018); see Invs. Title Ins. Co. v. Lawson, 68 Va. Cir. 337, 337 (Va. Cir. Ct. 2005) (finding that the Virginia Supreme Court's use of the language "dangerous employee . . . likely to harm" others indicates "that physical injury is a necessary element of negligent retention").

The court agrees with VMI that Vargas did not allege physical harm in his amended complaint. He alleges that VMI's negligent retention of Marcello caused him to suffer "injury to his business and property in the form of loss of salary and benefits, diminished earning capacity, harm to his professional reputation, damage to his career opportunities, and other consequential and compensatory losses." Am. Compl., ECF No. 4, ¶ 1392. Since Vargas does not allege that he suffered physical harm, his negligent retention claim cannot stand. Furthermore, short of referencing Marcello's intimidating conduct and aggressive tone, see id. ¶ 379, 1389, Vargas does not allege facts that tend to show that Marcello qualifies as a "dangerous employee" under the law. Count XII must be dismissed.

## VII. Plaintiff's Motion for Preliminary Injunction

Vargas seeks a preliminary injunction against VMI and VMI Alumni Agencies, requesting much of the same relief he seeks in his complaint. Among other things, Vargas requests that this court "restrain the continued enforcement of his termination and restore him to paid administrative status during litigation," seeks "termination of the trespass warning," and requests that "two identified material witnesses be placed on paid administrative status or otherwise insulated from supervisory authority exercised by the same decision-makers implicated in the reported conduct." Mot. for Prelim. Inj., ECF No. 27, at 2.

Vargas is not entitled to a preliminary injunction in this case. As discussed in the previous sections, each of the claims raised by Vargas in his complaint must be dismissed because they fail to state a claim for which relief may be granted or are barred by sovereign immunity. Because Vargas's claims do not survive even this early stage of the litigation, it is apparent that he is not "likely to succeed on the merits." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Additionally, Vargas cannot establish that he is "likely to suffer irreparable harm in the absence of preliminary relief." Id. Accordingly, the court **DENIES** plaintiff's motion for a preliminary injunction, ECF No. 27.

## VIII. Conclusion

For the foregoing reasons, defendants' motions to dismiss, ECF Nos. 19 and 22, are **GRANTED**. Those claims are dismissed without prejudice for failure to state a claim. Because Vargas is proceeding pro se, the court will afford him an additional opportunity to file an amended complaint within 30 days if he believes that he can remedy any of the pleading deficiencies identified above. If an amended complaint is not filed within 30 days, the case will be stricken from the court's active docket.

Additionally, Plaintiff's motion to compel, ECF No. 40, is **DENIED** as moot.

An appropriate order will be entered.

It is so **ORDERED**.

Entered: September 30, 2026

Michael F. Urbanski
Senior United States District Judge